JEFFREY BORNSTEIN – 99358
ERNEST GALVAN – 196065
KARA JANSSEN – 274762
HUGO CABRERA – 309289
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:     (415) 433-7104
Email:          jbornstein@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated,<br><br>                   Plaintiffs,<br><br>          v.<br><br>COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; CAROL BURTON in her official capacity as Interim Director of the Alameda County Behavioral Health Care Services Agency; and DOES 1 to 20, inclusive,<br><br>                   Defendants. | Case No. CV<br><br>**CIVIL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION**<br><br>(1) **Cruel and Unusual Use of Isolation:** Violations of 8th and 14th Amendments of U.S. Constitution, and Article I, Sections 7 and 17 of California Constitution<br><br>(2) **Failure to Provide Due Process to Prisoners:** Violations of 14th Amendments of U.S. Constitution, and Article I, Section 7 of California Constitution<br><br>(3) **Failure to Provide Adequate Mental Health Care to Prisoners:** Violations of 8th and 14th Amendments of U.S. Constitution, and Article I, Sections 7 and 17 of California Constitution<br><br>(4) **Failure to Provide Reasonable Accommodations to Prisoners with Disabilities:** Violations of Americans with Disabilities Act, Rehabilitation Act, and California Government Code § 11135 |

[3268027.10]

## NATURE OF ACTION

1.     The Alameda County Jail system is broken, especially when it comes to the way it treats people with psychiatric disabilities.  Due to understaffing, poor management, and lack of treatment space, Alameda County relies almost entirely on the unconstitutional use of isolation to manage prisoners, including prisoners with significant disabilities and mental health needs, resulting in horrific suffering.  Alameda County's use of isolation has had tragic consequences and, over the last five years, at least thirty-three individuals incarcerated in the Alameda County Jails have died, including thirteen individuals who committed suicide with many more unsuccessful attempts. These deaths are not isolated tragedies but rather are indicative of the harsh and unconstitutional conditions in the Jails.

2.     Instead of working to ensure prisoners with psychiatric disabilities are cared for adequately, per Alameda County policy, these prisoners are classified as "mentally disordered" and held in either the Behavioral Health Units or in Administrative Segregation because of their disabilities and with little to no access to programming, minimal out of cell time, practically no access to the outside, and no meaningful mental health treatment.  Mental health treatment is virtually non-existent at the Jails, even on the Behavioral Health unit – which is designated as the unit for prisoners with significant psychiatric disabilities.  Jail staff are untrained or otherwise unresponsive to the mental health needs of prisoners and fail to respond to emergency call buttons pressed by prisoners who are mentally ill and in the midst of a crisis.  Jail staff also fail to check on the well-being of prisoners who are suicidal, resulting in preventable deaths.  Mental health appointments are incredibly brief, often lasting only a few minutes, and occur cell side or at open tables on the unit where other prisoners and custody staff can hear everything being said.

3.     Prisoners with psychiatric disabilities are frequently punished for their disability-related behaviors by being put in Administrative Segregation, which is even more restrictive than the Behavioral Health Units.  Prisoners in Administrative Segregation are only allowed five hours of out of cell time per week and rarely, if ever, are allowed to

CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

[3268027.10]

go outside. Alameda County uses isolation as punishment, in what is referred to in its policies as "Disciplinary Isolation", and fails to provide prisoners in isolation generally, or in the Administrative Segregation units specifically, with due process and a meaningful method of challenging their placements.

4.      Prisoners who are suicidal are thrown into what are referred to as "safety cells" where they are stripped naked and given only a smock to cover themselves.  The safety cells contain no furniture and only a hole in the ground for prisoners to use as a bathroom, meaning that prisoners have to sleep and eat on the same floor that they must also urinate and defecate on and are also unable to wash their hands after going to the bathroom.  Prisoners in the safety cells are not allowed any out of cell time and are not allowed to keep any personal possessions in the safety cells, including reading material and toilet paper.  By Jail policy, prisoners can be confined for up to 72 hours in these cells. Yet, prisoners have been forced to stay in such cells for a week or more at a time. Conditions so bad, prisoners have stopped reporting suicidal feelings to staff in order to avoid being thrown into safety cells.

5.      This civil rights class action lawsuit seeks to remedy the dangerous, discriminatory, and unconstitutional conditions in the Glenn Dyer Detention Facility ("Glenn Dyer") in Oakland, California and the Santa Rita Jail ("Santa Rita" and collectively the "County Jails" or "Jails") in Dublin, California.  The eight individual Plaintiffs in the Jails bring this action on behalf of themselves and those similarly situated against Defendants County of Alameda ("Alameda County" or the "County"), Gregory J. Ahern ("Ahern") in his official capacity as Sheriff of the Alameda County Sheriff's Office ("Sheriff's Office"), and Carol Burton ("Burton") in her official capacity as Interim Director of Alameda County Behavioral Healthcare Services ("BHCS") (collectively, "Defendants").

6.      Plaintiffs seek a declaration that Defendants' ongoing policies and practices violate their constitutional and statutory rights, and further, such injunctive relief compelling Defendants to (1) cease the harmful, excessive and unconstitutional use of

1   isolation; (2) provide due process to prisoners regarding their placement in

2   provide prisoners with psychiatric disabilities meaningful access to the Jails' programs,

3   services, and activities, including by housing them in the least restrictive setting

4   appropriate to their needs; (4) provide constitutionally adequate mental health care; and (5)

5   stop and/or limit the use of safety cells to only those prisoners who are truly in crisis for

6   the shortest term possible before they are transferred to a hospital.

7                                    **JURISDICTION**

8          7.      This Court has jurisdiction over the claims brought under federal law

9   pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over the claims

10  brought under California law pursuant to 28 U.S.C. § 1367.  Plaintiffs seek declaratory and

11  injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202, 29 U.S.C. § 794a, 42 U.S.C.

12  §§ 1983 and 12117(a), California Government Code § 11135, and Article I, Sections 7 and

13  17 of the California Constitution.

14                                       **VENUE**

15         8.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(1), in that

16  Plaintiffs' claims for relief arose in this District and one or all of the Defendants reside in

17  this District.

18                                      **PARTIES**

19  **I.     PLAINTIFFS**

20         9.      PLAINTIFF ASHOK BABU is a California detainee and has been held at

21  Santa Rita since on or around August 6, 2017.  He is housed in Unit 09, which is the

22  Behavioral Health unit, in A pod and has been placed on Intensive Observation Log

23  ("IOL") for most of his stay at Santa Rita.  IOL is a form of suicide watch. Individuals on

24  IOL are not allowed to have socks or underwear and cannot participate in programming,

25  including classes and yard time.  While on IOL, BABU is confined to his cell for 23 to 24

26  hours per day.  BABU was first placed on IOL on or around August 18, 2017.

27  / / /

28  / / /

10. After being on IOL for approximately six weeks, BABU was transferred to John George Psychiatric Hospital ("John George") on September 30, 2017 on a 5150 on the grounds of danger to self and grave disability.

11. When BABU was discharged from John George on October 13, 2017 he was placed back on IOL and held in the Outpatient Housing Unit ("OPHU") for seven days in a cell for 24 hours a day without access to outside yards, programming, or even day room facilities. While he was held in the OPHU all his mental health visits were conducted either through his closed cell door or at his cell with the door open.

12. Once BABU was moved back to Unit 09 he remained on IOL status until it was discontinued on January 30, 2018. However, BABU was placed back on IOL less than a month later, on February 19, 2018. BABU has remained on IOL status for more than ten months, since February, and in total, he has spent nearly 15 months on IOL status. Defendants have given him no indication that he will be removed from IOL in the foreseeable future.

13. Since arriving at the Jail, BABU has not been able to go outside to the exercise yard. With no access to books, classes, or programs, BABU spends his time sleeping and crying. He also experiences shaking and dizziness and while incarcerated began using a cane for mobility. Being housed on IOL has not helped to stabilize him. BABU regularly hears voices telling him that he is "living in a cemetery" and "falling into a creek" and he continues to be suicidal, depressed and additionally suffers from anxiety attacks. According to Defendants records, BABU has been diagnosed as having "other specified schizophrenia spectrum and other psychotic disorder" consisting of "Depressive Disorder with Psychotic Features and 'Schizophrenia Unspecified." BABU is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

14. PLAINTIFF ROBERT BELL is a California detainee held at Santa Rita. BELL was initially held at Glen Dyer, beginning on or around January 9, 2018, but after making suicidal statements BELL was placed on IOL and transferred to the Behavioral

Health Unit at Santa Rita.  BELL remained on IOL for over four months, until May 21, 2018.  While on IOL, BELL was confined to his cell for at least 23 to 24 hours per day, was not allowed to wear socks or underwear, and rarely received clean clothing.  In order to get off of IOL, BELL informed mental health clinicians that he was no longer suicidal so that he could receive more time out of his cell.  BELL's mental health improved after being discharged from IOL and his desire to commit suicide decreased because, at that time, he could spend more time outside of his cell.

15.     Even though he still feels suicidal from time-to-time, BELL does not report that to mental health staff or deputies because he fears being placed back on IOL.  BELL hears voices and takes psychotropic medications to address his mental health needs, which include auditory hallucinations, anxiety, insomnia, and depression.  According to Defendants' records, BELL has been found to have Major Depressive Disorder, Post Traumatic Stress Disorder, and Panic Disorder.  BELL is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

16.     PLAINTIFF IBRAHIM KEEGAN-HORNSBY is a California pretrial detainee held at Santa Rita.  KEEGAN-HORNSBY was previously incarcerated at the County Jails in 2016 and 2017 and was housed in Unit 09, the Behavioral Health Unit, for the duration of each of his prior incarcerations.  KEEGAN-HORNSBY was booked back into Santa Rita Jail on December 28, 2017 following an approximately one week stay for inpatient treatment at John George.

17.     When he was admitted to Santa Rita on December 28, 2017, BHCS recommended that he be returned to John George for additional care because he was still suicidal.  However, the Sergeant on duty disagreed with the recommendation and the Sheriff's Office overrode BHCS' clinical judgement and instead placed KEEGAN-HORNSBY into a safety cell in the OPHU, which has no programming, day room, or outside area for recreation.  KEEGAN-HORNSBY was placed in the safety cell for a day without his clothes and with only blankets, which he used to sleep on the floor.  After

[3268027.10]

1   begging mental health staff to release him to a normal cell, KEEGAN-HORNSBY was

2   moved to the Behavioral Health Unit and placed on IOL for the next five months. During

3   this time, KEEGAN-HORNSBY was kept on IOL status even though mental health

4   providers noted that he presented as calm, cooperative, and without suicidal ideation on

5   multiple occasions. While on IOL, KEEGAN-HORNSBY was not allowed to wear

6   underwear or socks and was also not allowed to take classes or go outside. Since being

7   released from IOL status, KEEGAN-HORNSBY fears sharing information about his

8   mental health state with staff because he does not want to be returned to a safety cell or be

9   put back on IOL. Instead of talking to mental health staff KEEGAN-HORNSBY tries to

10  manage his own mental health by reading religious texts.

11      18.     Mental health staff have also refused to prescribe KEEGAN-HORNSBY the

12  same psychotropic medications that he received at John George. He has been struggling

13  with the side-effects of the medications that the Jail has instead prescribed for him.

14  According to Defendants' records, KEEGAN-HORNSBY has been diagnosed with

15  Adjustment Disorder with Depressed and Anxious Mood. KEEGAN-HORNSBY is a

16  person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and

17  California Government Code § 12926(j) and (m).

18      19.     PLAINTIFF DEMAREA JOHNSON is a California pretrial detainee and has

19  been held at Santa Rita on and off since 2012. He was most recently booked into Santa

20  Rita on June 27, 2018 and has been housed in an Administrative Segregation unit, in Unit

21  01, since arriving at Santa Rita. During previous stays at Santa Rita, JOHNSON was

22  housed in the Behavioral Health Unit. Typically, JOHNSON is let out of his cell for one

23  hour every other day, meaning that he usually spends 23 to 24 hours a day in his cell.

24  According to Defendants' records, JOHNSON has been diagnosed with schizophrenia and

25  his psychiatric history includes self-harm and command auditory hallucinations.

26  JOHNSON is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C.

27  § 705(9)(B), and California Government Code § 12926(j) and (m).

