# Exhibit C

# EVALUATION OF MENTAL HEALTH DELIVERY AT THE
# ALAMEDA COUNTY SHERIFF'S OFFICE
# SANTA RITA JAIL

# BY
# KERRY HUGHES, M.D.

# February 2020

1

## Contents

**Introduction** .................................................................................................................... 3

**Staffing** .......................................................................................................................... 3

**Intake Screening** ............................................................................................................. 6

**Mental Health Services** ................................................................................................... 7

    *Clinical contacts* ............................................................................................................ 7

        Mental health clinicians ........................................................................................... 7

        Psychiatry ............................................................................................................... 9

    *Programming* .............................................................................................................. 9

    *Out of cell activities* ................................................................................................ 10

    *Treatment Planning and Treatment Team Meetings* ................................................. 11

    *Referrals/Emergency Response* ................................................................................ 11

**Suicide Prevention** ......................................................................................................... 12

    *Safety Cells* ............................................................................................................... 13

    *Inmate Observation Logs (IOLs)/Close Observation* ............................................... 14

    *Suicide Risk Assessment* ........................................................................................... 15

    *Safety Planning and Post-Suicide Monitoring Follow-Up* ......................................... 16

    *Suicide Contracts* ..................................................................................................... 16

    *Completed Suicides and Deaths of Mental Health Inmates* ...................................... 17

**Max Custody/Administrative Segregation** ...................................................................... 17

**Medications** ................................................................................................................... 18

**Space Issues** ................................................................................................................... 19

**Discharge planning** ......................................................................................................... 19

**Access to Inpatient Mental Health Treatment** ................................................................ 20

**Training** ......................................................................................................................... 21

**Quality Assurance** .......................................................................................................... 23

- o
- **APPENDIX I**
  - o **REDACTED LIST OF INMATES INTERVIEWED**
- **APPENDIX II**
  - o **REDACTED CASE REVIEWS**

## Introduction

At the request of the parties in the matter of Ashok Babu, et al. v. County of Alameda, et al. Case No. 5:18-cv-07677-NC, a review was conducted regarding the provision of mental health services at the Alameda County Sheriff's Office (ACSO), Detention and Corrections Division, Santa Rita Jail Facility (SRJ).

The SRJ was visited on the following dates: July 11, 2019; September 25, 2019 and September 26, 2019.  The initial visit included tours of the facility.  The subsequent visits included interviews with 26 inmates housed in various locations in the facility, including the mental health units, max custody, administrative segregation, the outpatient housing unit (OPHU), mixed units and safety cells.  In addition, custody, medical and mental health supervisory and line staff were also interviewed in group and individual sessions. Healthcare records reviews were conducted for a subset of interviewed inmates, inmates who committed suicide, and inmate deaths.

This report will include findings regarding the mental health services provided at the SRJ based upon those tours and provided documents, including healthcare records.  The report also provides this reviewer's recommendations regarding areas of needed improvement.

## Staffing

The Alameda County Behavioral Health Care Services – Adult Forensic Behavioral Health (AFBH) staffing allocation at the time of the September 2019 monitoring visit was as follows:

