# Exhibit D

# Evaluation of the Alameda County Jail System

**Prepared by Terri McDonald**

**December 2019**

**Version 2**

**Introduction**

In June 2019, I was asked to serve as a neutral expert to review conditions of confinement and access to care in the Alameda County jail system.[1] The following findings are based on a review of the original complaint filed against Alameda County (County); two site visits that included tours of housing units, random interviews of inmates and random interviews of staff; and a review of over 18,000 pages of document production provided by the County.[2] The findings below were verbally shared with counsel and representatives from the Alameda County Sheriff's Department.

As a general impression, I found the facilities clean and orderly and generally well maintained. The population in the facility appeared in line with the rated capacity and no significant overcrowding conditions were apparent. The staff were committed to continuous improvement and open and responsive on both tours, whether it was management or a randomly selected staff member questioned during the tours. I was given full access to any inmate I requested to speak with and any document I requested to review. I sensed an earnest commitment to improve the system and a desire to operate the jail consistent with modern correctional standards.

While there is much positive to build upon, I did observe areas that require improvement and attention, and this document will describe those findings and examples related to the findings. Additionally, the document will provide a variety of recommendations for sustained improvement. These findings and recommendations are not listed in priority order and often intersect or are dependent upon one another. The recommendations for improvement are not exhaustive put hopefully provide ideas about how to continue to address many of the areas of concern. To avoid redundancy, this document does not restate a recommendation in various areas but many recommendations will support improvements in more than one area.

**Mental Health Services and Capacity**

Though I am not a licensed clinician, the impact of insufficient mental health clinical personnel and mental health treatment capacity are evident in virtually every problem area observed. During both tours and in reviewing copious documents, it is clear that mental health clinical personnel are spread thin, are not running sufficient groups in mental health units, are not called upon to support in crisis situations and are not present for overnight shifts.  The strain on mental health resources manifest in several ways:

Inmates in the mental health restricted housing units may not be receiving sufficient out of cell time and were not consistently observed in group counseling or individual counseling during the

---

[1] The only operating jail at the time of the review was the Santa Rita jail.
[2] Deep analysis of the classification system, clinical reviews and American with Disability Act (ADA) were not conducted by this writer as other experts had greater depth of knowledge. However, additional feedback can be provided as requested.

tours. I defer to clinical personnel on whether the frequency and quality of engagements meets clinical standards. While on tours, this writer did observe inmates out for group activities in mental health program and did observe clinical contacts but did not observe clinically run mental health groups or individual counseling in all mental health units.  It also did not appear that there was an interdisciplinary team in the mental health units of clinical and custody personnel working together to create the most therapeutic environment possible.

There did not appear to be extensive educational or life skills programming in the restricted mental health units. In fact, the program policy for the agency appears to inhibit mentally ill inmates from full program by restricting who is eligible to receive programming either through their housing location or through restrictions due to behavioral issues.[3]

There appears there may be limitations in collaboration and clinical staff availability, which misses the opportunity to reduce incidents. For example, in reviewing pre-planned use of force incidents, clinical personnel were not routinely called to assist with seeking compliance prior to use of force. There were several incidents reviewed where a clinician was requested, which is excellent, but it was not routine or a mandate and would be difficult with current clinical limitations.

Lack of clinical staffing during graveyard shifts manifested itself in several use of force incidents reviewed that occurred in the intake areas. In these cases, inmates in apparent need of mental health housing were languishing in the intake area for too long while awaiting evaluation and housing. While one cannot know for certain, perhaps some of those incidents may not have occurred had the inmate been assessed and housed in a timely manner. The lack of mental health staff overnight does not support the complex needs of large jail intake processes or meet the crisis needs that inmates have during graveyard hours.

Custody personnel may also be leaving inmates in cells who have made a suicidal statement, or they are moving those inmates to a safety cell or other environment without a timely mental health assessment. This appears to be due largely to a lack of mental health clinical personnel to assist with assessment.

The large span of time between clinical evaluation of inmates placed in a safety cell, for example within 8 hours and then every 24 hours thereafter, reflects insufficient clinical personnel to transition inmates in need of behavioral health services to and from an isolative environment. There are also limited mental health rounds in the restricted housing units and no mandate that mental health personnel provide input prior to placement of an inmate into administrative separation[4].

---

[3] County 001191-001192 – 5th Production
[4] For purposes of this report, the term administrative separation refers to placement in a celled unit in which removal from the cell generally is in restraints and the inmates in the unit are not permitted to mix unrestrained other than with an approved cellmate.

When clinical encounters occur, they appear to occur in settings that do not afford adequate privacy, which may inhibit an inmate's willingness to be candid. It is understood that clinical capacity is planned with renovations in the intake area and the construction of additional program capacity as funded by Senate Bill 863. These enhancements may prove critical to overall access to care.

