# Exhibit E

# Evaluation of the Alameda County Jail Population, Restricted Populations and
# Inmate Classification System

Prepared by

James Austin, Ph.D.

November 2019

**Introduction**

In June 2019, I was retained by Alameda County to conduct an evaluation of the County Jail's inmate classification system. For clarification, a jail classification system is the formal process by which all inmates are admitted, objectively assessed, monitored, housed and released while in the custody of the correctional agency. As such all inmate housing and programmatic decisions are under the direction of the classification system.

The basis for the study is related to a complaint filed by the law firm of Rosen Bien Galvan & Grunfeld, LLP on December 12, 2018 (*Babu v. County of Alameda*). The complaint claims that inmates housed in the Alameda County jail are experiencing excessive amounts of time in isolation cells, inadequate care for inmates with "psychiatric disabilities", unnecessary placement in administrative segregation, and improper care for inmates who are suicidal.[1]

In conducting this study, three key data files were requested and provided by the Alameda County Sheriff's Office (ACSO) that captured the individual attributes of people housed in the ACSO's jail system. Two were snapshots of the jail populations as of June 7, 2019 and September 8, 2019. These data files provide me with detailed information on the inmates who were housed in the jail system on those two days. The third data file consisted of all people who were released from the jail between September 1, 2018 and August 31, 2019. This data file shows the average length of stay (LOS) for released inmates, the methods of the released and other relevant inmate attributes.

In addition to the three data files, two site visits were conducted. The first visit was designed to get an orientation to the jail's architecture, housing units, and its current classification system. Based on that visit, a second visit was made to conduct interviews with a randomly selected number of inmates who were classified and assigned to the restricted housing units. While on site, the preliminary findings and recommendations were presented to all of the parties based on the data received to date. Some additional data were requested and were provided by the ACSO.

The report that follows is based on the data listed above. It focuses on the ACSO classification system and how inmates are assigned to general population and restricted housing units. Edits or additions to the report can be made based on comments or additional information received the involved parties.

**Major Jail Population Trends**

---

[1] Babu, Ashok et al., v. County of Alameda; Gregory J. Ahern; Carol Burton

1

In assessing the Alameda jail system, it's important to first examine the major jail trends that have been occurring over the past few years. Significantly, the average daily inmate population has been declining over the past several years. In 2007, the ACSO jail population was approximately 4,600. Beginning in 2009, the population began to decline and reached 2,463 as of June 2019. The two data snapshots received from the ACSO in June (2,213 inmates) and September (2,422 inmates), showed about the same jail population (Table 1).

The size of a jail population is the product of bookings times the length of stay (LOS). In Alameda, the major reason for the decline seems to be a decline in bookings that actually predates the passage of re-alignment (2012) and Proposition 47 (2015) although both of those legislative reforms seem to have accelerated the long term downward trend. Similarly, the decline in bookings is related to decline in adult arrests (Figure 2).

Figure 1



In terms of incarceration rates (inmates per 100,000 county population), Alameda County currently has a rate of incarceration that is below the California and U.S. (Table 1). This is relevant to the issues of crowding, lack of staffing/supervision and services, as jurisdictions seek to safely lower their jail populations. With an already low incarceration rate, it may be more difficult to develop and implement jail population reduction strategies than a jurisdiction that has a higher incarceration rate.

In terms of bed capacity, the BSCC website reports a bed capacity of over 4,000 beds but that figure does not take into account the large number of beds that have been taken off line as the jail population has declined.  Internally, the ACSO reported the Santa Rita Jail capacity at 3,717 beds. However, there are four units that are closed which lowers the jail's presently bed capacity to 2,676.

It's important that an operational capacity be established that accounts for seasonal, monthly, weekly and even daily fluctuations in the jail population. The operational capacity lows the jail to retain some level of constant vacancy so that inmates can be moved as needed into the appropriate housing units.

Typically, the operational capacity is set at 85-90% the bed capacity. That would mean that the jail population should not exceed 2,408 using the 90% range or 2,275 at the 85% range.  This assumes that the closed beds remain closed. The recent actual jail population has been below the 90% range but slightly above the 85% range. To split the difference at 87.5% operational capacity, the jail population should stay below 2,342 inmates (Table 1).



