| | |
|---|---|
| Gregory B. Thomas (SBN 239870)<br>E-mail: gthomas@bwslaw.com<br>Temitayo O. Peters (SBN 309913)<br>E-mail: tpeters@bwslaw.com<br>BURKE, WILLIAMS & SORENSEN, LLP<br>1901 Harrison Street, Suite 900<br>Oakland, CA 94612-3501<br>Tel: 510.273-8780 Fax: 510.839.9104<br><br>Paul B. Mello (SBN 179755)<br>E-mail: pmello@hansonbridgett.com<br>Samantha D. Wolff (SBN 240280)<br>E-Mail: swolff@hansonbridgett.com<br>HANSON BRIDGETT LLP<br>425 Market Street, 26th Floor<br>San Francisco, California 94105<br>Telephone: (415) 777-3200<br>Facsimile: (415) 541-9366<br><br>Attorneys for Defendants<br>COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; KARYN TRIBBLE in her official capacity as Director of the Alameda County Behavioral Health Care Services Agency; | JEFFREY L. BORNSTEIN – 099358<br>ERNEST GALVAN – 196065<br>KARA J. JANSSEN – 274762<br>REKHA ARULANANTHAM - 317995<br>ROSEN BIEN GALVAN & GRUNFELD LLP<br>101 Mission Street, Sixth Floor<br>San Francisco, California 94105-1738<br>Telephone: (415) 433-6830<br>Facsimile: (415) 433-7104<br>Email:  jbornstein@rbgg.com<br>         egalvan@rbgg.com<br>         kjanssen@rbgg.com<br>         rarulanantham@rbgg.com<br><br>Attorneys for Plaintiffs |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNESBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated,<br><br>Plaintiffs, | Case No. 5:18-CV-07677<br><br>**JOINT STATEMENT RE PANDEMIC RESPONSE**<br><br>Judge: Hon. Nathanael Cousins<br>Date: July 31, 2020<br>Time: 09:00 am<br>Crtrm.: Telephonic |

|   |   |
|---|---|
| v. | |
| COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; KARYN TRIBBLE in her official capacity as Director of the Alameda County Behavioral Health Care Services Agency; and DOES 1 to 20, inclusive,, | |
| Defendants. | |

After the status hearing of July 17, 2010, the Court directed the parties to meet and confer on the topics listed below and to provide a status update by July 29, 2020:

1. Transportation plans for inmates to and from court.

2. Continued consultation with the Alameda County Public Health Department, particularly regarding testing.

3. The percent turnover of the jail's population, particularly relative to aggregate testing; that is, what percentage of the current population has been tested given that the human population of the jail does not remain constant even if the total number of inmates remains somewhat stable.

4. Procedures for inmates who refuse tests; whether these inmates are mixed with those who test negative.

5. Confirmation that all new books are quarantined after intake.

6. Any updates on Defendants' proposed policy changes, including more mask access for inmates, counseling by Adult Forensic Behavioral Health, and enhanced staff discipline policies to ensure mask compliance.

7. Contact tracing results and any other explanation for the current spike in cases.

8. Any updated findings or recommendations from expert Mike Brady.

9. Whether a decrease in the total jail population would mitigate the increased risks of COVID-19 inherent in the custodial setting.

**1.     Transportation plans for inmates to and from court.**

On July 24, 2020, Defense counsel provided Plaintiffs' counsel with a copy of a Memorandum dated June 2, 2020, titled "Covid 19 Transportation Plan."  A copy is attached to this statement as **Exhibit 1.**  Defense counsel represents that neutral expert Mike Brady reviewed and approved the plan.  The plan restricts transport van occupancy to three incarcerated persons, and states that "for larger transport vehicles, deputies will load inmates to allow for social distancing."

The plan designates transport trucks and procedures according color-coded medical classifications:  Green, Orange Yellow and Red.[1]  For Green and Orange transports, the procedure refers to trucks with 2-person and 9-person compartments, and provides for one person in a 2-person compartment, and 2 persons in a 9-person compartment.

For county-court transportation of persons currently in 14-day new-book observation, the procedure provides for one person per compartment of any size.

---

[1] From a Wellpath PowerPoint dated June 1, 2020, the color codes are:
- ❖ Green:  No symptoms, no known contact with persons with Covid-like symptoms.
- ❖ Orange: No symptoms, but high risk (aged 65 or older, diabetic over 50, heart disease, lung disease, kidney disease, immunosuppresive medications, AIDs, etc.).
- ❖ Yellow: No symptoms, but known contact with Covid-19 patient or patient suspected of Covid-like symptoms, or personal history of high risk travel.
- ❖ Red:  Covid-19 symptoms or known Covid-19 positive test.