28  / / /

20.     PLAINTIFF BRANDON JONES is a federal pretrial detainee held at Santa Rita.  JONES was previously incarcerated at Santa Rita for portions of 2016, 2017 and in the Winter and Spring of 2018. JONES was most recently booked back into Santa Rita on or around July 5, 2018.  Throughout his prior incarcerations and in his current stay JONES has been housed in the Behavioral Health unit.  On December 7, 2016 JONES was placed in an isolation cell and severely decompensated.  Custody staff requested assistance from mental health after observing JONES flooding his cell, peeing on the floor, and dumping his food and water on the floor.  When mental health staff arrived they noted that JONES was "standing naked in his cell and his mattress was on the floor and everything was wet." Mental health staff transferred JONES to John George but he was returned to Santa Rita on December 8, 2016, less than 24 hours later, and placed in a safety cell in the OPHU. Prisoners in the OPHU have no access to the yard or a day room and are held in their cells for 24 hours a day.  After returning from John George on December 8th, JONES was held in the OPHU for more than 72 hours in 24-hour-a-day solitary confinement, until at least December 11th, despite having been cleared by classification to return to the Behavioral Health unit two days earlier, on December 9th.   When JONES returned to the Behavioral Health Unit he was placed back into an isolation cell similar to the one he had decompensated in only days prior.  The only interactions JONES had with mental health staff prior to being sent to John George and after returning from John George were conducted at his cell door, frequently through a slot in the door, referred to as the cuffing portal.

21.     JONES was booked back into Santa Rita on or around July 5, 2018 but was not seen by mental health staff until September 4, 2018, nearly two months later, despite his history of requiring mental health treatment during his prior incarcerations and despite being again housed in the Behavioral Health Unit.  The records from the September 4 visit note that JONES was not seen upon arrival at the Jail and that although classification officers at booking noted JONES' "history of 'mental' classification" they transferred JONES to the Behavioral Health unit without notifying mental health.

7
CIVIL CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

22.     According to Defendants' records, JONES has been diagnosed with schizophrenia and bipolar disorder.  JONES is a person with a disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

23.     PLAINTIFF ROBERTO SERRANO is a federal pretrial detainee and has been held at Glenn Dyer since on or around April 22, 2017.  SERRANO has been housed in isolation in Administrative Segregation since arriving at Glenn Dyer over a year ago. On a typical day, SERRANO is locked in his cell for 23 to 24 hours a day and has sometimes gone months without being able to go outside for exercise and recreation. SERRANO has been given no meaningful opportunity to challenge his placement in isolation.  SERRANO has and continues to suffer significant harm from his prolonged isolation and, he now experiences paranoia, fear and distrust of others, loss of social skills, chronic insomnia, anxiety, agitation, and depression as a result of his continued isolated confinement.

24.     PLAINTIFF STEPHANIE NAVARRO, who is also known as JAMEE ANN NAVARRO, is a California pretrial detainee in custody at Santa Rita.  NAVARRO has been held at Santa Rita before and during a prior stay in 2014, NAVARRO was confined in two separate safety cells.  NAVARRO was most recently booked into Santa Rita on March 14, 2017 and has been housed in isolation in Housing Unit 21, the woman's Behavioral Health unit referred to on BCHS forms as the "mental pod", and in Housing Unit 24, which is the woman's Administrative Segregation Unit.  In November of 2017, NAVARRO was transferred to Napa Psychiatric State Hospital for competency restoration and was returned to Santa Rita on February 13, 2018.  NAVARRO is currently housed in Housing Unit 24 where NAVARRO is confined to her cell for 23 to 24 hours per day. NAVARRO's housing pod holds many prisoners with serious mental illnesses, including prisoners who scream throughout the day and night, which causes NAVARRO to hear a constant buzzing noise in her head.  In the community, NAVARRO is prescribed medications to treat her PTSD, but Santa Rita mental health staff have refused to prescribe

1 the same medications. NAVARRO has been designated as "mental classification" by

2 Defendants, which she has been told means that she cannot be housed in any units besides

3 the women's Behavioral Health unit and the woman's Administrative Segregation unit.

4 According to Defendants' records, NAVARRO has been diagnosed with bipolar disorder,

5 Borderline Personality Disorder, and PTSD and is a person with a disability as defined in

6 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j)

7 and (m).

8      25.    PLAINTIFF ALEXANDER WASHINGTON is a California pretrial

9 detainee held at Santa Rita.  WASHINGTON was initially booked into Santa Rita in

10 March of 2017.  Upon intake WASHINGTON was identified as suicidal and was initially

11 placed on IOL and assigned to the Behavioral Health Unit, Unit 09. However, the

12 following day WASHINGTON was placed into an isolation cell in the Administrative

13 Segregation Unit, Unit 02.  Once placed in the isolation cell WASHINGTON

14 decompensated and began flooding his cell, banging his head, and yelling that he wanted

15 to die. He was then moved to a safety cell in Unit 02 where he was held for an additional

16 day before being returned to Administrative Segregation.  Safety cells contain no furniture

17 and only a hole in the floor to use as a toilet.  WASHINGTON was not allowed any of his

18 possessions or clothes and was instead only provided with a "modesty garment" and

19 blanket to cover himself. In addition, the safety cell he was kept in did not have a working

20 light and was covered in feces and blood from previous occupants.  On March 19, 2017,

21 BHCS recommended that WASHINGTON be moved to Housing Unit 09.  Despite BHCS'

22 recommendation, WASHINGTON was kept in Administrative Segregation on Unit 02 for

23 an additional six weeks, through at least May 5, 2017.  WASHINGTON was subsequently

24 released but was arrested again on August 16, 2018 and sent to John George before being

25 booked back into Santa Rita on August 17, 2018.

26      26.    Since August 17, 2018, WASHINGTON has been housed in the Behavioral

27 Health Unit on Unit 09. After one day, WASHINGTON was moved to IOL, where he

28 remained for one month.  When he was finally visited by mental health staff,

1   WASHINGTON told mental health staff that he was no longer suicidal so that he could be
2   discharged from IOL.  During his current incarceration at Santa Rita, WASHINGTON has
3   tried discussing traumatic events in his life with therapists at Santa Rita but cannot do so
4   safely because custody staff insist on listening in to his appointments.  WASHINGTON
5   has sometimes gone significant periods of time without seeing a psychiatrist and once had
6   to endure painful side effects of psychotropic medications for approximately four to six
7   weeks before being able to see a doctor who could adjust his medications.  According to
8   Defendants' records, WASHINGTON has been diagnosed with PTSD and Depressive
9   Disorder.  WASHINGTON is a person with a disability as defined in 42 U.S.C. § 12102,
10  29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).

11  **II.     DEFENDANTS**

12          27.     DEFENDANT COUNTY OF ALAMEDA (the "County" or "Alameda
13  County") is a public entity, duly organized and existing under the laws of the State of
14  California.  The County employs 50 or more persons.  Defendant Alameda County
15  operates and manages the County Jails including through the County's management and
16  operation of the Alameda County Sheriff's Office ("Sheriff's Office"), and Alameda
17  County Behavioral Health Care Services ("BHCS").  Defendant Alameda County is, and
18  was at all relevant times mentioned herein, responsible for the actions and/or inactions and
19  the policies, procedures, practices, and customs of the Sheriff's Office and BHCS, and
20  their respective employees and/or agents.  The County is responsible for ensuring that the
21  basic human needs of individuals in its custody are met, and for ensuring that individuals
22  are not at risk of serious harm, including by providing appropriate funding, oversight, and
23  corrective action to ensure adequate conditions.  The County is also responsible for
24  ensuring that jail policies and practices do not violate prisoners' constitutional rights.  The
25  County by law possesses ultimate authority over and responsibility for the mental health
26  care, treatment, and safekeeping of Plaintiffs and the class and subclass they seek to
27  represent.  The County receives state and federal funds for use in the operation of the
28  County Jails.

[3268027.10]

28.     DEFENDANT GREGORY J. AHERN ("AHERN") is the elected Sheriff of the County of Alameda and, as Sheriff, is responsible for overseeing all Alameda County detention facilities run by the Alameda County Sheriff's department, including Glenn Dyer and Santa Rita.  AHERN is sued in his official capacity only.

29.     DEFENDANT CAROL BURTON ("BURTON") is the Interim Director of the Alameda County Behavioral Health Care Services Agency.   As Interim Director, BURTON is responsible for the provision of mental health care in the Jails. BURTON is sued in her official capacity only.

30.     Plaintiffs are ignorant of the true names and capacities of defendants sued in this complaint as DOES 1 through 20, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this complaint.

31.     At all times mentioned in this complaint, each Defendant was the agent of the others, was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them was committed on behalf of every other Defendant.

## FACTUAL ALLEGATIONS

### I.    DEFENDANTS' JAIL FACILITIES

32.     Defendants operate and control two Jail facilities in Alameda County, Glenn Dyer Detention Facility ("Glenn Dyer") in Oakland, California and the Santa Rita Jail ("Santa Rita") in Dublin, California, (collectively, the "Jails").

33.     Glenn Dyer is a 20-level, 234,000 square-foot, maximum-security lockup. The facility provides booking, intake, and custodial services for all of Alameda County. Glenn Dyer also houses federal prisoners under a contract with the U.S Marshal Service.

/ / /

/ / /

34.     Santa Rita is considered a "mega-jail" and ranks as the third largest facility in California and the fifth largest in the nation.  Santa Rita houses detainees who are either awaiting adjudication of their pending criminal matters or serving a sentence determined by the courts.

## II. DEFENDANTS ROUTINELY OVERUSE AND IMPROPERLY USE ISOLATION AND SUBJECT PRISONERS IN ISOLATION, INCLUDING PRISONERS WITH DISABILITIES, TO INHUMANE CONDITIONS

35.     Defendants are deliberately indifferent to the substantial and obvious risk of harm caused by Defendants' policies and practices of locking prisoners in isolation, including prisoners with psychiatric disabilities, for prolonged periods of time.  Over the last several decades, mental health and correctional experts have documented the harmful effects of prolonged isolation.  Common side effects of prolonged isolation include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors.  Due to these side effects, prolonged isolation is known to worsen existing psychiatric disabilities and can cause prisoners without pre-existing psychiatric disabilities to develop them.

36.     Placement in isolation imposes an atypical and significant hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process.  Defendants fail to provide process adequate to protect that liberty interest.  Despite the harmful and punitive conditions in these units, Defendants lack an effective, accurate classification system to determine who gets placed in isolation.  Prisoners are placed in isolation indefinitely, with some individuals held in isolation for years while they resolve pending criminal cases.  Defendants offer prisoners no meaningful way to challenge their placement in isolation, despite purporting to conduct regular review of these placements.  Defendants assign prisoners to isolation units based on their classification as mentally ill, even where those pending charges do not involve acts of violence.

37.     Defendants use multiple terms to refer to isolation including Administrative Isolation, Disciplinary Isolation, and Temporary Isolation.  Defendants also use the term

"Special Cells" to refer to isolation cells and safety cells.  Individuals housed in these areas are referred to as "Special Management Inmates."  Class I Special Management Inmates are defined to include all prisoners in Administrative Isolation, Disciplinary Isolation, Temporary Isolation, Protective Custody, all prisoners assigned to the Behavioral Health units and all prisoners in isolation cells.  Class II Special Management Inmates are defined as individuals on IOL status.  Housing Units may also have isolation cells specific to those units.  Plaintiffs refer to all of the above housing statuses, collectively, as "isolation."

38.    Approximately 10% of all prisoners at Santa Rita and approximately 20% of all prisoners at Glenn Dyer are housed in what is known as Administrative Isolation. Prisoners on Administrative Isolation are housed alone in a cell and are only permitted to go outside of their cell alone for extremely limited periods of time, further depriving them of any social interactions.

39.    Defendants use isolation as a form of punishment, including for behaviors that are related to an individual's psychiatric disabilities.  Disciplinary Isolation is defined in Defendants' policies as "punitive segregation from the general jail population and restricted privileges for an inmate who has committed a serious rule violation."  Such "serious rule violations" include being generally disrespectful, excessive whistling or other noise, possessing unauthorized clothing, reporting to a program late, failing to cooperate with work or education programs, possessing more than 15 vending machine tokens, or failing to return a tray after meal time.  Individuals in Disciplinary Isolation are permitted to leave their cells for up to one hour a day, five days a week.  There is no cap on the use of Disciplinary Isolation and prisoners may be held in Disciplinary Isolation for more than 30 days, even for a single rule violation, where authorized by the Commanding Officer at the Jails.

40.    Defendants control housing assignments and house prisoners in isolation in various housing units in the jails, including, but not limited to, in Administrative Segregation units, which house prisoners on Administrative Isolation, Disciplinary Isolation, Temporary Isolation and Protective Custody (men's Housing Units 01, 02, and

08 and women's housing unit 24) and Behavioral Health units (men's Housing Unit 09 and women's Housing Unit 21), for 22 or 23 hours or more per day.  Prisoners housed in Administrative Segregation, including those with serious psychiatric disabilities, are sometimes kept in their cells between 23 and 24 hours per day, sometimes only being let out of their cells to use the dayroom for one hour every other day.  In these units, this scant dayroom time is the only chance people have to shower, make phone calls, or order commissary.  All of the beds in these units are located in locked cells and prisoners are typically required to eat meals in their cells as well.