*Supervisory Staff*

- AFBH Director – filled

- Behavioral Health (BH) Clinical Manager – 2.0 FTE, 1.0 FTE vacant

- BH Clinical Supervisor – 4.0 FTE, 1 FTE vacant

*Clinical Staff*

- Clinician I/II – 17 FTE, 5 FTE vacant

- Marriage & Family Therapist II – 1 FTE, filled

- Rehabilitation Counselor II –2 FTE

- Mental Health Specialist – 3 FTE, 2 FTE vacant

*Medical Staff*

- Employed Psychiatrists – 5.75 FTE, 1 on extended leave

- Retiree Annuitant – 0.5 FTE

- Employed Pharmacist – 1 FTE

- Locum Tenens Psychiatrists – .85 FTE

- Locum Tenens PMHNP – 1.5 FTE

- Locum Tenens LVN - .75 FTE

- Lead Psychiatrist – 1.0 FTE, filled

*Clerical staff*

- Program Specialist – 1.0 FTE

- Administrative Assistant – 1.0 FTE

- Administrative Support Managers – 1.0 FTE filled, 1.0 FTE on loan to

  another clinic

- Supervising Clerk I – 1.0 FTE

- Specialist Clerk I/II – 6.0 FTE filled, 2.0 FTE vacant

At the time of the visit, there were two vacant specialist clerk I/II positions, one psychiatrist on extended leave, one BH Clinical Manager, one BH Clinical Supervisor, two mental health specialists and five clinician I/II vacancies.  Psychiatry utilized contract/locum tenens positions to cover staffing shortages. Caseloads for clinicians ranged from 60 to 100 patients.  Staff and supervisors, patient interviews, and records reviews indicated that the current staffing levels were insufficient in light of the high patient turnover, as well as the very high clinical treatment demands.  These staffing levels resulted in brief, superficial clinical contacts, delayed response to referrals, and patients not seen in the frequency required. Additionally, clerical staffing allocations and vacancies also resulted in very high workloads and turnover of staff which negatively impacted patient care. It appeared that the mental health clinical, supervisory and clerical staffing levels were insufficient for the program demands.

Healthcare records reviews confirmed the onsite observations, and staff and inmate interviews regarding insufficient staffing. Multiple entries in the healthcare records noted that appointments were not completed and had to be rescheduled due to insufficient time related to workload issues and overbooking.

Additionally, it should be noted that the healthcare records also often mentioned inability to complete scheduled mental health contacts due to insufficient custody staffing. Insufficient custody staff frequently resulted in cell-front contacts or cancelled contacts as the inmate was not allowed out of cell.  The practice of cell-front contacts was concerning due to the lack of confidentiality and the inability to conduct an adequate evaluation at cell-front.

Cell-front mental health contacts did occur if an inmate refused to attend a scheduled appointment.  These brief check-ins were performed to ensure that the inmate was not in crisis and to encourage the inmate to attend his/her appointment or the next scheduled appointment.

The policies for psychiatric credentialing and peer review were reviewed. The policy outlined a process for annual internal peer review and external peer review by the Behavioral Health Care Services (BHCS) Medical Director's office at least every two years. The county contracted with a Credentialing Agency (currently MedVersant) to provide psychiatric credentialing.

## Intake Screening

A pre-intake screening was conducted by custody staff during which inmates were searched and fingerprinted. The Intake Transfer Release (ITR) team evaluated incoming inmates to the jail. At the time of the SRJ visit, the team was comprised of one psychologist, one licensed marriage and family therapist (LMFT) and a social worker. This staff was responsible for assessing new intakes; their responsibilities also included responding to suicide referrals, evaluating new safety cell placements and general population coverage. This staff also evaluated returns from the psychiatric inpatient unit at John George Psychiatric Hospital (JGPH). These duties were covered by on-call staff when ITR staff was not on duty. Both clinical and supervisor staff provided support to ITR staff when there were coverage issues. Inmates presenting with uncooperative behavior, in restraints, or with known severe illness or recent motor vehicle accidents may not be accepted into the jail prior to medical clearance. This also included inmates with active suicide plans or intent and those presenting with active psychotic symptoms. Positive screenings were referred for further mental health assessment and treatment.

RNs performed nursing screenings in the booking/intake area. These screenings were observed during the tour.  Of concern was the lack of confidentiality during the nursing intake screenings.

During the tour, two screenings were in process which was not uncommon. Screenings occurred in partitioned spaces with clear partitions between, allowing anyone in the area to see and hear the assessments.  The monitor was also shown an area under construction which will be the new nurse screening area. This area included four rooms.  The new area would address the poor confidentiality as the screenings would occur in a confidential setting.

Staff also reported issues with timely verification of medications on arrival for patients arriving to the jail. Further, there were reported problems with obtaining information regarding the last dosage of medications taken, which resulted in psychiatrists not providing bridge medication orders until the patient was scheduled to be seen. Healthcare records reviews verified delays in the ordering of psychotropic medications upon arrival to the facility.

**Mental Health Services**

During the monitoring visit, inmates were interviewed in a confidential setting from the mental health housing units, segregation units and general population housing units.  Additionally, clinical, clerical and supervisory mental health staff were also interviewed in individual and group settings. The information provided in these interviews was consistent with the document and healthcare records reviews.

Issues of concern were noted regarding the provision of mental health services at the jail.  Based upon the information obtained, it appeared that mental health, clerical and custody staffing shortages and vacancies negatively affected the provision of mental health services.