There may also exist the opportunity to improve continuity of care in medication administration between the community and custody as it does not appear that electronic unit health record databases speak to each other between services provided in the community and the jail. It also did not appear that information technology systems linked between medical, mental health and custody. This is a concern that should be referred to a clinical expert for review.

It also does not appear that the unit health or jail information databases have a "flag" that alerts clinical and custody personnel when inmates have mental health histories, or histories of suicidal behavior or ideation. It appears that each time an inmate enters the system, the inmate is treated as a new intake without the benefit of prior medical or mental health records including those related to medication needs, or self-harming or other behavioral issues.

*Recommendations*

1. *Conduct a staffing analysis and needs assessment for clinical personnel to identify needs and address the opportunities for improvement detailed above.  The National Commission on Correctional Health Care Standards may be able to assist.*
   a. *In the interim, recommend increasing mental health clinical staffing to provide for 24-hour coverage, seven days per week.*
2. *Increase clinical groups in behavior health units and identify methods to provide for privacy during clinical contacts, including during intake and individual and group clinical encounters.*
3. *Evaluate the ability to integrate electronic unit health records systems in order to share information between jail medical and mental health providers and community providers.*
4. *Create alerts in the unit health and custody databases for prior suicidal or self-harming behavior and/or ideation.*
5. *Create interdisciplinary teams in the behavioral health units and include mental health clinical personnel in pre-planned use of force incidents, prior to placement of an inmate in a segregated setting, when an inmate is making a suicidal statement and prior to rehousing an inmate released from suicide observation in any unit.*
6. *Create an information technology solution or other reporting system that advises the watch commander and clinical leadership when an inmate is being held in the intake area for more than 4 hours.*

**Out of Cell Time in Restricted Units**

Based upon on-site observations, discussions with employees, interviews of inmates and review of paper logs, it is evident that inmates in restricted and controlled housing units, including the medical housing unit, are not receiving appropriate out of cell time. This includes dayroom activities, outdoor recreation activities, programming and showers.  The staff interviewed appear committed to meeting the mandates and understand the importance of out of cell opportunities but often did not appear to have sufficient staff in the units to meet the mandates.

Evidence of inadequate out of cell time was visible in units during the tour. While several units did have inmates out individually and in groups, it was not consistent.  In most living units toured, inmates were not observed using housing unit recreation yards and only general population female inmates were observed using the large facility yard.

Many units I entered had no inmates in the dayroom for activities because there was insufficient staff in the unit to meet the competing priorities in the unit. Units may have had individual inmates in dayrooms for showers, phone and out of cell time, but there were often no deputy personnel in the units directly supervising them. It appeared that unit supervision became the responsibility of the control booth technician.

A review of the medical unit logs[5] showed daily lack of out of cell time for showers and other activities. Out of cell "refusals" were also noted routinely on all restricted housing logs. Refusals can be an easy way to document that out of cell time was offered in efforts to meet minimum out of cell mandates, but such frequent refusals raise questions about whether out of cell time is being offered consistently. Routine refusals of inmates to utilize the yard and dayroom does not absolve a correctional system of it's responsibility to try to mitigate well documented damage associated with inmates isolating in their cells, particularly those who require mental health services. If all inmates utilized out of cell and yard time, it might be mathematically impossible for the County to provide adequate out of cell opportunities with the current configuration of the yards and dayrooms. The inability to meet the current out of cell requirements was recognized both by sheriff's managers and deputies working in the units and has been a documented and recognized challenge.[6]

Ensuring that inmates are receiving adequate out of cell time, clinical contacts and programming will require a significant commitment from the County, but the reforms are critical.

---

[5] County 003685-003718 – 12th Production
[6] Refer to American Correctional Association audit – County 001235 - 5th Production

*Recommendations:*

1. *In addition to clinical staffing analysis recommended above, conduct an analysis of custody and programmatic personnel as well. The National Institute of Corrections (NIC) may be able to provide technical assistance. The staffing analysis should consider the various recommendations from this and other expert reports and develop a comprehensive approach.*

2. *The current paper logs tracking out of cell time should be replaced with an information technology system.  In the interim, another format, perhaps a single page for each inmate in restricted housing units should be developed to show each individual inmate's out of cell time, including program hours, showers, dayroom time, outdoor recreation times, and visiting for a period no less than one week. Logs will assist custody and clinical personnel in evaluating socialization needs and identify inmates who are isolating or at risk for mental health decompensation. The current paper system was difficult to quickly assess which inmates were and were not routinely receiving out of cell time.*

3. *The yards should be evaluated to determine if they can be reconfigured to increase outdoor recreation opportunities. Outdoor recreation hours should be encouraged and expanded, which may require additional lighting and dedicated recreation officers. Use of recreational therapists should be considered in behavior health units.*