**Table 1.  Alameda County Jail Populations, Incarceration Rates, and Bed Capacity**

| | |
|---|---|
| Population as of July 2009 | 4,600 |
| Population as of June 7, 2019 | 2,213 |
| Population of September 8, 2019 | 2,422 |
| | |
| Alameda Jail Incarceration Rate Per 100,000 Population | 144 |
| California Jail Incarceration Rate (2019) | 188 |
| U.S. Jail Incarceration Rate (2017) | 233 |
| | |
| ACSO Rated Bed Capacity | 3,717 beds |
| With Four Closed Units | 2,676 beds |
| At 87.5% Operational Capacity | 2,342 beds |

Table 2 provides a more precise analysis of the principle drivers of the jail population and is based on the jail release data file. It represents the number of releases in year and shows the method of release and the average LOS for each release method. By knowing those two factors (releases and LOS), one can also compute the amount of jail beds being occupied by each method of release.  The release file was formatted to so that it was person based and only recorded one unique booking and release by a single individual in a year.

The overall LOS is 30 days for these 22,271 people which is above the national average of 23 days but is low compared to most California jails due to realignment. Of note is that 13,133 people were released within 3 days or less and typically by bail or citation release.  By contrast, for the 9,338 people who do not get out in 3 days, their average LOS is 72 days with the people who are eventually sentenced to state prison having both the longest LOS and occupy the greatest number of beds.

The point of this analysis is that the inmates who are housed on a daily basis are most likely to be convicted of their crimes (mostly felony charges) and will have a length of stay of 2-3 months prior to release.  As will be shown later in the report, it is these people who are most likely to be housed in those restricted populations for substantial periods of time that are the subjects of the litigation.

The attributes of the jail population as of September 8, 2019 are summarized in Table 3. On that date, the population was 2,442  with the vast majority of the inmates being male (91%), Black (48%), with an average age of 35 (lowest age of 18 years and maximum of 85 years). Overall this population had been in custody *thus far* an average of 198 days with males and Hispanics having a longer average LOS to date.

4

**Table 2.  Alameda County Jail Releases**
**September 1, 2018 to August 31, 2019**

| Release Reason | Average LOS (Days) | Releases | Estimated ADP |
|---|---|---|---|
| Total | 30 days | 22,471 | 1,874 inmates |
| State Prison Term Prescribed | 420 | 398 | 457 |
| Picked Up Out of Agency | 60 | 2,125 | 349 |
| Released (Un-coded Reason) | 66 | 1,168 | 213 |
| Probation (Formal) | 57 | 1,331 | 209 |
| No Complaint Filed | 17 | 3,460 | 158 |
| Time Served | 72 | 913 | 148 |
| Dismissed | 68 | 670 | 125 |
| Own Recognizance | 17 | 1,383 | 65 |
| Bail | 4 | 3,660 | 40 |
| Own Recognizance to Program | 101 | 122 | 34 |
| Citation in Jail After Booking | 2 | 6,471 | 33 |
| Ordered Released | 19 | 459 | 24 |
| Released Probation Terminated | 82 | 60 | 13 |
| Event Booked in Error | 23 | 153 | 9 |
| Died While in Custody | 200 | 2 | 1 |
| Other | 1 | 95 | 0 |

Table 4 shows the current classification status of the jail population and their associated average LOS to date.  About 60% are in the general population while 40% are in some type of restrictive status which is a relatively high percent.  By restricted housing I mean inmates who are unable to be placed in the general population.  These are commonly defined in any jail or prison classification system to include protective custody, administrative segregation, disciplinary segregation, acute, sub-acute and step down mental health units, and medical care (infirmary, disability) housing units.  The general population designations are restricted only by the assessed classification custody levels.

The largest restricted populations are people assigned to Protective Custody (PC), Administrative Separation, Mental Health, and the segregated Sureno Gang statuses. While constituting a small percent of the jail population the Max-Separation inmates have a very long average LOS to date (over 400 days).  Within the general population there is a progressive increase in the average LOS as one moves up the three classification levels as one would expect in a classification system that is heavily driven by the inmate's current offense(s) and prior record.