For federal court transportation of persons currently in 14-day new-book observation, the plan requires deputies to determine the date the person arrived at SRJ. People who arrived on the same day transport together; people arrived on different days transport separately, one person per van.

For Yellow transports, deputies are to use a 7-compartment "Ambu truck" with 2 separate wheelchair lift compartments, one person per compartment. For "mass transport," deputies are to use a larger truck with 14 compartments. Red transport is the same as Yellow except that "if logistically possible," each Red person will be transported in a separate vehicle. If more than one Red inmate must be transported in the same vehicle, "Covid-19 positives will be transported with other Covid-19 positives."

The plan also provides that dayshift deputies are to disinfect all vehicles before inmates board them, and again after inmates de-board them, and at change of shift.

Plaintiffs' counsel reserves comment on the plan pending our clients' experience with its actual implementation.

Defendants' Response

The transportation plan has been reviewed and approved by the Alameda County Public Health Department (ACPHD) and joint expert Mike Brady.

**2.    Continued consultation with the Alameda County Public Health Department, particularly regarding testing.**

Defendants' Response

In connection with the COVID-19 response at Santa Rita Jail, ACPHD guidance has adhered to CDC guidelines for correctional facilities and ACPHD has closely reviewed

other CDC publications such as Morbidity and Mortality Weekly Reports to identify the most up-to-date information on COVID-19 that may be relevant to congregate settings, such as correctional facilities. ACPHD continually reviews testing data in connection with the public health response and as part of an investigation to guide public health interventions and recommendations.

At present, the data suggest that there is not widespread transmission of COVID-19 at Santa Rita Jail. Based on a review of the data, the recent increase in COVID-19 cases has primarily been detected in two housing units (HU 22 and HU 25). Most recently, ACPHD has recommended several changes to existing testing policies at Santa Rita Jail, all of which have been implemented and included in the COVID-19 Outbreak Control Plan (updated on July 27.)

First, in addition to a single test within 48 hours of intake, ACPHD has recommended that ACSO also offer new books a test at the 10th day after intake, before being released from intake quarantine. Second, ACPHD has recommended either serial "point prevalence surveys[2]" be conducted in any housing unit where an inmate or staff member has tested positive or repeat testing every 7 days among those who are quarantined and initially tested negative. Third, ACPHD has recommended that ACSO offer testing on release for any inmates whose release dates is known in advance.

/ / /

---

[2] A data collection tool used to identify the number of people with a disease or condition at a specific point in time.

Plaintiffs Response:

While this is an improvement, it still does not go far enough. Were all of the previously positive inmates who were tested and found to Covid positive retested and found to be negative? We also believe that Public Health does not appreciate that the jail setting is one of the most dangerous congregate settings in the County, along with nursing homes, and therefore needs to be monitored, inspected and attended to more proactively. This can and should include more testing and more efforts to reduce the jail's population whenever possible.

**3. The percent turnover of the jail's population, particularly relative to aggregate testing; that is, what percentage of the current population has been tested given that the human population of the jail does not remain constant even if the total number of inmates remains somewhat stable.**

Defendants' Response

Defendants understand the court's question. However, because of the way in which testing data is compiled and the manner in which the daily COVID-19 line list is maintained, Defendants will require more time to answer the court's precise question if the following data is insufficient to satisfy the court's inquiry. Out of a total of 2242 tests taken as of July 27, there were a total of 129 duplicate patients. Therefore, as of July 27, 2113 individual inmate-patients have taken COVID-19 tests since the beginning of the pandemic. If the court desires, Defendants can create a snapshot from a specific date to give the court accurate testing percentages at a discrete point in time, but will need additional time to do so.