41.    Prisoners in the Behavioral Health Units are kept in their cells for 22 to 23 hours per day and sometimes not let out at all in a 24 hour period.  When they are let out for cells for one or even in some cases two hours, they must compete with the other prisoners for access to services such as the phone (both for making calls to attorneys and family and for placing commissary orders), showers, and hygiene tools such as nail clippers and razors.  Approximately one hour of this extremely limited out of cell time is also consumed each day by pill call.  In the Behavioral Health Units, some prisoners are double-celled, but being locked with a cellmate in a small cell does not compensate for the severe isolation.  Instead, this double-celling requires two strangers with psychiatric disabilities to live around-the-clock in intolerably cramped conditions.  Deputies in the Behavioral Health units verbally harass mentally ill inmates, calling them slurs like "crazies" and telling them things like "you crazies go back to your cells now" and to "stop faking" mental illness.

42.    Prisoners held in Administrative Segregation units are typically locked in single-occupancy cells and cannot have conversations with other individuals unless they speak into the vents in their cells, or shout loudly enough for people to hear through the cell walls and doors.  Any communication among suspected gang members, even just a greeting, may be and has been used by Defendant to justify extending isolation.  Defendants also typically shackle prisoners housed in Administrative Segregation every time they have contact with anyone outside of their cells.

[3268027.10]

43.    Disability-related behaviors may also be used to justify extending isolation. BHCS records indicate that, on at least one occasion, Plaintiff NAVARRO became hypomanic, a symptom related to her bipolar disorder, and instead of providing her with the mental health treatment she sorely needed, Defendants moved her from the Behavioral Health Unit to the Administrative Segregation unit.  BHCS records indicate she was moved due to her "hypomanic" behaviors and because a deputy, not a BHCS mental health professional, found she was not "re-directable" by that deputy's standards.

44.    Prisoners with psychiatric disabilities who are moved to the Outpatient Housing Unit ("OPHU") for treatment or monitoring have no access to an outside yard or day room.  Prisoners housed in the OPHU are supposed to be escorted by deputies to exercise facilities on other units but, upon information and belief, this rarely - if ever - happens.  As a result, prisoners housed in the OPHU because of their disabilities are kept in their cells 24 hours a day in isolation without any access to programming.  Plaintiffs BABU, JONES, and  KEEGAN-HORNSBY have all been housed in 24 hour a day isolation in the OPHU due to behaviors related to their underlying psychiatric disabilities. Plaintiff BABU was held in the OPHU for seven days without ever leaving his cell and during that time was also denied access to reading materials, the phone and to showers.

45.    Defendants subject some prisoners in its jails to even more extreme forms of isolation.  At Santa Rita, some of the isolation cells are located outside of the main housing units, in the hallway.   These cells are completely separated from the rest of the housing unit such that prisoners cannot hear or see any activity in the housing unit.  These prisoners cannot even attempt to interact with other prisoners.  Officers have no line of sight into these cells, and people locked in the cells experience extreme sensory deprivation.

46.    Plaintiff WASHINGTON was recently held in a hallway isolation cell for two days after telling deputies that he had lice.  Instead of assessing him for lice, the deputies assumed he was hallucinating and put him in the isolation cell.  The cell had only a small window and WASHINGTON could not hear any sounds from his housing unit. The hallway isolation cell was very cold but WASHINGTON was not provided with

1  blankets or a mattress for the 48 hours he was held there.

2       47.     Defendants do not conduct meaningful or effective review of isolation

3  placements and do not provide prisoners with meaningful methods to understand why they

4  have been placed in isolation and how they can be removed from isolation.

5       48.     At Glenn Dyer, federal pretrial prisoners are often placed in administrative

6  isolation indefinitely, with some prisoners housed in isolation for years while they resolve

7  their federal cases.  Plaintiff SERRANO has been housed in isolation for over 19 months,

8  since arriving at Glenn Dyer on April 21, 2017 as a federal pretrial detainee.   SERRANO

9  is housed alone in a small cell.  He is allowed out of his cell only for one hour every other

10  day and always alone.  He is allowed access to the outdoor exercise yard only rarely and

11  has sometimes gone months without going outside. Since being housed in isolation,

12  SERRANO has been and continues to experience paranoia, fear and distrust of others, loss

13  of social skills, chronic insomnia, anxiety, agitation, and depression as a result of long-

14  term extreme isolation. Despite his worsening mental health, SERRANO has never been

15  told what to do or how to get help if he experiences a mental health crisis.

16       49.     Prior to arriving at Glenn Dyer, SERRANO was held at the Santa Clara

17  County Jail in San Jose, California.  When he arrived at Glenn Dyer in April 2017,

18  classification officers assigned SERRANO to isolation in an Administrative Segregation

19  unit.  Officers told SERRANO that he was being housed in isolation so that he would serve

20  out the balance of discipline that had been imposed on him at the Santa Clara County Jail

21  for a fight that occurred at the Santa Clara County Jail nearly two years ago.  SERRANO

22  had no meaningful opportunity to challenge his placement.  In response to a grievance, he

23  was told only that he is in administrative isolation due to his "in house history" and his

24  criminal case.  SERRANO has not been disciplined for any serious rules infraction nor for

25  any act of violence while at Glenn Dyer, and certainly has not been disciplined for

26  anything that should result in indefinite placement in isolation.  Upon information and

27  belief, prisoners facing the same or similar criminal charges are housed in the general

28  population at the County Jails.

50.     Plaintiff JOHNSON has been incarcerated at Santa Rita as a California pretrial detainee since June 27, 2018.  JOHNSON has been confined in isolation in an Administrative Segregation unit since he was booked into Santa Rita even though he has not been disciplined for any act of violence while at Santa Rita.  He has not been informed by Jail staff of the reason for his placement and has had no meaningful opportunity to challenge his placement.  He has also received no notice or other information from Jail staff regarding his placement in isolation.  JOHNSON was told to write to classification to find out why he is in isolation and he did so but has never received a response from classification.  Upon information and belief, prisoners facing the same or similar criminal charges as JOHNSON are housed in the general population at the Jails.

51.     Prolonged isolation is harmful to all prisoners, but it is particularly harmful for prisoners with psychiatric disabilities.  Defendants have not modified their policies and procedures to accommodate people with such disabilities so that they do not suffer harm, and worsening of their pre-existing disabilities, from isolation.

52.     Defendants have a policy of locking prisoners with psychiatric disabilities in highly restrictive isolation units because of their disabilities and without offering reasonable modifications that would permit them to be housed in less restrictive areas. As a result, Defendants deny prisoners with psychiatric disabilities with meaningful access to the Jails programs, services, and activities.  Per the Jails' policies, prisoners categorized as "mentally disordered" and prisoners on IOL for suicidal tendencies, bizarre behavior, pyschotropic medication, or medical observation must be housed in special management units (which includes the Behavioral Health units), maximum security units, or in the Out-Patient Housing Unit – all of which are highly restrictive units that provide significantly reduced, or non-existent, access to educational and rehabilitative programming compared to that available to their non-disabled peers.  Prisoners with psychiatric disabilities held in these units may receive as little as five hours of time outside of their cell per week, far less than their non-disabled peers.

/ / /

[3268027.10]

53.     Defendants' disciplinary process fails to take into account behavior which results from psychiatric disabilities  and the lack of adequate mental health care at the Jails. As a result, Defendants lock people with psychiatric disabilities in isolation, including in safety cells, for nonconforming and erratic behaviors related to their psychiatric disabilities without exploring whether less restrictive options or alternatives could resolve the behaviors.  This policy and practice deprives prisoners with psychiatric disabilities of access to the programs, services, and activities available in the less restrictive units.  The restrictive conditions and lack of programming options in the Administrative Segregation and Behavioral Health Units serve only to worsen these disability-related behaviors. Instead of providing treatment, however, Defendants respond by locking prisoners in isolation for even longer periods of time.

54.     Defendants also fail to monitor prisoners with and without psychiatric disabilities or provide sufficient mental health services to prisoners locked in isolation. This is despite the well-known medical and mental health dangers of locking people in their cells for prolonged periods of time.

55.      Plaintiff JOHNSON has been held in isolation for the entirety of his current stay at Santa Rita despite his significant psychiatric disabilities.  Mental health staff at the Jail have repeatedly emphasized the severity of his mental disorder, noting that he once had "a cardboard cell phone that he had drawn on, in which he talks with his grandpa, uncle and 6 kids", that he was "unpredictable" and prone to yelling "time travel.  Fiji man," and that he was "rambling, disorganized… has a fixed delusion about McDonald's." Despite his clear need for mental health treatment, he has been housed in an Administrative Segregation unit since June 2018, where he is housed alone in a tiny cell without access to programming.  He has seen mental health staff only once during this stay, for roughly six minutes at his cell door.

56.     JOHNSON is allowed out of his cell only for one hour every other day and always alone.  He has never been offered outside yard time during his current stay.  He spends much of his time in isolation watching the TV in his unit's dayroom through his

cell door, which he can only see from an angle and cannot hear.  This prolonged isolation has worsened JOHNSON's pre-existing psychiatric disabilities and, as a result, he experiences repeated and debilitating auditory hallucinations, loss of social skills, anxiety, agitation, and depression.

57.     By policy, the County requires only five hours a week of out of cell time for prisoners housed in isolation.  This is below any acceptable corrections standard including the standards set by the  American Correctional Association which require that prisoners are provided with at least one hour a day outside of their cells.  This level of isolation is harmful to the mental and physical health of any prisoner, but is especially dangerous for prisoners with mental illness.

58.     Prisoners in the isolation units, including in Administrative Segregation and in the Behavioral Health units are rarely, if ever, permitted to go outside and are deprived of adequate opportunities to exercise.  Exercise opportunities at the County Jails are well below all established detention standards.  *See* Cal. Code Regs. tit. 15 § 1065 (requiring 3 hours of "exercise" per 7 days); Cal. Code Regs. tit. 15 § 1006 ("'Exercise' means physical exertion of large muscle groups."); Cal. Code Regs. tit. 24 § 1231.2.10 (defining exercise area minimum of at least one exercise area of not less than 600 sq. ft.).

59.     Prisoners in isolation at Glenn Dyer are offered outdoor exercise as little as one hour per month.  Plaintiff SERRANO has at times gone for months without being able to go outside.

60.     Prisoners in isolation in Administrative Segregation units at Santa Rita may receive even fewer outdoor exercise opportunities.  Plaintiff JOHNSON has not been to the outside yard even once since he was booked into Santa Rita six months ago.  Plaintiff NAVARRO has only been able to go outside to the yard three times over the past year while in the Administrative Segregation unit and is only permitted to go outside alone, denying her any social interaction with other prisoners.

61.     Access to outdoor exercise for those in the Behavioral Health Unit at Santa Rita is likewise rare, with many prisoners not receiving outdoor exercise opportunities for

[3268027.10]

several months at a time.  Plaintiff JONES has not been outside to the yard for over a year.
Plaintiffs BELL has not been outside to the yard for several months.  When BELL has
asked for yard time in the past the deputies just ignore his request.  Plaintiff KEEGAN-
HORNSBY has only been allowed to go to the yard 3-4 times over the past year.  He has
requested yard time from deputies, at various times, his requests have been denied
numerous times.  Plaintiff BABU has never been permitted to go to the outside yard.
Plaintiff WASHINGTON has also not been allowed to go to the outside yard since he
arrived at Santa Rita in August 2018.

62.     Defendants offer a wide variety of programs to prisoners which, if
completed, can result in sentence reductions and better enable prisoners to reintegrate into
the community.  These programs could also be helpful at sentencing in federal cases.
Defendants prohibit prisoners in isolation cells from attending structured group
recreational, religious, educational, or vocational programs which are offered to general
population prisoners.  This includes the Behavioral Health Units and OPHU prisoners with
psychiatric disabilities.

63.     Glenn Dyer offers several programs to prisoners including: Adult Based
Education and General Education Development, to allow prisoners to get their GED or
High School diploma, Literacy programs, Bible Study, One on One Faith Based
Counseling, and recreational games such as cards and board games.  Upon information and
belief only the GED program and One on One Faith Based Counseling are available in
Glenn Dyer's Administrative Segregation unit.

64.     Santa Rita offers more than twenty-five programs to prisoners including:
Adult Based Education and General Education Development, to allow prisoners to get
their GED or High School diploma; English as a Second Language; Literacy; Sheriff's
Work Alternative Program; Anger Management; Restorative Justice; Bible Study; One on
One Faith Based Counseling; Chapel Services; Career Development programs including
Employability, Computer Technology, Barbering, Cosmetology, Food Service,
Commercial Baking Commercial Kitchen; Parenting classes including Dads Acquiring and

20

1  Developing Skills (DADS), Teaching and Loving Kids (TALK), and Maximizing

2  Opportunities for Mothers to Succeed (MOMS); Substance Abuse programs including

3  Narcotics Anonymous, Deciding, Educating, Understanding, Counseling, and Evaluation

4  (DEUCE), Breaking the Chains, and Alcoholics Anonymous; and recreational games such

5  as cards and board games.