*Clinical contacts*

Mental health clinicians

Inmates reported that the frequency of clinical contacts with mental health clinicians varied widely.  Some inmates reported that they were seen infrequently (less than monthly); inmates on

7

IOL reported at least weekly contacts, which was consistent with institutional policy. Healthcare records reviews indicated that the frequency of clinical contacts was generally appropriate with some few exceptions noted.

Healthcare records reviews revealed poor continuity of care, with inmates seen by different mental health clinicians at each visit.  Although changes in clinicians typically occurred with housing units, the reviews indicated that such changes were not always associated with housing moves.  It appeared that insufficient mental health staffing with staff turnover and coverage may have resulted in the problems with continuity of care.

Of concern was the consistent report of very brief, superficial clinical encounters.  Inmates consistently reported that sessions generally lasted approximately five to ten minutes or less.

Clinical contacts generally occurred at cell-front or at the tables in the housing pods. This information was reported by staff and inmates, and was confirmed by onsite observations as well as healthcare records documentation. Cell-front contacts do not allow adequate assessment of inmates and are particularly concerning for evaluation of suicide risk.  Inmates may be reluctant to discuss personal or potentially embarrassing information at cell-front where that information may be overhead by neighboring inmates or staff.  Additionally, information provided at cell-front may be of a sensitive nature that may pose a risk to inmates if overhead by others.  Further, contacts that occurred at the housing pod tables was also not confidential as custody officers were present within hearing distance of the interviews. Neither of these settings afforded needed confidentiality for clinical contacts.

Psychiatry[1]

Inmates reported similar frequency and quality of psychiatric contacts.  Sessions generally occurred at cell-front, with some occurring at the tables in the housing pod. They also reported that sessions were brief and superficial in content.  Interviewed inmates also expressed concern regarding seeing different psychiatrists routinely.  Healthcare records reviews confirmed these reports. Although some psychiatric notes were very detailed and included important clinical information, others included cut and pasted information that was forwarded for each clinical session.

As was reported with mental health clinician contacts, the lack of confidentiality for psychiatric clinical contacts was concerning and impaired the provision of adequate mental health services.

Telepsychiatry was reportedly not utilized at the SRJ at the time of the visit; however, telepsychiatry was recently implemented at the SRJ in late February 2020.

*Programming*

Of concern was the lack of programming provided to inmates housed in the mental health and segregation units. Inmates in segregation reported that no groups or out of cell programming were offered.  Inmates in the mental health unit reported that one group "Breaking the Chains" was offered; however, it was nearly impossible to access the group.

Interviewed inmates consistently reported that they would be interested in participating in group therapy and other activities if offered.

---

[1] This section pertains to psychiatric services delivered in the housing units only.  Additional mental health services were delivered in the clinic at SRJ.

Staff reported that other programming was provided by outside groups for inmates, as well as by education; however, it appeared that access to these activities was limited and generally unavailable for the majority of mental health inmates.

Healthcare records reviews documented the provision of limited groups for individuals housed in the segregation units and general population.  One instance of referral and acceptance into the Breaking the Chains program was noted.

The records also documented the provision of materials, including self-help and other reading materials and activities for in-cell use by mental health clinicians.  Such activities should be strongly encouraged as they help to mitigate against the lack of out of cell activities and programming.

*Out of cell activities*

Of additional concern was the lack of out of cell time for inmates interviewed in the segregation and mental health units. Inmates consistently reported that they received a maximum of one to two hours of "pod time" out of cell per day.  During this time, inmates had to use the phone, watch television, and shower.

Inmates in the mental health units also reported infrequent laundry exchange, and several were observed with soiled clothing.

Inmates also reported very infrequent yard time; most reported less than one hour per week of yard time, which was inconsistently provided.

The lack of out of cell time with no programming was very problematic, as there were severely mentally ill inmates housed in the segregation and mental health units. It was not surprising that these inmates without adequate programming, out of cell time and inadequate clinical contacts

had increased symptoms with decompensation, increased suicidality and the need for inpatient referrals.