4. *Policies and training should be updated to create an expectation that custody personnel notify supervisors and clinicians when inmates are refusing activities, meals, medications, or other activities for a designated period.*
   a. *A policy should be created that requires that a supervisor review programming logs in restricted housing units on a daily basis to determine whether any inmate is not being afforded out of cell time opportunities pursuant to policy or whether routine refusals are occurring.*
   b. *The policy and training should be updated to include the requirement that staff do not simply accept a single refusal for out of cell time in the behavior health units and to require more than one attempt to meaningfully communicate to the inmate the importance of out of cell time.*

5. *Consideration to increase out of cell time to a minimum 10 hours per week should occur and the staffing and out of cell options of dayroom, yard and programming outside of the unit will likely require enhancement to meet this target.*

6. *Supervisors must have a more pronounced role in monitoring out of cell and program activities and have a more visible presence in living units. It is anticipated this will require an augmentation to the current sergeant and lieutenant resources.*

**Programming**

The Sheriff's Department commitment to provide a range of rehabilitative programming is commendable. The staff assigned to the program unit are proud of the work that they do and are committed to reducing recidivism through providing quality care and programming. There were clearly program opportunities occurring in the general population and restricted housing units. Use of tablets for technology solutions is also an important innovation and commitment to engaging inmates while in custody.

Unfortunately, the programming options did not appear to be sufficient to accommodate all inmates and it appears that some groups of inmates have greater access to programming than others. Inmates in restricted and closed housing units have less opportunity for programming, even if they were not in an administrative separation setting. The path of travel challenges to the classrooms, inability to mix inmates in the classroom space and lack of escort and housing unit staff may contribute to this disparity. Programming schedules exist and were provided during tours of the units. Staff and inmates are aware of the schedules, but it appears that the reality of the daily program does not mirror program schedules.

*Recommendation*

1. *Re-evaluate policy and practice related to program eligibility and distribute limited program provider hours for more equitable access to programs.*
2. *Evaluate and address path of travel issues into classroom for mobility impaired inmates and staff.*
3. *Expand program provision in closed and restricted housing units with charter schools, community based and faith-based providers, volunteers and mental health personnel.*
4. *Establish easily deciphered daily tracking system for programs provided and inmates who attended.*
5. *Consider revising the program schedule consistent with realistic program expectations and adhere to the revised schedule absent extenuating circumstances.*
6. *Seek options for alternative to custody community-based drug treatment and mental health services.*
7. *Re-evaluate and validate classification system to program inmates in the least restrictive environment consistent with safety needs. The National Institute for Corrections can assist with this effort.*
8. *Seek opportunities to add classroom capacity through modular construction or the construction of the SB 863 building.*

**Security Checks**

The timeliness and quality of security checks is insufficient. In reviewing dozens of documents, observing staff in housing units and speaking to deputies in the housing units, it is clear that staff understand the importance and expectation for conducting security checks, but those checks are both untimely and cursory at times. In reviewing safety logs provided by the County, there are numerous missing entries or entries that are so exact on time (i.e. 0700, 0715, 0730, 0745) that it raises questions about their accuracy.[7]

In observing staff working in the units, I watched for more than 45 minutes as staff either did not complete the mandated safety checks or hurriedly passed by cells that were darkened without shining a flashlight or turning on a light. I had previously observed several of these cells and could not see with clarity in the cell without the aid of additional lighting. I observed safety check logs outside of safety cells that were incomplete and observed two safety cells with inmates in them that did not have a safety log on the outside of the cell.

Staff were candid in stating that they are unable to complete quality security checks within established timeframes and that they simply leave the security check logs blank if they are unable to meet the mandate. In one attempted suicide review, it appeared the staff may have left the unit for over an hour and missed a mandated check during which time an inmate attempted suicide in the unsupervised dorm.[8]

In more than one suicide review, the timeliness and quality of security checks is in question.[9] The County's inability to meet timeliness of security checks is referenced in Policy 8.18 (Section B.2) as well as in the American Correctional Association (ACA) audit in 2016, referencing lack of timely security checks.[10] It appears that the lack of timeliness is likely driven primarily by staff vacancies as I did not observe staff simply sitting idle. On the contrary, staff appear busy, moving hurriedly from one task to the next.

*Recommendations*

1. *Regarding the staffing review of custodial positions recommended above, the consider the following:*
    a. *Consider use of alternative classification other than deputy sheriffs to assist with security checks, such as providing a safety bonus for technicians. The Los Angeles County Sheriff's department has experience with this model or the National Institute of Corrections may be able to provide assistance as well.*

---

[7] Examples include: County 10053-10058 and County 10103-10105 – 21st Production (1 of 2)
[8] Incident number 19-11080
[9] Refer to Morbidity and Suicide Review section for further discussion on failure to address this issue in critical incident reviews.
[10] County 001235 - 5th production

b.  *The County could review and expand the role of clinical personnel to include additional assistance, particularly with inmates on 15-minute checks and in converting housing pods to a more clinical mission.*

c.  *Work with the county executive office to move long term sick deputies from their budget position number into a "blanket" position to allow backfilling or create as needed or on-call deputy item to reduce critical staff vacancies.*

d.  *Conduct a review of transportation and consider creating a medical transportation team to discontinue pulling deputies from the housing units to conduct emergency transportation details.*