**Table 3. Attributes of the Alameda County Jail Population
September 8, 2019**

| Attribute | Inmates | % | LOS to Date (days) |
|---|---|---|---|
| Total | 2,442 | 100% | 198 |
| Gender | | | |
| Male | 2,220 | 91% | 205 |
| Female | 118 | 5% | 118 |
| Race | | | |
| Black | 1170 | 48% | 199 |
| White | 383 | 16% | 150 |
| Hispanic | 675 | 28% | 236 |
| Age | Min = 18 | Ave. 35 | Max = 85 |

**Table 4. Current Jail Population as of September 8, 2019**

| Class Level | Inmates | % | LOS to Date (days) |
|---|---|---|---|
| Unclassified | 31 | 1% | 264 |
| General Population | 1,432 | 59% | 174 |
| Max | 651 | 27% | 291 |
| Medium | 232 | 10% | 93 |
| Minimum | 549 | 23% | 69 |
| Restricted | 957 | 40% | 227 |
| Protective Custody | 305 | 13% | 262 |
| Ad Sep | 286 | 12% | 247 |
| Max-Sep | 57 | 2% | 442 |
| Mental Health | 237 | 10% | 88 |
| Sureno Gang | 51 | 2% | 402 |
| Border Brothers Gang | 21 | 1% | 234 |
| Total | 2,420 | 100% | 198 |

Table 5 provides even a more detailed breakdown of the various classification populations for both the June 7 and September 8 snapshot data files along with their average LOS to date. Of note there are 23 discrete categories many of which are linked to the time in each status. This is

**Table 5. Current Classification Levels and Average LOS to Date**
**June 7, 2019 and September 8, 2019**

| Classification | June 7, 2019 LOS | June 7, 2019 Inmates | September 8, 2019 LOS | September 8, 2019 Inmates |
|---|---|---|---|---|
| Unclassified | 74.7 | 170 | 263.9 | 31 |
| General Population | | | | |
| Max | 309.6 | 613 | 291.2 | 651 |
| Medium | 121.7 | 192 | 92.9 | 232 |
| Minimum | 87.9 | 422 | 69.3 | 549 |
| Restricted Populations | | | | |
| Ad Sep | 471.7 | 92 | 409.2 | 130 |
| Ad Sep 7 Day | 151.1 | 140 | 127.6 | 133 |
| Ad Sep 72 Hr. | 102.0 | 3 | 25.7 | 23 |
| Max Sep | 718.9 | 19 | 630.9 | 31 |
| Max Sep 7 Day | 263.9 | 23 | 224.5 | 25 |
| Max Sep 72 Hr. | 201.0 | 2 | 0.2 | 1 |
| Mental Max | 156.8 | 97 | 119.0 | 116 |
| Mental Med | 137.0 | 37 | 55.4 | 53 |
| Mental Min | 94.2 | 54 | 59.8 | 68 |
| P/C Max | 477.4 | 89 | 424.5 | 96 |
| P/C Max 14 Day | 63.9 | 14 | 50.2 | 9 |
| P/C Max 72 Hr. | 20.5 | 2 | 1.4 | 5 |
| P/C Med | 280.8 | 78 | 291.2 | 79 |
| P/C Med 14 Day | 18.1 | 14 | 44.9 | 9 |
| P/C Mental | 246.2 | 22 | 200.1 | 28 |
| P/C Mental 14 Day | 64.8 | 6 | 32.3 | 6 |
| P/C Min | 222.0 | 36 | 184.3 | 50 |
| P/C Min 14 Day | 47.8 | 12 | 22.0 | 14 |
| P/C Med 72 Hr. | N/A | N/A | 0.8 | 2 |
| P/C Mental 72 Hr. | N/A | N/A | 2.5 | 4 |
| P/C Min 72 Hr. | 2.7 | 3 | 2.7 | 3 |
| Sureno | 339.9 | 56 | 402.4 | 51 |
| Border Brothers | 292.8 | 19 | 233.7 | 21 |
| Civil | 8.0 | 1 | 107.4 | 2 |
| Total | 215.9 | 2213 | 198.1 | 2422 |

purposely done by the ACSO to make sure there is a timely review of those who were recently assigned to a restricted status are reviewed again within 3-7 days to verify that the status is valid.