/ / /

/ / /

Plaintiffs Response:

We are trying to understand what percentage of people housed in jail during the pandemic have actually been tested for Covid. The baseline is not the current population, but the number of people who have flowed through the jail. The ACSO should have current figures on monthly bookings to determine the number of unique individuals who have been housed in the jail since the pandemic started. We can make an estimate based on the monthly booking figures reported on the Board of State and Community Corrections.[3] That dashboard reports 2,421 bookings in March 2020. We do not know if these numbers refer to unique individuals, or whether there are some repeat bookings in that figure. Discounting the number to 2,000 to allow for repeat bookings and the impact of the zero-bail rule, and multiplying by five to account for each month from March through July inclusive yields 10,000 individuals. Taking the test number above of 2,113 as the numerator and 10,000 unique bookings as the denominator yields a testing percentage of 21.1%. As noted, this is an estimate based on March 2020 total bookings; the actual figures are likely different. The testing rate is too low given the risks inherent in the jail population, and the fact that ACSO represents it is testing all new books.

**4.     Procedures for inmates who refuse tests; whether these inmates are mixed with those who test negative.**

Plaintiffs' counsel has raised the issue of whether persons who refuse the new-book tests are mixed with new books who are tested during the 14-day new-book observation

---

[3] https://public.tableau.com/profile/kstevens#!/vizhome/ACJROctober2013/About

quarantine. The issue is that a person with the virus who is not tested could infect one of the tested persons during the new-book quarantine, and that by the time the newly infected person develops symptoms they will be out of quarantine. This concern is ameliorated somewhat by adding the test at the 10th day of quarantine, which increases the chance of catching infections that pass from one person to another during quarantine. The problem of approximately 30% refusals is still something that creates an issue in the way in which people are quarantined.

<u>Defendants' Response</u>

ACPHD's guidance adheres to CDC guidelines for correctional facilities and has closely reviewed other CDC publications such as Morbidity and Mortality Weekly Reports to identify the most up-to-date information on COVID-19 that may be relevant to congregate settings, such as correctional facilities. ACPHD continually reviews testing data in connection with the public health response and as part of an investigation to guide public health interventions and recommendations. ACPHD has recently recommended and ACSO has implemented additional intake quarantine testing. All inmates will be offered testing within the first 48 hours and then again at the tenth day of the intake quarantine.

With regard to refusals, inmates who refuse testing during their intake quarantine are still quarantined and monitored for the full fourteen days before being assigned to a housing unit.

After inmates complete intake quarantine, they are assigned to a housing unit/pod. Should that assigned housing unit/pod be for any reason, for example after presentation of a COVID-19-positive inmate, the entire housing unit/pod is offered testing on days 7-10 of the quarantine in accordance with the COVID-19 Outbreak Control Plan. For inmates who

refuse such testing, Wellpath offers them additional testing on two successive days. Symptomatic inmates who refuse testing are treated as presumptively positive and are medically isolated per the COVID-19 Outbreak Control Plan.

Overall, the refusal rate for intake testing has been about 27% according to Wellpath.   The refusal rate for testing in quarantined units has varied from unit to unit.  For the most recent housing units in which such testing was conducted - HU 22 and 25 - there were zero refusals (also according to Wellpath). However, previous testing in HU9 and 34 had higher rates of refusal.   Wellpath is using the same personnel to conduct testing and believes this continuity has been effective in minimizing refusals.

**5.     Confirmation that all new books are quarantined after intake.**

Plaintiffs' counsel has received some complaints about persons arriving in Housing Unit 3 without first going to through new book quarantine.  Counsel for both parties discussed this issue during a telephone conference on July 24, 2020.  Defense counsel asked for the names of the persons complaining which Plaintiffs' counsel had not received from the CJA attorneys who reported the complaint.

<u>Defendants' Response</u>

All newly booked inmates are quarantined for fourteen days.  Defendants are unaware of any facts to indicate that this policy is not being followed.

**6.     Any updates on Defendants' proposed policy changes, including more mask access for inmates, counseling by Adult Forensic Behavioral Health, and enhanced staff discipline policies to ensure mask compliance.**

<u>Defendants' Response</u>

In addition to the public health interventions addressed above, on July 24, ACSO

implemented a new policy requiring inmates to wear masks anytime they are outside of their cells and/or dormitories, absent any contraindicating medical factors. ACSO was an early adopter of masking policies for inmates and has always provided and strongly encouraged inmates to wear masks. Now ACSO, by policy, is requiring inmates to wear masks as one of the single most effective tools to prevent the spread of COVID-19. ACPHD has reviewed that this new masking policy is grounded in scientific data and validated by many evolving studies. A secondary study supporting this new policy was recently published by CDC entitled "Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy — Springfield, Missouri, May 2020." (Link: https://www.cdc.gov/mmwr/volumes/69/wr/mm6928e2.htm.) ACSO has also prepared an updated educational video for all inmates to explain this new masking policy.