6       65.    Defendants discriminate against prisoners with psychiatric disabilities,

7  because those prisoners are housed in restrictive and isolative housing units without access

8  to the above listed programs offered throughout the rest of Santa Rita.  They are thereby

9  deprived of the opportunity to reduce their sentences and better position themselves for

10  release because of their psychiatric disabilities.  Of these many programs, only two

11  programs – Breaking the Chains and a GED correspondence class, are offered to prisoners

12  with psychiatric disabilities in the Behavioral Health unit and only one program, Chapel

13  Services, is offered to prisoners in the Administrative Segregation units, which also

14  includes prisoners with psychiatric disabilities.

15       66.    Plaintiffs BABU,  BELL, KEEGAN-HORNSBY, JOHNSON, JONES,

16  NAVARRO, and WASHINGTON would like to participate in the Jail's educational

17  programs, group, and/or religious services, but cannot because of they are placed in

18  restrictive and isolative housing units because of their psychiatric  disabilities.  If there

19  were education and other programming opportunities offered in their respective housing

20  units, they would participate.  Plaintiff KEEGAN-HORNSBY needs to take a domestic

21  violence class to assist him with his criminal case but has been unable to do so because the

22  class is not offered in the Behavioral Health unit. He was told he could transfer to a general

23  population unit to take the class but would then be unable to get needed mental health

24  treatment, putting him in the impossible position of choosing between mental health

25  treatment and obtaining needed rehabilitative programming.  Due to the severity of his

26  mental health needs KEEGAN-HORNSBY had no choice but to forgo the rehabilitative

27  programming and instead stay in the Behavioral Health Unit.

28  / / /

67.     Adding to the harmful effects of isolation, lack of outdoor exercise, and lack of structured programming, conditions in the isolation units are deplorable.  Some prisoners with inadequately treated mental illnesses smear themselves and the walls of their cell with excrement.  The smell of feces pervades throughout the units.  These unsanitary conditions are compounded by the failure to provide soap to prisoners who cannot afford to purchase soap, and by custody staff's failure to distribute adequate cleaning supplies to prisoners or provide sufficient time to allow prisoners to clean their cells.  Defendants also serve prisoners bland and extremely repetitive meals with little nutritional value which are frequently contaminated with rocks, plastic, and rodent feces.

68.     Some prisoners in the isolation units are incoherent, unresponsive, or actively delusional.  Some are partially or fully naked in their cells.  Some scream repeatedly in anguish, or are so consumed by auditory or visual hallucinations that they are unable to communicate.

69.     The conditions in isolation significantly increase the risk that prisoners with psychiatric disabilities will have their condition decompensate when placed in isolation.  A significantly disproportionate percentage of suicides occur in isolation units.  Because of the risks posed by isolation to prisoners with psychiatric disabilities, a consensus has been reached in mental health correctional communities that prisoners with psychiatric disabilities should only be placed in isolation if absolutely necessary.  In addition, if prisoners with mental illness are placed in isolation, there must be limits on the amount of time they remain in such units, they must be monitored closely, and they must be provided with significant structured and unstructured out-of-cell time.

70.     Defendants do not have adequate safeguards in place to ensure that prisoners with psychiatric disabilities are only placed in isolation when absolutely necessary.  In fact, upon information and belief, Defendants have a policy and practice of placing prisoners with the most serious psychiatric disabilities in Housing Unit 1 F-Pod, Housing Unit 2 F-Pod, and Housing Unit 8 F-Pod, all Administrative Segregation units.  As a result, rather than only placing prisoners with psychiatric disabilities in isolation when absolutely

1 | necessary, Defendants have a policy and practice of placing mentally ill prisoners there
2 | *because of* their disabilities and keeping them there for long periods of time.

3 | 71.    For example, the coroner's report regarding the death of prisoner Jesus
4 | Dickey on June 27, 2018 states that Mr. Dickey was initially housed in Housing Unit 8,
5 | pod E, cell #6 as a "mental PC" but was moved to Housing Unit 8 F-Pod (an
6 | administrative segregation unit) because he was "not getting along with other inmates in E-
7 | pod." Mr. Dickey died in the isolation cell to which he was moved.

8 | 72.    Defendants lack policies and practices to reevaluate whether prisoners with
9 | mental illness placed in isolation should remain in isolation. The amount of unstructured
10 | out-of-cell time that Defendants provide to prisoners in Administrative Segregation—a
11 | maximum of five hours per week—falls below the standard of care and constitutes cruel
12 | and unusual punishment. And no amount of structured out-of-cell time, such as group
13 | therapy of formal group programming, is provided to prisoners in isolation including to
14 | prisoners with psychiatric disabilities in the Behavioral Health Units.

15 | 73.    Defendants' policy for conducting safety checks is inadequate to ensure the
16 | safety of prisoners with serious mental illness in Administrative Segregation units and in
17 | the Behavioral Health Units. Defendants have a policy requiring safety checks once every
18 | half hour in isolation units, but fail to follow this policy and frequently fail to conduct
19 | appropriate checks at intermittent and unpredictable times. Defendants' performance of
20 | safety checks is perfunctory and does not include direct visual observation that is sufficient
21 | to assess the prisoner's well-being and behavior. Defendants fail to utilize verbal
22 | interaction as a part of their safety checks even when visual observation of the subject
23 | prisoner is obscured or circumstances otherwise demonstrate reason for concern about the
24 | prisoner's well-being and behavior.  As a result, prisoners in isolation are placed at an
25 | increased risk of harm.

26 | 74.    The lack of adequate functional emergency call buttons and custody staff's
27 | slow response times compound the risk to inmate safety presented by the lack of regularly
28 | performed safety checks by custody staff. Custody staff's failure to perform adequate

welfare checks and failure to timely respond to emergencies is exacerbated by severe understaffing of custody deputies at the Jails.

75.     Prior to committing suicide, on April 7, 2018, Logan Masterson was housed in isolation in Housing Unit 2.  He had been discontinued from placement in a safety cell on suicide watch just two days earlier.  Incident reports relating to Mr. Masterson's suicide state that general observation checks were not performed on Mr. Masterson for over an hour before he was found hanged in his cell.  The welfare check that was performed last on Mr. Masterson was dangerously cursory and superficial.  According to the incident reports, the custody officer's view of Mr. Masterson was "obstructed" and he "could not tell what Masterson was doing."  At this time, the cell was thoroughly contaminated with feces, and "[t]here was fecal matter on the walls, floor, and window of the cell."  Despite having no clear view of Mr. Masterson, despite the horrific condition of Mr. Masterson's cell, despite Mr. Masterson's bizarre behavior including flooding his cell, and despite Mr. Masterson's having been on suicide watch fewer than 36 hours earlier, the custody officer "did not spend more than a few seconds looking in the direction of [Masterson's] cell."

76.     Prior to committing suicide, Edwin Villalta was assigned to Administrative Segregation and held in isolation in Housing Unit 01.  Mr. Villalta was found dead in his cell on November 28, 2017 after hanging himself from the unoccupied upper bunk in his cell with his County issued blanket.  Mr. Villalta was not on IOL at the time and was discovered during a routine check of the unit.

77.     Defendants' inadequate policies and procedures for monitoring prisoners in administrative isolation units, including prisoners with psychiatric disabilities placed both Mr. Villalta and Mr. Masterson at risk prior to their suicides and contributed to their suicides because Defendants failed to conduct meaningful safety checks at frequent and unpredictable times.

78.     The cumulative effect of prolonged isolation, along with the denial of opportunities for vocational, recreational, educational, and religious programming, being housed in a small cramped and filthy cell have caused and continue to cause prisoners at

[3268027.10]

1 the Jails, including prisoners with psychiatric disabilities, serious physical and

2 psychological harm and puts them at substantial risk of continued significant harm in the

3 future.

4 **III. DEFENDANTS FAIL TO PROVIDE MINIMALLY ADEQUATE MENTAL HEALTH CARE TO PRISONERS AND DISCRIMINATE AGAINST**

5 **PRISONERS WITH PSYCHIATRIC DISABILITIES**

6       79.    Defendants fail to meet their constitutional obligation to provide adequate

7 mental health care to prisoners in the Jails. Defendants are deliberately indifferent to the

8 fact that their failure to provide adequate mental health care subjects prisoners to a

9 substantial risk of deteriorating psychiatric conditions, extreme and unnecessary anguish,

10 suffering and death. Defendants exacerbate the psychological trauma experienced by

11 prisoners with serious mental health conditions who are housed in isolation, including in

12 safety cells, by failing to provide them with necessary mental health care. As a result, their

13 disabilities worsen and their disability-related behaviors escalate, causing them to be kept

14 in isolation longer.

15       80.    All mental health care in the Jails is provided by Defendant Alameda

16 County.

17       81.    Defendants control prisoners' access to mental health care professionals and

18 medications, inside or outside of the Jails. Accordingly, prisoners cannot receive any

19 mental health care services, including psychotropic medication, group and individual

20 therapy, and suicide intervention, unless Defendants provide them.

21       82.    Defendants fail to adequately train custody and mental health care staff in

22 how to provide appropriate and timely mental health care. The lack of training is evident

23 from the numerous incidents in which prisoners' health and lives have been, and continue

24 to be, placed at risk as a result of the deficient mental health care provided in the Jails. As

25 a result of a lack of adequate training, custody and health care staff fail to: (a) provide

26 timely and appropriate mental health screening; (b) track and monitor prisoners with

27 psychiatric disabilities; (c) properly administer and monitor psychotropic medications;

28 (d) recognize and properly refer prisoners exhibiting signs and symptoms of psychiatric

1  disabilities to mental health staff;  (e) respond adequately to prisoners who are suicidal;

2  (f) appropriately house prisoners with serious mental illness in the least restrictive setting

3  appropriate to their needs; (g) properly respond to prisoners' requests for mental health

4  care or provide appropriate follow-up care; (h) provide confidential spaces for mental

5  health treatment; (i) maintain accurate and complete mental health records; and fail to

6  (j) provide appropriate reentry services for prisoners with psychiatric disabilities to allow

7  them to properly continue their mental health care.

8      83.    Defendants' policies and practices for mental health screening and tracking

9  are inadequate.  Defendants fail to adequately identify, track, and treat the mental health

10  problems of newly arriving prisoners with psychiatric disabilities during the screening and

11  intake process.  Defendants' failure to identify and initiate adequate mental health

12  treatment via the Jails' intake process places prisoners arriving at the Jails with psychiatric

13  disabilities at a significant risk of serious harm, including death.

14      84.    When a prisoner is newly booked into the Jail, the first step of the intake

15  process involves custody or medical staff completing a brief one-page general health

16  screening form, called a Medical Intake Triage/Receiving Screening form, through a

17  cursory interview conducted with the prisoner in a non-confidential area of the Jail.  Upon

18  information and belief, many questions contained in this form are frequently not asked

19  during the intake process, including those about mental health history and other basic and

20  essential data necessary to identify prisoners in need of mental health care, including those

21  at risk of self-harm. After the initial screening, newly booked prisoners are typically

22  interviewed by a member of the medical staff.  Mental health staff from BHCS play no

23  role in this process.  None of the Plaintiffs were told anything about mental health

24  treatment available at the Jails during the intake process.  Plaintiff BELL was told only that

25  he would be placed on IOL without any further explanation and Plaintiff KEEGAN-

26  HORNSBY was similarly placed directly into a safety cell after coming to Santa Rita from

27  John George without any explanation for why he was being placed in the safety cell or

28  when he would be moved to a "normal" cell.

85.     Mental health staff only evaluate prisoners at intake if the medical care or custody staff who complete the intake assessment forms refer the prisoner to mental health care staff.  Intake evaluations by mental health staff, when they occur at all, frequently do not take place until days or weeks after a prisoner is booked into the Jails.  Even when prisoners disclose a psychiatric disability to staff, Defendants do not appropriately follow-up with the prisoner and some prisoners with psychiatric disabilities may never be seen by mental health staff during their incarceration.  As a result, prisoners with psychiatric disabilities are either denied care, or their care is delayed, putting them at increased risk of serious harm including serious injury or death. For instance, Plaintiff JONES was not seen for nearly two months after re-entering Santa Rita because classification noted his "mental" classification but failed to properly notify mental health staff.

86.     The process prisoners are supposed to use to access mental health care is not explained to prisoners during intake.  The "Alameda County Jail Handbook" states that prisoners should "[t]alk to someone from the medical staff immediately … they can schedule an appointment with [BHCS] Criminal Justice Mental Health."  Upon information and belief, this handbook is not given to prisoners at intake. Rather, prisoners must request the handbook from custody staff, often repeatedly, and then may or may not receive a copy.  Plaintiffs BELL, BABU, WASHINGTON, and KEEGAN-HORNSBY have never received a copy of the handbook.  Plaintiffs SERRANO, NAVARRO, and JOHNSON were only able to obtain a copy of the handbook after filing a written request.  Regardless, the process described in the handbook is inadequate, and it is not followed in practice at the Jails.  Medical staff frequently fail to inform mental health staff, even when prisoners disclose an active mental health crisis.

87.     Prisoners may use the message request system at the Jails to access mental health staff, but responses typically take one and a half to two weeks.  For a prisoner having a mental health crisis, this is an unacceptably long and dangerous delay and puts prisoners at increased risk of harm.