*Treatment Planning and Treatment Team Meetings*
No formal treatment team meetings were conducted at the SRJ.  Additionally, healthcare records indicated that treatment planning was poorly documented and required improvement. The lack of formal treatment team meetings, especially considering the limited clinical contacts, made it difficult for staff to provide adequate treatment planning and to communicate necessary clinical information to treatment providers. Examples were noted in the healthcare records reviews of problems with communication between mental health clinicians and psychiatrists. This was another area of needed improvement.

*Referrals/Emergency Response*
Most of the inmates interviewed reported delayed or no response to emergency and routine requests for mental health services, and that they frequently remained in the safety cell for prolonged periods while awaiting mental health assessment. Instances were noted in the healthcare records reviews that referrals to mental health and to psychiatry were not made when indicated.

The custody and medical/mental health policies and procedures regarding referrals were reviewed. The reviewer was unable to locate timelines for completion of requests for mental health services. Clear guidelines for timely completion and response to referrals was indicated.

Four and five point restraints were not authorized for use at the SRJ; however, the custody policy outlined the use of restraints with inmate movement as well as the use of the WRAP and Pro-Straint Restraint Chair, restraint devices.  A station order at the SRJ prohibited the use of the WRAP restraint device at the SRJ. Additionally, provided documents included a Restraint

11

Observation Log which included an area for medical/mental health documentation. The policy appropriately instructed staff to initiate involuntary acute psychiatric hospitalization per WIC 5150 when an inmate met the criteria for a 72-hour psychiatric emergency evaluation.

Documentation in the healthcare records revealed one very troubling instance of the use of the WRAP in the transport of an agitated inmate that ultimately resulted in his death. Documentation of appropriate medical monitoring was absent.  While the WRAP device is currently no longer in use at SRJ, additional training regarding the appropriate use of restraints with monitoring and guidelines for release should be instituted.

In another case reviewed, an inmate was found hanging; however, the arriving custody officer did not have access to a cut down tool timely. This lapse in emergency response should be immediately addressed.

Order for Mental Health Care Forms were noted in some healthcare records.  These forms were used by the Superior Court of Alameda County to order the SRJ to provide mental health care for specific individual inmates.  In the examples noted in the healthcare records, the inmates were already receiving mental health services, or they were seen subsequently after receiving the forms.  It appeared that the SRJ mental health staff were responsive to these court requests for services.

**Suicide Prevention**

Inmates were monitored at the SRJ for suicidality by various means.  Jail policy indicated that male inmates were re-housed in a special handling unit, but they may be moved to a special handling pod within the housing unit.  Female inmates remained in their housing units. This housing sometimes included housing in a double capacity cell if approved by classification.

Inmates in administrative segregation were placed in single cells. Depending upon the severity of the condition, inmates were frequently placed into safety cells or isolation cells. Policy outlined the use of housing unit isolation cells on a temporary basis only with the approval of an on-duty supervisor; they were intended for the transitional movement needs of inmates or the prevention of destructive/disruptive behavior. Policy outlined the use of safety cells for inmates who were deemed to be a danger to themselves, others, or revealed an intent to cause self-inflicted physical harm or destruction of property; this placement should only occur with the approval of a Watch Commander. Inmates returned from psychiatric hospitals were generally placed into the outpatient housing unit (OPHU) upon return for up to three days for observation and stabilization.

*Safety Cells*
Inmates with an active suicide plan and means, or who were actively engaging in self-injurious behavior were placed into safety cells. Placement into the safety cells was initiated by custody, medical or AFBH staff. Discontinuation from the safety cells may only be recommended by the AFBH staff. When an inmate was placed into the cells, the AFBH ITR (booking) screener was notified, and between 7:30 am to 3:00 pm, the ITR clinician would notify the housing unit clinicians regarding placement.  Housing unit clinicians were responsible for evaluating new safety cell placements and ongoing assessments Monday to Friday, 7:30 am to 3:00 pm, within eight hours of placement.  ITR staff were responsible for those duties Monday to Friday 3:00 pm to 10:00 pm, and from 7:30 am to 11:00 pm on weekends and holidays, within eight hours of placement. When notification was received by the on-call clinician, they were required to make arrangements to have the inmate evaluated within eight hours with the ITR or housing unit staff.

Ongoing rechecks were required every 24 hours.  Policy prohibited maintaining an inmate in a safety cell for more than 72 hours.

All clothing and personal property was removed, and inmates were only provided a "modesty garment" and "security blanket".  Inmates were not provided mattresses.