2.  *Consider using an inmate work assignment position to assist with security checks in high risk mental health areas to enhance, not supplant, staff security checks. The Federal Bureau of Prison has experience with this model.*

3.  *Evaluate the use of information technology systems to track completion of security checks and include the ability to notify a supervisor and watch commander when security checks are not being completed. There are several systems available and tested but recommend a system that does not create the sound of metal striking metal (i.e. the "pipe"), and one which will allow staff to note the inmate's status at the time of the security check (i.e. sleeping, eating, pacing, etc).*

4.  *Review policy and training on conducting quality security checks, including the creation of a video to model appropriate security check observations. Increase supervisory oversight in reviewing quality and timeliness of security checks.*

5.  *All suicide and suicide attempt reviews should review timeliness and quality of security checks as an aspect of the after-action review.*

**Use of Safety Cells**

The use of safety cells is troubling. These conclusions are drawn from observing the cells, reviewing log books, talking to inmates in the cells, reviewing use of force incidents and interviews with staff. While staff advised readily and knowingly what the policies were concerning placement, documentation, cleanliness of the cells, etc. I observed several violations of stated and written policies during both tours.

While it is recognized the staff may feel they have limited options other than to use safety cells when an inmate engages in self-injurious behavior or makes serious threats, the location of the cells, isolative and stark nature of the cells, lack of significant oversight prior to placement in the cells, lack of mental health intervention and consistent engagement of inmates in the cells, inconsistent security checks, apparent inadequate service provision while inmates are in the cells and cleanliness of the cells are problematic.

There is also potential to misuse the cells and miss opportunities for clinical personnel to develop a treatment and behavioral plan when inmates are placed in the cell. Just this year, it appears

Inmate Tiffany M spent extended periods in a safety cell and it is not clear whether clinical personnel developed strong behavioral plans, in partnership with custody, to address the behaviors or clinical needs that lead to Inmate Tiffany M ending up in a safety cell.[11] While on my first tour, there was also an inmate who had been in the cell for what I believe may have been more than a week and that should have raised a red flag to clinical personnel and custody leadership.[12]

*Recommendations:*

1. *Develop a plan to discontinue the use of safety cells. In the interim:*
    a. *Significantly enhance service provision to inmates placed in the cells*
    b. *Place greater restrictions and controls on who is permitted to place an inmate in the cell*
    c. *Assign clinical personnel to work in the area where the cells are utilized and increase their rounding and engagement with inmates in those cells.*
    d. *Deep clean the cells immediately and between each use*
    e. *Reconfigure the security check log system to a single shift report with greater detail of service provision during the shift to assist with ensuring inmates are receiving services.*
    f. *Require at least once per shift sergeant and lieutenant rounds to interact with inmates in the cells and require documentation of those rounds.*
    g. *Increase executive approval requirements of both mental health and sheriff personnel to require on-going approval for placement in a safety cell every 4 hours the cells must be utilized.*
2. *Seek opportunities to increase clinical housing capacity within the existing system and though contracted capacity in the community.*
    a. *It appears several of the housing unit pods can be converted to create a stepdown mental health program and create units that increase observation and reduce opportunity for self-harm. By removing the upper bunk in the cells and utilizing a suicide reduction auditing tool to reduce ligature opportunities (i.e. breakaway fire sprinklers and security lighting), the jail can eliminate the need for safety cells.*
    b. *In creating such a unit, the county should increase clinical personnel working directly in the units in partnership with custody and should evaluate if this unit could also support an involuntary medication program.*
    c. *Perhaps the newly designed construction plan could consider the placement of specialized cells within the new building if option 2.a is unrealistic.*
3. *Evaluate expansion of mental health diversion by working with justice partners and mental health to find alternative placements for low to medium risk inmates whose*

---

[11] County 104293-10473. 21st Production (1 of 2)
[12] Unfortunately, I did not record the name of the inmate or the location where the inmate was housed. This observation occurred on June 25, 2019.

*behavior appears more associated with behavioral health issues than violent criminality. This will reduce pressure on limited clinical beds in the jail.*

4. *Evaluate wait list for State Hospitals pursuant to court order to determine competency and create a strategy to reduce the waitlist or seek a contract with the State to develop a restoration program within the jail.*

**Administrative Separation**

This feedback is based on tours of the restricted housing units, review of documentation, review of policies and discussions with staff and inmates in those units. The County has a commitment to staffing a classification unit and is committed to routine reclassification. The classification staff are actively involved in reviewing housing placements and there are policies guiding their decisions. The classification team was also open to discussing current practices and continuing to refine systems and could benefit from support from the National Institution of Corrections and classification experts to refine policies and training of the team.