On both snapshot dates, inmates assigned to Administrative Separation, Max Separation, Protective Custody Max, and the segregated Sureno gang unit have significantly longer lengths of stay (well over a year in custody to date).

The country also provided the number of assaults occurring the jail over a 13-month period from June 2018 thru June 2019.  A total of 297 assaults were recorded which computes to an annual assault rate of 12 per 100 inmate population.  This rate is within the range one typically sees in a local jail or state prison system.

In terms of jail mortalities, there were 19 mortalities reported by the ACSO between January 1, 2017 and October 2019.  This computes to a mortality rate of .56 per month or 6.7 per year. Based on an average jail population of approximately 2,300, the annual mortality rate per 100,000 inmate population is 292 which compares to the national jail mortality rate of 137 per 100,000 (Bureau of Justice Statistics. 2016. *Mortality in Local Jails, 2000-2014 - Statistical Tables*, Washington, DC: BJS, DOJ). Caution must be made in interpreting any metrics with such low base rates as they can fluctuate significantly from year to year.  Nonetheless the ACSO rate is about twice the national rate.

**The Classification System**

There are a number of positive attributes regarding the current inmate classification system which can be summarized as follows:

1. There are detailed policies that determine how the system functions;

2. There are dedicated classification deputies who are well trained in the current classification process;

3. All inmates are interviewed by the classification staff within 72 hours of booking to determine the inmate's initial classification level;

4. The factors used to assess an inmate's classification level are those used in other jail classification systems;

5. The classification level can be changed and over-ridded by the Deputy Classification officer with the approval of a supervisor (Sgt. or higher level);

6. There is a PREA assessment process that seeks to determine the inmate's risk for sexual assault or being a possible predator;

7. There is a detailed housing plan that is being adhered to by ACSO with no inter-pod transfers being allowed without approval of the Classification Unit; and,

8. There is good documentation on the basis for inmate transfers and changes in the inmate's classification level.

There are some aspects of the current system that need to be addressed. These can be summarized as follows:

1. The scoring system is an antiquated process that was developed by the data system vendor and does not meet industry standards as promulgated by the National Institute of Corrections Jail Center in areas as described below.

2. The scoring process is a series of "yes" and "no" questions that are used by Classification Deputies to determine the classification level (minimum, medium and maximum) using their review of the current offense, prior record and other factors. Acceptable classification systems generally use an additive point system that computes a total point score and is then scaled to three classification levels (also minimum, medium and maximum). The one exception to the additive point system is the decision tree model of which the NIC has not formally endorsed and can only be used with the permission of its developer Northpointe.

3. A major part of the NIC jail classification system is a range of over-rides (discretionary and non-discretionary) factors that can be used to alter the classification designation. Under the ACSO system there is no formal set of over-ride reasons.

4. There is no formal re-classification system for all inmates. The Minimum Jail Standards 1050 states that an inmate may request a review of his/her status if sentenced to more than 60 days, and that such requests are to be honored every 30 days. There should be a proactive policy that requires a reclassification review every 60 days for all inmates with a formal interview with the inmate.

5. There is not a reclassification scoring form that allows the inmate's classification level to be adjusted based on the inmate's conduct the past 60 days.

6. There should be tighter controls on the intra-unit cell transfers. Inmates cannot be transferred from one pod to another unless approved by the Classification Unit but deputies assigned to the pod can make cell transfers. They should not be allowed to make such transfers unless there is an emergency and only to temporally place an inmate in an unoccupied cell.

**Restricted Housing Placements**

As noted above and compared to most jails, there is a large percentage of the inmate population in non-general population status. In particular, the percentages in the administrative segregation and protective custody statuses are high. The 10% assigned to one of three mental health statuses seems high if these inmates reflect acute and sub-acute SMI status. There does not appear to be a stepdown program for the mental health populations.