Next, ACSO has enhanced its discipline policy for staff members to maximize compliance with ACSO's policy of requiring staff to wear masks at SRJ.

In addition, AFBH continues to counsel its clients regarding safe practices including good hygiene, wearing masks, and how to cope with anxiety related to COVID-19.

Finally, ACSO has agreed to random, unannounced spot checks of compliance with COVID-19 policies and procedures by joint expert Mike Brady.

/ / /

/ / /

/ / /

/ / /

**7.     Contact tracing results and any other explanation for the current spike in cases.**

Defendants' Response

Based on ACPHD's review with respect to Housing Unit 25, there appears to have been transmission in the kitchen among inmates and staff. Transmission likely occurred on more than one date. The first case detected in the kitchen occurred among a staff member. It is likely that some inmates who worked in the kitchen then spread COVID-19 within Housing Unit 25

For Housing Unit 22, a total of 56 inmates were COVID-19 positive; 49 were booked prior to intake testing, and 7 inmates came into Santa Rita Jail after intake testing was implemented. One of the 7 inmates who was COVID-19-positive and was booked after the time period when intake testing was in place did go through the Intake Transfer and Release area of SRJ during the time period when there was an outbreak among staff. Based on indirect evidence, ACPHD believes an epidemiologically possible/plausible explanation for the increase in cases in Housing Unit 22 is that the inmate mentioned above, or other inmates who came in after the time period when intake testing was implemented, may have gone through intake screening and have been exposed to a person with COVID-19 just prior to entry into the jail or in the jail. These persons may have tested negative on intake testing and completed quarantine, but could have later developed asymptomatic COVID-19 and then spread to other inmates upon entry to Housing Unit 22. This is based on indirect evidence, but ACPHD believes it is an epidemiologically possible/plausible explanation for the increase in cases in Housing Unit 22. ACPHD cannot definitively state that this is the only reason why there was an increase in cases in

Housing Unit 22. While there is no definitive evidence to suggest that this inmate was exposed to an infected staff member, this is also a possibility. ACPHD has modified its testing recommendations to ensure testing occurs on day 2 and day 10 after intake.

**8.     Any updated findings or recommendations from expert Mike Brady.**

The parties exchanged emails regarding Mr. Brady's recommendations to Public Health during the week of July 13. One of Mr. Brady's recommendations was to add testing at the 10th day of the new-book quarantine. That question appears to have been addressed now.

Mr. Brady also raised questions about mixing female new books with Orange patients and general population/protective custody inmates. He also raised the issue of all of female inmates sharing the Pod program area without cleaning between groups. Plaintiffs' counsel is not aware of how this issue has been resolved.

Mr. Brady also raised the question of using dormitories for new-book quarantine, and recommended that such practices stop—that all quarantine be limited to celled units. The ACPHD agreed that "inmates who have not completed the 14-day quarantine period should not be placed in the general population or dormitory setting." The ACSO stated that new books are primarily quarantined in HU 22, 23 and 21 for women, and that classification was working on a plan to discontinue intake quarantines in HU 35, a dorm unit. Plaintiffs' counsel does not yet know whether this has been completed.

<u>Defendants' Response</u>

Defendants advised Mr. Brady on July 15 that all newly booked females are housed based on the inmate security classification, their respective medical classification, and cohort. Newly booked inmates (both males and females) are housed in one of the

designated intake units, i.e., HU 21, 22, 23, or one of the units specially designated for COVID-19-positive or suspected COVID-19-positive inmates. Currently, intake units house green and orange inmates. These inmates are housed in cells and precautionary measures are taken to prevent mixing of security/medical classifications.  If an exigent circumstance prevents an inmate from being housed in one of the aforementioned units, then an inmate may be place in an Administrative Separation unit, which may house orange inmates. Administrate Separation units are comprised of single/dual occupancy cells and separation is facilitated by the physical concrete walls of each pod. The classification protocol is uniformly applied in such circumstances.  ACSO plans to close HU 35 for intake quarantine purposes on Friday, July 31.

Defendants believe that all of Mr. Brady's questions have been answered.