/ / /

[3268027.10]

88.     Defendants fail to ensure that requests for care reach mental health care staff in a timely manner, if at all.  Upon information and belief, there is no policy in place to ensure that requests for mental health care are forwarded to mental health care staff.  As a result, prisoners with psychiatric disabilities are not timely seen or adequately treated.

89.     Plaintiff JOHNSON has not been told how to access mental health care at Santa Rita.  Plaintiff JOHNSON has filed sick call slips requesting to be moved from the Administrative Segregation unit to the men's Behavioral Health Unit, in the hopes of receiving more mental health care. He has not received any responses from Jail staff to these requests.

90.     By custom and policy, there is poor coordination of care for prisoners with psychiatric disabilities.  Upon information and believe, Defendants do not track the numbers of prisoners with psychiatric disabilities or their specific housing locations and/or disability-related needs.

91.     Upon information and belief, by custom and policy, neither medical nor corrections staff is adequately trained to recognize signs and symptoms of mental illness, and to refer prisoners who exhibit such signs and symptoms to mental health staff.  As a result, staff fail to make appropriate referrals and prisoners who exhibit symptoms of mental illness are not timely treated.

92.     For example, Plaintiff JOHNSON told medical staff on December 13, 2017 that he was hearing voices telling him to harm himself.  Jail mental health staff did not receive a referral for this contact until December 16, 2017, when a mental health clinician at Santa Rita reviewed the medical staff referral.  Despite JOHNSON's urgent concerns, he was not actually assessed by a member of mental health staff until December 27, 2017.

93.     Defendants' policies and practices for prisoners who have been taking prescribed psychotropic medications are inadequate.  Upon information and belief, Defendants fail to adequately train mental health staff in how to evaluate and treat prisoners who arrive at the Jails and have been taking prescribed psychotropic medications and fail to provide adequate treatment to such prisoners.  Instead, Defendants routinely

1 | refuse to provide prisoners with the same prescribed psychotropic medication regimen they

2 | were taking prior to their arrest.

3 |     94.    Defendants have publicly acknowledged that necessary and appropriately

4 | prescribed medications may not be available at the Jails.  During a September 11, 2017

5 | meeting of the Alameda County Mental Health Advisory Board, the Board heard reports

6 | from the Criminal Justice Committee about "the challenges experienced by the mentally ill

7 | in Santa Rita Jail" because "not all medications are available."  As a result, medications

8 | that differ from those prescribed are routinely substituted even after confirmation of

9 | prisoner's valid prescriptions.  These substituted medications can be less effective, cause

10 | unforeseen side effects, and otherwise destabilize a patient, at a time when mental health

11 | stressors for the prisoner are high.  Prisoners at Santa Rita with mental illness may also be

12 | over-medicated.  Prisoners report observing individuals, who enter with "normal"

13 | behavior, becoming like "zombies" soon after starting on the antipsychotic medications

14 | prescribed by mental health staff.

15 |     95.    Upon information and belief, Defendants lack any comprehensive system for

16 | monitoring the prescription, distribution, efficacy, and side effects of psychotropic

17 | medication and for ensuring continuity of care for prisoners with mental illness.

18 |     96.    As a result of Defendants' failure to provide medically necessary

19 | psychotropic medications, prisoners with psychiatric disabilities are put at increased risk of

20 | serious harm including:  (1) withdrawal symptoms when the medications they were

21 | prescribed before admission to the Jails are abruptly terminated; (2) recurrence of

22 | debilitating symptoms such as hallucinations and suicidality; and (3) severe mental

23 | decompensation.  In addition, pursuant to what is known as the "kindling phenomenon,"

24 | interruptions in prisoners' psychotropic medications can cause a prisoners' underlying

25 | mental illness to worsen, putting them at increased risk of harm.  This not only worsens the

26 | underlying condition, but makes it more difficult to treat the underlying condition.

27 |     97.    Plaintiff JOHNSON entered Santa Rita with valid community prescriptions

28 | for Remeron, Abilify, Zyprexa, and Risperdal for paranoid schizophrenia.  He had been

[3268027.10]

1  released from Santa Rita only two and a half months earlier, during which he was housed

2  in the men's Behavioral Health unit and was prescribed psychiatric medications. Despite

3  his very recent history of care, however, he did not receive his community prescriptions for

4  five days after he was booked and has been housed in the Administrative Segregation unit,

5  rather than the men's Behavioral Health unit, where he had been housed before. In the

6  intervening period before his medications were restarted, he began experiencing increased

7  auditory hallucinations and other symptoms of his psychiatric disabilities. His

8  decompensation could have been prevented if he had received his medications at his

9  booking, rather than several days later.

10         98.    Upon information and belief, Defendants fail to maintain adequate, accurate,

11  and confidential mental health care records. For example, upon information and belief,

12  psychiatrists often change prisoners' medications without documenting a clinical rationale.

13  Upon information and belief, psychiatrists also fail to document their justification and

14  reasoning for changing the diagnosis and treatment plans for prisoners returning to the Jail

15  from psychiatric hospitals. As a result of Defendants' failure to maintain adequate mental

16  health care records, prisoners suffer from a substantial risk of misdiagnosis, dangerous

17  mistakes, and unnecessary delays in care.

18         99.    Upon information and belief, Defendants fail to request and/or obtain

19  medical files from outside providers for significant periods of time after the prisoner's

20  arrival at the Jail (if at all). Defendants' repeated failures to timely obtain medical records

21  from outside providers or pharmacies reduces the quality of care, as mental health staff

22  must then treat prisoners without pertinent background information which significantly

23  increases the risk of misdiagnosis, mistreatment, and harm and places prisoners at an

24  increased risk of harm.

25         100.   Prisoners' mental health records kept by Defendant BHCS usually contain no

26  records of any community care, even when a prisoner discloses a history of psychiatric

27  care in the community, and even when Defendants note such prior treatment history in a

28  prisoner's mental health records. When a prisoner is transferred out of the Jails for care,

1    Defendants fail to obtain records of that care even long after the prisoner has returned to

2    the Jails.

3        101.    The Jails lack adequate facilities to conduct mental health encounters and

4    routinely conduct rushed mental health encounters in spaces that lack any confidentiality

5    or patient privacy.  At Glenn Dyer, mental health consultations take place in a prisoner's

6    pod or in the adjacent dayroom, spaces which lack privacy and confidentiality.  Custody

7    deputies are present and can see and hear the full interaction, and other prisoners, including

8    the patient's pod-mates, can observe the encounter as well.  At Santa Rita, mental health

9    encounters either similarly occur cell-front, on-unit or sometimes in the hallway near the

10   central clinic, locations which all lack confidentiality and patient privacy.  Prisoners who

11   have requested confidential encounters during cell-door visits have been told that there is

12   not enough custody staff to provide private meetings.  The lack of confidentiality creates

13   great risks of harm, as Defendants put prisoners to the impossible choice between seeking

14   help in a mental health crisis and disclosing mental health and medical issues in front of

15   deputies and other prisoners, making them vulnerable to victimization.

16       102.    Defendants are well aware of the serious dangers caused by the lack of

17   confidential treatment space for mental health encounters.  In 2015, the Sheriff's Office

18   applied for construction financing funding pursuant to California Senate Bill 863.  Those

19   application materials openly acknowledge the lack of sufficient facilities at Santa Rita and

20   state that:  "The layout of [Santa Rita] stretches one-half mile in length, requiring

21   extensive movement between housing units and program and treatment areas within the

22   jail. This design is not conducive to providing programming and treatment services in

23   many ways. … Approximately 20-25% of [Santa Rita] inmates have been identified as

24   having some form of mental illness.  Out of the more than 1 million square feet of building

25   space within [Santa Rita], only 1,025 square feet of it was designed as a Mental Health

26   Clinic for mental health services and treatment.  The limited space restricts the overall

27   number of inmates that can be served. Often times, staff are forced to use a card table in

28   the open hallway to conduct what should be confidential interviews …. Due to limited

[3268027.10]

space within [Santa Rita], the clinic spaces are shared with other jail services, further impacting the delivery of mental health services by limited availability and access to interview rooms.  Due to the limited mental health space, counseling appointments for many inmates occur with mental health clinicians in the housing units, meeting in the common dining area at a stainless steel dining table with a deputy standing nearby. … There is little privacy or confidentiality, as other inmates in the housing unit can see through their cell door windows or the pod windows that the inmate is speaking with somebody who is recognizable as a mental health worker and the deputy providing security for the staff member is within hearing distance. The environment is not appropriate for therapeutic care and is not conducive for the inmate to speak openly with the mental health professional.  Housing unit operations are additionally impacted during these appointments since all inmate movement in this area of the housing unit is suspended to provide as much privacy and confidentiality as possible for the inmate as well as for the safety of all present. The conditions described above contribute to inmates refusing mental health services."  Those conditions have not changed materially in the intervening three years since the report.

103.    These conditions undermine the efficacy of what mental health care is provided at the Jails.  For example, Plaintiff WASHINGTON, who has appointments only lasting a few minutes with mental health staff in the common area outside of his pod,  was laughed at by a deputy who was eavesdropping on his conversation with mental health staff as he was describing childhood sexual abuse and being underfed.  Since that appointment, WASHINGTON has been afraid to talk to mental health staff about his trauma.

104.    Plaintiff NAVARRO for a time refused mental health appointments at her cell door because she did not want her entire unit to know about her mental health needs.

105.    Plaintiff KEEGAN-HORNSBY's meetings with mental health staff also occur within earshot of deputies, and he therefore does not feel comfortable discussing conditions at Santa Rita with mental health staff because he fears retaliation by deputies

who mistreat him.

106.   Upon information and belief, staff who do not have adequate training regarding how to treat mental health issues attempt to interact with prisoners on their own, and end up resorting to use of physical force and/or violence to control prisoners. Prisoners with severe mental illness have been beaten up by deputies for conduct caused by their conditions.  Plaintiff KEEGAN-HORNSBY was threatened by a deputy while on suicide watch, who told him he would "smash his face with [his] shield."  Plaintiff WASHINGTON has been told that "mentals don't need classes" when he has asked for programming.  Multiple prisoners at the County Jails have reported deputies using racial epithets against them, and threatening other actions if they file grievances about said deputies' conduct or other conditions at the County Jails

107.   Defendants house prisoners with psychiatric disabilities in highly restrictive isolation units and offer them no group programming or group therapy of any kind.  The lack of structured out-of-cell time falls far below the standard of care, and places prisoners with psychiatric disabilities at an increased risk of serious harm.

108.   For acutely and chronically mentally ill prisoners, the standard of care requires psychosocial rehabilitation services, which include structured out-of-cell programming that addresses their symptoms of mental illness, reduces their isolation, and promotes compliance with treatment and medications.  Without this care, seriously mentally ill prisoners are at an unreasonable risk of decompensating and of not responding fully to the treatment they do receive.  This deterioration can have many damaging effects, including increased symptoms and non-response to future treatment.  Defendants fail to provide these services to prisoners with psychiatric disabilities and thereby put them at an increased risk of harm due to the worsening of their disabilities.

109.   Prisoners who rely on treatments other than psychiatric medication receive no meaningful mental health care at the Jails.  Plaintiff JONES has a history of mental health conditions and has been diagnosed with bipolar disorder, but does not take psychiatric medications.  He has been housed in Housing Unit 09 since arriving at Santa

[3268027.10]

Rita.  In the community, JONES manages his bipolar disorder through non-psychopharmacological means, such as diet and exercise.  At Santa Rita, no meaningful forms of non-psychopharmacological treatment are available to JONES.  On a prior incarceration, the lack of non-psychopharmacological treatment caused JONES to decompensate and to experience a psychiatric crisis, leading to an emergency hospital transfer.  JONES continues to be held in isolation without access to appropriate treatment, and as such continues to be at an increased risk of harm.  JONES has had no access to the activities, programs, and services offered to general population prisoners, including religious services and educational programs, because they are not offered in Housing Unit 09.  JONES has not been able to go outside in over a year for recreation or exercise.

110.    When prisoners interact with mental health clinicians, the encounters are superficial, and non-confidential.  The encounters are also extremely brief, usually lasting only around five minutes.  No therapy is provided.  Clinicians typically ask little more than "are you suicidal?" and "have you been taking your medications?"

111.    Plaintiff NAVARRO is supposed to see mental health every month but sometimes goes longer without seeing anyone.  These appointments last less than five minutes and have not been helpful to NAVARRO because such a short amount of time is not even sufficient to describe her mental health history, much less to address issues which she is currently experiencing.  Plaintiffs BELL and JOHNSON only see mental health approximately once per month for ten minutes or less, which is not enough time for either of them to explain how they are feeling.  Despite being on IOL Plaintiff BABU sometimes goes an entire month without seeing mental health staff and when he does see them the encounters are very brief.  Plaintiff WASHINGTON sees mental health staff approximately once a week but for mere minutes at a time and whenever they meet there are deputies standing nearby who can hear everything he says.