The use of the safety cells as the primary mechanism of suicide prevention was problematic.  As the AFBH Training Manual stated the safety cell is a "specially padded cell, which is called "the Safety Cell" or S/C for short."  It further stated "The Safety Cell does not have a toilet fixture, instead it has a grated hole in the floor and the inmate does not get toilet paper.  All food is served on floppy tray.  The S/C is a very inhospitable place to do time in."

The placement of suicidal inmates into the safety cells where they were required to utilize a hole in the floor for toileting, with no toilet paper, no eating utensils or means to clean their hands at meals, and the lack of adequate clothing/covering and mattresses was alarming.  These interventions are perceived as punitive and inhumane by inmates, and such conditions will frequently result in inmates not conveying true suicidal intent to avoid safety cell placement.

Inmates and staff also reported that women were not provided with sanitary products during menses.  This was of significant concern.

Documentation of the use of the safety cell indicated that inmates were generally placed into the cells for less than 72 hours according to policy.

*Inmate Observation Logs (IOLs)/Close Observation*
IOL was utilized for inmates with current suicidal ideation, but no specific plan or means to harm themselves. It was also utilized for those with a history of suicide attempts with current risk until assessed by a mental health clinician, as well as for those who arrived at booking with a

14

history of suicide attempts with current risk, and those who had been booked from John George Psychiatric Emergency Services/Pavilion. Inmates also were placed on IOL after removal from the safety cell, or when chronic suicidal ideation was present.  Monitoring usually occurred in the inmate's cell. Certain items of bedding, clothing and razors were removed. Mental health staff were required to assess inmates within eight hours of placement, and every seven days thereafter with recommendations regarding continuation of this monitoring.  Custody checks were required at staggered and random intervals every 15 minutes. Inmates could remain on this status for an indefinite period.

Although contacts for inmates on IOL was performed weekly by policy, instances were noted in which the weekly frequency of contact for a potentially suicidal inmate was insufficient.  The facility should develop an adequate means of suicide risk assessment to determine the appropriate interval for clinical contacts for these inmates that is individualized based upon actual suicide risk.

Documentation of contacts for inmates on IOL indicated that they were seen weekly according to policy.

*Suicide Risk Assessment*
Documents were reviewed in the AFBH training materials that described a form that included criteria regarding suicide assessment.  Despite the presence of this form, there was little information included that provided guidance to staff regarding the appropriate assessment of suicide risk. The use of an adequate suicide risk assessment may be beneficial in appropriately determining suicide risk and allow for the removal of indefinite placement on the restrictive IOL, and to better tailor clinical contacts based upon actual suicide risk.  Appropriate suicide risk

assessment may also allow for more timely removal of suicide precautions and minimizing the use of the safety cell.

Healthcare records reviews did not identify the presence or use of an adequate suicide risk assessment tool.

*Safety Planning and Post-Suicide Monitoring Follow-Up*

A blank copy of the safety plan was provided.  This form was adequate for the development of a safety plan to address suicidality.  Healthcare records indicated that this plan was generally utilized when clinically appropriate; however, exceptions were noted in which safety planning was not developed when indicated.  Clinicians documented their efforts to work with inmates to understand and to utilize their safety plans; however, the content of the safety plans required improvement.  Further training was required to assist clinicians in the development of more effective safety plans.

Clinical follow-up after the discontinuation of suicide monitoring was reviewed in the healthcare records.  Healthcare records noted variability in the frequency of contacts, with some cases noted for timely and clinically appropriate post-suicide monitoring follow up and some with insufficient follow up.

*Suicide Contracts*

Mental health staff reported, and healthcare records reviews documented the use of "safety contracts" to prevent self-injurious behavior and suicide. These measures have been proven to be ineffective, and they can result in a false sense of comfort for staff without preventing suicide attempts and behavior. An example was noted in which the clinician "contracted for safety" with a potentially suicidal inmate, with discontinuation of suicide monitoring; the inmate subsequently required resumption of suicide monitoring despite the presence of this "contract".

16

Such contracts should not be utilized and are not a substitute for adequate mental health evaluation, suicide risk assessment and appropriate treatment planning.

*Completed Suicides and Deaths of Mental Health Inmates*
There were six completed suicides that occurred from January 2017 to the time of this report. Additionally, there were several deaths for which the cause of death was pending.  Five of those cases were reviewed, and the findings are included in Appendix II.