In general, the jail appears to be over reliant on segregation, and inmates in administrative separation are not being afforded ample access to out of cell opportunities and programming. It appears inmates are too easily placed into administrative separation and there may be some hesitance to remove the inmate when they do not present a known serious risk to institutional safety. Additionally, based on the classification practices, once in maximum custody administrative separation, inmates are not permitted to work their way to minimum or medium classification.

As mentioned, the lack of mental health involvement prior to an inmate being placed in the unit or routinely assessing inmates through rounds, groups and individual counseling should be addressed. The methods and policies for double celling in maximum custody and restricted housing should also be considered.

*Recommendations*

1. *Work with consultant to update policies and training on placement criteria, approvals needed and reclassification from restricted housing units.*
2. *Update policy to require mental health evaluation prior to placement of inmates into restricted housing, daily mental health rounds of maximum administrative separation housing and routine clinical engagement with inmates in restricted housing.*
3. *As with the above recommendation regarding privacy, identify methods to create privacy in clinical contact in the restricted housing units.*
4. *Create an updated policy on double celling in restricted housing/administrative separation that takes into consideration criminal history/sophistication, willingness to accept a*

*cellmate, size and age of the inmates in comparison to each other and reason for placement.*

5. *Increase supervisory presence and rounds in restricted housing units.*

6. *Update classification policies and training that creates greater scrutiny prior to placement of inmates into restricted housing, more meaningful review for continued placement and the ability for an inmate to work their way through positive behavior from a restricted housing unit to a minimum custody unit if their behavior and case factors support such placement.*

7. *Create a step-down protocol from the maximum administrative separation housing unit that begins integration and increases programming opportunities with the goal to safely transition inmates to the least restrictive environment while maintaining safety.*

   a. *Continue current concepts to create integrated yards, dayroom activities and programming as an aspect of the step-down protocol. The National Institute of Corrections has significant information to assist jurisdictions with the reduction of reliance on restricted and segregated housing units.*

**Use of Force**

This section is based on review of dozens of use of force reports and videos on pre-planned physical interventions. As a result, it is recommended that the Sheriff's Department review the tactics used in physical interventions (emergent and pre-planned) as well as update the use of force policies and training. It also recommended the Sheriff's Department improve the intensity of the review process for use of force.

Generally the use of force reports were well written and provided a clear description of the circumstances giving rise to force and the force used. Clearly much work has gone into training staff on report writing, collecting reports from all involved, utilization of body worn` cameras and layers of review post incident.  These are all best practices in use of force in correctional settings.

However, I believe that increased training in de-escalation techniques, close review of the pattern of hand and knee strikes in all circumstances, a review of the use of less lethal options during pre-planned operations and the quality and willingness to continue address what appear to be unnecessary or excessive force in post incident reviews are critical. Although I did not review completed use of force reviews with all force reports provided, of completed review packages reviewed, I found insufficient critical analysis of tactical decisions that I believe was warranted in those cases.

For example, in more than 50% of use of force incidents reflected in the last two quarters of 2018, staff are reported to have engaged in striking or kneeing inmates.[13] This is an unusually high percentage of use of hands and knees as weapons when physical strengths and holds generally

---

[13] County 009315-009316 – 20th Production (1 of 2)

may be more appropriate. There were a variety of reports where staff appear to justify striking inmates in the face when they feared they might be spit on, which should have been questioned and addressed in a meaningful use of force review. In several cases, staff in the intake center entered holding cells and engaged in force incidents when it appears based on reports that time permitted staff to simply secure a door and wait for the situation to de-escalate, or to call for a supervisor.[14] Admittedly I did not review each of the completed use of force reviews but the prevalence of these cases reflect that there may be insufficient analysis of tactics used in use of force incident.

In none of the completed force reviews provided were any questions from supervisors or managers reviewing the force address any policy or training issues or a review of an employee's prior use of force history. I am told that in the last year, the agency has been addressing what appear to be unnecessary or excessive striking contacts through the internal affairs process but I did not seek additional information or statics to review that contention and have no reason to disbelieve that comment.

Addressing unnecessary striking, waiting for a supervisor and driving towards de-escalation as a tool of first resort can be a difficult cultural and tactical issue. Based, however, on the Sheriff's Department's own reports, 50%-60% of use of force incidents involve staff striking or kneeing inmates this change is a necessary step. This frequency of striking appears inconsistent with correctional use of force practices and is an urgent area that must be addressed.