The process for being admitted and released from these statuses is controlled by the Classification Unit. It seems to be a somewhat informal process in terms of the criteria and process for admitting and releasing a person from restricted housing. The primary method for ensuring proper assignment to and release from restricted housing is a system of checks and balances among the staff assigned to the classification unit.

To better assess this population 35 inmates assigned to these units were randomly selected off of the September 8, 2019 snapshot data file. An attempt was made to interview each person who were in custody as the time of the September 11-12, 2019 site visit. Of the 35 inmates selected 25 were interviewed. The ten that were not interviewed were either no longer in custody or declined to be interviewed.

In the general the following trends emerged from these interviews separated by the Mental Health/PC and Max-Separation Units:

*Administrative Separation Interviews*

1. Most stated they had voluntarily requested placement in the restricted unit and needed protection from other inmates;

2. All of them were either getting out of their cells every other day (per ACSO policy) or at least being offered the opportunity to do so;

3. All were on some type of psychotropic drugs due to their diagnosed mental illness(es);

4. None stated that they were receiving regular non-medication treatment services (e.g., counseling, structured recreation therapy, etc.);

5. Most have been incarcerated either in the ACSO jail system or another county jail/state prison time before but were not placed in restricted housing;

6. Most have good conduct records while assigned to the restricted unit (e.g., no major disciplinary incidents, no complaints from staff, etc.);

*Protective Custody Interviews*

7.  Most were voluntary commitments meaning that they had initiated the request and was approved by the Classification unit;

8.  A large percentage were on psychotropic drugs prescribed by the psychiatrist who visit the unit on a weekly basis; and,

9.  None on such medication or assigned to the mental health units were receiving structured non-medication mental health treatment.

*Max-Separation Interviews*

10. There are a wide variety of reasons for placement in this status such as protection due to bad debts with other inmates, inmates desiring to drop-out of a gang, being a high-profile inmates due to nature of crime or law enforcement officials, and fights with other inmates;

11. As noted above, most have been incarcerated at the ACSO jail, other county jail systems or state prison but did not require restricted housing;

12. All had good conduct records since being assigned to the Max-Sep units;

13. They are receiving daily and long amounts of out of cell time;

14. There are very few programs being made available to them except for the GED program;

15. None have major or minor mental health issues; and,

16. All wanted to remain in the unit but want enhance privileges which would in effect make it a general population environment.

*PC-Max Interviews*

17. These inmates need protection from other inmates for variety of security issues such as conviction of a sex crime, prior gang involvement, snitch or sexual orientation;

18. As noted above, most have been incarcerated at the ACSO jail, other county jail systems or state prison but did not require restricted housing;

19. All but a few were double celled;

20. All had good conduct records; and,

21. None reported having major mental health issues.

**Other Observations**

During the course of the two site visits, there were other observations that are relevant to this assessment. First, was the lack of security staff in the units visited. Generally, there was only one officer in the unit which precluded the ability to escort inmates to and from program areas or other out of cell activities as needed.

Second, there were few if any structured activities taking place in the units during the visits to the restricted housing units. The restricted housing units are designed so that a single deputy can visually observed inmate conduct in each internal pad but it was rarely Collectively these observations suggest a chronic shortage of security staff.

Third, on one site visit there was one inmate who had been held in a temporary isolation cell for what appeared to have been for several weeks. While the cell-check log had been properly completed for the past few days, it was clear that staff had not taken the opportunity to actually open the cell to verify the mental health and medical status of the inmate. While this may be an isolated incident, it is concerning that it even existed.

Finally, one of the inmates who had been transferred from the general population to protective custody due to his sexual orientation had, in my opinion, manipulated the ASCO classification staff to arrange a questionable cell transfer. Staff expressed the frustration that they feel they have no legal basis to deny any inmate request to be transferred to PC and/or a request for a cell transfer.

**Summary of Recommendations**

1. Design and implement a formal reclassification instrument and policies so that all inmates are formally interviewed and re-classed every 60 days;

2. Develop a formal process for the admission, review and release of inmates to and from the various restricted housing units;

3. The restricted housing process would include sufficient due process and transparency so the inmate would have a written basis for the admission, conditions of confinement in the unit, a 30 day review process, and the basis for release to the general population;

4. If a policy does not exist that does not permit Housing Unit Deputies to make cell changes without the approval of the classification unit, one should be developed and implemented.