**9. Whether a decrease in the total jail population would mitigate the increased risks of COVID-19 inherent in the custodial setting.**

<u>Plaintiffs' Response</u>

Plaintiffs' answer to this question is an unqualified "yes."  The jail population has been rising recently.  Before the pandemic it was approximately 2,500 persons.  It reached a nadir in April around 1,700 persons, but is now rising again to 1,900 persons.  In previous status updates, Plaintiffs' counsel has referred to the many calls of public health officials to get people out of jail settings to prevent outbreaks.  Some agencies, like the ACSO have taken some steps, but not nearly enough to prevent outbreaks of the type we are now seeing.  Plaintiffs urge all stakeholders, including local and federal prosecutors, to review their positions on pre-trial detention case-by-case.

For people serving sentences in the County jail, the ASCO should use its authority to release as many as possible. The state corrections department is dealing with its own massive outbreak, and has closed intake from the counties. This is likely contributing to the recent rises in ACSO population, as persons committed to CDCR cannot be transported there. Defense counsel rightly points out the public safety concerns with early release. At least for the persons committed to CDCR, their continued jail detention actually prolongs their confinement, as the credit earning statutes and regulations provide more good time and work time credits for persons who actually arrive at CDCR. The ACSO should take a second look at the release dates of committed inmates and adjust them based on the release dates they would have attained at CDCR. This would not be early release—this would be on-time release, and would create more space for medical isolation, quarantine, and social distancing. It would also prepare ACSO for the inevitable short-staffing that will come as more people call in sick due to Covid-19 symptoms or exposures .

Defendants' Response

At present, the data suggest that there is not widespread transmission of COVID-19 at Santa Rita Jail. Based on a review of the data, the recent increase in COVID-19 cases has primarily been detected in two housing units (HU 22 and HU 25). Most recently, ACPHD has recommended several changes to existing testing policies at Santa Rita Jail, all of which have been implemented and included in the COVID-19 Outbreak Control Plan (updated on July 27.)

In addition, it is worth noting that the jail's population is approximately 700 inmates lower than it was before the pandemic. Moreover, the jail presently has sufficient quarantine and isolation spaces to mitigate the effects of COVID-19. With regard to SRJ's

county inmate population, ACSO has cooperated and partnered with our criminal justice partners including the Alameda County Probation Department, Alameda County District Attorney's Office, Alameda County Public Defender's Office, and the Alameda County Superior Court to safely and significantly reduce the jail's population in light of the COVID-19 pandemic.  These efforts have not stopped.  As the Court may know, the Judicial Council of California approved Circulating Order 20-11, which repealed its previously issued statewide Emergency Bail Schedule as of June 20, 2020.  In light of this repeal, on June 16, 2020, the Superior Court of Alameda County ("Court"), in consultation with its justice partners and with the unanimous consent of its Judicial Executive Committee, adopted its own "zero bail" emergency bail schedule through amendments to emergency Local Rule 4.115.  The Court's amended emergency bail schedule incorporates the repealed statewide schedule into the emergency bail schedule previously adopted by the Court during this coronavirus crisis.  The Court also made related conforming amendments to emergency Local Rule 4.116, which permits bail requests pursuant to Penal Code section 1269c.  See http://www.alameda.courts.ca.gov/Resources/Documents/ExecOffice/COVID-19%20June%2016%20Press%20Release%20-FINAL.pdf.

/ / /

/ / /

/ / /

/ / /

/ / /

ACSO continues to remain confident that its COVID-19 policies and procedures make Santa Rita Jail a safe and humane environment for all inmates in custody.

DATED: July 29, 2020        Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Ernest Galvan*
     Ernest Galvan

Attorneys for Plaintiffs

DATED: July 29, 2020        BURKE, WILLIAMS & SORENSEN, LLP

By:  */s/ Gregory B. Thomas*
     Gregory B. Thomas

DATED: July 29, 2020        HANSON BRIDGETT, LLP

By:  */s/ Paul B.Mello*
     Paul B.Mello

Attorneys for Defendants

EXHIBIT 1

**Alameda County Sheriff's Office**

Santa Rita Jail
5325 Broder Boulevard, Dublin, CA 94568-3309

Gregory J. Ahern, Sheriff
Director of Emergency Services
Coroner - Marshal

# MEMORANDUM

DATE: June 3, 2020

TO: Yesenia Sanchez, Commander

FROM: Brian Barker, Lieutenant

VIA: Chain of Command

SUBJECT: **COVID 19 TRANSPORTATION PLAN**

Due to the Covid-19 pandemic, some safety precautions and a temporary transportation plan has been implemented in order to safely transport inmates to their destination(s). The designated transportation plan is as follows:

EXTERNAL TRANSPORTS

Inmates will be brought to ITR by ITR staff and staged in tanks designated by medical and custody classification. Transportation will have designated trucks to transport Green, Orange, Yellow and Red medically classed inmates. There will be signs in the windshield to differentiate between the different trucks. All inmates will be checked for any signs or symptoms of Covid-19 prior to transport in accordance with Centers for Disease and Control (CDC) guidelines. All inmates will be provided a mask and directed to wear it. ***Deputies will wear proper personal protective equipment (PPE) while transporting inmates according to the inmate's medical classification.*** No more than three inmates will be transported in the same transport *van*. For larger transport vehicles, deputies will load inmates to allow for social distancing.