112.    Defendants fail to provide adequate and timely mental health care to prisoners who are experiencing psychiatric crisis.  At Glenn Dyer, when a prisoner discloses that he or she is having a psychiatric crisis, prisoners are transferred to Santa Rita

[3268027.10]

to see a psychiatrist instead of promptly being evaluated by a qualified mental health provider at Glenn Dyer.  Prisoners who are transported from Glenn Dyer for mental health care may spend hours sitting in a booking cell before being transferred to a housing unit in order to receive care.  Prisoners then may wait for several more hours before being able to have a brief consultation with a mental health professional and then getting sent back to Glenn Dyer.  As a result, prisoners held at Glenn Dyer often avoid seeking help for mental health issues to avoid going through the drawn out and frequently traumatic process of transferring between the Jails and sitting and waiting for many hours. The fact that mental health services are not provided at Glenn Dyer puts prisoners held there at increased risk of harm due to the drawn out process they must go through in order to access basic mental health services.

113.    Defendants fail to timely respond to emergency calls for help from prisoners in crisis.  The cells at Glenn Dyer lack any call button for prisoner emergencies.  While the cells at Santa Rita are equipped with call buttons, many are non-functional or go ignored by custody staff when activated by prisoners in crisis.

114.    Deputies do not respond to Plaintiff JOHNSON and do not check on him when he presses the emergency button in his cell because he needs to see mental health urgently. Plaintiff BABU, who is on IOL, is only checked on by staff once an hour despite the fact that he has expressed a desire to harm himself.  When BABU has pressed the emergency button in his cell to request immediate medical or mental health assistance, deputies have told him to wait until pill call to ask medical staff for assistance

115.    Defendants fail to identify, treat, track, and supervise prisoners who are at risk for suicide.  Defendants' policies and practices for screening, supervising, and treating prisoners at risk for suicide are inadequate.

116.    These shortcomings in Defendants suicide prevention and treatment programs have had tragic consequences.  According to figures maintained by the California Department of Justice, from 2014 to 2017 at least 30 individuals have died while incarcerated in the Jails. Of those deaths, 12 were classified as suicides.  Since 2017,

35

there has been at least one suicide and many more attempted suicides at the Jails.  The rate of suicides at the Jail is nearly twice the national average for jail facilities.

117.    Upon information and belief, Defendants do not adequately train custody staff to identify prisoners who are at risk of suicide and respond appropriately to prisoners who are exhibiting suicidal tendencies, putting them at increased risk of harm.  This is especially problematic because custody staff, both during the intake process and for the duration of a prisoner's time in the Jail, have the primary responsibility for alerting mental health staff when a prisoner is suicidal.

118.    Defendants routinely fail to identify and track prisoners who are at risk for suicide.  Logan Masterson was suicidal when he arrived at the Santa Rita on April 4, 2018.  According to a Sherriff's Office Incident Report, Mr. Masterson was initially placed on suicide watch in a safety cell.  The morning of April 6, 2018, Mr. Masterson was rehoused to Administrative Segregation in Housing Unit 02.  The conditions in this isolation unit place prisoners at increased risk of harm, including suicide.  There, Mr. Masterson was housed alone in a single cell containing a bunk bed.  On April, 7, 2018, Mr. Masterson committed suicide by hanging himself in his cell by his bed sheets, which he tied to the top bunk.

119.    Less than two hours before his suicide, at about 2:45 PM, Mr. Masterson was observed engaging in strange behavior, flooding his cell by clogging the toilet and/or sink in his cell and causing water to pool inside his cell and leak out into the area surrounding his cell.  At this time, Mr. Masterson had also partially covered the window into his cell with wet toilet paper.  Custody officers observed this behavior, but did not contact mental health staff, intervene, or question Mr. Masterson about his state.  Instead, custody staff simply ordered the water to be turned off in Mr. Masterson's cell.  At about 3:20 PM, a custody officer conducted a cursory observation check on Mr. Masterson, but his view of Mr. Masterson was "obstructed" and he "could not tell what Masterson was doing."  At this time, the cell was thoroughly contaminated with feces, and "[t]here was fecal matter on the walls, floor, and window of the cell."  Despite having no clear view of

[3268027.10]

1  Mr. Masterson, despite the horrific condition of Mr. Masterson's cell, despite Mr.

2  Masterson's strange behavior, and despite Mr. Masterson's having been on suicide watch

3  fewer than 36 hours earlier, the custody officer "did not spend more than a few seconds

4  looking in the direction of [Mr. Masterson's] cell." Over an hour then passed without any

5  safety check being performed on Mr. Masterson. At about 4:29 PM, Mr. Masterson was

6  found dead in his cell. Before he died, Mr. Masterson told other prisoners in his pod that

7  he "wanted to talk to mental health but he said the Housing Unit technician did not respond

8  to his intercom button."

9      120.   Another prisoner, Jesus Dametrius Dickey, died in his Santa Rita cell on

10  June 27, 2018 from water intoxication. According to the Coroner's report, Mr. Dickey had

11  a history of schizophrenia and likely suffered psychogenic polydipsia (excessive thirst

12  caused by his mental illness). Despite his diagnosis, he was housed in an Administrative

13  Segregation unit instead of the Behavioral Health unit. Unsupervised and housed in

14  isolation, he drank so much water that he died.

15      121.   Defendants routinely house suicidal and seriously mentally ill prisoners in

16  conditions that result in further deterioration of their mental health in violation of standards

17  of minimally adequate mental health care and basic human dignity. Rather than

18  individually determining the least restrictive environment in which a suicidal prisoner can

19  be safely housed, Defendants have a policy and practice of placing prisoners with serious

20  psychiatric disabilities in safety cells. The safety cells are single cells with no furnishings,

21  toilets, or (in most cases) windows for outside light. The only features of the cell are the

22  door, which has a slot through which food can be delivered, and a grate in the floor that

23  serves as the toilet. Without toilet paper in these cells, and no way to wash, feces makes

24  its way across the cell, on the floors, and walls. When housing a prisoner in a safety cell,

25  Defendants routinely remove all of the prisoner's clothing, leaving the prisoner naked in

26  the room. In some instances, Defendants permit a prisoner to have a tear-proof smock to

27  wear and nothing else. There is no mattress or pad, let alone a bed, in the safety cells for

28  prisoners to sit or sleep on. Prisoners are thus forced to sit, sleep, and eat on the same

[3268027.10]

cold, dirty floor on which the grate for the toilet is located.  Defendants' improper use safety cells places prisoners with psychiatric disabilities at an increased and unreasonable risk of harm.

122.    The safety cells are rarely cleaned when a prisoner is being housed in one of the cells and are not cleaned sufficiently once a prisoner is released from the cell.  These conditions are traumatic for all prisoners, but especially for those who are already experiencing severe mental health symptoms.  Suicidal prisoners perceive the safety cells as a method of punishment which dissuades them from telling staff they are suicidal.

123.    For example, Plaintiff WASHINGTON experienced dungeon-like conditions in one of Santa Rita's safety cells.  WASHINGTON was placed in a safety cell because he was suicidal and that cell was cold, dark and smelled like feces.  WASHINGTON perceived the safety cell to be punishment and no longer reports suicidal feelings to mental health staff because he fears being returned to a safety cell.

124.    Plaintiff NAVARRO, who was suicidal and held in two different safety cells in the span of 24 hours, was moved from one to another wearing only a safety vest, and describes her experience in the safety cells the most humiliating and degrading experience of her entire life.  She does not intend to report suicidality to mental health again to avoid being sent back to the safety cell.

125.    Plaintiff WASHINGTON was held in a safety cell that was covered in feces, blood, and urine. His clothes were removed and he was only given a safety vest to wear without underwear, shoes, or socks.  WASHINGTON hopes to never go back to a safety cell ever again.

126.    Plaintiff JOHNSON was held in a safety cell in these same conditions for approximately three to four days.

127.    Plaintiff KEEGAN-HORNSBY was also held in a safety cell, which felt like he was being punished for being suicidal.  Because of his experience he is afraid to tell staff if he feels suicidal because he does not want to go back to the safety cell.

/ / /

[3268027.10]

128.   Defendants exacerbate the psychological trauma prisoners with psychiatric disabilities experience in isolation by failing to provide them with necessary mental health care while they are there.  These prisoners do not receive sufficient contact with mental health providers (if they receive mental health care at all).  And, the harsh conditions of their confinement render less effective the minimal treatment they do receive.  As a result, they are put at an increased risk of harm because the conditions in isolation can cause their symptoms, including suicidality, to escalate and force them to stay in isolation even longer.

129.   Upon information and belief, when prisoners are housed in isolation, all of the prisoner's interactions with mental health care staff take place at the cell front door through the handcuffing port; none of the interactions are face to face without barriers. While Defendants may consider safety cells "safe" for suicidal and seriously mentally ill prisoners, in fact the safety cells lack any therapeutic value, and do not replace the need for psychiatric hospitalization and treatment.

130.   By policy, mental health staff are required only to evaluate an inmate placed in a safety cell 8 hours after the placement, and every 24 hours after that.  But even this inadequate policy is not followed, and prisoners placed in safety cells may go more than 30 hours without any contact or evaluation by mental health staff.  Jail staff then abruptly release these inmates back to their housing units without the administration of any objective suicide risk assessment tool, without close monitoring of their symptoms, and without a timely follow-up appointment with a clinician, thereby putting the prisoners at increased risk of harm.

131.   Prisoner records show frequent use by mental health staff of "safety contracts" in an attempt to prevent self-injurious behavior.  These "contracts" are ineffective, and can result in a false and dangerous sense of comfort.  They are not a substitute for adequate mental health evaluation, suicide risk assessment and appropriate treatment planning.

132.   Defendants fail to sufficiently observe prisoners who have been identified as being at risk of suicide, including prisoners who have been placed in safety cells.

Specifically, Defendants lack any policy or procedure for, and therefore fail to provide, constant observation of prisoners who are actively suicidal, either threatening to or engaging in the act of suicide.

133.   Defendants fail to ensure by policy and practice that mental health care staff are consulted prior to placing a prisoner in a safety cell and before a prisoner is released from a safety cell.  Upon information and belief, by not adequately involving mental health care staff in the decision to put prisoners in a safety cell, Defendants overuse the safety cells and place prisoners who do not require exposure to the punitive conditions of the safety cells to those conditions.  Upon information and belief, by not adequately involving mental health care staff in the decision to release prisoners from safety cells, Defendants increase the risk that a prisoner who still requires enhanced monitoring and intervention will be placed back into housing conditions where they are not monitored as closely and are more able to engage in self-harm.

134.   Defendants fail to adequately follow up with, monitor, and treat prisoners who have been released from safety cells.  Logan Masterson committed suicide while housed in isolation in Housing Unit 02 fewer than 36 hours after being released from a safety cell, where he had been placed due to suicidality.

135.   Suicide hazards are rife at Santa Rita, where all of the cells in the Administrative Segregation units and the Behavioral Health unit contain bunk beds.  In the Administrative Segregation units, this is true despite these cells being occupied by only one prisoner.  These bunk beds are an easy hanging point and have been used by prisoners to attempt and commit suicide at Santa Rita, but even prisoners specifically placed on suicide watch may be left alone in these cells.

136.   Defendants have knowledge of the substantial risk of harm caused by inadequate suicide prevention and treatment policies and practices in the Jails, but have failed to take steps to prevent, or even to diminish, the harmful effects of these unlawful policies and practices.  Defendants are thus deliberately indifferent to the risk of harm to prisoners created by their failure to operate a constitutionally adequate suicide prevention

1   and treatment program.

2       137.    Upon information and belief, Santa Rita's Behavioral Health Unit, Unit 09,

3   is overcrowded and this has caused custody and mental health staff to improperly remove

4   prisoners' "mentally disordered status" and rehouse them in general population, without

5   any actual improvement in mental health.

6       138.    Defendants fail to maintain sufficient numbers of mental health care

7   professionals to provide minimally adequate care to the nearly 3,000 prisoners in the Jails.

8   The understaffing of mental health staff at the Jails exacerbates the problems caused by

9   inadequate mental health treatment and lack of appropriate treatment space.  Upon

10  information and belief, the small number of scheduled encounters with clinicians are

11  frequently cancelled or rescheduled due to overbooking.  Many cancelled appointments are

12  never rescheduled, even where a prisoner is in present need of treatment.

13      139.    The Jail's low staffing levels result in mental health care staff being unable

14  to timely respond to prisoners' requests for psychiatric evaluations and treatment, to

15  adequately screen, track, monitor, and provide follow-up care to prisoners who are

16  suffering from serious mental illnesses, and to provide adequate group and individual

17  therapy.  Upon information and belief, Defendants often place such prisoners in safety

18  cells until mental health care staff are available to see them.