### Max Custody/Administrative Segregation
Clinical contacts for inmates housed in Administrative Segregation or on max custody status were similar to those housed in other units.  Clinical contacts by the psychiatrist and mental health clinicians usually occurred at cell-front.  During the visit, some contacts were observed out of cell at tables in the dayroom; however, an officer was present very close to the interview which provided no confidentiality for the clinical encounter.

Out of cell activities for inmates housed on these units was limited.  Staff and inmates reported that two programs, Five Keys and Breaking the Chains, were available for max custody inmates. Additionally, inmates had limited access to pastoral and re-entry services. Inmates housed on those units reported poor access to those programs.

Inmates housed on these units also reported poor access to yard.

Inmates housed in segregation units in jails and prisons are at increased risk for suicide. Due to the increased isolation inherent in housing in a segregation unit and the increased risk of suicide with inmates housed in segregation units, daily rounds are recommended. In addition, many jails and prisons also provide weekly mental health rounds to assist in decreased isolation and increased monitoring for those units.  Neither of those practices were in place at the SRJ. In light of the limited out of cell programming, poor confidentiality of clinical encounters and inadequate

17

clinical encounters, daily rounding by nursing or mental health staff with weekly clinical

contacts or rounding are recommended. This would also allow for observation and monitoring of

non-mental health inmates, who were only seen in response to mental health referral and who

also present with increased risk for suicide due to their segregated status. Additionally, inmates

should continue to be provided with in-cell activities such as reading materials, therapeutic

documentation, puzzles and other items to decrease boredom and isolation.

The maximum security units at SRJ functioned as a de facto mental health unit.  This was of

concern as the risk of suicide is elevated for inmates housed in segregation units.  This risk is

further compounded by the lack of out of cell time, lack of programming, limited and insufficient

clinical contacts and poor confidentiality with clinical contacts.

## Medications

Interviewed inmates reported few issues with lapses in medication continuity with medication

refills. There were, however, several reports of delays in continuity of medications upon arrival

to the facility, and the reasons for this may be related to problems with medication verification.

Fourteen-day bridge orders were utilized for new arrivals, and orders were received from the on-

call psychiatrist during off hours. Review of healthcare records indicated that there were some

lapses in continuity of medications upon arrival to the jail.

The AFBH Santa Rita Jail Formulary was provided and reviewed.  The formulary was

comprehensive, and it included representatives for the various medication classifications.  It was

inclusive of a reasonable range of psychotropic medications, including clozapine.  First and

second generation long-acting injectable antipsychotic medications were available with prior

approval. The formulary also provided guidance to prescribers regarding dosage, medication side-effects, monitoring and laboratory studies.

Upon discharge, inmates were provided a ten-day supply of medications which were sent to a local pharmacy for patient pick-up or provided directly to the inmate. This system worked well with planned releases; however, inmates were not infrequently released unplanned, and the system for medication provision at the time of release from the jail was inadequate in those circumstances. Documentation of the provision of discharge medications was noted in the healthcare records.

Forced psychotropic medications were authorized by AFBH in psychiatric emergencies as defined by California Welfare and Institutions Code Sections 5008(m) and 5332(e).

Examples were noted in which inmates hoarded medications which were taken in suicide attempts. The facility should review medication management procedures and ensure that medication administration is performed appropriately.

## Space Issues

Adequate treatment space for group therapy sessions was cited by the staff as one of the reasons for the lack of provision of group therapy. The lack of appropriate space was noted during the visit when space had to be identified for the monitor's confidential inmate interviews. The lack of appropriate space not only negatively affected the provision of group therapy, but it was also a factor in the lack of confidential clinical contacts for mental health clinicians; insufficient staffing levels also played a role in these limitations.

## Discharge planning

Interviewed inmates reported that there were problems with re-entry planning and coordination of services upon discharge.

19

A clinician was assigned to act as the discharge planner and received referrals from other staff. Additionally, Bay Area Community Support (BACS) was tasked with assisting in re-entry planning, meeting with inmates prior to release. It was reported that despite these interventions, review after re-incarceration indicated that most of the patients never made their initial appointments after release.