*Recommendations*

1. *Revamp use of force policy and training to increase de-escalation training and address over-reliance on striking and kneeing during force scenarios.*
   a. *The policy should reiterate supervisor and managerial responsibility to address tactical mistakes or unnecessary or excessive force in a steadfast and unapologetic manner.*
   b. *Policy should require consistent use of early warning system review on staff prevalence rates in use of force and types of force.*
   c. *Policy should require clinical engagement where appropriate in developing behavior plans with inmates who are engaged in multiple force incidents.*
   d. *Meet with labor and employees to better understand why they are relying on strikes and knees and what tactics or tools need to be developed or provided to reduce reliance on striking and kneeing.*
   e. *Policy should be clear that inmates will not be hit in the head/face or kneed/kicked absent life threatening or other extenuating circumstances.*

---

[14] Examples include but are not limited to Incident Reports: 18-9920; 18-13720; 18-15010; 18-15089; 18-17550; 18-17624; 18-18757; 18-8876; 18-0903; 18-2508; 18-2861; 18-3297; 18-3919; 18-5014; 18-5555; 18-6163; 18-6433; 18-7239; 18-7049; 18-8171

2. *Increase the number of supervisors and clinical personnel in the living units to assist with de-escalating crisis situations.*
3. *In addition to body cameras, explore updating fixed cameras with priority placed in the intake areas and areas with highest prevalence of force. It is noted that there has been the addition of a lieutenant in the area to assist and oversee the unit.*
4. *Consider the creation an independent use of force review team to create a second review process, looking for systems and training issues for continuous quality improvement.*
5. *The agency should review the circumstances when less lethal impact weapons, such as the 37mm or FN 303 are warranted, and determine when chemical agents may be more appropriate in cell extractions.*
6. *Mental health personnel should be contacted for support for all pre-planned force incidents in the jail.*
7. *Control booth technicians and other staff should author their own supplemental reports when they witness force.*

**Grievances and Inmate Discipline**

Information was provided on inmate grievances and inmate discipline, particularly the role of mental health clinicians in the disciplinary process of mentally ill inmates.  It is commendable that the system has developed and implemented a disciplinary system that is more refined than many jail systems. It is also commendable that of the reports reviewed, clinicians provided input on the majority of disciplinary reports for inmates receiving mental health services. The grievance information was not presented in a manner that easily assisted in reviewing access to the systems, timeliness or quality of responses or trends in grievances.  Staff and inmates were aware of the grievance system but grievance forms were not readily available in all housing units without an inmate needing to request one from the staff. It is noted that the electronic tablets will help with ensuring access, timeliness in response to grievances and generating reports on trends.

*Recommendations:*

1. *Continue process of inclusion of clinicians in disciplinary system and track when the clinicians make a recommendation to consider the mental health of the inmate in the process as the feedback from clinicians did not appear to impact the decision in the majority of reports reviewed.*
2. *Consider discontinuing seeking an opinion on the level of discipline that should be assessed from the deputy authoring the report. This is inconsistent with normal correctional practices and inconsistent with arresting officers writing a report on an alleged crime.*
3. *Consider replacing disciplinary diets with practices more consistent with restorative justice principles for all inmates, and particularly for mentally ill inmates. Food related disciplinary actions should generally be related to food related incidents.*

4. *Evaluate the tracking and metrics system for inmate grievances to seek formats that better inform management on timeliness, trends, problem areas, etc. Again, the use of the electronic tablets are an excellent tool to assist in this area.*
   a. *It is understood the tablet program will support access to grievances but ensure a system is in available and responsive for inmates who do not have access to the tablets.*
5. *Ensure supervisors are conducting daily rounds in housing units to ensure access to grievance systems.*

**Morbidity and Suicide Reviews**

This section feedback is based on review of all morbidity reviews provided as well as discussions with Sheriff's Department personnel. While it is promising and commendable that there is a death review process in effect, the depth of the reviews should be enhanced.  For example, of all suicide reviews provided, all were determined to be within policy.  However, on virtually all paper reviews, it appears that opportunities for system improvements would have been identified with more thorough reviews. Some examples of areas that seem the reviews could have assessed more thoroughly are addressed below.

In commenting on the below deaths, I did not seek follow up response to the areas that caused concern and recognize that in seeking additional information, it may have satisfied a concern. However, the lack of a deep analysis is itself a problem and a missed opportunity for system improvement and increased accountability. These comments do not imply purposeful inaction but highlight a sentinel event review system that would benefit from increased training and support. Examples of issues that should have been evaluated in various death review that are not documented as being considered in the reviews provided:

<u>**Inmate**</u> ▨▨▨▨▨▨[15] - As with all death reviews, any video availability of the event was not mentioned and no mention of review of either the unit camera or body worn cameras. There was no mention if security checks were timely and thorough. Neither the Unit Health Record or Custody record spoke to prior incarceration and mental health history, including suicide attempts.  There was no mention on the lack of a mechanism to connect prior incarceration history and community health care with the jail unit health record. Nor is there a mention of the lack of an integrated jail medical record and mental health record. It does not appear there was a continuity of medication upon intake but that is not listed as evaluated. Appears the inmate flooded his cell earlier in the shift but record was silent as to whether he was removed from the cell to clean the cell and does not appear mental health was notified of his behavioral issues. The security check log  has

---

[15] Incident Report 18-6033 – 8th Production

troubling entries that are too routine to be considered reliable. The medical/mental health review appeared less than thorough but will defer to clinical expert to comment.