12

5.  Replace the antiquated classification scoring system with an updated additive point system that mirrors the requirements of the NIC Objective Jail Classification system;

6.  Develop a re-entry process for those inmates who are SMI and have spent a significant amount of time in restricted housing.[2] Such a process would ensure a referral is made to a community based behavioral health provider and that the continuation of psychotropic medication can continue. The process would require the ACSO to daily develop a list of people who are on the mental health caseload and are about to be released in the next 12-36 hours and ensure there is a smooth transition to community based behavioral health providers.

7.  Develop a tighter policy on Protective Custody that discourages the manipulation of inmates to seek PC status when in fact it is not required.  In particular, implement a procedure to release such inmates to certain general population units on a controlled basis.

8.  It appears there are insufficient custody staff to adequately supervise and escort inmates to needed services within and outside of the housing units. It's beyond the scope of this assignment to specify how many staff are required but such a staffing study should be completed.

9.  If it is found that more staff (both custody and behavioral health) are required, one option other than trying to fund, recruit and retain additional staff is to develop a strategic plan to lower the jail population and close further housing units so that existing staff will be sufficient.[3]

10. Further reductions in the jail population could be achieved (as it has in several large jails such as New York City, Cook County, Philadelphia, and Lucas County) by implementing a of administrative reforms (reducing court continuances) for detained defendants, greater use of split sentencing, and usage of the milestone credits for sentenced inmates.[4] The

---

[2] Defendant's counsel has objected to this recommendation stating that is beyond my scope of evaluating the jail classification system. Plaintiff's counsel has objected to the Defendant's counsel objection. In my experience, the process by which inmates are released from restricted housing units to the community is part of the formal classification system.

[3] Defendant's counsel has objected to this recommendation stating that is beyond my scope of evaluating the jail classification system. Plaintiff's counsel has objected to the Defendant's counsel objection. In my experience, the lack of security staff adversely impacts the ability of the classification system to function properly. Specifically, the housing which is a key part of the classification system details privileges, out of cell time, and access to programs that are commensurate with the inmate's classification designation. An inability to deliver such services and privileges on a consistent basis will adversely impact the overall classification system.

[4] Defendant's counsel has objected to this recommendation stating that is beyond my scope of evaluating the jail classification system. Plaintiff's counsel has objected to the Defendant's counsel objection. In my experience, safely reducing a jail population will have a positive impact on a jail system in terms of staff, inmate and public safety.  This is especially true in a jail system such as Alameda where staff shortages and the availability of mental health, rehabilitative and structured recreational services for the restricted housing populations exist.

Appendix contains several concrete ideas that have been successfully implemented in other large jails that would serve to safely lower the ACSO jail population.

**Appendix – Suggestions for Safely Reducing Jail Populations**

*A.  Enhanced Sheriff Screening/Risk and Referral Capability*

This recommendation would create a dedicated position (Jail Population Navigator (JPN) or Jail Population Manager (JPM)) within the Sheriff's Department whose sole function is to daily screen the current jail population for inmates who a) should be released to the community under the Sheriff's supervision and b) pretrial defendants whose LOS, offenses, and risk assessment indicate immediate action(s) by the court to dispose of the pending charges.

In addition to the creating the position, there are a number of technical requirements. First, there needs to be a daily Inmate Census Report (ICR) written in excel that contains the same information that were produced by the Sheriff for this report. The programming work has already been accomplished so the only remaining task would be to institutionalize the process.

Second, the person assigned to this position must have or needs to develop analytic skills so that a number of complicated filters can be applied to the daily ICR. This will produce an interactive dashboard capability that can be applied to one of the commonly available dashboard applications like MS Power BI.

For example, one can now identify those inmates currently incarcerated who meet the following conditions:

1. Are assigned to minimum security;
2. Are charged with non-violent crimes;
3. Are eligible for 10% bond;
4. Are in pretrial status; and
5. Have been in custody for 7 days or more.