1. Green Transports

    Inmates will be loaded according to their medical and security classification. Most trucks have twelve, two-man compartments and two nine-man compartments. One inmate will be placed in a two-man compartment to keep with the recommended six-foot "social distancing." Two inmates can be placed in the nine-man compartment for the same purpose. When trucks arrive at ECHOJ or return to SRJ, the appropriate signs will be displayed on the windshield identifying which medical classification is on board. Drivers will notify ITR or ECHOJ/JJC deputies the truck is ready to be off loaded. Deputies will minimally wear a mask and gloves.

2. Orange Transports

16594489.1

Inmates will be loaded and transported in the same manner as Green Transports.

3. Fourteen Day Observation New-Book Transports (HU23, 21B, & 22A)

   Inmates will be loaded one at a time. Only one inmate will occupy a compartment, regardless of the size of the compartment. At all times, inmates will be kept six feet apart to adhere to the "social distancing" guidelines. When trucks arrive at ECHOJ/JJC or return to SRJ, the appropriate signs will be displayed on the windshield advising which medical classification is on board. Drivers will notify ITR and ECHOJ/JJC deputies the truck is ready to be off loaded. Deputies will minimally wear a mask and gloves.

4. Fourteen Day Observation New-Book Transports- US Marshals

   Generally, these inmates are transferred back and forth to the Oakland Federal courthouse for processing, fingerprinting and photographs. Deputies need to confirm the date inmates arrived at SRJ. If they arrived on the same day, they may ride in the same transport and will be loaded into the van one at a time, separated by classification. If they have different arrival dates, they will be transported separately, one inmate per van. Thus far, the number of inmates needing to return to the Federal courthouse for processing have been very low; one to two. At all times, inmates will be kept six feet apart to adhere to the "social distancing" guidelines. At a minimum, deputies will wear a mask and gloves.

5. Yellow Transports

   Deputies will utilize an Ambu truck which has 2 separate wheelchair lift compartments, if needed, which are located in the rear of the box compartment. Inmates will be loaded one at a time, one inmate per compartment. The Ambu truck only has 7 compartments. For mass transport, we will utilize a larger truck with 1 wheelchair lift, but multiple compartments (14 total compartments). At all times, inmates will be kept six feet apart to adhere to the "social distancing" guidelines. All trucks have a separate cab the driver and his partner ride in, with the inmates secured in a separate compartment (the box portion of the truck). Inmates and deputies do not share the "same air" while in transport with these vehicles. At a minimum, deputies will wear a mask and gloves. Yellow transports will occur only when absolutely necessary.

6. Red Transports

   Same process as Yellow Transports. If logistically possible, each Red inmate will be transported in a separate vehicle. If, for some reason, more than one inmate is required to be transported in the same vehicle, Covid-19 Positives will be transported with other Covid-19 Positives. A Red inmate that has not been confirmed Covid-19 Positive will not be

transported with a confirmed Covid-19 Positive inmate. Inmates will be placed in the furthest rear compartment of any transport vehicle.

No Covid-19 Positive inmates will be transported unless it is a hospital transport. Inmates should have their temperature checked prior to transport and be asymptomatic (unless for a hospital transport). Deputies transporting Covid-19 Positive inmates must wear a N-95 mask, protective eyewear, gloves, and a gown.

## CLEANING/DISINFECTING OF VEHICLES

On dayshift, prior to the inmates being loaded, dayshift deputies will disinfect ALL vehicles regardless of vehicle color designation in accordance with CDC guidelines. Vehicles must also be disinfected after transport once inmates have been off-loaded. At change of shift, swing shift deputies will disinfect vehicles prior to loading any inmates. They will also disinfect vehicles when they have been off-loaded.

This transportation plan may be modified as we navigate through this pandemic. It will remain in effect until further notice by the Detentions and Corrections Division Commander.

BDB: rs