19      140.    The Jail fails to staff sufficient deputies to enable prisoners to access mental

20  health services and other programs available at the Jails.  Plaintiffs have repeatedly been

21  denied access to mental health care because no deputies were available to allow mental

22  health professions to access Plaintiffs for treatment, including on their unit or at their cell

23  door.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

# CLASS ACTION ALLEGATIONS

**Prisoner Class**

141.   All Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all adult men and women who are now, or will be in the future, incarcerated in the Alameda County Jails ("Prisoner Class").

### Numerosity:  Fed. R. Civ. P. 23(a)(1)

142.   The Prisoner Class is sufficiently numerous that joinder of all members of the class is impracticable and unfeasible.  Currently, there are more than 2,000 prisoners in the Jails, as well as thousands of individuals either in CDCR custody or in the community on probation, mandatory supervision, home confinement, and Post-Release Community Supervision ("PRCS"), all of whom are subject to being returned to the Jails at any time on an alleged violation or revocation of their supervision or to participate in civil or criminal court proceeding.  In addition, the class is fluid as new prisoners enter the Jails and others are released on a daily basis.  All prisoners in the Jails are subject to Defendants policies and procedures regarding the use of isolation and the provision of mental health care.  Due to these policies and procedures, all prisoners in the Jails are currently harmed or are at substantial risk of being harmed, by excessive placement in isolation without due process and all prisoners in the Jails receive or are at substantial risk of receiving inadequate mental health care.

143.   The Prisoner Class members are identifiable using records maintained in the ordinary course of business by Defendants.

### Commonality:  Fed. R. Civ. P. 23(a)(2)

144.   There are multiple questions of law and fact common to the Prisoner Class, including, but not limited to:

      a.   Whether Defendants' use of isolation violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of

[3268027.10]

the California Constitution;

b.      Whether Defendants' policies and practices regarding classification to isolation units violates the Due Process Clause of the Fourteenth Amendment and Article I, Section 7 of the California Constitution;

c.      Whether Defendants' policies and practices of not providing a housing environment free of debilitating and inhumane conditions to prisoners subjected to isolation poses a substantial risk of serious harm

d.      Whether Defendants have been deliberately indifferent to the Prisoner Class members' risk of injury and harm from the debilitating isolation and inhumane conditions to which they are subjected.

e.      Whether Defendants' failure to provide minimally adequate mental health care to prisoners violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution, and Article I, Sections 7 and 17 of the California Constitution.

f.      Whether Defendants' failure to operate a system that provides minimally adequate mental health care poses a substantial risk of harm.

g.      Whether Defendants have been deliberately indifferent to the serious mental health care needs of class members.

145.    Defendants are expected to raise common defenses to these claims, including denying that their actions violate the law.

<u>Typicality:  Fed. R. Civ. P. 23(a)(3)</u>

146.    The claims of the named Plaintiffs are typical of the claims of the members of the proposed class as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the Prisoner Class claims.

<u>Adequacy:  Fed. R. Civ. P. 23(a)(4)</u>

147.    Plaintiffs will fairly and adequately represent and protect the interests of the putative Prisoner Class members and diligently service as Class Representatives. Plaintiffs' interests are co-extensive with those of the Prisoner Class and Plaintiffs have no

[3268027.10]

1    conflict(s) of interest that would be antagonistic to those of the other class members.

2    Plaintiffs have retained counsel who are competent and experienced in complex class

3    action litigation and prisoner's rights litigation and who possess the resources necessary to

4    fairly and adequately represent the Prisoner Class.

5                                          Fed. R. Civ. P. 23(b)

6           148.    This action is also maintainable as a class action pursuant to Federal Rule of

7    Civil Procedure 23(b)(2) because Defendants policies, practices, actions, and omissions

8    that form the basis of the claims of the Prisoner Class are common to and apply generally

9    to all members of the Prisoner Class.  All of the Jails' policies are centrally promulgated,

10   disseminated, and enforced by Defendants. The injunctive and declaratory relief sought is

11   appropriate and will apply as a whole to all members of the Prisoner Class.

12         **Prisoners with Disabilities Subclass**

13          149.    All Plaintiffs bring this action on their own behalf and, pursuant to Rule

14   23(a), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all

15   qualified individuals with a psychiatric disability, as that term is defined in 42 U.S.C.

16   § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m), and

17   who are now, or will be in the future, incarcerated in the Alameda County Jails

18   ("Disability Subclass").

19                                  Numerosity:  Fed. R. Civ. P. 23(a)(1)

20          150.    The Disability Subclass is sufficiently numerous that joinder of all members

21   of the subclass is impracticable and unfeasible.  The exact number of members of the

22   Prisoners with Disabilities Subclass is unknown.  The Sheriff's Office estimates that 20-

23   25% of the more than 2,000 prisoners at Santa Rita have a mental illness and are therefore

24   qualified individuals with disabilities as that term is defined in 42 U.S.C. § 12102, 29

25   U.S.C. § 705(9)(B), and California Government Code § 12926(j) and (m).  In addition, the

26   Disability Subclass is fluid, as new prisoners with psychiatric disabilities enter the Jails

27   and others are released.

28   / / /

151.    The Disability Subclass members are identifiable using records maintained in the ordinary course of business by Defendants.

Commonality:  Fed. R. Civ. P. 23(a)(2)

152.    There are questions of law and fact common to the Disability Subclass, including, but not limited to:

a.    Whether Defendants' policies and practices deny prisoners with psychiatric disabilities meaningful access to the benefits of the services, programs, or activities of a public entity.

b.    Whether Defendants' failure to reasonably accommodate prisoners with psychiatric disabilities violates the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and California Government Code § 11135.

c.    Whether Defendants' failure to house prisoners with psychiatric disabilities in the most integrated setting appropriate to their needs violates the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and California Government Code § 11135.

d.    Whether Defendants' housing policies and practices discriminate against prisoners with psychiatric disabilities in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and California Government Code § 11135.

153.    Defendants are expected to raise common defenses to these claims, including denying that their actions violate the law.

Typicality:  Fed. R. Civ. P. 23(a)(3)

154.    The claims of the named Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON, JONES, NAVARRO, and WASHINGTON are typical of the claims of the members of the proposed class as their claims arise from the same policies, practices, and courses of conduct, and their claims are based on the same theory of law as the Disability Subclass claims.

[3268027.10]

1

<u>Adequacy:  Fed. R. Civ. P. 23(a)(4)</u>

2      155.    Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON, JONES,

3    NAVARRO, and WASHINGTON will fairly and adequately represent and protect the

4    interests of the putative Disability Subclass members and diligently service as

5    representatives of the proposed subclass.  Plaintiffs' interests are co-extensive with those

6    of the subclass and Plaintiffs have no conflict(s) of interest that would be antagonistic to

7    those of the other subclass members.  Plaintiffs have retained counsel who are competent

8    and experienced in complex class action litigation and prisoner's rights litigation and who

9    possess the resources necessary to fairly and adequately represent the Disability Subclass.

10                           <u>Fed. R. Civ. P. 23(b)(2)</u>

11      156.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P.

12    23(b)(2) because Defendants policies, practices, actions, and omissions that form the basis

13    of the claims of the Disability Subclass are common to and apply generally to all members

14    of the proposed subclass.  All of the Jails' policies regarding prisoners with psychiatric

15    disabilities are centrally promulgated, disseminated, and enforced by Defendants. The

16    injunctive and declaratory relief sought is appropriate and will apply as a whole to all

17    members of the Disability Subclass.

18                         **FIRST CAUSE OF ACTION**
     **(Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983)**
19                **(ALL PLAINTIFFS and the Prisoner Class**
                        **Against ALL DEFENDANTS)**
20

21      157.    Plaintiffs re-allege and incorporate by reference herein all allegations

22    previously made above.

23      158.    By their policies and practices described above, Defendants subject Plaintiffs

24    and the Prisoner Class they represent, to a substantial risk of serious harm and injury from

25    the harmful and inhumane effects of prolonged isolation, the denial of due process in

26    relationship to classification and housing decisions, and inadequate mental health care.

27    Defendants further subject Plaintiffs and the Prisoner Class to a substantial risk of serious

28    harm and injury from the way Defendants use safety cells and isolation, including harm

1  caused by the conditions of confinement which provide for inadequate physical exercise

2  and programming, inadequate mental health treatment, and extreme social isolation and

3  environmental deprivation.  These policies and practices have been, and continue to be,

4  implemented by Defendants and their agents, officials, employees and all persons acting in

5  concert with them under color of state law, in their official capacities, and are the

6  proximate cause of Plaintiffs' and the Prisoner Class' ongoing deprivation of rights

7  secured by the United States Constitution under the Eighth Amendment.

8         159.   By their policies and practices described above, Defendants subject Plaintiffs

9  and the Prisoner Class they represent, to a substantial risk of serious harm from the

10  provision of inadequate mental health care.  These policies and practices have been, and

11  continue to be, implemented by Defendants AHERN and BURTON and their agents,

12  officials, employees and all persons acting in concert with them under color of state law, in

13  their official capacities, and are the proximate cause of Plaintiffs' and the Prisoner Class'

14  ongoing deprivation of rights secured by the United States Constitution under the Eighth

15  Amendment.

16         160.   The policies, practices and customs described above are the official policies,

17  practices and customs of Defendant COUNTY OF ALAMEDA, and are the direct and

18  proximate cause of Plaintiffs being subjected to known risks of serious harms in violation

19  of the Eighth Amendment.  The policies, practices and customs described above include

20  Defendant COUNTY OF ALAMEDA's failure to train its staff in the face of an obvious

21  need for training to prevent the violations described above.

22         161.   Defendants have been and are aware of all of the deprivations complained of

23  herein, and have condoned or been deliberately indifferent to such conduct.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

## SECOND CAUSE OF ACTION

### (Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983)
### (ALL PLAINTIFFS and the Prisoner Class Against ALL DEFENDANTS)

162.    Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

163.    Placement in isolation imposes an atypical, substantial, and different hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process.  By their policies and practices described above, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of harm due to the denial of due process in relationship to classification and housing decisions, including placement in isolation and the use of safety cells.  These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Prisoner Class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

164.    The policies, practices and customs described above are the official policies, practices and customs of Defendant COUNTY OF ALAMEDA, and are the direct and proximate cause of Plaintiffs being subjected to known risks of serious harms in violation of the Eighth Amendment.  The policies, practices and customs described above include Defendant COUNTY OF ALAMEDA's failure to train its staff in the face of an obvious need for training to prevent the violations described above.

165.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

**THIRD CAUSE OF ACTION**

**(Article I, Section 7 of the California Constitution)**

**(ALL PLAINTIFFS and the Prisoner Class Against ALL DEFENDANTS)**

166.    Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

167.    Placement in isolation imposes an atypical, substantial, and different hardship on the prisoner in relation to the ordinary incidents of incarcerated life, so as to create a liberty interest protected by due process.  By their policies and practices described above, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of harm due to the denial of due process in relationship to classification and housing decisions, including placement in isolation and the use of safety cells.  These policies and practices have been, and continue to be, implemented by Defendants and their agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Prisoner Class' ongoing deprivation of rights secured by the California Constitution, Article I, Section 7.

168.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as outlined below.

**FOURTH CAUSE OF ACTION**

**(Article I, Section 17 of the California Constitution)**

**( ALL PLAINTIFFS and the Prisoner Class Against ALL DEFENDANTS)**

169.    Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

170.    By their policies and practices described above, Defendants subject Plaintiffs and the Prisoner Class they represent, to a substantial risk of serious harm and injury from the harmful and inhumane effects of prolonged isolation, the denial of due process in

[3268027.10]

1  relationship to classification and housing decisions, and inadequate mental health care.

2  Defendants further subject Plaintiffs and the Prisoner Class to a substantial risk of serious

3  harm and injury from the way Defendants use safety cells and isolation, including harm

4  caused by the conditions of confinement which provide for inadequate physical exercise

5  and programming, inadequate mental health treatment, and extreme social isolation and

6  environmental deprivation.   These policies and practices have been, and continue to be,

7  implemented by Defendants and their agents or employees in their official capacities, and

8  are the proximate cause of Plaintiffs' and the Prisoner Class's ongoing deprivation of

9  rights secured by the California Constitution, Article I, Section 17.

10       171.    Defendants have been and are aware of all of the deprivations complained of

11  herein, and have condoned or been deliberately indifferent to such conduct.

12       WHEREFORE, Plaintiffs and the Prisoner Class they represent request relief as

13  outlined below.

14                         **FIFTH CAUSE OF ACTION**

15           **(Americans with Disabilities Act, 42 U.S.C. § 12132)**

16  **(Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON,  JONES, NAVARRO,**
    **and WASHINGTON and the Disability Subclass Against ALL DEFENDANTS)**
17

18       172.    Plaintiffs re-allege and incorporate by reference herein all allegations

19  previously made above.

20       173.    The Americans with Disabilities Act ("ADA") prohibits public entities,

21  including Defendants from denying "a qualified individual with a disability … the benefits

22  of the services, programs, or activities of [the] public entity" because of the individual's

23  disability.  42 U.S.C. § 12132.  Defendants are legally responsible for all violations of the

24  ADA committed by County staff and contractors who provide programs, services, or

25  activities, including but not limited to mental health care to prisoners in the Jails.