The facility had a process in place for planned releases from the jail; those records were flagged by clerical staff, and discharge medications were provided when noted by the release deputy. However, for those inmates released from court or with unplanned release from jail, this system did not work. This is an area of needed improvement, and the supervisory staff discussed some possible options to address this issue. These options included the placement of a full-time nurse practitioner in the booking area who could oversee releases and ensure medication provision. The facility was also investigating methods of improved communication to the release deputies to inform them if an inmate required discharge medications; this could be accomplished by some type of computer notification or flag to alert release deputies. Better communication was also needed for those individuals who were released at court, as well as those who did not show for follow-up appointments with community agencies, such as Bay Area Community Support (BACS).

There was documentation that staff worked with inmates with known release dates from the jail in the healthcare records.

### Access to Inpatient Mental Health Treatment

One of the most difficult issues facing the jail was the lack of access to inpatient mental health care. Inmates and staff reported poor access to adequate inpatient services.  Inmates were frequently returned quickly, prior to stabilization from John George Psychiatric Hospital (JGPH);

these inmates were subsequently placed into a safety cell or IOL.  Review of some provided documents indicated that severely mentally ill inmates remained at the facility who were in need of inpatient mental health treatment.

Healthcare records indicated that staff frequently sent inmates to JGPH on WIC 5150 commitment for inpatient stabilization; these referrals were usually returned to SRJ within 24 hours, and their symptoms were unchanged.  Examples were noted in which inmates were repeatedly referred for inpatient treatment and subsequently returned to the jail.  An example of delay in referral for inpatient treatment was also noted.  Despite the obstacles in obtaining inpatient treatment for referred inmates, the facility should continue to refer when clinically indicated.

## Training

Training materials and lesson plans were reviewed.  The 16-hour Crisis Intervention Team (CIT) Detention and Corrections (D&C) Course included training regarding persons with mental illness in crisis in custody, overviews regarding mental disorders, crisis management conducting suicidal evaluations and suicide prevention, working with mental health staff at the facility and services available, treatment of veterans, substance abuse, inpatient treatment and treatment of persons with disabilities.

The AFBH Training Manual was reviewed.  This training manual provided instruction to staff regarding various aspects of jail functioning and mental health treatment in a very detailed, instructive manner, including intake screening, suicide assessment, prevention and treatment, malingering, referrals, emergency response, countertransference and other important areas. The training also included real-life scenarios.

21

The materials provided were comprehensive and detailed, covering necessary aspects of jail functioning and mental health treatment.  The materials appeared to be directed at custody, medical and mental health staff.  The monitor was unable to determine what percentage of staff received this valuable training from the information provided.

Information provided the following required training requirements:

- Required American Correctional Association Training for All Staff
    - Clinical Staff – 40 hours annually
    - Clerical Staff – 16 hours annually
- Required Biennial Training for All Staff with Clinical Licenses of LCSW, MFT or LPCC
    - 36 hours of Continuing Education Units (CEUs)
- Required Biennial Training for Psychiatrists
    - 50 hours of Continuing Medical Education (CME)
- Required Biennial Training for Pharmacists
    - 30 hours of Continuing Medical Education (CME)

A recommendation would include providing specialized treatment for correctional staff working in mental health and segregated units to address some of the complaints from inmates during interviews regarding inappropriate and insensitive behavior toward mentally ill inmates.

Additional areas of recommended training and supervision are included in the Summary and Recommendations sections of this report.

## Quality Assurance

The minutes of the Suicide Prevention Committee for 2017 to 2019 were reviewed. The minutes reflected discussion and analysis that included completed suicides, serious suicide attempts, inmates of concern, updates of prior attempts last period, and other follow-ups. This committee met monthly.

No information was provided regarding mortality reviews for completed suicides or serious suicide attempts, nor was information provided regarding ongoing audits and corrective action as a result of findings noted in mortality reviews with corrective action.

**Summary and Recommendations**

I would like to thank the staff at SRJ, as well as the parties for assisting in the development and completion of this report.  During the onsite visits, the staff at the facility were helpful, cooperative and provided needed assistance and access for inmate and staff interviews and tours. Additionally, needed documents and healthcare records were provided that greatly informed the development of this report.

The following are recommendations to address the issues of concern identified in this report.