**Inmate** ███ [16] **–** No review of video or body worn cameras. No mention of security checks. Appears he had been in two separate fights the night before, but no mention if he received any medical treatment after the fights. With two prior fights, had mental health or a supervisor spoken with him? Appears that according to the unit logbook that the ambulance may have taken up to 50 minutes to arrive. Discrepancy in documentation is not noted or explained. The medical/mental health review appeared less than thorough but will defer to clinical expert to comment.

**Inmate** ███ [17] **–** While the investigation may have cleared staff relative to the death, there is no discussion on administrative policies compliance. Was the equipment applied according to manufacturer recommendations? Were the staff trained in the use of the wrap and did they follow that training? Was policy up to date and provided appropriate direction on the use of the wrap? Where the tactics during the use of force consistent with the threat?

**Inmate** ███ [18] **–** No discussion on age, size and criminal sophistication difference between the two inmates in this in-cell homicide. No discussion on double celling policy or need to evaluate current practices of double celling.

**Inmate** ███ [19] - While cause of death appears natural, there are issues that should have been addressed in the summary. For example, there appears to have been a delay in transport to the hospital (appears a 4.5 hour delay). There were facial injuries noted in autopsy and reported by treating clinician which suggests the use of force reports/videos should have been included and evaluated in the death review. Coroner report indicates inmate was seen banging the back of his head in his cell but autopsy shows facial injuries. Report should have noted and addressed discrepancy, particularly when the treating physician at the hospital had concerns. Appears Mr. ███ may have died from pneumonia but had he recently been to hospital and whether he was assessed for pneumonia during the prior hospital stay is silent. Refer to clinical and peer review but lack of questioning in review is noted.

These are examples on five death reviews but these are only examples as this author had critical unaddressed questions from virtually all morbidity reviews provided. The lack of documentation of a complex and reflective interdisciplinary analysis of these deaths does not allow the system

---

[16] Incident Report 18-11115 – 15th Production
[17] Incident Report 18-10962 – 18th Production
[18] Incident Report 19-9513 – 23rd Production
[19] Incident Report 17-6991 – 21st Production (2 of 2)

to engage in continuous improvement and reduce future critical incidents.  These types of critical questions should not go unanswered or unaddressed.

*Recommendations*

1. *Work with outside consultant to build internal capacity to conduct intensive morbidly reviews and develop sustainable corrective action process for each sentinel event.*
2. *Capture all stationary video and body camera footage in all death and critical incidents and include review of available video in the package and subsequent report.*
3. *Any use of force reports and reviews should be assessed in the death review package.*
4. *Review all training and policies (or lack thereof) associated with the incident and include in the package and subsequent report.*
5. *Reassess deaths from determine period (i.e. last three years) to seek opportunities for system improvement and develop a comprehensive corrective action plan from those reviews.*
6. *Review current structure for sentinel review and determine if staffing and experience support comprehensive post incident analysis.*
    a. *If this does not already occur, consider including risk management, county counsel and/or and inspector general in all future morbidly reviews.*
7. *Consider the purchase of and installation of portable gurneys (i.e. stokes litters) in units for ease of removing injured staff/inmates from upper tiers in emergency situations.*
8. *Purchase and maintain industrial grade cut down tools in all housing unit control booths in the event staff encounter a suicide by ligature.*
9. *Consider consulting with a suicide prevention expert, such as Lyndsey Hayes, to assist with suicide prevention, training and harm reduction strategies.*


**Policies and Training**

The agency has an abundance of policies, which is excellent. Additionally, the updated Prison Rape Elimination Act (PREA) policy can serve as a model for other agencies as a thorough and complete policy and shows the capacity and commitment to develop comprehensive policies. Because policy is the framework for quality operations, the foundation of thorough and updated policies supported by targeted training, quality sentinel event review and routine auditing cannot be overstated.

Unfortunately, other than the PREA policy, many of the other policies appear in need of updating, may lack necessary clarity or use language that is ill-advised and may lend to the use of language by staff that is not appropriate (i.e. "mentally disordered" or "isolation"). The following are examples and not exhaustive.

The most critical behavioral health policies regarding the use of Intensive Observation and safety cells have not been updated since 2009.[20] The American with Disability Act (ADA) policy[21] is in need of significant revision. The transportation policy does not mandate that a clinician be contacted if an inmate who is developmentally disabled or in need of mental health services refuses transportation and that should be rectified in both policy and practice.[22] Fortunately, during discussions on the restraint policy, as an example of an area of concern, the Sheriff's department provided an updated policy, demonstrating a commitment to update policies as time and resources permit.