This final point underscores the need to address the issue of unnecessary court delays for case processing for people who are in pretrial status.   Such excessive delays are often linked to unnecessary use of continuances by both the defense counsel and the prosecutors. It is possible to further enhance the analytic capabilities of the JPN to measure the number of court appearances that have occurred thus far for these defendants.

*B.  Develop a Supervised Release Program (SPR) for Felony Defendants*

This concept was rigorously tested by the U.S. Department of Justice in an experimental field study in three jurisdictions (Austin et al., 1985)  that showed people charged with felony level crimes and who have not been released within 3-7 days of booking had significantly lower re-

arrest and FTA rates than defendants released on bails or non-supervised own recognizance (OR).[5]

There are two major benefits to his recommendation.  First, the SPR would focus more directly on defendants who are suitable for release but are spending excessive periods in pretrial detention status. This is achieved by focusing on defendants who have been charged with felony level crimes, are eligible for bail, but have been unable to secure release within the first 3-7 days of booking.

The second benefit is that these defendants would be supervised by the Alameda County Probation Department (ACPD) which already has an effective supervision capability.  ACPD can also tap into its texting and the EMU capabilities to provide that form of supervision to the SPR caseload. It should be noted that expanding EMU has been a very successful component in other large jails such as Lucas County (Ohio), Cook-Chicago and Clark-Las Vegas. The research is clear that EMU reduces recidivism rates and costs of incarceration for pretrial defendants and sentenced offenders.[6]

C.  *Expedite Case Processing for Detained Defendants*

While not under the control of the Sheriff, the courts could implement case processing reforms that would reduce the number of unnecessary and lengthy court continuances.  Other jurisdictions have found that these events are a major driver of their pretrial populations.  In Cook County dropped its jail population from 8,346 to 5,744 by to expanding EMU, requiring bail to be set at a level that is affordable to defendants, and reducing the number of continuances (see following page). Significantly it was the number of continuances requested by Judges that were reduced.  Some suggestions for reducing unnecessary continuances would be as follows:

1.  The request for a continuance must be submitted in writing to the court at least 24 hours prior to the scheduled court appearance;
2.  Prosecution, Defense, and the Court would be allocated one continuance after charges have been filed;
3.  The continuance request can only be submitted for the following three reasons:
    a. Discovery issue
    b. Availability of witness(es)
    c. Conflict of representation;
4.  If granted, the continuance shall only be for 14 calendar days; and,
5.  Additional continuances will only be granted if the defendant is no longer in pretrial detention.

---

[5] Austin, James, Barry Krisberg, and Paul Litsky. *The Effectiveness of Supervised Pretrial Release.* October 1, 1985. Crime and Delinquency: https://doi.org/10.1177/0011128785031004004

[6] https://www.wsipp.wa.gov/BenefitCost?topicId=2

| Minimizing Delays in Case Processing by Limiting Continuances | Theme: **Capacity & Efficiency** |
|---|---|
| Indicator 3.5 | Topic 3: Timeliness of Case Processing |

| How it's measured | Average number of continuances in disposed felony cases |
|---|---|
| Data elements needed | 1. Continuance granted<br>2. Party requesting continuance<br>3. Date of continuance request |
| Frequency | Quarterly |
| Rationale for measuring this indicator | Continuances extend the time to case disposition and should be used sparingly because of possible negative effects to the defendant and to limited prosecutorial resources. |

**RESULTS**                                        **Cook County, Illinois**

January 1, 2017– December 31, 2018

### Description of the results

The average number of continuances in felony cases decreased steadily over the 30-month period, from roughly 4 continuances per case disposed in Quarter 1 of 2017 to 2.5 continuances per case disposed in Quarter 2 of 2019. The large majority of continuances (roughly 76%) were requested by the court; however, the number of such continuance decreased over the 30-month period. The number of continuances requested by the prosecutor or defense remained steady during the 30-month period, with prosecutors granted slightly more continuances than defense attorneys.



**Total Number of Continuances in Disposed Felony Cases**

### What we found

There was a clear downward trend in the total number of continuances requested and the number of continuances requested by the court during the 30-month period examined; the number of continuances requested by the prosecutor or defense remained stable.

17