26       174.    The ADA defines "a qualified individual with a disability" as a person who

27  suffers from a "physical or mental impairment that substantially limits one or more major

28  life activities," including, but not limited to, "caring for oneself, performing manual tasks,

seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(1)(A), (2)(A).  Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON, JONES, NAVARRO, and WASHINGTON  and members of the Disability Subclass are individuals with disabilities as defined in the ADA, as they have mental impairments that substantially limit one or more major life activities.  Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON, JONES, NAVARRO, and WASHINGTON are qualified – with or without reasonable modifications – to participate in the programs, services, and activities offered by Defendants and are therefore qualified individuals with disabilities within the meaning of 42 U.S.C. §§ 12102, 12131, and 28 C.F.R. § 35.104.

175.    The programs, services, and activities that Defendants provide to prisoners include, but are not limited to, sleeping, eating, showering, toileting, communicating with those outside the Jail by mail and telephone, exercising, entertainment, safety and security, the Jail's administrative, disciplinary, and classification proceedings, medical, mental health, and dental services, library, educational, vocational, substance abuse treatment, parenting classes, and anger management classes, and discharge services.  Defendants' programs, services, and activities are covered by the ADA.

176.    Under the ADA, Defendants must provide prisoners with disabilities reasonable accommodations and modifications to policies and procedures so that they can avail themselves of and participate in all programs and activities offered by Defendants.

177.    Congress directed the United States Department of Justice ("DOJ") to write regulations implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134. Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA. 28 C.F.R. § 35.101 *et seq*. These regulations include regulations specific to adult detention and correctional facilities. 28 C.F.R. § 35.152.

178.    A public entity must "administer services, programs, and activities in the most integrated setting appropriate to" an individual's needs and is therefore prohibited

[3268027.10]

from unnecessarily segregating or isolating the individual. 28 C.F.R. § 35.130(d). Public entities responsible for the operation or management of adult detention and correctional facilities "shall ensure that [prisoners] or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals. Unless it is appropriate to make an exception, a public entity—(i) Shall not place [prisoners] or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available; (ii) Shall not place [prisoners] or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment; (iii) Shall not place [prisoners] or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed; and (iv) Shall not deprive [prisoners] or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed." 28 C.F.R. § 35.152(b)(2). Furthermore, a public entity may not "deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities." 28 C.F.R. § 35.130(b)(2).

179.   In providing any aid, benefit, or service, a public entity "may not . . . [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others," or "provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." 28 C.F.R. § 35.130(b)(1)(i)-(iv).

180.   When Defendants house individuals with disabilities in isolation due to their disabilities, Defendants deny Plaintiffs and the Disability Subclass the opportunity to participate in services, programs, or activities that are in the most integrated setting appropriate to their needs, that are as effective in affording equal opportunity as those provided to others, and that are not separate or different from those offered to their nondisabled peers.

181.   A public entity may not (1) "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary[,]" 28 C.F.R. § 35.130(b)(8); or (2) "utilize criteria or methods of administration . . . that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability . . . or the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. §35.130(b)(3)(i)(ii).

182.   Defendants have imposed eligibility criteria and methods of administration that screen out persons with disabilities and subject them to discrimination by housing prisoners with disabilities in isolation due to their disabilities and disability-related behaviors.  Defendants have not shown that such criteria are necessary for the provision of the service, program, or activity being offered or that such requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities, as required by 28 C.F.R. § 35.130(h).

183.   A public entity "shall make reasonable modifications in policies, practices, or procedure when the modifications are necessary to avoid discrimination on the basis of disability[.]" 28 C.F.R. § 35.130(b)(7).  Defendants fail to make reasonable modifications to avoid discrimination, including but not limited to: (1) implementing an identification/tracking system to track prisoners with psychiatric disabilities and their disability-related needs; (2) modifying policies and procedures to provide prisoners with disabilities with meaningful access to programs and services; and modifying policies and

[3268027.10]

1  procedures to prohibit prisoners with psychiatric disabilities from being placed in isolation.

2    184.    Defendants have failed to make available information to the Disability

3  Subclass about their rights under the ADA while detained in the Jails. *See* 28 C.F.R. §

4  35.106.

5    185.    As a result of Defendants' policy and practice of discriminating against and

6  failing to provide reasonable accommodations to prisoners with disabilities, Plaintiffs and

7  the Prisoners with Disabilities Subclass they represent do not have equal access to Jail

8  activities, programs, and services for which they are otherwise qualified.

9    WHEREFORE, Plaintiffs and the Prisoners with Disabilities Subclass they

10  represent request relief as outlined below.

## SIXTH CAUSE OF ACTION

### (Rehabilitation Act, 29 U.S.C. § 794)

**(Plaintiffs BABU, BELL, KEEGAN-HORNSBY,  JOHNSON, JONES, NAVARRO, and WASHINGTON and the Prisoner Class Against ALL DEFENDANTS)**

15    186.    Plaintiffs re-allege and incorporate by reference herein all allegations

16  previously made above.

17    187.    Section 504 of the Rehabilitation Act provides, in pertinent part that "[n]o

18  otherwise qualified individual with a disability in the United States . . . shall, solely by

19  reason of his or her disability, be excluded from the participation in, be denied the benefits

20  of, or be subjected to discrimination under any program or activity receiving federal

21  financial assistance[.]" 29 U.S.C. § 794(a).

22    188.    At all times relevant to this action, Defendants are and have been recipients

23  of federal financial assistance within the meaning of the Rehabilitation Act including for

24  programs or activities offered at the Jails.

25    189.    Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON, JONES,

26  NAVARRO, and WASHINGTON and the Disability Subclass they represent are qualified

27  individuals with disabilities as defined in the Rehabilitation Act as they all have

28  impairments that substantially limit a major life activity, and they were and/or are all

[3268027.10]

1  residents of the Jails qualified—with or without reasonable accommodation—to participate

2  in the programs, services, and activities offered by Defendants. 29 U.S.C. § 705(20)(B);

3  28 C.F.R. § 41.32.

4      190.   By their policy and practice of discriminating against and failing to

5  reasonably accommodate prisoners with disabilities, Defendants violate Section 504 of the

6  Rehabilitation Act, 29 U.S.C. § 794.

7      191.   The DOJ is charged under Executive Order 12250 with coordinating the

8  implementation of Section 504 of the Rehabilitation Act of 1973. 28 C.F.R. § 41.1.

9      192.   In providing any aid, benefit, or service, a recipient of federal financial

10  assistance "may not . . . [d]eny a qualified handicapped person the opportunity to

11  participate in or benefit from the aid, benefit or service," "[a]fford a qualified handicapped

12  person an opportunity to participate in or benefit from the aid, benefit, or service that is not

13  equal to that afforded others," "[p]rovide a qualified handicapped person with an aid,

14  benefit, or service that is not as effective in affording equal opportunity . . . as that

15  provided to others," "[o]therwise limit a qualified handicapped person in the enjoyment of

16  any right, privilege, advantage, or opportunity enjoyed by others," or "provide different or

17  separate aids, benefits, or services to individuals with disabilities or to any class of

18  individuals with disabilities than is provided to others unless such action is necessary to

19  provide qualified individuals with disabilities with aids, benefits, or services that are as

20  effective as those provided to others." 45 C.F.R. § 84.4(b)(i)(iv), (vii). A public entity also

21  may not "deny a qualified individual with a disability the opportunity to participate in

22  services, programs, or activities that are not separate or different, despite the existence of

23  permissibly separate or different programs or activities." 45 C.F.R. § 84.4(b)(3).

24      193.   By housing Plaintiffs and members of the Disability Subclass in more

25  restrictive housing, Defendants exclude them from participating in and deny them the

26  benefits of Defendants' education and rehabilitative programs, services, and activities

27  solely by reason of their disabilities.

28  / / /

194.   As a result of Defendants' discriminating against and failing to provide a grievance procedure and reasonable accommodations, Plaintiffs and the Prisoners with Disabilities Subclass they represent do not have equal access to the Jails' activities, programs, and services for which they are otherwise qualified.

195.   Because Defendants' discriminatory conduct is ongoing, declaratory relief and injunctive relief are appropriate remedies. Further, as a direct result of Defendants' actions, Plaintiffs and members of the Plaintiff Class are suffering irreparable harm, including lost education and rehabilitative opportunities. Therefore, speedy and immediate relief is appropriate.

196.   Pursuant to 29 U.S.C. § 794a, Plaintiffs are entitled to declaratory and injunctive relief and to recover from Defendants the reasonable attorneys' fees and costs incurred in bringing this action.

WHEREFORE, Plaintiffs and the Prisoners with Disabilities Subclass they represent request relief as outlined below.

## SEVENTH CAUSE OF ACTION

### (Cal. Gov't Code § 11135)

**By Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON,  JONES, NAVARRO, and WASHINGTON  and the Disability Subclass Against ALL DEFENDANTS)**

197.   Plaintiffs re-allege and incorporate by reference herein all allegations previously made above.

198.   Upon information and belief, each Defendant was, at all times relevant to this action, and is currently operating or administering a program or activity that receives state financial assistance within the meaning of section 11135, including educational and rehabilitative programs and activities offered in the Jails.

199.   Plaintiffs BABU, BELL, KEEGAN-HORNSBY, JOHNSON, JONES, NAVARRO, and WASHINGTON, and the Disability Subclass were, at all times relevant to this action, and are currently "persons in the State of California" within the meaning of California Government Code section 11135.  Plaintiffs BABU, BELL, KEEGAN-

1    HORNSBY, JOHNSON, JONES, NAVARRO, and WASHINGTON, and the Disability

2    Subclass all have disabilities as defined by California Government Code section 12926,

3    and they were and/or are all residents of the County Jails qualified to participate in the

4    programs, services and activities of the County Jails.

5        200.   Defendants have violated the rights of Plaintiffs and members of the Plaintiff

6    Class secured by Section 11135 *et seq.* and the regulations promulgated thereunder, 22

7    Cal. Code Regs. § 98100, *et seq.*

8        WHEREFORE, Plaintiffs and the Prisoners with Disabilities Subclass they

9    represent request relief as outlined below.

10                              **PRAYER FOR RELIEF**

11        Plaintiffs and the class and subclass they represent have no adequate remedy at law

12   to redress the wrongs suffered as set forth in this Complaint.  Plaintiffs have suffered and

13   will continue to suffer irreparable injury as a result of the unlawful acts, omissions,

14   policies, and practices of the Defendants as alleged herein, unless Plaintiffs are granted the

15   relief they request.  Plaintiffs and Defendants have an actual controversy and opposing

16   legal positions as to Defendants' violations of the constitutions and laws of the United

17   States and the State of California.  The need for relief is critical because the rights at issue

18   are paramount under the constitutions and laws of the United States and the State of

19   California.

20        WHEREFORE, Plaintiffs, on behalf of themselves, the proposed class and subclass,

21   and all others similarly situated, pray for judgment and the following specific relief against

22   Defendants as follows:

23        201.   An order certifying that this action may be maintained as a class action

24   pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

25        202.   A finding that the conditions, acts, omissions, policies, and practices

26   described above are in violation of the rights of Plaintiffs and the class and subclass they

27   represent under the Eighth and Fourteenth Amendments to the United States Constitution,

28   the ADA, the Rehabilitation Act,  Article I, Sections 7 and 17 of the California

1  Constitution, and California Government Code § 11135;

2       203.   An order requiring Defendants, their agents, officials, employees, and all

3  persons acting in concert with them under color of state law or otherwise to cease

4  inhumane use of prolonged isolation, to cease indefinitely placing prisoners with

5  psychiatric disabilities in isolation, to establish a constitutionally adequate process for

6  determination of prisoner classification and housing placement, to cease violating the due

7  process rights of prisoners; to provide minimally adequate mental health care to prisoners,

8  and to cease discriminating against and failing to provide accommodations to prisoners

9  with psychiatric disabilities;

10      204.   An order enjoining Defendants, their agents, officials, employees, and all

11  persons acting in concert with them under color of state law or otherwise, from continuing

12  the unlawful acts, conditions, and practices described in this Complaint;

13      205.   An award to Plaintiffs, pursuant to 29 U.S.C. § 794a, 42 U.S.C. §§ 1988,

14  12205, and California Code of Civil Procedure § 1021.5, of the costs of this suit and

15  reasonable attorneys' fees and litigation expenses;

16      206.   An order retaining jurisdiction of this case until Defendants have fully

17  complied with the orders of this Court, and there is a reasonable assurance that Defendants

18  will continue to comply in the future absent continuing jurisdiction; and

19      207.   An award to Plaintiffs of such other and further relief as the Court deems just

20  and proper.

21                              Respectfully submitted,

22  DATED:  December 21, 2018        ROSEN BIEN GALVAN & GRUNFELD LLP

23

24                              By:  */s/ Jeffrey L. Bornstein*
                                     Jeffrey L. Bornstein

25

26

27

28

58