1. Mental health staffing appeared to be insufficient. A staffing analysis is indicated to determine the appropriate staffing levels for staff and supervisory clinicians, clerical and psychiatric staff.  Additionally, custody staffing levels appeared to negatively impact the provision of mental health services.

2. The facility should work to improve the timely verification of medications for newly arriving inmates at SRJ to prevent delays in medication continuity upon arrival to the facility.

3. Issues of confidentiality for clinical contacts with mental health clinicians and psychiatrists should be addressed. Appropriate space for clinical interviews and sufficient escort staff should be made available to ensure that clinical contacts occur in a confidential setting.

4. The facility should work to ensure that continuity of care is achieved for mental health clinician and psychiatric contacts. This would require having sufficient staff to ensure consistency and to provide coverage for absent staff.

5. The facility should work to ensure that mental health clinical encounters are of sufficient duration and content and occur in a confidential setting.

6. The facility should work to provide out of cell programming, such as group therapy, education and other activities for inmates housed in mental health and segregation units, as well as sufficient out of cell time for showering, phone use and socialization.

7. The facility should work to ensure that adequate yard time is provided.

8. Staff should be encouraged to continue to provide in-cell activities, such as therapeutic and self-help materials to decrease boredom and to mitigate against isolation.

9. Formal, individualized treatment plans should be developed for inmates receiving mental health services.

10. The development of consistent treatment team meetings would help to increase communication between treating clinicians, provide a forum for the discussion of difficult or high-risk individuals, and assist in the development of appropriate treatment planning. Information discussed in treatment team meetings could also be provided with medical providers when indicated to ensure communication of relevant findings and issues of concern.

11. The facility should work to improve the process of referral for mental health services.  A system of tracking to determine if referrals are timely addressed is indicated.  Policy should address timelines for the timely completion of routine and emergency mental health referrals. Additional training may be necessary to ensure that psychiatric referrals are submitted as clinically indicated.

12. Additional training, if not already provided, should include the appropriate use of the WRAP, including appropriate medical monitoring and guidelines for release.

13. Cutdown tools should be securely located and accessible to custody staff in all inmate areas, especially in the housing units.

14. The facility should consider the discontinuation of the use of safety cells as the primary means of suicide prevention. The use of these cells may prevent inmates from conveying true suicidal intent due to the nature of the conditions. In the interim, safety mattresses, safety eating utensils and feminine hygiene products should be made available for inmates housed in the safety cells.

15. The facility should examine the use of IOL and consider amending clinical contacts based upon actual suicide risk rather than weekly for all inmates under observation.

16. The facility should utilize an accepted suicide risk assessment tool which can assist staff in the appropriate determination of suicide risk.

17. The use of suicide or safety contacts should be discontinued.

18. Additional training regarding the appropriate use and development of safety plans should be provided on an ongoing basis with supervisory monitoring and feedback regarding the adequacy of safety plans developed.

25

19. The facility should ensure a system for the appropriate follow-up for inmates after the discontinuation of suicide monitoring.

20. If not already in place, a system for mortality review for serious suicide attempts and completed suicides should be developed.

21. Daily nursing or mental health rounds for segregated inmates is recommended.

22. Weekly clinical contacts for segregated mental health inmates is recommended.

23. Increased programming for segregated inmates is recommended.  This might be achieved by group or individual therapy, as well as in-cell activities to decrease the isolation inherent with housing in those units.  The County should review the placement of persons with serious mental illness in segregated settings and reduce overreliance on segregation.

24. The facility should work to address the difficulties in the provision of discharge medications and re-entry planning for those individuals for whom discharge is uncertain. Discharge planning should include coordination with community services to prevent persons with serious mental illness from returning to the jail.

25. The facility should work to identify appropriate space for the provision of group and individual therapy.

26. The County should work to provide access to appropriate inpatient psychiatric care for SRJ inmates. Inmates should be referred for inpatient care without delay, regardless of concerns of malingering or behaviors due to secondary gain.

27. Additional training, supervision and monitoring is indicated to ensure that medication administration is performed appropriately to prevent medication hoarding.

Please contact me should you have any questions regarding this report.

Respectfully submitted,

*Kerry Hughes, M.D.*

Kerry Hughes, M.D.

1579 Monroe Dr., Suite F, Box 612

Atlanta, GA 30324

Phone: 404-277-4912

Fax: 404-364-9708

Email: dockc99@aol.com