In addition to requiring a commitment to review and update existing policies, the training lesson plans provided are due for an update and inclusion of evolving correctional best practices. The mental health policies, while plentiful, appeared at times to provide more guidance about use of computer equipment and billing then informing how service provisions should occur in the various living units and intake.[23]

To be a continuously improving organization, a constant interplay between policy, training, auditing and critical incident review must occur. Absent that continued feedback and process improvement loop, the same critical incidents reoccur and organizations struggle to understand the reasons why.

***Continuous Quality Improvement***



---

[20] County 001460-001465 – 6th Production
[21] Policy 8.14 – 3rd Production
[22] Policy 13.08 – 3rd Production
[23] County 001302-001424 – 5th Production

Page 18

*Recommendations*

1. *Develop a strategy to review and update all policies and lesson plans based on findings from feedback from the various experts and critical incident reviews (including use of force reviews).*
2. *Going forward, evaluate policies and lesson plans associated with every use of force and critical incident review to determine if updates or revisions are necessary as a result of those reviews. Ensure the documentation process for critical incidents and use of force reviews documents reflects that a review of polices and training has occurred.*
3. *Evaluate current critical incident review teams, policy units, training resources and auditing functions to determine if they are sufficient to develop a highly functioning process improvement system.*
4. *Be inclusive, to the extent possible based on security needs, of the policy revisions so that they are well understood by staff and inmates alike.*

**Correctional Expertise**

The managers and supervisors encountered during the tours presented as intelligent, professional and committed to overseeing excellent corrections. However, they had limited supervisorial and managerial experience in managing a large jail and suffer from a rotational schedule that does not develop well rounded correctional leaders. As with many sheriff's departments, the value of correctional experience may take a second seat to patrol operations and the top tier talent may desire to work in patrol. As a result, the ability to learn from experience erodes as supervisors and managers rotate from custody operations out to patrol.

*Recommendations*

1. *Consider developing a career pathway for supervisors and managers to remain in the jail and incentivize a career in corrections as a valuable pathway in the county.*
2. *Ensure involvement with the NIC Large Jail Network, American Jail Association, American Correctional Association and encourage and incentivize correctional training and certifications available from those organizations and others.*

**Miscellaneous Comments and Recommendations**

The previous sections of the report addressed larger segments of jail operations but during the review, the following issues were noted or opportunities were apparent:

1. *There are insufficient Sergeants and Lieutenants to support daily activities, much less train and adequately evaluate staff. Far too many use of force incidents reviewed occurred*

*without a supervisor present. No unit lieutenants or sergeants were observed in the living units during the tours and there appears to be little assurance that sergeants are conducting spot reviews in the housing units, looking at cleanliness, compliance with daily programming requirements, review of documentation such as security check and out of cell logs.*

2. *The silo nature of the provision of medical and behavior health is problematic. The county should seek a governance structure to improve collaboration between community behavior health, medical treatment providers and the Department of Mental Health.*

3. *It is recommended the County evaluate inmate work assignments to determine how inmate workers, particularly AB 109 sentenced inmates, can be used to assist with facility improvements and programming. Areas discussed with Sheriff's team include certification program for deep cleaning[24], wellness check support (security checks),[25] student tutors/merit masters[26] and access to program support aides[27]. There are literally hundreds of inmate programs and assignments that can assist with improving daily jail operations while training inmates on a skill that is transferable upon release.*

4. *Create a daily check and auditing sheet for supervisors to use in conducing rounds to ensure security checks, out of cell opportunities, grievances and sick call slips are available, etc. are occurring.*

5. *While overall the facility was clean and in good order, there were some units that needed support. Evaluate maintenance staffing levels to assist with maintaining the cells/dorms/living units in appropriate order and cleanliness. Staff report having challenges with inmates entering the cells when they were not as clean or maintained as the staff would like.*

   a. *Consider increased use of inmate porters*
   b. *Purchase pressure washers and water shop vacuums for all housing units for quick clean up.*

**Conclusion**

There is much to build upon in the system. Namely that there is a commitment to improve and a willing and transparent approach from the leadership to allow an evaluation of the system in a transparent and collaborative manner. The facilities are in generally good order and there is a commitment to providing services above the minimum, including education and rehabilitative programming. The managers and the staff in the jail were candid and engaging, both willing to listen to new ideas and share where they see opportunity to improve. The system is utilizing

---

[24] Program provided by California Department of Corrections and Rehabilitation (CDCR)
[25] Program available in the Federal Bureau of Prisons
[26] Program currently offered by Los Angeles County Sheriff's Department
[27] Refer to CDCR Gold Coat program

evolving technologies, such as body worn cameras and electronic tablets, to show a commitment to being a correctional leader.

I appreciate the opportunity to assist in this important review and believe given the resources and support, the areas of concern can be rectified and the Alameda County Jail system can be one of the most effective large jails in America.