1  JEFFREY L. BORNSTEIN – 099358
   ERNEST GALVAN – 196065
2  KARA J. JANSSEN – 274762
   ROSEN BIEN GALVAN & GRUNFELD LLP
3  101 Mission Street, Sixth Floor
   San Francisco, California 94105-1738
4  Telephone:   (415) 433-6830
   Facsimile:    (415) 433-7104
5  Email:         jbornstein@rbgg.com
                  egalvan@rbgg.com
6                 kjanssen@rbgg.com

7  Attorneys for Plaintiffs

8              UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11 | ASHOK BABU, ROBERT BELL,          | Case No. 5:18-CV-07677
   | IBRAHIM KEEGAN-HORNESBY,          |
12 | DEMAREA JOHNSON, BRANDON          | **DECLARATION OF KARA JANSSEN**
   | JONES, STEPHANIE NAVARRO,         | **IN SUPPORT OF PLAINTIFFS'**
13 | ROBERTO SERRANO, and              | **UNOPPOSED MOTION FOR**
   | ALEXANDER WASHINGTON on behalf    | **PRELIMINARY APPROVAL OF**
14 | of themselves and all others similarly | **CONSENT DECREE**
   | situated,                         |
15 |                                   | Date:      September 22, 2021
   |          Plaintiffs,              | Time:      1:00 pm
16 |                                   |
   |     v.                            | Judge:   Hon. Nathanael Cousins
17 |                                   |
   | COUNTY OF ALAMEDA; GREGORY J.     |
18 | AHERN in his official capacity as Sheriff |
   | of the Alameda County Sheriff's Office; |
19 | KARYN TRIBBLE in her official capacity |
   | as Director of the Alameda County |
20 | Behavioral Health Care Services Agency; |
   | and DOES 1 to 20, inclusive,,     |
21 |                                   |
   |          Defendants.              |
22

23

24

25

26

27

28

1

DECLARATION OF KARA J. JANSSEN

2

I, Kara J. Janssen, declare:

3    1.    I am an attorney duly admitted to practice before this Court.  I am Senior

4 Counsel in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

5 Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a

6 witness, I could competently so testify.  I make this declaration in support of Plaintiffs'

7 Unopposed Motion for Preliminary Approval of Consent Decree.

8    2.    As part of the General Order 56 process, the Parties agreed to retain a panel

9 of Joint Experts to tour the Jail, evaluate the policies, procedures, practices, and conditions

10 in the Jail, and complete reports with their findings.  The Parties then used these reports, as

11 well additional information obtained from class members and other relevant parties, to

12 negotiate the terms contained in the Consent Decree attached hereto.  With the assistance

13 of Magistrate Judge Laurel Beeler, the Parties worked extensively to understand, study,

14 and then negotiate the outcomes, goals and timetables for the transformative changes that

15 are required by the Consent Decree.  Following extensive settlement negotiations, the

16 Parties reached agreement on a Consent Decree.  Defendants' counsel have advised me

17 that the Consent Decree has been approved by the County of Alameda Board of

18 Supervisors.  A true and correct copy of the Consent Decree is attached as **Exhibit 1**.

19    3.    As of August 23, 2021, Plaintiffs' Counsel has billed a total of 5,262 hours

20 for a total lodestar of $2,578,743.50 with an additional $12,832.40 in costs and expenses.

21 Detailed billing records were previously provided to defense counsel prior to the mediation

22 before Judge Beeler.  Plaintiffs' Counsel will file additional evidence, including updated

23 detailed billing records, in support of this request in conjunction with Plaintiffs'

24 Unopposed Motion for Attorneys' Fees and Costs.

25 / / /

26 / / /

27 / / /

28 / / /

DECLARATION OF KARA JANSSEN IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR
PRELIMINARY APPROVAL OF CONSENT DECREE

1    I declare under penalty of perjury under the laws of the United States of America
2    that the foregoing is true and correct, and that this declaration is executed at San Francisco,
3    California this 26th day of August, 2021.

4

5                                                    _/s/ Kara Janssen_____
                                                     Kara J. Janssen
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# E X H I B I T   1

JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
KARA J. JANSSEN – 274762
ROSEN BIEN GALVAN &
GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
Email: jbornstein@rbgg.com
        egalvan@rbgg.com
        kjanssen@rbgg.com

Attorneys for Plaintiffs

GREGORY B. THOMAS – 239870
TEMITAYO O. PETERS – 309913
BURKE, WILLIAMS &
SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, CA  94612-3501
Telephone:   (510) 273-8780
Facsimile:    (510) 839-9104
Email: gthomas@bwslaw.com
        tpeters@bwslaw.com

PAUL B. MELLO – 179755
SAMANTHA D. WOLFF – 240280
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777-3200
Facsimile:    (415) 541-9366
Email: pmello@hansonbridgett.com
        swolff@hansonbridgett.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNESBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA; GREGORY J. AHERN in his official capacity as Sheriff of the Alameda County Sheriff's Office; KARYN TRIBBLE in her official capacity as Director of the Alameda County Behavioral Health Care Services Agency; and DOES 1 to 20, inclusive, <br><br> Defendants. | Case No. 5:18-CV-07677 <br><br> **CONSENT DECREE** |

# TABLE OF CONTENTS

Page

I.   RECITALS ............................................................................................................. 1

II.  DEFINITIONS ...................................................................................................... 3

III. INJUNCTIVE RELIEF ....................................................................................... 6

    A.   COVID-19 Measures ................................................................................... 6

        1.   Masks, Personal Protective Equipment, Personal Hygiene, and Cleaning .......................................................................................... 7

        2.   Testing ............................................................................................. 8

        3.   Intake Procedures ........................................................................... 8

        4.   Medical Isolation and Quarantine .................................................. 9

        5.   Miscellaneous ................................................................................. 9

    B.   Custody and Mental Health Staffing ........................................................ 10

        1.   Custody Staffing ........................................................................... 11

        2.   Mental Health Staffing ................................................................. 12

    C.   Classification and Use of Restrictive Housing .......................................... 13

    D.   Provision of Programming, Recreation and Out of Cell Time .................... 17

        1.   Out of Cell Time ........................................................................... 17

            (a)   Restrictive Housing, Recreate Alone Status ("Step 1"): ......... 18

            (b)   Restrictive Housing, Recreate Together Status ("Step 2"): ...................................................................................... 19

            (c)   General Population – Celled Housing: ................................... 19

        2.   Outdoor Recreation ...................................................................... 23

        3.   Programming ................................................................................. 24

    E.   Use of Force and Disciplinary Measures .................................................. 25

        1.   Use of Force .................................................................................. 25

        2.   Restraint Devices .......................................................................... 27

        3.   Disciplinary Process ..................................................................... 27

    F.   Grievances ................................................................................................. 28

17786622.1[3703035.23]

| | G. | Mental Healthcare | 29 |
| | | 1. | Intake | 30 |
| | | 2. | Clinical and Psychiatric Care | 34 |
| | | | (a) | Levels of Care | 35 |
| | | | (b) | Individual Therapy, Group Therapy, and Treatment Planning | 35 |
| | | | (c) | Care in Restrictive Housing Units and Therapeutic Housing Units | 37 |
| | | 3. | Psychiatric Medication Management and Care System | 38 |
| | | 4. | Suicide Prevention | 39 |
| | | | (a) | Safety Cells | 39 |
| | | | (b) | Call Button Response | 41 |
| | | | (c) | Observation, Prevention and Review of Completed Suicides and Suicide Attempts | 41 |
| | | 5. | Emergency Referrals | 45 |
| | | 6. | Therapeutic Housing Units for Behavioral Health Clients | 46 |
| | | 7. | Custodial Staff Training on Interacting with Individuals with Mental Health Issues | 48 |
| | H. | Inmate Advisory Council and Ombudsperson Program | 49 |
| | I. | Discharge Planning | 49 |
| | J. | ADA | 51 |
| | | 1. | ADA Coordinator | 51 |
| | | 2. | Effective Communication | 53 |
| | | 3. | Intake & Orientation | 54 |
| | | 4. | Provision of Reasonable Modifications | 55 |
| | | 5. | Tracking | 56 |
| | | 6. | Housing Placements | 58 |
| | | 7. | Access to Out-Of-Cell Time and Yard | 58 |
| | | 8. | Access to Programs and Work Assignments | 59 |
| | | 9. | ADA Grievances and Requests | 59 |

CONSENT DECREE

17786622.1[3703035.23]

|  |  | (a) | ADA Requests | 59 |
|  |  | (b) | ADA Grievances | 60 |
| IV. | | MONITORING & IMPLEMENTATION | | 61 |
| | A. | Development of Policies, Procedures, and Training | | 61 |
| | B. | Development of Implementation Plan | | 62 |
| | C. | Monitoring by Joint Experts | | 62 |
| | | 1. | Joint Expert Facility Tours | 64 |
| | | 2. | Joint Expert Reports | 64 |
| | D. | Monitoring by Class Counsel | | 66 |
| V. | | DISPUTE RESOLUTION | | 68 |
| VI. | | SETTLEMENT APPROVAL PROCESS | | 69 |
| | A. | Motion for Preliminary Approval | | 69 |
| | B. | Class Notice | | 69 |
| | C. | Fairness Hearing | | 69 |
| VII. | | ATTORNEY'S FEES AND COSTS | | 70 |
| VIII. | | EFFECT OF CONSENT DECREE IN OTHER ACTIONS | | 71 |
| IX. | | DURATION AND TERMINATION | | 71 |
| X. | | RESERVATION OF JURISDICTION AND ENFORCEMENT | | 73 |
| XI. | | MISCELLANEOUS | | 73 |
| | A. | Knowing Agreement | | 73 |
| | B. | Binding on Successors | | 73 |
| | C. | Construction | | 73 |
| | D. | Severability | | 74 |
| | E. | Counterparts | | 74 |
| | F. | Governing Law | | 74 |
| | G. | Execution of Documents | | 74 |
| | H. | Signatories | | 74 |
| | I. | Notices and Communication | | 74 |

1    This Consent Decree is made and entered into by and through Plaintiffs Ashok

2  Babu, Robert Bell, Ibrahim Keegan-Hornesby, Demarea Johnson, Brandon Jones,

3  Stephanie Navarro, Roberto Serrano, and Alexander Washington individually and on

4  behalf of the Plaintiff Class and Disability Subclass ("Plaintiffs") and Defendant County of

5  Alameda, Gregory J. Ahern in his official capacity as Sheriff of the Alameda County

6  Sheriff's Office, and Karyn Tribble in her official capacity as Director of the Alameda

7  County Behavioral Health Care Services Agency ("Defendants").  Plaintiffs and

8  Defendants are collectively referred to herein as the Parties.

9  **I.    RECITALS**

10   Plaintiffs filed *Babu v. Ahern,* Case No. 5:18-cv-07677-NC (the "Action") on

11  December 21, 2018.  Dkt. No. 1.  The Action alleges that Defendants fail to provide

12  minimally adequate mental health care and conditions of confinement affecting individuals

13  incarcerated within Santa Rita Jail ("Jail"), including, but not limited to, relying on the

14  excessive use of isolation, providing an insufficient amount of out-of-cell time and

15  programming, inadequate classification systems, and a lack of due process protections,

16  among other items, in violation of the Eighth and Fourteenth Amendments to the United

17  States Constitution and the California Constitution.  The Action further alleges that

18  Defendants discriminate against individuals with psychiatric disabilities by denying them

19  equal access to programs, services and/or activities offered at the Jail, including

20  accommodations needed to access programming, the grievance and request processes, and

21  accommodations needed to protect the rights and safety of persons with disabilities in use-

22  of-force situations and in the Jail's disciplinary processes, in violation of the Americans

23  with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and California

24  Government Code § 11135.  Defendants deny these allegations.

25   On January 21, 2020, the Court certified a class consisting of "all adults who are

26  now, or in the future will be, incarcerated in the Alameda County Jail" ("Class") and a

27  subclass defined as "all qualified individuals with a psychiatric disability, as that term is

28  defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code

§ 12926(j) and (m), and who are now, or will be in the future, incarcerated in the Alameda County Jail" ("Disability Subclass").

The Parties agreed to retain a panel of Joint Experts to evaluate the policies, procedures, practices, and conditions in the Jail and to complete reports with their findings. The Joint Experts toured the Jail on multiple occasions, interviewed staff and inmates, and reviewed extensive documents, including policies, procedures, training materials, mental health records, and records relating to programming, out-of-cell time, and classification. Copies of the Joint Experts' reports were filed with the Court in March 2020 and are part of the record in this case. Dkt. Nos. 111, 112. The Parties then negotiated the terms contained herein.

After the Class and Disability Subclass were certified, and while the Parties were negotiating a resolution, the COVID-19 pandemic struck resulting in COVID-19 cases among the Class. The Parties engaged in a meet and confer process related to COVID-19 that was overseen by the Court. Defendants retained an outside expert to conduct spot-checks related to COVID-19 policies beginning in May 2020. On July 29, 2020, Plaintiffs filed a motion to amend the Complaint to include allegations concerning COVID-19 related policies and practices (Dkt. 173), which was granted on August 13, 2020 (Dkt. 184), and the Amended Complaint was filed on August 17, 2020 (Dkt. 186).

Through this Consent Decree, Defendants agree to implement the measures set forth herein, subject to monitoring and, if necessary, enforcement by this Court. By entry into this Consent Decree the Parties intend to, and hereby do, resolve all claims raised in this Action. The Parties believe this Consent Decree is fair, reasonable, and adequate to protect the interests of all Parties, and each party to this Consent Decree was represented by counsel during its negotiation and execution. The Parties further stipulate that this Consent Decree complies in all respects with the provisions of 18 U.S.C § 3626(a) and that the prospective relief in this Consent Decree is narrowly drawn, extends no further than necessary to correct the violations of federal rights agreed to by the Parties, is the least intrusive means necessary to correct those violations, and will not have an adverse impact

17786622.1[3703035.23]

1   on public safety or the operation of a criminal justice system.

2   **II.    DEFINITIONS**

3       The following definitions apply to the terms of this Consent Decree.  Unless

4   explicitly stated to the contrary, any term not expressly defined in this Section or

5   elsewhere in this Consent Decree that has an expressly defined meaning under Title II of

6   the ADA, Section 504 of the Rehabilitation Act of 1973 and/or Section 11135 of the

7   California Government Code, shall have the meaning ascribed to it by current statute.  The

8   Department of Justice regulations implementing Title II of the ADA use the phrase

9   "reasonable modifications" (*see* 28 C.F.R. § 35.130(b)(7)); while the phrase, "reasonable

10  accommodation," is primarily used in Title I of the ADA, see 42 U.S.C § 12111.  These

11  terms are frequently used interchangeably by the courts and are used interchangeably

12  herein.  All other terms shall be interpreted according to their plain and ordinary meaning.

13      **"Administrative Housing"** refers to Restrictive Housing Units, Therapeutic

14  Housing Units, and any other unit that houses people who cannot be placed in General

15  Population.

16      **"ACSO"** refers to the Alameda County Sheriff's Office.

17      **"AFBH"** refers to Adult Forensic Behavioral Health Services.

18      **"County"** refers to the County of Alameda.

19      **"Disability"** or **"Disabilities"** means a psychiatric disability, as that term is defined

20  in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California Government Code § 12926(j)

21  and (m).

22      **"Behavioral Health Client"** refers to all incarcerated persons in the Jail with a

23  current need for any Mental Health Services.

24      **"Classification Unit"** is the unit of the Jail staffed by specially trained ACSO staff

25  who are responsible for, among other things, monitoring the placement of all incarcerated

26  persons in all housing units, designating an individual's classification status including

27  security level (Minimum, Medium, or Maximum) and placement (General Population or

28  Administrative Housing).

17786622.1[3703035.23]

1   "**Discipline**" is the imposition of penalties on incarcerated people for misconduct
2   that violates Jail facility rules.

3   "**Effective Communication**" means that any written or spoken communication
4   must be as clear and understandable to people with disabilities as it is for people who do
5   not have disabilities.

6   "**Effective Date**" means the date this Consent Decree is approved and entered by
7   the Court.

8   "**Isolation**" means confinement for 22 hours or more per day in a locked room or
9   cell, with or without a cellmate, and with limited social contact as compared with the
10  general population whether pursuant to disciplinary, administrative, or classification
11  action.

12  "**Joint Experts**" refers to experts who were jointly retained by the Parties:
13  Dr. James Austin (classification); Kerry Hughes, M.D. (mental health services); Terri
14  McDonald (custody operations and restrictive housing); and Michael Brady and Rick
15  Wells from Sabot Consulting (disability access and custody staffing).  Eloisa Carolina
16  Montoya, Psy.D., replaced Dr. Hughes as the joint mental health expert as of May 3, 2021.

17  "**Material Compliance**" requires that, for each provision, the Jail has developed
18  and implemented a policy incorporating the requirement, trained relevant personnel on the
19  policy, and relevant personnel are complying with the requirement in actual practice.

20  "**Medical Isolation**" is the practice of isolating incarcerated people from the rest of
21  the Jail population when they present with symptoms consistent with a contagious disease
22  or test positive for a contagious disease in order to stem the risk of transmission throughout
23  the Jail.

24  "**Non-Compliance**" indicates that the Jail has not met the components of the
25  relevant provision of the Consent Decree.

26  "**Out-of-Cell Activities**" means any opportunity to engage in leisure, recreation,
27  entertainment, programming, learning, or physical activities that occur outside of the
28  incarcerated person's cell.  The activities may be self-directed or County-facilitated

1  including, but not limited to, outdoor recreation, group programming and/or classes,
2  vocational programs, games, use of tablets, and other socialization among inmates.

3      "**Partial Compliance**" indicates that the Jail has achieved compliance with some of
4  the components of the relevant provision of the Consent Decree, but significant work
5  remains.

6      "**Psychiatric Disability**" or "**Psychiatric Disabilities**" means a psychiatric
7  disability as defined in 42 U.S.C. § 12102, 29 U.S.C. § 705(9)(B), and California
8  Government Code § 12926(j) and (m) and includes cognitive, developmental, intellectual,
9  and/or learning related disabilities.

10     "**Qualified Mental Health Professional**" means psychiatrists, psychologists,
11 psychiatric social workers, licensed professional counselors, psychiatric nurses, or others
12 who by virtue of their education, credentials, and experience are permitted by law to
13 evaluate and care for the mental health needs of patients.

14     "**Quarantine**" is the practice of separating and restricting individuals who may
15 have been exposed to a contagious disease for a fixed period of time or until positive
16 confirmatory test results are received.

17     "**Recreation Space**" includes day rooms, pod areas, quasi-yards, and outdoor areas
18 on both the minimum and maximum sides of the Jail.

19     "**Restraint Devices**" means equipment utilized to restrict the movement of an
20 incarcerated person; this includes the Pro-Straint Restraint Chair, and any other device
21 which immobilizes an incarcerated person's extremities, and/or prevents the inmate from
22 being ambulatory.  This does not include handcuffs or waist chains.

23     "**Restrictive Housing**" refers to individuals placed in either Restrictive Housing
24 Step 1 or Restrictive Housing Step 2.

25     "**Serious Mental Illness**" or "**SMI**" means a current diagnosis of a major
26 psychiatric disorder, and that disorder significantly impairs that person's judgment,
27 behavior, capacity to recognize reality, and/or ability to cope with the customary demands
28 of life in the General Population facilities of the Jail.  This may include, but is not limited

1  to, an incarcerated person who has current symptoms and/or requires treatment for the

2  following diagnoses: Schizophrenia (all subtypes), Delusional Disorder, Schizophreniform

3  Disorder, Schizoaffective Disorder, Brief Psychotic Disorder, Substance-Induced

4  Psychotic Disorder (excluding intoxication and withdrawal), Psychotic Disorder Due to A

5  General Medical Condition, Psychotic Disorder Not Otherwise Specified, Major

6  Depressive Disorders, and Bipolar Disorders I and II.

7  　　　　"**Staff**" refers to ACSO staff, sworn and unsworn, AFBH staff, and all third-party

8  contractors to the extent that the County has delegated to these third parties the

9  responsibility of complying with aspects of this Consent Decree.  Notwithstanding the

10  above, Defendants are and remain responsible for ensuring the implementation of all

11  corrective actions set forth herein.

12  　　　　"**Substantial Compliance**" indicates that the Jail has achieved Material

13  Compliance with the components of the relevant provision of the Consent Decree.

14  　　　　**"Therapeutic Housing Unit(s)"** refers to specialized housing units with a focus on

15  mental health treatment, admission to which is controlled by the Therapeutic Housing

16  Committee.

17  **III.   INJUNCTIVE RELIEF**

18  　　　　**A.   COVID-19 Measures**

19  　　　　On March 4, 2020, Governor Gavin Newsom declared a state of emergency in the

20  State of California due to the global COVID-19 outbreak.  At the invitation of the

21  Honorable Nathanael Cousins on March 16, 2020, the Parties began to meet and confer

22  and participate in regular status conferences before the Court regarding the impact of

23  COVID-19 on class members and to discuss ways to further limit the spread of COVID-19

24  in the Jail.  On August 13, 2020, the Court granted Plaintiffs' Motion for Leave to File

25  Plaintiffs' First Amended Complaint, which alleges that the COVID-19 pandemic impacts

26  all aspects of the care, custody and confinement of the certified class and subclass.

27  Plaintiffs filed this First Amended Complaint on August 17, 2020.

28

1    Defendants implemented extensive measures to contain the spread of COVID-19.

2    These measures are set forth in the Outbreak Control Plan[1], which directs Defendants'

3    response to COVID-19[2], and are described generally below.  Defendants shall continue to

4    implement a robust and effective response to the COVID-19 pandemic pursuant to the

5    current Outbreak Control Plan and in consultation with the Alameda County Public Health

6    Department ("ACPHD") and guided by State and Federal public health authorities,

7    including the California Department of Public Health ("CDPH") and Centers for Disease

8    Control and Prevention ("CDC").  Defendants' response to the COVID-19 pandemic is,

9    however, subject to change as the scientific and public health communities learn more

10   about this novel virus and their guidance evolves.  Based on the measures Defendants have

11   taken to date to contain the spread of COVID-19 in the Jail in conjunction with Plaintiffs'

12   involvement, as well as the Court's oversight, to the parties' knowledge, no court has

13   found Defendants' response to the pandemic to be deficient.

14   **1.    Masks, Personal Protective Equipment, Personal Hygiene, and Cleaning**

15

16   Defendants shall: (a) require contractors, staff, and visitors to the Jail to wear a

17   facial covering and adequate Personal Protective Equipment ("PPE"), including gowns,

18   goggles, face shields, and/or gloves; (b) provide masks, including cloth masks, medical

19   masks, surgical masks, or N95 masks, as appropriate, at no charge to all incarcerated

20   persons, including all newly booked individuals upon entry into the Jail, and ensure masks

21   are replaced as needed; (c) provide for an enhanced schedule for cleaning common areas,

---

[1] References below to the measures Defendants have implemented in response to the COVID-19 pandemic are drawn from the Outbreak Control Plan, including the terminology used below to describe these measures.

[2] The Outbreak Control Plan is available online at https://www.alamedacountysheriff.org/about-us/covid-19-stats.  The current version of the Outbreak Master Control Plan effective as of the execution of this Consent Decree is attached as **Exhibit A**.  As provided for herein, this document may be updated or otherwise modified following the execution of this Consent Decree as needed consistent with local, State, and/or Federal public health guidance.

including the pod/dayroom and shower facilities, and an enhanced schedule for laundry services; and (d) ensure that cleaning supplies and soap are made available to incarcerated persons at no charge to allow them to clean themselves and inside their cells, for as long as these measures are recommended by public health authorities for correctional environments.

### 2.    Testing

Defendants shall provide COVID-19 tests to all: (a) newly booked individuals within 48 hours of booking and again after ten (10) days of incarceration in the Jail; (b) individuals at least forty-eight (48) hours prior to release from custody; (c) individuals housed in a pod or housing unit who have had recent contact with an individual suspected of having COVID-19 (the "index patient"); and (d) individuals who are placed in an "orange" housing unit from another housing area within the Jail due to their vulnerability to serious illness from COVID-19, for as long as this measure is recommended by public health authorities for correctional environments.

Defendants shall also provide for additional opportunities to complete a test to individuals who initially refuse testing.

### 3.    Intake Procedures

Defendants shall: (a) screen newly booked individuals for COVID-19 symptoms, potential contact with COVID-19 positive individuals, and any conditions that make them medically vulnerable to COVID-19, as defined by the most recent CDC guidance and as may be modified by ACPHD, before they are brought inside the Jail facility; (b) separate individuals who have COVID-19 symptoms or potential contact with COVID-19 positive individuals from individuals who have conditions that make them medically vulnerable to COVID-19 as defined by the Outbreak Control Plan, and as may be modified by ACPHD; and (c) quarantine newly booked individuals for at least fourteen (14) days, for as long as these measures are recommended by public health authorities for correctional environments.

17786622.1)[3703035.23]

### 4. Medical Isolation and Quarantine

Defendants shall: (a) house persons who test positive for COVID-19, or who are showing symptoms of COVID-19 in non-punitive Medical Isolation; (b) quarantine incarcerated individuals housed in a pod or housing unit who have had recent contact with an individual suspected of having COVID-19 (the "index patient") for fourteen (14) days in non-punitive quarantine or until testing comes back negative on the index patient; and (c) quarantine incarcerated individuals in non-punitive quarantine who have had contact with known COVID-19 cases for fourteen (14) days, for as long as these measures are recommended by public health authorities for correctional environments.

### 5. Miscellaneous

Defendants shall also take the following measures, for as long as these measures are recommended by public health authorities for correctional environments:

(i) Provide for temperature and symptom screens for Staff, contractors, and visitors, based on the most recent CDC recommendations and as may be modified by the State and/or ACPHD, to be performed before they are allowed to enter the Jail.

(ii) Prohibit Staff, contractors, or visitors displaying symptoms or who have had contact, or who have disclosed close contact with confirmed COVID-19 cases, inside or outside of the Jail, from entering the Jail for a period of time to be determined based on the most recent CDC guidelines and as may be modified by ACPHD.

(iii) Provide for housing of medically vulnerable individuals in a manner that limits the risk of COVID-19 spread to these individuals to the extent possible.

(iv) Provide for the safe transportation of individuals to and from the Jail to prevent the spread of COVID-19 to the extent reasonably possible. Incarcerated persons who are positive for COVID-19 or display symptoms of COVID-19 shall not make in-person or video court appearances. Incarcerated persons who claim contact with a person with known or suspected COVID-19, with high risk travel history, or are otherwise in quarantine status shall be prevented from making in-person court appearances until they are no longer on quarantine status. Precautions shall be taken to mitigate the spread of COVID-19 during all video-court appearances, including masking, social distancing, and cleaning of the area before and after such appearances.

(v) Provide incarcerated persons with educational materials regarding COVID-19 and the Jail's policies to limit the spread of COVID-19 including policies

17786622.1[3703035.23]

regarding Quarantine, Medical Isolation, laundry replacement, mask replacement, and distribution of cleaning supplies in Spanish, English, Korean, Tagalog, Mandarin, Cantonese, Vietnamese, and alternative formats as needed for individuals with disabilities.

(vi)    Track and record: (1) all individual COVID-19 cases and the units under Quarantine as soon as they are identified; (2) all Staff and contractor COVID-19 cases; (3) all detainees who have been exposed to COVID-19, if possible; (4) all hospitalizations for COVID-19 and/or complications caused by COVID-19; and (5) all deaths from COVID-19.

(vii)    Maintain the public facing COVID-19 webpage on the ACSO website, including continuing the practice of daily updates of case numbers and other relevant information that is currently reflected on the ACSO website, for the duration of the pandemic.

Defendants shall continue to offer vaccinations to all incarcerated persons and staff on a regular basis, consistent with CDPH and ACPHD public requirements and guidance and shall continue to provide education and take other necessary steps to encourage vaccinations.

Notwithstanding the above, nothing prohibits Defendants from taking additional steps above and beyond those listed herein to address the spread of COVID-19, or from modifying their response consistent with local, State, and/or Federal public health guidance.  Defendants shall continue to comply with the Outbreak Control Plan for the duration of the pandemic, and consistent with guidance from ACPHD.

**B.    Custody and Mental Health Staffing**

Defendants shall maintain sufficient mental health and custody staff to meet the requirements of this Consent Decree, including maintaining sufficient mental health clinical staffing to provide for adequate 24-hour coverage, seven days a week, and sufficient custodial staff to ensure that programing, recreation, transportation and movement, out-of-cell and outdoor time and all other jail functions can proceed safely.  To the extent possible, Custody staff assigned to positions where mental health training is required, including staff assigned to the Therapeutic Housing Units, shall be strongly encouraged to serve in these roles for at least three years to provide for consistency and to maximize the benefit of the training and expertise of the staff assigned to these areas.

1

**1.     Custody Staffing**

2

An initial staffing assessment of custody staffing levels was conducted by Mike

3 Brady of Sabot Consulting in April 2020 ("Staffing Report").  Dkt. Nos. 111, 112.  Based

4 on this assessment, the Parties agree that staffing at the Jail must be increased.

5

Defendants further agree to implement the recommendations contained in the

6 Staffing Report, including: (1) making best efforts to hire a total of two hundred fifty-

7 nine (259) sworn staff and seventy-two (72) non-sworn staff over a three-year period to

8 work in the Jail in order to reach the minimum staffing levels required to safely operate the

9 Jail without employing mandatory overtime, these positions shall be devoted solely to

10 staffing the Jail, and the Sheriff shall certify annually that these positions are used solely

11 for the Jail; (2) cease the practice of carrying out-of-division vacancies in the Detentions &

12 Corrections division; and (3) establish and implement a Compliance Unit consisting of at

13 least one sergeant, two lieutenants, and one captain, to oversee the following subject areas:

14 ADA, Grievance and Appeals, the Prison Rape Elimination Act, revisions to and

15 implementation of updated policies and procedures, Litigation Compliance/Internal

16 Compliance including COVID-19 related issues, and Multi-Service Deputies; (4) provide

17 an annual written certification, each year from the Effective Date, to be sent to Class

18 Counsel pursuant to the Protective Order, by the Sheriff certifying the total number of

19 authorized positions for the Jail, including a breakdown by rank and duties, and the total

20 number of positions filled on an average basis over the past calendar year, including an

21 explanation for any vacancies lasting longer than ninety (90) days; and (5) within six

22 (6) months from the Effective Date, creating a plan to transition to a direct supervision

23 staffing model for all Restrictive Housing Units and Therapeutic Housing Units.  The

24 Compliance Captain will be strongly encouraged to serve a minimum assignment of three

25 (3) years.

26

Defendants have created a dedicated Behavioral Health Access Team ("BHAT").

27 Custody staff assigned to the BHAT shall be strongly encouraged to serve at least a three

28 (3) year assignment to provide for consistency and to maximize the benefit of the training

1   and expertise of the Custody staff assigned to this unit.  The BHAT shall directly work

2   with AFBH to facilitate: (a) clinical interactions in individual and group settings, (b) assist

3   in facilitating evaluations in the Intake, Transfer, and Release Unit, and (c) group

4   programs.  Deputies assigned to the BHAT shall be provided with comprehensive Crisis

5   Intervention/Behavioral Health training developed in coordination with AFBH regarding

6   working with Behavioral Health Clients, including training on de-escalation techniques,

7   problem solving, and particular issues that may be raised when interacting with Behavioral

8   Health Clients.  The duration and topics for the training shall be mutually agreed upon by

9   the Parties within sixty (60) days of the Effective Date of the Consent Decree and may be

10  combined with the trainings of all Staff to be conducted pursuant to Section IV(A).

11  Deputies assigned to the BHAT will complete this training prior to beginning their BHAT

12  assignment.  Current BHAT deputies shall further receive an annual refresher training on

13  the topics, the duration of which shall be mutually agreed upon by the Parties within sixty

14  (60) days of the Effective Date.

15      ACSO also maintains a team of deputies who are assigned to the clinics ("Clinic

16  Deputies") to transport incarcerated persons between the housing units and the clinic for

17  medical, dental, and some behavioral health appointments.  Further, within six (6) months

18  of the Effective Date, ACSO shall develop a team of five (5) deputies per shift who shall

19  be responsible for emergency, medical, and other off-base transportation for inmates on an

20  as-needed basis ("Emergency Health Care Access Team").  These deputies shall receive

21  training regarding interacting with Behavioral Health Clients.

22          **2.      Mental Health Staffing**

23      The Parties agree that staffing for mental health services must be increased.  The

24  Board of Supervisors has authorized AFBH to hire an additional one hundred seven

25  (107) employees for the Jail over three (3) fiscal years.  Pursuant to this authorization,

26  AFBH intends to hire an additional twenty-seven (27) positions for fiscal year (FY) 2020-

27  2021, an additional forty-two (42) positions for FY 2021-2022, and an additional thirty-

28  eight (38) AFBH positions for a total number of one hundred sixty-one (161) authorized

positions by FY 2022-2023.  AFBH has also created a new Forensic and Diversion Services Director (Forensic Director) position.  The Forensic Director position is a system-level director position overseeing all services in detention centers and forensic outpatient programs.  In this role, the Forensic Director shall be the overall leader of AFBH personnel and mental health contractors at the Jail.

Defendants shall ensure that any third-party mental health providers are trained in all aspects of pertinent AFBH policies and procedures including those outlined by this Consent Decree and shall oversee and monitor third-party vendor services.  Third-party vendors shall provide clinically appropriate services and shall maximize confidentiality.

To the extent that Defendants provide telehealth mental health services, meaning the use of electronic information and telecommunications technologies to support long-distance clinical health care, including telepsychiatry, Defendants shall ensure effective communication.  Defendants shall also ensure that incarcerated persons are provided maximum confidentiality in interactions with telepsychiatry providers, but it is understood that custody staff may need to observe the interaction to ensure safety and security.  In such circumstances, custody staff will stand at the greatest distance possible while ensuring safety and security.  Defendants shall continue to provide Behavioral Health Clients with access to on-site, in-person clinically appropriate services and any use of telehealth services shall be overseen and supported by on-site AFBH staff.

## C.    Classification and Use of Restrictive Housing

Defendants shall implement a new classification system, based upon the findings and recommendations contained in Dr. Austin's expert report (Dkt. 111), within three (3) months of the Effective Date.  The new classification system shall be approved by Dr. Austin prior to implementation.  To the extent COVID-19 related measures require an individual to be temporarily housed in a more restrictive setting, such as a celled setting instead of a dorm for Medical Isolation or Quarantine purposes, they shall be returned to housing commensurate with their classification level as soon as deemed medically appropriate.  This system shall, at minimum, incorporate and/or include the concepts,

1  processes, and/or procedures listed below.

2  (i)      All initial classification interviews at intake shall include a face-to-face, in-
3           person, interview with the incarcerated individual in addition to review of any
           relevant documents.

4  (ii)     Development and implementation of new policies regarding classification,
5           including replacing the prior scoring system with an updated additive point
           system that mirrors the National Institute of Corrections Objective Jail
6           Classification system, and which requires a classification review including a
           face-to-face interview of all General Population Inmates in Medium or
7           Maximum settings every sixty (60) days.  If it appears an inmate in a Minimum
           General Population setting may be placed in a higher classification, a face-to-
8           face interview shall be conducted.

9  (iii)    Individuals will either be assigned to the General Population or to
10          Administrative Housing, which includes: Protective Custody, Incompatible
           Gang Members, Restrictive Housing, Therapeutic Housing, or the Medical
11          Infirmary.  Regardless of their population assignment, all incarcerated persons
           will also be assigned a custody level (Minimum, Medium or Maximum) as
12          determined by either the initial or reclassification process.

13 (iv)     Development and implementation of a formal process for the admission, review
14          and release of individuals to and from Administrative Housing, including
           sufficient due process and transparency to provide the incarcerated person with
15          a written basis for the admission within seventy-two (72) hours, explanation of
           the process for appealing placement in the unit, conditions of confinement in
16          the unit, an ongoing 30-day review process, and the basis for release to the
17          general population.

18 (v)      The formal process for admission to and discharge from the Restrictive
19          Housing units shall require the development and implementation of a
           Restrictive Housing Committee ("RHC") that shall approve all placements.
20          The RHC shall be chaired by a sergeant or higher from the Classification Unit
           and include an AFBH representative at the supervisory level or higher and an
21          ACSO representative from outside the Classification Unit at the sergeant level
           or higher.
22
23 (vi)     Individuals shall not be placed in Restrictive Housing unless they are referred to
           the RHC for review.  Individuals may be referred based on the following
24          circumstances: (1) recent assaultive behavior resulting in serious injury;
           (2) recent assaultive behavior involving use of a weapon; (3) repeated patterns
25          of assaultive behavior (such as gassing); (4) where they pose a high escape risk;
           or (5) repeatedly threatening to assault other incarcerated persons or Staff.  All
26          referrals shall clearly document the reason for the referral in the form attached
           to this Consent Decree as **Exhibit B**.  Incarcerated individuals shall not be
27          referred to Restrictive Housing for rule violations beyond the five categories
           enumerated herein.
28

(vii)  After receiving a referral, the RHC shall conduct a formal review within seven (7) calendar days to assess whether the individual meets the above criteria for placement in restrictive housing.  The RHC shall base this review on a face-to-face interview with the incarcerated individual and a review of relevant documents including any documents provided by the incarcerated person in response to the referral.  Incarcerated individuals can request an opportunity to have witnesses heard regarding factual disputes in response to the referral, to be permitted at the RHC's discretion.  If the RHC determines, based on this review, that the incarcerated individual meets the criteria for restrictive housing, they will assign the individual for placement in Restrictive Housing Step 1 or Restrictive Housing Step 2 as appropriate.

(viii)  The RHC shall meet at least weekly to review referrals, conduct scheduled reviews of individual placements as outlined in Section III(D)(1) (Out-of-Cell Time Section), and, in their discretion, review any requests for re-evaluation received from incarcerated individuals currently in Restrictive Housing.  The RHC shall document these meetings in written notes including how many requests and/or referrals were reviewed, how many individuals were admitted to, released from, or moved between Steps in the Restrictive Housing Settings, and the reasons for the RHC's decisions as to each.

(ix)  Individuals shall be moved from Step 1 to Step 2, and from Step 2 to General Population, based on clearly outlined, written criteria to include an absence of serious assaultive behavior and no major disciplinary reports during the period of placement immediately prior to the review.  The presumption shall be that individuals are to be released as quickly as possible back into General Population, consistent with safety and security needs.  The RHC has the authority to release any individual at any time to a General Population setting or to move an individual from Step 1 to Step 2 or Step 2 to Step 1 in accordance with the policies and procedures, set forth herein.

(x)  Individuals with SMI shall not be placed in Restrictive Housing, Recreate Alone Status ("Step 1") unless the criteria outlined in Section III(D)(1) has been met and subject to the safeguards contained in that section.

(xi)  ACSO shall notify and consult with AFBH clinical staff, as appropriate, within twenty-four (24) hours of placing any Behavioral Health Clients in Restrictive Housing at which time AFBH shall assess the individual to determine whether such placement is contraindicated due to mental health concerns.  AFBH shall offer to conduct this assessment in a confidential setting.  This assessment shall be documented and, if placement is contraindicated,  ACSO shall work with AFBH to identify and implement appropriate alternatives and/or mitigating measures.

(xii)  Development and implementation of a formal process for the admission, review and release of individuals to and from the Therapeutic Housing Units shall include the development of a Therapeutic Housing Committee ("THC").  The THC shall be chaired by an AFBH representative at the supervisory level or

higher, and further include a sergeant from the Classification Unit and an ACSO representative from outside the Classification Unit at the sergeant level or higher.

(xiii) Any Staff member may refer an individual to the THC for placement in a Therapeutic Housing Unit. All referrals shall clearly document the reason for the referral in writing. After receiving a referral, the THC shall conduct a review to assess the individual's treatment needs and determine the appropriate therapeutic interventions and placement. This review shall include a face-to-face interview with the incarcerated individual and a review of relevant documents. This review shall occur within seven (7) days of referral. Individuals in crisis may be placed in an appropriate Therapeutic Housing Unit pending the outcome of the review. Only the THC may admit or discharge individuals to and from the Therapeutic Housing Units and shall do so based on clearly articulated, written criteria. The presumption shall be that individuals are to be released as quickly as possible back into General Population, consistent with their mental health needs. The THC has the authority to release any individual at any time to a General Population setting.

(xiv) Development and implementation of policies and procedures requiring the Classification Unit to formally approve all intra- and inter- housing unit cell transfers;

(xv) Development and implementation of policies and procedures regarding continuation and discontinuation of protective custody status, including due process for releasing incarcerated persons who do not meet the requirements for protective custody status into general population units;

(xvi) Development and implementation of policies and procedures on double celling that takes into consideration criminal history/sophistication, willingness to accept a cellmate, size and age of the incarcerated persons in comparison to each other and reason for placement and in which cell assignments must be reviewed and approved by the Classification Unit with input from housing unit staff.

(xvii) Development and implementation of step-down protocols for the Restrictive Housing Units and Therapeutic Housing Units that begin integration and increase programming opportunities with the goal to safely transition incarcerated individuals to the least restrictive environment as quickly as possible.

(xviii) Development and implementation of policies and procedures to ensure that inmates with disabilities (including but not limited to SMI) are not over-classified and housed out-of-level on account of their disability, including that an individual's Psychiatric Disability shall not be considered as a basis for classification decisions outside of the process for placing individuals in an appropriate Therapeutic Housing Unit consistent with their underlying classification level.

(xix)    Implementation of a system to produce reports: (1) of class members with SMI who have a known release date within the next 12-36 hours for use in discharge planning and (2) regarding lengths of stay for class members in restrictive housing, particularly with respect to class members with SMI.

(xx)    The RHC shall review reports regarding length of stay on a quarterly basis to identify: (1) any individuals who have been in Restrictive Housing for thirty (30) days or longer and (2) any patterns regarding class members' placement and/or discharge.  Defendants shall take any corrective actions needed, including revising policies and looking into individuals' cases to identify interventions aimed at reducing their length of stay in Restrictive Housing. Individuals who have been in Restrictive Housing for more than ninety (90) days shall have their placement reviewed by an AFBH manager and by the ACSO Classification Lieutenant or higher.

(xxi)    Appropriate due process in classification decisions as well as oversight including methods for individuals to grieve and/or otherwise appeal classification-related decisions.  This shall include the ability to appeal classification decisions directly to the Classification Supervisor on the basis of lack of due process, for example failure to conduct a required face-to-face interview, or based on factual error such as the use of incorrect information regarding the individual's identity, charges, gang affiliation, and/or correctional history, or other errors.  The Classification Supervisor shall respond within seven (7) days from receiving the appeal and shall correct any factual errors and/or request additional information as appropriate.

(xxii)    Training for custody staff on the new classification system and policies listed above as outlined in Section IV(A).

### D.    Provision of Programming, Recreation and Out of Cell Time

#### 1.    Out of Cell Time

Defendants have agreed to implement a new classification system, as outlined in Section III(C).  This new classification system is designed to produce two objective classification decisions that will guide the housing of each incarcerated person: (1) custody level (Minimum, Medium, and Maximum), and (2) population assignment (*e.g.,* General Population, Incompatible Gang Member, Protective Custody, Behavioral Health, Medical, or Administrative Separation).

/ / /

/ / /

/ / /

Based on the implementation of this new classification system, the Parties agree to the following minimum out-of-cell times[3]:

### (a) Restrictive Housing, Recreate Alone Status ("Step 1"):

(i) This is the most restrictive designation. Individuals with SMI[4] should not be placed in Step 1 except where: (1) the individual presents with such an immediate and serious danger that there is no reasonable alternative as determined by a Classification sergeant using the following criteria; whether the individual committed an assaultive act against someone within the past seventy-two (72) hours or whether the individual is threatening to imminently commit an assaultive act; and (2) a Qualified Mental Health Professional determines that: (a) such placement is not contraindicated, (b) the individual is not a suicide risk, and (c) the individual does not have active psychotic symptoms. If an incarcerated person with SMI placed in Step 1 suffers a deterioration in their mental health, engages in self-harm, or develops a heightened risk of suicide, or if the individual develops signs or symptoms of SMI that had not previously been identified, the individual will be referred for appropriate assessment from a Qualified Mental Health Professional within twenty-four (24) hours, who shall recommend appropriate housing and treatment. The Qualified Mental Health Professional will work with Classification to identify appropriate alternate housing if deemed necessary, and document the clinical reasons for the move and the individual's treatment needs going forward. Classification shall ensure that the person is moved promptly and document the move.

(ii) Individuals who are on "Recreate Alone" status (meaning they cannot recreate with other inmates) shall be offered at least fourteen (14) hours per week of out-of-cell time, which shall include at least some amount of Structured Time, as set forth below. ACSO shall use best efforts to offer individuals two (2) hours of out-of-cell time per day.

(iii) Defendants shall use best efforts to provide at least five (5) hours per week of Structured Time (which includes therapeutic, educational, substance abuse, self-help, religious or other structured programming), which will count towards the total out-of-cell time. Inmates may participate in these programs in handcuffs or other appropriate restraints only if necessary to ensure the safety and security of the Jail. If ACSO is unable to meet this requirement, the Parties agree to meet and confer regarding the reasons why and to examine methods of increasing the amount of Structured Time.

---

[3] These minimum out-of-cell time requirements apply to all inmates unless specifically contraindicated by a mental health treatment plan for suicide precautions. Out-of-cell time minimums for the individuals housed in the Therapeutic Housing Units are addressed in Section III(G)(6).

[4] Inmates with SMI shall be housed in the least restrictive environment possible as determined by a Qualified Mental Health Professional.

(iv)     This population shall be evaluated within fourteen (14) days of placement in Step 1 for ability to return to general population or to transition to Step 2. Inmates retained in Step 1 following initial review will be evaluated no less than every thirty (30) days thereafter.  Incarcerated persons with SMI placed in Step 1 for longer than thirty (30) days shall have their cases reviewed by the Classification Lieutenant and Assistant Director of AFBH, or their designee, weekly following the initial thirty (30) days.  If continued placement on Step 1 is approved by the Classification Lieutenant and Assistant Director of AFBH the reasons for doing so must be documented.

**(b)     Restrictive Housing, Recreate Together Status ("Step 2"):**

(i)      Individuals shall be offered at least twenty-one (21) hours per week of out-of-cell time, which shall include at least some amount of Structured Time, as set forth below.  ACSO shall use best efforts to offer individuals three (3) hours of out of cell time per day.

(ii)     If an incarcerated person with SMI placed in Step 2 suffers a deterioration in their mental health, engages in self-harm, or develops a heightened risk of suicide, or if the individual develops signs or symptoms of SMI that had not previously been identified, the individual will be referred for appropriate assessment from a Qualified Mental Health Professional, within twenty-four (24) hours, who shall recommend appropriate housing and treatment and shall provide the recommended treatment.

(iii)    Defendants shall use best efforts to provide at least eleven (11) hours per week of Structured Time, which will count towards the total out-of-cell time. Incarcerated persons will participate in Structured Time programs in restraints if necessary to ensure the safety and security of the Jail.  Incarcerated persons may participate in these programs in handcuffs or other appropriate restraints only if necessary to ensure the safety and security of the Jail.  If ACSO is unable to meet this requirement, the Parties agree to meet and confer regarding the reasons why and to examine methods of increasing the amount of Structured Time.

(iv)     Step 2 individuals who already received an initial review within fourteen (14) days (while in Step 1) shall be reevaluated for placement in the general population at least every thirty (30) days.  Step 2 individuals who have not received an initial review shall receive an initial review within fourteen (14) days of placement in Step 2.

**(c)     General Population – Celled Housing[5]:**

(i)      Individuals shall be offered at least twenty-eight (28) hours per week of out of

---

[5] These minimums apply to individuals housed in celled settings, individuals housed in dormitory settings will receive additional recreational time and Defendants will make best efforts to ensure individuals in all housing settings receive the maximum amount of out-of-cell time to the extent possible.

cell time, which shall include at least some amount of Structured Time, as set forth below.  ACSO shall use best efforts to offer individuals four (4) hours of out of cell time per day.

(ii)   Defendants shall use best efforts to provide at least fourteen (14) hours per week of Structured Time, which will count towards the total out-of-cell time.  If ACSO is unable to meet this requirement, the Parties agree to meet and confer regarding the reasons why and to examine methods of increasing the amount of Structured Time.

The above minimum out-of-cell times for individuals placed in Step 1 and Step 2 may not be fully achievable until reconfiguration of the Recreation Space (defined to include all outdoor recreation spaces and any interior space within the housing units that will need to be modified to ensure the provision of out-of-cell time), described below in subsection III(D)(2), is completed.  Defendants agree to offer at least the following out-of-cell time minimums for the first three months following the Effective Date: (1) seven (7) hours of out-of-cell time, including structured and un-structured time to Restrictive Housing inmates on Rec-Alone status (Step 1) per week; and (2) fourteen (14) hours of out-of-cell time, including structured and unstructured time to Restrictive Housing inmates on Co-Recreation status (Step 2) per week.

Beginning on the fourth month after the Effective Date, Defendants agree to offer the following out-of-cell time minimums: (1) ten (10) hours of out-of-cell time, including structured and un-structured time to Restrictive Housing inmates on Rec-Alone status (Step 1) per week; and (2) seventeen (17) hours of out-of-cell time, including structured and unstructured time to Restrictive Housing inmates on Co-Recreation status (Step 2) per week.

If at any time during the interim period ACSO is unable to meet the above-listed out-of-cell minimums, the Parties agree to meet and confer regarding the reasons why and to examine methods of increasing the amount of out-of-cell time.  Defendants will make best efforts to offer out-of-cell time on a daily basis during the interim period.

The Parties agree to meet and confer to discuss any challenges Defendants face in reaching these minimum requirements, as well as Defendants' ability to increase these

1    minimum requirements as reconfiguration proceeds.  Defendants will endeavor to provide

2    additional out-of-cell time to the extent feasible prior to the completion of reconfiguration,

3    including by implementing restorative justice practices in an effort to increase the numbers

4    of individuals who can recreate together consistent with the Jail's classification system.

5            Reconfiguration of all Recreation Spaces shall be completed no later than twenty-

6    four (24) months from the Effective Date.  The Parties agree to meet and confer within

7    three (3) months of the Effective Date regarding interim timelines for completion of the

8    following: (1) Installation of custody-grade security desks in Step 1 Housing Unit day

9    rooms; (2) Reconfiguration of Quasi-Yard space, including in Step 1 and Step 2 Housing

10   Units; (3) Creation of outdoor recreation space; and (4) any other reconfiguration projects

11   necessary to effectuate the terms of this Consent Decree.

12           Individuals engaged in Out-of-Cell Activities, including, but not limited to, pod

13   time, structured and unstructured time (including all out-of-cell programming), education,

14   work, vocational training, and yard time (including quasi yard time), shall be provided

15   reasonable access to bathroom facilities as needed.

16           All newly-booked inmates who are quarantined for COVID-19 and who test

17   negative for COVID-19 on their first test (administered within the first forty-eight

18   (48) hours upon intake), shall also be offered the maximum amount of out-of-cell time

19   consistent with evolving public health guidance to shower and exercise.  Inmates in

20   COVID-19 intake quarantine will also be provided with tablets as soon as possible[6] upon

21   placement in an intake quarantine housing unit to make phone calls and access educational

22   materials, entertainment applications, therapeutic tools, and other Jail resources.  Out-of-

23   cell time in the intake quarantine units may be curtailed for inmates who refuse to comply

24   with COVID-19 protocols imposed by public health in these units.

25

26

27   _____

[6] Incarcerated persons arriving before 8:00 p.m. will receive a tablet as soon as practicable,
but in any event, that same day.  Incarcerated persons arriving in an intake quarantine
28   housing unit after 8:00 p.m. will receive a tablet the following day at 8:00 a.m. when
tablets are distributed to the unit for the day.

These minimum requirements for out-of-cell time are subject to exceptions including, but not limited to, disturbances that require staffing to be re-directed to other areas of the Jail on an emergency and temporary basis, healthcare emergencies, natural disasters, and any other emergencies that restrict movement and out-of-cell time of inmates to preserve the safety and security of inmates and staff.  Any limits on out-of-cell time due to the aforementioned exceptions shall be documented (to include the reason and length of the time limit), and the limits will last only as long as necessary to address the underlying reason for the exception and shall be approved and reviewed by the Watch Commander. Individuals in Restrictive Housing who are unable to safely participate in out-of-cell time because they are violent, combative, and/or assaultive are not subject to the minimum out-of-cell time requirements described in this section for such period of time as they are determined to be unsafe outside of their cell.  This determination shall be documented and approved by the Restrictive Housing Committee and shall be revisited on a weekly basis. Individuals engaged in Out-of-Cell Activities, including, but not limited to, pod time, structured and unstructured time (including all out-of-cell programming), education, work, vocational training, and yard time (including quasi yard time), shall be provided reasonable access to bathroom facilities as needed.

In order to properly track out-of-cell time, Defendants shall replace the prior practice of using paper logs with an electronic information technology system to allow for comprehensive tracking of out-of-cell time and refusals within twelve (12) months of the Effective Date.  In the interim, Defendants shall develop and implement a process for tracking out-of-cell time in the restrictive housing units including a paper for each person incarcerated on the unit showing out-of-cell time including program hours, showers, dayroom, outdoor recreation times, and visiting for a period of no less than one week at a time.  These logs, and the information technology system once implemented, are intended to assist ACSO and AFBH Staff in evaluating socialization needs and identifying persons who are isolating or at risk of mental health decompensation.  ACSO Supervisors shall also review programming and out-of-cell logs in the administrative separation units and

any other Restrictive Housing Units and Therapeutic Housing Units to determine whether any incarcerated persons are not being afforded out-of-cell time opportunities pursuant to policy or whether routine refusals are occurring.  Defendants shall further update their policies and training to include a requirement that staff must attempt more than once to meaningfully communicate the importance of out-of-cell time where individuals initially refuse to come out of their cells.

Defendants shall also develop and implement policies requiring ACSO Staff to notify supervisors and AFBH Staff when incarcerated persons are, on a repeated basis, refusing to come out of their cells, refusing to shower, or are clearly neglecting other basic care and grooming and where they visually appear to be depressed, withdrawn or delusional.  Once notified, AFBH Staff shall follow-up with the incarcerated person within twenty-four (24) hours of receiving the initial notification or change in status.  Defendants shall also ensure there is sufficient supervisory presence in all housing units and that supervisors play a pronounced role in monitoring out-of-cell and program activities and are visibly present in the units.

### 2.    Outdoor Recreation

Defendants shall provide Class Counsel their plan to reconfigure the Recreation Space within six (6) months of the Effective Date and meet and confer with Class Counsel regarding the plan and any additional methods of expediting construction and/or maximizing out-of-cell time in the interim, in accordance with the terms of this Consent Decree.  The plan shall include a timeline for reconfiguring the large yard within twenty-four (24) months of the Effective Date.  Due to the urgency of reconfiguring the Recreation Space, the County shall take all steps necessary to expedite all planning and construction activities.  Reconfiguration of the Recreation Space shall include, but not be limited to, dividing Recreation Space to allow for multiple inmates to recreate simultaneously, increasing lighting for evening recreation, and using recreational therapists or other clinicians for Behavioral Health Clients.  In the absence of conditions that would preclude outdoor access, including, but not limited to, severe or unsafe inclement weather,

1  disturbances (as defined above), healthcare emergencies, natural disasters, and any other

2  emergencies that restrict movement and out-of-cell time of inmates to preserve the safety

3  and security of inmates and staff, all incarcerated persons shall be provided access to

4  outdoor recreation.  Any limits on out-of-cell time due the aforementioned exceptions will

5  last only as long as necessary to address the underlying reason for the exception and shall

6  be documented and approved by the Watch Commander.

7         Outdoor recreation time is included within the minimum amount of out-of-cell time

8  listed above.  Defendants shall implement policies and procedures to ensure that outdoor

9  recreation time is maximized to the extent feasible for all people including those in

10 restrictive housing.

11             **3.       Programming**

12        Defendants shall provide programming within the facility consistent with

13 classification level, including providing access to the Sandy Turner Education Center and

14 Transition Center services for Behavioral Health Clients, as a means of suicide/self-harm

15 prevention and in order to provide equal access to incarcerated persons with disabilities.

16 AFBH will designate an individual to coordinate identification and implementation of

17 internal and external group resources and partnerships.  In evaluating current and future

18 programming and work opportunities for incarcerated persons, Defendants shall evaluate

19 worker assignments for incarcerated individuals to determine whether additional work

20 opportunities could be created to assist with facility improvements and programming, such

21 as creating programs for deep cleaning, student tutor/merit masters, and access to program

22 support aides.  Defendants shall further establish a daily tracking system for programs

23 provided and incarcerated individuals who attended.

24        When appropriate and consistent with individual clinical input, Behavioral Health

25 Clients shall have equal access and opportunity to participate in jail programming, work

26 opportunities, and education programming for which they are qualified.  Similarly,

27 Behavioral Health Clients shall further receive, at minimum, privileges consistent with

28 their classification level regardless of where they are housed.  Defendants shall review and

1  update any policies and practices related to program eligibility to maximize the number of

2  persons eligible for programming.  Defendants shall consult with various inmate services

3  providers, including educational providers, faith-based providers, and mental health

4  providers, to evaluate and expand program offerings throughout the Jail.  ACBH, including

5  AFBH, shall continue to cooperate with the Alameda County Behavioral Mental Health

6  Court and to seek options for alternatives to custody through community-based

7  organizations and treatment providers.

8       Defendants shall ensure there is adequate space for program offerings including

9  evaluating whether additional classroom capacity can be created through modular

10  construction or other means, such as relocating administrative space.

11       **E.    Use of Force and Disciplinary Measures**

12            **1.    Use of Force**

13       Defendants shall work with the agreed-upon joint subject matter expert, as

14  discussed in Section IV(A), to develop and implement an updated written use-of-force

15  policy, and any necessary forms as well as associated training materials, for those persons

16  incarcerated at the Jail, within six (6) months of the Effective Date .  The updated use-of-

17  force policy shall address the issues identified in the McDonald expert report for all uses of

18  force both planned and un-planned.  Under that policy, use of force shall only be

19  authorized in the type, amount, manner, and circumstances authorized by that policy.

20  When force must be used, ACSO staff shall only use that amount of force that is

21  objectively reasonable and appears necessary to control the situation or stop the threat, and

22  the force must be in the service of a legitimate correctional objective.  Staff shall be trained

23  on any and all updated policies and forms as detailed in Section IV(A) and Defendants

24  shall consult with joint expert Terri McDonald on the content and provider of de-escalation

25  training to address and reduce ACSO staff using force, to include striking and kneeing

26  during use-of-force scenarios at the Jail.

27       The use-of-force policy shall include at least the following components: (1) reiterate

28  supervisory and managerial responsibility to address tactical mistakes or unnecessary or

excessive force in a steadfast and unapologetic manner; (2) require consistent use of the ACSO Personnel Early Intervention System ("PEIS"), which has the capability to track use of force and prevalence rates as one of the metrics evaluated in a use of force review; (3) require clinical engagement by AFBH where appropriate in developing behavior plans with incarcerated individuals who are engaged in multiple force incidents; (4) be clear that incarcerated individuals shall not be hit on the head or face nor kneed or kicked absent extenuating circumstances where there is a deadly threat or assaultive behavior, defined consistent with Section 240 of the California Penal Code as intent coupled with the present ability to inflict violent injury; (5) address the pre-planned use of force on individuals with known Psychiatric Disabilities, including coordinating with AFBH on de-escalation measures, such as use of cooling down periods or other appropriate methods, to avoid or otherwise limit the use of force as much as possible; and (6) training on best practices for staff who conduct use of force reviews.

Defendants shall ensure AFBH clinical staff is present in advance of all pre-planned use-of-force incidents so that they may attempt to de-escalate the situation. Defendants shall document all de-escalation attempts. To the extent possible, AFBH staff shall not be present during the actual use of force, in accordance with their MOU.

Defendants shall further: (a) ensure there is supervisory review of all use-of-force incidents; (b) develop an independent custodial use-of-force review team within the Compliance Unit to identify and address systems and training issues for continuous quality improvement to include de-escalation techniques; (c) work with ACSO Support Services to regularly review the use-of-force policy with respect to the circumstances when less lethal impact weapons are warranted and to determine when chemical agents may be used in cell extractions; and (d) ensure fixed cameras are placed throughout the Jail for security and monitoring purposes with priority for cameras to be placed in intake areas and areas with highest prevalence of force.

Defendants shall also evaluate all policies and training associated with every use-of-force review to determine if updates or revisions are necessary as a result of those reviews

1   and shall ensure the documentation process for use-of-force review reflects that a review

2   of polices and training has occurred.  Defendants agree to maintain adequate resources to

3   ensure appropriate independent use of force reviews, training, and auditing to comply with

4   the terms of this Consent Decree.

5                    **2.      Restraint Devices**

6          Restraint Devices shall be applied for only the amount of time reasonably necessary

7   and shall never be applied as a punishment or as a substitute for treatment.  Defendants

8   have discontinued the use of WRAP devices at the Jail and shall not resume their use at the

9   Jail.

10         AFBH and medical staff shall be alerted any time a restraint log is initiated for a

11  Behavioral Health Client.  Once notified, medical staff shall review the individual's health

12  record and provide an opinion on placement and retention in the Restraint Device.  A

13  Qualified Mental Health Professional shall conduct an assessment, as soon as practicable,

14  but in any event within four (4) hours of initiation of the restraint log.

15         Defendants shall develop, in consultation with the Joint Expert(s) and as discussed

16  in Section IV(A), policies, procedures, and training regarding the appropriate use of other

17  Restraint Devices, including appropriate medical monitoring, provision of fluids, restroom

18  breaks, and guidelines for release from restraints.  Defendants shall provide such training

19  within six (6) months of the Effective Date, and shall provide recurring training on an

20  annual basis.

21                   **3.      Disciplinary Process**

22         Defendants' shall develop written policies and procedures, as set forth in

23  Section IV(A), which shall require meaningful consideration of the relationship between

24  the individuals' behavior and any mental health or intellectual disability, the efficacy of

25  disciplinary measures versus alternative measures that are designed to effectuate change in

26  behavior through clinical intervention, and the impact of disciplinary measures on the

27  health and well-being of prisoners with disabilities.  The delivery of mental health

28  treatment shall not be withheld from Behavioral Health Clients due to Discipline.

1   Behavioral Health Clients shall also not be subject to Discipline for refusing treatment or

2   medications, engaging in self-injurious behavior, or threats of self-injurious behavior.

3          ACSO shall include Qualified Mental Health Professionals in the disciplinary

4   process relating to SMI clients.  For Behavioral Health Clients who are not SMI, ACSO

5   shall notify a Qualified Mental Health Professional of the initiation of the disciplinary

6   process, including the basis for disciplinary action, and shall include a Qualified Mental

7   Health Professional as appropriate in the disciplinary process.  Defendants shall develop a

8   form for Qualified Mental Health Professional to use that allows them to indicate:

9   (a) whether the reported behavior was related to mental illness or adaptive functioning

10  deficits, including whether the behavior was related to an act of self-harm; (b) any other

11  mitigating factors regarding the individual's behavior, disability, or circumstances that

12  should be considered; and (c) whether certain sanctions should be avoided due to the

13  individual's underlying disability and/or mental health needs.  ACSO shall further ensure

14  recommendations regarding whether the mental health of the individual impacted their

15  actions are appropriately considered and proper interventions provided to Behavioral

16  Health Clients and avoid punishing Behavioral Health Clients for manifestations of their

17  disabilities.  To the extent ACSO chooses to not follow the Qualified Mental Health

18  Professional's recommendations, ACSO shall document and explain in writing why the

19  recommendation was not followed.

20         Defendants shall limit the practice of seeking an opinion on the level of discipline

21  that should be assessed from the ACSO staff authoring the report.  Defendants shall cease

22  the use of disciplinary diets in all cases other than food-related disciplinary cases.

23  Defendants' policies shall include timelines for disciplinary proceedings and the

24  imposition of Discipline.  Placement in a higher classification, including placement to

25  Restrictive Housing, is governed by the classification process outlined in Section III(C).

26         **F.    Grievances**

27         Defendants shall evaluate the tracking and metrics system for grievances to seek

28  formats that better inform management on timeliness, trends, problem areas, etc.  Where

1  grievances are available for completion on tablets, incarcerated persons shall continue to

2  have the option of accessing paper forms, and the tablets shall allow individuals to submit

3  grievances without deputy assistance or approval.  Defendants shall ensure supervisors are

4  conducting and documenting daily rounds in housing units to ensure access to grievance

5  systems, including that paper forms are readily available to incarcerated persons on their

6  housing unit or pod.  Defendants shall also keep statistics regarding the kinds of grievances

7  filed, any corrective actions taken, and any staff issues that arise from this process.  The

8  Compliance Captain shall report through the chain of command on any such systemic or

9  staff issue(s) promptly.

10          **G.      Mental Healthcare**

11          Defendants shall work with the agreed-upon joint subject matter expert, as

12  discussed in Section IV(A), to develop and implement policies, procedures, and forms

13  required to implement the provisions contained herein.  All Staff shall be trained on the

14  topics, as discussed in Section IV(A), including any modifications to policies and

15  procedures, described herein.

16          Consistent with the preceding paragraph Defendants shall implement revised

17  policies and procedures to ensure appropriate access to therapeutic and behavioral health

18  services throughout the Jail.  These policies and procedures shall include the staffing,

19  establishing admission and discharge criteria, levels of care, and treatment plans and

20  services for all therapeutic housing unit(s) within six (6) months of the Effective Date,

21  including the current Behavioral Health Unit and any other units housing Behavioral

22  Health Clients designated as SMI, to ensure increased coordination between mental health

23  and custody staff.

24          Within three (3) months of the Effective Date, Defendants shall develop a plan to

25  implement Therapeutic Housing Unit(s) at the Jail, as set forth in Section III(G)(6).  Final

26  implementation of the Therapeutic Housing Unit(s) shall be dependent upon completion of

27  reconfiguration of the units; however, Defendants shall implement the Therapeutic

28  Housing Unit(s) within one (1) year of the Effective Date.

1    During the interim period, individuals with SMI shall receive the therapeutic

2  services described in Sections III(F)(2), (3), and (4) as deemed clinically necessary for

3  their individual needs.  Defendants shall also develop policies and procedures to provide

4  incarcerated persons appropriate access to therapeutic and behavioral health services

5  throughout the Jail.  Defendants shall develop appropriate training to all custody staff

6  including staff assigned to any units where Behavioral Health Clients may be housed

7  regarding the needs of Behavioral Health Clients, mental health resources available at the

8  Jail, and how to assist Behavioral Health Clients in accessing such resources within six

9  (6) months of the Effective Date.  Thereafter, Defendants shall implement the policies and

10  procedures, including providing appropriate training to all staff, consistent with

11  Section IV(A).

12    Mental health staff shall communicate with custody staff regarding the mental

13  health needs of Behavioral Health Clients on their housing unit where necessary to

14  coordinate care.  Defendants shall develop and implement policies and procedures

15  governing coordination and sharing of information between mental health staff and

16  custody staff in a manner that respects the confidentiality rights of Behavioral Health

17  Clients to include standards and protocols to assure compliance with such policies.

18    **1.    Intake**

19  Defendants shall take the following actions regarding mental healthcare at intake:

20  a.  Implement an appropriate standardized initial assessment tool to screen clients at

21    intake for mental health concerns.  This assessment shall include specific

22    screening for suicidality and potential for self-harm.  At a minimum, the

23    screening for suicidality and potential self-harm shall include: (a) Review of

24    suicide risk notifications in relevant medical, mental health, and custody

25    records, including as to prior suicide attempts, self-harm, and/or mental health

26    needs; (b) Any prior suicidal ideation or attempts, self-harm, mental health

27    treatment including medication, and/or hospitalization; (c) Current suicidal

28    ideation, threat, or plan, or feelings of helplessness and/or hopelessness;

(d) Other relevant suicide risk factors, such as: (i) Recent significant loss (job, relationship, death of family member/close friend); (ii) History of suicidal behavior by family member/close friend; (iii) Upcoming court appearances; and (e) Transporting officer's impressions about risk.  The screening shall also include the specific questions targeted towards individuals with co-occurring mental health and substance abuse disorders, including: (1) substance(s) or medication(s) used, including the amount, time of last use, and history of use; (2) any physical observations, such as shaking, seizing, or hallucinating; (3) history of drug withdrawal symptoms, such as agitation, tremors, seizures, hallucinations, or delirium tremens; and (4) any history or serious risk of delirium, depression, mania, or psychosis.

b.  An "Emergent" mental health condition requires immediate assessment and treatment by a Qualified Mental Health Professional in a safe therapeutic setting to avoid serious harm.  Individuals requiring "Emergent" mental health treatment include: individuals who report any suicidal ideation or intent, or who attempt to harm themselves; individuals about whom the transporting officer reports a threat or attempt to harm themselves; or individuals who are at imminent risk of harming themselves or others; individuals who have severely decompensated; or individuals who appear disorientated or confused and who are unable to respond to basic requests or give basic information.  Individuals identified as in crisis or otherwise having Emergent mental health concerns shall be seen as soon as possible by a Qualified Mental Health Professional, but no longer than within four (4) hours of referral.

c.  An "Urgent" mental health condition requires assessment and treatment by a Qualified Mental Health Provider in a safe therapeutic setting.  Individuals requiring "Urgent" mental health treatment include: individuals displaying signs and symptoms of acute mental illness; individuals who are so psychotic that they are at imminent risk of severe decompensation; or individuals who have

17786622.1[3703035.23]

attempted suicide or report suicidal ideation or plan within the past thirty (30) days.  Individuals identified as having Urgent concerns shall be seen by a Qualified Mental Health Professional within twenty-four (24) hours of referral.

d. A "Routine" mental health condition requires assessment and treatment by a Qualified Mental Health Professional in a safe therapeutic setting.  Individuals requiring "Routine" mental health treatment include individuals who do not meet criteria for Urgent or Emergent referral.  Individuals identified as having Routine concerns shall be seen by a Qualified Mental Health Professional within five (5) business days or seven (7) calendar days of referral.

e. Following intake, individuals who request mental health services or who are otherwise referred by Staff for mental health services whose concerns are not Emergent or Urgent shall be seen by a Qualified Mental Health Professional within fourteen (14) days of the request or referral.  Individuals who present with Emergent or Urgent concerns post-intake shall be assessed and seen in accordance with the timelines set forth above.

f. This initial mental health screening shall be conducted by a Qualified Mental Health Professional in a confidential setting.  The Jail shall ensure that the initial mental health screening is completed within four (4) hours of admission, or as soon as practicable if there are a large number of incarcerated persons being processed through intake or if there is a serious disturbance or other emergency within the Jail that prevents AFBH from fulfilling this task.  The screening shall be documented and entered into AFBH's electronic mental health records system.  AFBH shall promptly obtain copies of records from community-based care provided through ACBH and request copies of records from other county-contractors immediately following the individual's admission to the Jail.

g. Develop and implement an intake database requirement to flag self-harm incidents from prior incarcerations.  This flag shall be entered by AFBH into ACSO's Jail Management System (ATIMS) and AFBH's Clinician's Gateway

System (or equivalents). This flag shall be used to identify patients who are "high moderate or high risk" based upon an appropriate scoring protocol. Individuals who engage in self-directed harm, either during arrest or while in custody at SRJ, including in prior incarcerations at SRJ, shall be referred by either ACSO, AFBH, or Wellpath, for evaluation and scoring. The flag shall incorporate a modifier to indicate the level of risk which shall only be visible within the Clinician's Gateway System. The flag shall be used to ensure that AFBH, ACSO, and Wellpath are all aware of the occurrence of higher risk behaviors so appropriate interventions can be made. The flag shall also be historical so that when an individual leaves and returns to custody, the flag shall auto-populate in all relevant systems to ensure the patient is evaluated as soon as possible and to mitigate risk for additional self-harm. Once the flag is implemented, ACSO and AFBH shall work together to conduct appropriate training for relevant staff members.

h. Develop and implement a new alert system (computerized or otherwise) to advise the Intake, Transfer and Release Lieutenant (or Watch Commander, when the Intake, Transfer and Release Lieutenant is unavailable or off duty) when a person is held in the intake area for more than four (4) hours. Once alerted, the notified lieutenant shall follow-up every ninety (90) minutes thereafter to ensure the inmate is processed as expeditiously as possible. Defendants shall process individuals through intake within eight (8) hours, except where it is impossible due to mass arrests, serious disturbances, critical incidents, or other emergencies that divert significant staffing resources, in accordance with the classification system.

i. Develop and implement policies and procedures to provide for the timely verification of medications within twenty-four (24) hours for newly arriving inmates to prevent delays in medication continuity upon arrival to the facility.

j. Ensure that all mental health intake interviews and assessments conducted in

ITR shall occur in private and confidential spaces.  Staff shall inform newly arriving individuals how to request mental health services.  Upon completion of the intake screening form staff shall refer individuals identified as having mental health concerns for a follow-up assessment.

k.  Prior to accepting custody of any arrestee, Jail personnel conduct a pre-booking screening of all individuals while they are still in the custody of an arresting officer to identify potentially urgent medical and/or emergent mental health issues and are deferred to outside treatment when necessary including if arrestees indicate they are suicidal.  Arrestees who express suicidality during the pre-booking screening shall be assessed to determine if they meet criteria under Welfare and Institutions Code § 5150 ("Section 5150").  Individuals who meet criteria under Section 5150 are deferred to psychiatric care and treatment and are not admitted to the Jail.  Subsequent admission to the Jail of individuals who were deferred to outside medical or mental health treatment shall be predicated upon obtaining clearance from a community hospital.

l.  Defendants shall implement quality assurance policies and procedures that provide for periodic audits of the intake screening process in accordance with the standards set forth above.

### 2.  Clinical and Psychiatric Care

Defendants shall take the following actions:

a.  Conduct all mental health clinical and psychiatric encounters in confidential settings, with consistent providers, and ensure such encounters are of appropriate clinical duration.  Cell-side check-ins are presumed to be inappropriate for clinical encounters absent clinically appropriate extenuating circumstances, such as when an inmate refuses to leave their cell.  ACSO escort staff shall be made available as necessary to ensure that clinical contacts occur in confidential settings.  Defendants shall also assess the current space available for incarcerated persons housed in Step 1, Step 2, or Therapeutic Housing Units

located in Maximum custody units for clinical interviews and develop a plan for increasing access to appropriate, private, spaces for clinical interviews within six (6) months of the Effective Date.  Individuals housed outside of these areas shall continue to be seen confidentially, including in AFBH's clinical offices.  In addition to interim measures to address these issues, Defendants shall use best efforts to construct and activate the Mental Health/Program Services Building which will provide programming, medical and mental health treatment and administrative space at SRJ.

b.  Implement an electronic tracking system aimed at improving the process of referring patients to mental health services and tracking the timeliness of said referrals.  This tracking system shall include alert and scheduling functions to ensure timely delivery of mental health services.

c.  Develop and implement a policy addressing timelines for the completion of routine and emergency mental health referrals in accordance with community correctional and professional standards.

d.  Provide appropriate training to ensure that psychiatric referrals are submitted as clinically indicated.

e.  Develop and implement quality assurance policies and procedures that provide for periodic audits of the mental health care provided at the Jail in accordance with the standards set forth in this section.

#### (a)    Levels of Care

Defendants shall develop and implement the mental health levels of care, including a list of the clearly defined levels of care which shall describe the following: (1) level of functioning, and (2) service components, including treatment services, programming available, and treatment goals ("Levels of Care").  The Levels of Care is attached hereto as **Exhibit C**.

#### (b)    Individual Therapy, Group Therapy, and Treatment Planning

Defendants shall take the following actions:

(i)    Provide that mental health clinicians offer encounters that are clinically appropriate, of clinically appropriate duration and conducted in confidential settings with consistent providers.  The phrase "clinically appropriate" shall be defined to refer to the quality and quantity of mental care necessary to promote individual functioning within the least restrictive environment consistent with the safety and security needs of the patient and the facility, to provide patients with reasonable safety from serious risk of self-harm, and to ensure adequate treatment for their serious mental health needs.

(ii)   Identify clinically appropriate spaces for the provision of group and individual therapy and provide that these areas are available for use in providing confidential therapy and are given priority for such use.

(iii)  Provide out-of-cell programming, including but not limited to group therapy, education, substance abuse counseling, and other activities for inmates housed in Restrictive Housing Units and Therapeutic Housing Units.

(iv)   Provide regular, consistent therapy and counseling in group and individual settings as clinically appropriate.

(v)    Provide in-cell activities, such as therapeutic and self-help materials to decrease boredom and to mitigate against isolation.

(vi)   Develop formal clinical treatment teams comprised of clinicians and other appropriate staff for each Therapeutic Housing Unit and Restrictive Housing Unit to deliver mental health care services to Behavioral Health Clients housed in those units within six (6) months of the Effective Date.  These teams shall work similar schedules and be co-located in an adequately sized space to allow for frequent treatment team meetings for each individual client and collective pods, which shall enable them to collaborate on providing programming for their assigned housing units.  For Behavioral Health Clients not housed in a Special Handling Unit, a clinician and/or other provider shall be assigned as needed.

(vii)  Develop and implement policies and procedures to establish treatment teams to provide formal, clinically appropriate individualized assessment and planning (treatment plans) for Behavioral Health Clients receiving ongoing mental health services.  Assessment and planning for mental health services includes, at minimum, diagnosis or diagnoses; a brief explanation of the inmate's condition(s) and need for treatment; the anticipated follow-up schedule for clinical evaluation and assessment including the type and frequency of diagnostic testing and therapeutic regimens if applicable; and counsel the patient about adaptation to the correctional environment including possible coping strategies.

(viii) Individualized mental health treatment plans shall be developed for all Behavioral Health Clients by a Qualified Mental Health Professional within thirty (30) days of an incarcerated person's initial mental health assessment at

intake or upon referral.  Plans shall be reviewed and updated as necessary at least every ninety (90) days for Behavioral Health Clients generally and every thirty (30) days for SMI Clients, and more frequently as needed.  The treatment plan shall include treatment goals and objectives including at least the following components: (1) documentation of involvement/discussion with the incarcerated person in developing the treatment plan, including documentation if the individual refuses involvement; (2) frequency of follow-up for evaluation and adjustment of treatment modalities; (3) adjustment of psychotropic medications, if indicated; (4) when clinically indicated, referrals for testing to identify intellectual disabilities, medical testing and evaluation, including blood levels for medication monitoring as required; (5) when appropriate, instructions about diet, exercise, personal hygiene issues, and adaption to the correctional environment; (6) documentation of treatment goals and notation of clinical status progress (stable, improving, or declining); and (7) adjustment of treatment modalities, including behavioral plans, as clinically appropriate.  The treatment plan shall also include referral to treatment after release where recommended by mental health staff as set forth in Section III(I) (Discharge Planning).  Where individuals are discharged from suicide precautions, the plan shall describe warning signs, triggers, symptoms, and coping strategies for if suicidal thoughts reoccur.

(ix)    Develop and implement policies and procedures to provide consistent treatment team meetings to increase communication between treating clinicians, provide a forum for the discussion of difficult or high-risk individuals, and assist in the development of appropriate treatment planning.  AFBH shall consult with ACSO regarding an individual's treatment plan as deemed appropriate by a Qualified Mental Health Professional and in a manner which protects client confidentiality to the maximum extent possible consistent with HIPAA requirements.

(x)     Provide information discussed in treatment team meetings to medical providers when indicated to ensure communication of relevant findings and issues of concern.

(xi)    Provide calming and restorative instruction, which may include in-person classes or groups on a regularly scheduled basis in units housing Behavioral Health Clients.

(xii)   Provide substance abuse programs targeted to individuals with co-occurring mental health and substance abuse issues on a regularly scheduled basis for Behavioral Health Clients.

### (c)     Care in Restrictive Housing Units and Therapeutic Housing Units

Defendants shall take the following actions:

(i)     Provide daily mental health rounds in Restrictive Housing Units and Therapeutic Housing Units to allow for direct observation of and interaction

with the incarcerated individual, including face-to-face contact and specific outreach to people on psychiatric medications to check their status. Individuals shall be permitted to make requests for care during these rounds. Where a Qualified Mental Health Professional determines that an individual's placement in Restrictive Housing Unit is contraindicated, they may initiate transfer of the individual to a higher level of care in a Therapeutic Housing Unit.

(ii)    Offer weekly face-to-face clinical contacts, that are therapeutic, confidential, and conducted out-of-cell, for Behavioral Health Clients in Restrictive Housing Units and Therapeutic Housing Units.

(iii)   Provide additional clinical contacts to individuals in Restrictive Housing Units and Therapeutic Housing Units, as needed, based on individualized treatment plans.

(iv)    Defendants shall ensure individuals expressing suicidal ideation are provided clinically appropriate mental health evaluation and care. Individuals who express suicidal ideation shall be assessed by a Qualified Mental Health Professional and shall not be placed in restrictive housing if a Qualified Mental Health Professional determines they are at risk for suicide.

### 3.    Psychiatric Medication Management and Care System

Defendants shall ensure that psychiatric medications are ordered in a timely manner, are consistently delivered to individuals regardless of where they are housed, and are administered to individuals in the correct dosages. Defendants shall integrate the Jail's electronic unit health records systems in order to share information regarding medication administration and clinical care as appropriate between the Jail's medical and mental health providers and outside community providers operated through the County. Psychiatric medications prescribed by community-based providers shall be made available to Behavioral Health Clients at the Jail unless a Qualified Mental Health Professional makes a determination that it is not clinically appropriate. Any decision to discontinue and/or replace verified medication that an individual had been receiving in the community must be made by a prescribing mental health provider who shall document the reason for discontinuing and/or replacing the medication and any substitute medication provided. Defendants shall ensure that, absent exigent circumstances, initial doses of prescribed psychiatric medications are delivered to inmates within forty-eight (48) hours of the prescription, unless it is clinically required to deliver the medication sooner.

Defendants shall maintain an anti-psychotic medication registry that identifies all inmates receiving two (2) or more anti-psychotic medications, the names of the medications, the dosage of the medications, and the date when each was prescribed.  The lead psychiatrist shall review this registry every two (2) weeks to determine: (1) continued justification for medication regimen, (2) whether one medication could be used to address symptoms, and (3) whether medication changes are needed due to an adverse reaction.  All determinations and required actions shall be documented.

Defendants shall ensure that health care staff document when individuals refuse prescribed psychotropic medications and follow-up by referring the patient to the AFBH prescribing provider after four refusals of the same medication in a one-week period or three (3) consecutive refusals of the same medication in a one-week period.

Defendants shall conduct audits on a periodic basis of 5% of charts of all patients receiving psychotropic medications with the frequency of such audits to be established in consultation with the joint neutral mental health expert to ensure that psychotropic medication is appropriately administered and that referrals for psychotropic medication refusals are being made consistent with policy.  Charts will be randomly selected and are to include patients in all applicable housing units.

### 4.    Suicide Prevention

Defendants shall develop, in consultation with Plaintiffs, a new mutually-agreed upon Suicide Prevention Policy and associated training that shall include the following:

### (a)    Safety Cells

Use of a safety cell should only be used as a measure of last resort for inmates expressing suicidal ideation and actively demonstrating self-harm.  It is a primary goal of this Agreement to phase out the use of such cells to the maximum extent feasible as soon as it is safe to do so.  To this end, Defendants shall reconfigure and/or construct suicide resistant cells within six months of the Effective Date.  The Parties shall meet and confer within three (3) months of the Effective Date regarding: (1) the status of reconfigurations and/or construction efforts; (2) methods to expedite such efforts including areas to

1  prioritize; and (3) any interim actions necessary to protect the mental health and safety of

2  class members pending the completion of reconfiguration and/or construction efforts.

3     Once that work is completed, Defendants agree to severely curtail the use of safety

4  cells, except as a last resort, and to only use safety cells when an inmate expresses suicidal

5  ideation and is actively demonstrating self-harm and there is no other safe alternative,

6  subject to the limitations set forth below.

7     In the interim, safety cells should only be used in exigent circumstances in which

8  the inmate poses an imminent risk of self-harm.  A Qualified Mental Health Professional

9  must evaluate the need to continue safety cell placement within one (1) hour of the initial

10  placement to the extent feasible.

11    Individuals may not be housed in a safety cell for longer than eight (8) hours.

12  During that time, the individual shall be re-assessed by mental health and either

13  transported on a 5150 hold if appropriate or transferred from the safety cell to another

14  appropriate cell, including a suicide resistant cell if necessary.

15    Defendants shall adopt graduated suicide precautions, including use of special

16  purpose cells, reconfigured suicide resistant cells, one-on-one suicide watch, and a step

17  down to suicide precautions with less intensive observation.  Cells with structural blind

18  spots shall not be used for housing individuals on suicide precautions.  Once Defendants

19  have completed reconfiguration and/or construction of suicide resistant cells, the use of

20  safety cells shall be limited to no more than four (4) hours.

21    Defendants shall ensure that the safety cell is clean prior to the placement of a new

22  individual in the safety cell.  Safety cells shall also be cleaned on a normal cleaning

23  schedule when not in use.  Defendants shall provide individuals housed in safety cells with

24  a safety mattress, safety eating utensils, toilet paper, and feminine hygiene products.

25    Custody staff may only temporarily place an inmate in a modesty garment until the

26  individual is evaluated by a Qualified Mental Health Provider, as set forth above.

27  Decisions about the continued use of a garment (smock) or removal of normal clothing

28  shall be made solely by a Qualified Mental Health Professional based on individualized

clinical judgment.  Individuals placed in a safety cell shall continue to be offered medication and treatment as deemed clinically appropriate by a Qualified Mental Health Provider.  Defendants shall develop new policies and associated training on security checks, including the levels of supervision necessary for individuals placed in safety cells.

### (b)	Call Button Response

Defendants agree to continue to ensure that there are working call buttons in all cells and shall continue to conduct periodic checks of call buttons in all units and address any maintenance issues as soon as possible.  If a call button is found to be inoperable, the individual shall be moved to a cell with a working call button as soon as practicable. Defendants shall develop and implement policies, procedures, and forms required to implement the provisions contained herein.

### (c)	Observation, Prevention and Review of Completed Suicides and Suicide Attempts

#### (i)	Security Checks and Use of Suicide Precautions

Defendants shall develop new policies and associated training, as set forth in Section IV(A), regarding the use of suicide precautions, including one-on-one suicide watch, step down to suicide precautions, and associated cleaning schedules for any cells used for suicide precautions.  Defendants shall identify and implement a suicide risk assessment tool to assist staff in the appropriate determination of suicide risk described in Section III(F)(1)(A) .

Defendants shall also continue to provide ongoing training regarding the appropriate use and development of safety plans with supervisory monitoring and feedback regarding the adequacy of safety plans developed.  To the extent it occurs, Defendants shall discontinue the use of language referencing suicide and/or safety contracts.

Defendants shall ensure cut-down tools are securely located and accessible to custody staff in all inmate areas, especially in the housing units, including appropriate emergency materials that may be needed to respond to suicide attempts in close proximity to all housing units.

1        Custody staff, medical staff, or mental health staff may initiate suicide precautions

2    to ensure client safety.  If the suicide precaution was not initiated by mental health staff, as

3    soon as possible but at least within four (4) hours absent exigent circumstances, a

4    Qualified Mental Health Professional must conduct a face-to-face assessment of the

5    individual and decide whether to continue suicide precautions using a self-harm

6    assessment and screening tool establishing actual suicide risk as described in

7    Section III(F)(1)(A).  The assessment shall be documented, as well as any suicide

8    precautions initiated, including the level of observation, housing location, and any

9    restrictions on privileges.

10        Individuals placed on suicide watch shall be placed on Close Observation.

11    Individuals on Close Observation shall be visually observed at least every fifteen

12    (15) minutes on a staggered basis.  A Qualified Mental Health Professional may determine

13    that Constant Observation is necessary if the individual is actively harming themself based

14    on the application of specific criteria to be set forth in written policy.  Individuals on

15    Constant Observation shall be observed at all times until they can be transported in

16    accordance with the Jail's Emergency Referral process as outlined in Section III(G)(5) or

17    until a Qualified Mental Health Professional determines that Constant Observation is no

18    longer necessary.  A Qualified Mental Health Professional shall oversee the care provided

19    to individuals placed on either Close Observation or Constant Observation status.

20        Individuals placed on suicide precautions shall continue to receive therapeutic

21    interventions and treatment, including consistent out-of-cell therapy and counseling in

22    group and/or individual settings and medication, as clinically appropriate.  AFBH shall

23    document in the individual's mental health record any interventions attempted and whether

24    any interventions need to be modified, including a schedule for timely follow-up

25    appointments.  All individuals shall be encouraged to be forthcoming about any self-

26    injurious thoughts and all reports of feeling thoughts of self-harm shall be taken seriously

27    and given the appropriate clinical intervention including the use of positive incentives

28    where appropriate.

Qualified Mental Health Professionals shall see inmates on suicide precautions on an individualized schedule based on actual suicide risk, for instance, daily or hourly as needed to assess whether suicide precautions shall be continued.  These assessments shall be documented including any modifications to suicide precautions deemed necessary, whether the individual refused or requested the assessment cell-side.  Where individuals refuse assessment, a Qualified Mental Health Professional shall continue to attempt to see the individual and document all follow-up attempts.  Psychiatrists, clinicians, or other providers as appropriate shall meet with custody staff on a daily basis to review any individuals placed on suicide precautions regarding any collaborative steps that should be taken.  These meetings shall be documented in the form of minutes stored and maintained by mental health staff or by entry in the individual inmate's record.

A Qualified Mental Health Professional shall complete and document a suicide risk assessment prior to discharging a prisoner from suicide precautions in order to ensure that the discharge is appropriate, that appropriate treatment and safety planning is completed, and to provide input regarding a clinically appropriate housing placement.  Individuals discharged from suicide precautions shall remain on the mental health caseload and receive regularly scheduled clinical assessments and contacts as deemed clinically necessary by a mental health clinician.  Unless individual circumstances direct otherwise, mental health staff shall conduct an individualized follow-up assessment within twenty-four (24) hours of discharge, again within seventy-two (72) hours of discharge, and again within one (1) week of discharge.

Cancellation of privileges for individuals on suicide precautions shall be avoided whenever possible and utilized only as a last resort.  Individuals on suicide precautions shall be offered out-of-cell time consistent with Section III(G)(6) unless a Qualified Mental Health Professional determines it is specifically contraindicated due to their treatment needs.  Where such a determination is made, individuals on suicide precaution shall be offered sufficient daily out-of-cell time to allow them to shower, use the phone, and access the dayroom and/or outdoor yard to the maximum extent possible.  Inmates on

suicide precautions shall be evaluated by a Qualified Mental Health Professional to determine whether denial of access to property is necessary to ensure the inmate's safety. Individuals on suicide precautions shall receive privileges consistent with their classification when it is deemed safe to do so by a Qualified Mental Health Professional. If a Qualified Mental Health Professional determines that certain property or privileges must be withheld based on the suicide risk assessment, this determination shall be documented including the reasons why the particular property or privilege poses an actual risk. The individual shall be reassessed for such privileges by a Mental Health Provider at least every three (3) days, with the determination and reasoning documented in writing, and the privileges restored at the earliest clinically appropriate time possible based on actual suicide risk.

Defendants shall develop and implement updated policies and associated training for all custody staff, as well as training for custody staff newly hired and/or assigned to the Jail, regarding how to conduct quality security checks for inmates placed on suicide precautions and regarding suicide prevention and precautions generally. The training shall include the creation of a video to model appropriate security check observations as well as in-person training and shall address at least the following topics: (a) avoiding obstacles (negative attitudes) to suicide prevention; (b) review of recent suicides and serious suicide attempts at the jail within the last two years and any patterns or lessons learned (c) why facility environments are conducive to suicidal behavior; (d) identifying suicide risk despite the denial of risk; (e) potential predisposing factors to suicide; (f) high-risk suicide periods; (g) warning signs and symptoms; (h) components of the jail suicide prevention program; (i) liability issues associated with inmate suicide; and ( j) crisis intervention including practical exercises regarding the proper response to a suicide attempt and the proper use of cut-down tools.

All clinical mental health staff shall receive additional training on how to complete a comprehensive suicide risk assessment and how to develop a reasonable safety plan that contains specific strategies for reducing future risk of suicide.

1   Defendants shall continue to ensure supervisory oversight in reviewing quality and

2   timeliness of security checks and require regular auditing of safety check logs against

3   video recordings.  Defendants shall also consider use of Sheriff's Technicians to assist

4   with security checks.

5           (ii)     Suicide Reviews

6   Defendants shall develop and implement updated policies, practices, and associated

7   training regarding reviews of suicides and suicide attempts at the Jail.  All suicide and

8   serious suicide attempt reviews shall be conducted by a multi-disciplinary team including

9   representatives from both AFBH and custody and shall include: (1) a clinical

10  mortality/morbidity review, defined as an assessment of the clinical care provided and the

11  circumstances leading to the death or serious suicide attempt; (2) a psychological autopsy,

12  defined as a written reconstruction of the person's life with an emphasis on the factors that

13  led up to and may have contributed to the death or serious suicide attempt, (3) an

14  administrative review, defined as an assessment of the correctional and emergency

15  response actions surrounding the person's death or serious suicide attempt; and (4) a

16  discussion of any changes, including to policies, procedures, training, or other areas, that

17  may be needed based on the review.

18  Defendants shall notify Class Counsel and the Joint Experts of the fact a suicide

19  occurred within twenty-four (24) hours and shall notify Class Counsel of any "Serious

20  Suicide Attempts," meaning where an individual is admitted to the hospital for treatment

21  following the attempt, within seventy-two (72) hours.  Defendants shall provide Class

22  Counsel and the relevant Joint Experts with the underlying incident reports and review

23  documents as they become available.

24  **5.      Emergency Referrals**

25  Defendants shall develop and implement standards and timelines for emergency

26  referrals and handling of 5150 psychiatric holds for incarcerated persons.  For individuals

27  sent to John George Psychiatric Hospital, AFBH in coordination with ACSO, shall

28  coordinate with John George to promote continuity of care, including sharing records and

1  information about what led to decompensation, strategies for treatment, and treatment

2  plans to promote patient well-being after returning to the jail.  AFBH shall further reassess

3  the individual upon return to the jail to ensure the individual is stabilized prior to returning

4  them to a housing unit.  If AFBH staff determine that the individual is not sufficiently

5  stabilized to safely function in a jail setting, they shall re-initiate a 5150 to John George.

6  AFBH shall track the number of 5150 holds initiated from the Jail and perform a review of

7  all cases where individuals were sent to John George, on at least a quarterly basis, to

8  identify any patterns, practices, or conditions that need to be addressed systematically.

9         The County shall assess and review the quality of the care provided to incarcerated

10  persons sent to John George, or any other psychiatric facilities that accept 5150s from the

11  Jail, including continuity of care between John George and the Jail, the types and the

12  quality of services provided to incarcerated clients and resultant outcomes including any

13  subsequent suicide attempts or further 5150s.  In particular, AFBH shall assess

14  inmate/patients upon their return to the Jail to confirm they are no longer gravely disabled

15  and/or suicidal.  The County shall develop a process and procedures by which AFBH shall

16  seek input from treating clinicians at John George regarding any needed changes to the

17  individual's treatment plan.  The County shall conduct this analysis within sixty (60) days

18  of the Effective Date and develop a plan for addressing any issues, including whether the

19  County could create any alternatives to sending Behavioral Health Clients in crisis to John

20  George.  A copy of the analysis and plan shall be provided to Class Counsel.

**6.      Therapeutic Housing Units for Behavioral Health Clients**

22         The following amounts of out-of-cell time shall apply to inmates housed in the

23  Therapeutic Housing Units, unless a Qualified Mental Health Professional determines that

24  such amounts of time are clinically contraindicated: Individuals who are housed in the

25  most restrictive setting within the Therapeutic Housing Units shall be offered at least one

26  (1) hour per day of structured time and three (3) hours per day of unstructured time.

27  Individuals housed in the less-restrictive, transitional units within the Therapeutic Housing

28  Units shall be offered at least two (2) hours per day of structured time and three (3) hours

1   per day of unstructured time.  Individuals in the least restrictive areas of the program shall

2   generally be allowed eight (8) hours per day out of cell.

3       Defendants shall re-orient the way in which all units, including the Therapeutic

4   Housing Units, are managed so that all units provide appropriate access to therapeutic and

5   behavioral health services as appropriate.  Placement in and discharge from a Therapeutic

6   Housing Unit shall be determined by a Qualified Mental Health Professional, in

7   consultation with custody staff as appropriate.  Defendants shall provide a sufficient

8   number of beds in the Therapeutic Housing Units at all necessary levels of clinical care

9   and levels of security, including on both the Maximum and on the Minimum and Medium

10  sides of the Jail, to meet the needs of the population.

11      Defendants shall also ensure that mental health programming and care available for

12  women is equivalent to the range of services offered to men.

13      The Parties shall meet and confer within three (3) months of the Effective Date

14  regarding Defendants proposed plan for the Therapeutic Housing Units including staffing

15  of these units, number of beds required for each level of care, programs and treatment

16  services to be provided on the units, timing of any required construction and development

17  of benchmarks with respect to measuring the efficacy of programs and treatment

18  components offered on these units.  Within six (6) months of the Effective Date,

19  Defendants shall finalize and begin to implement the plan for creating the Therapeutic

20  Housing Units and implement policies for the management of the Therapeutic Housing

21  Units including providing access to AFBH staff in these units as appropriate and according

22  to the severity of the unit's mental health needs.  Delays in the re-configuration of the

23  Therapeutic Housing Unit(s) due to construction shall not delay implementation of

24  therapeutic services, including but not limited to: mental health intake screening process,

25  provision and monitoring of psychiatric medications, referral processes, treatment plans,

26  and AFBH's involvement in discharge planning as set forth in Section III(I).  Admission

27  and discharge decisions shall be made by a multi-disciplinary team led by an AFBH staff

28  member and focused on the individual's treatment needs.  At a minimum, the plan shall

17786622.1[3703035.23]

1  also include: (1) the criteria for admission to and discharge from the Therapeutic Housing

2  Units as well for each level of care overall; (2) clear behavioral expectations for

3  progression to less restrictive settings including step-down units and/or general population;

4  (3) positive incentives for participation in treatment; (4) privileges and restrictions within

5  each level of care with the goal of housing individuals in the least restrictive setting

6  possible; and (5) an orientation at each level or pod as to the rules and expectations for that

7  level or pod.

8          The Therapeutic Housing Units shall be sufficiently staffed with appropriate Mental

9  Health Providers and dedicated custodial staff including on nights and weekends.  ACSO

10 staff assigned to these units shall receive specialized training in mental health.  AFBH

11 shall have qualified staff available onsite twenty-four (24) hours a day, seven (7) days a

12 week to address crisis situations in-person as needed throughout the Jail.  Additionally,

13 AFBH staff shall be assigned to the Behavioral Health Units and Therapeutic unit(s)

14 during the day to allow for constant client contact and treatment, and give AFBH the

15 ability to provide programming and other therapeutic activities.

16              **7.    Custodial Staff Training on Interacting with Individuals with
                         Mental Health Issues**

17

18         Defendants shall develop and implement custodial staff training on de-escalation

19 and patients experiencing mental health crisis, which shall be provided to all current

20 ACSO jail staff.  Class Counsel shall be provided with an opportunity to review the

21 proposed training materials and to provide input.  Class Counsel shall also be permitted to

22 attend the initial training to observe and may attend additional trainings upon request.  The

23 training shall, at minimum, including discussion of any relevant policies and procedures,

24 de-escalation techniques, crisis intervention, identifying people in mental health crises,

25 interacting with individuals with mental illness, appropriate referral practices, suicide and

26 self-harm detection and prevention, relevant bias and cultural competency issues,

27 confidentiality standards, and approaches on how to respond to individuals in crisis, with

28 an emphasis on developing and working in teams with AFBH as much as possible.  The

1  training shall include an assessment component, such as using interactive practice

2  scenarios, to measure staff comprehension.  Class Counsel shall be provided an

3  opportunity to review and comment on all training materials and may attend the training to

4  observe upon request.  This training shall also be provided to all new staff and current staff

5  shall complete a refresher training on these topics on a biennial basis.

6  **H.  Inmate Advisory Council and Ombudsperson Program**

7  Defendants shall establish an Inmate Advisory Council and Ombudsperson

8  Program, in consultation with the Joint Experts as provided in Section IV(A), to work with

9  the aforementioned Compliance Unit and senior Jail staff to provide individuals

10  incarcerated at the Jail a venue to raise and address new and ongoing concerns and

11  possible ways to improve living conditions at the Jail.  The Inmate Advisory Council shall

12  strive to have representation from all housing units and classifications at the Jail.

13  **I.  Discharge Planning**

14  Defendants shall implement systems, including through close coordination between

15  Alameda County Behavioral Health and the Jail, to facilitate the initiation or continuation

16  of community-based services for people with mental health disabilities while incarcerated

17  and to transition seamlessly into such services upon release, as described below.

18  AFBH staff shall work to develop a written plan prior to release for inmates who

19  are current Behavioral Health Clients and who remain in the Jail for longer than seventy-

20  two (72) hours following booking.  Transition and discharge planning for current

21  Behavioral Health Clients shall begin as soon as feasible but no longer than seventy-two

22  (72) hours following booking or identification as a Behavioral Health Client in an effort to

23  prevent needless psychiatric institutionalization for those individuals following release

24  from Jail.  The discharge plan shall be updated by AFBH on at least a quarterly basis,

25  regardless of whether a release date has been set.

26  AFBH shall work with Alameda County Social Services to facilitate evaluating the

27  individual's eligibility for benefits, as appropriate, including SSI, SSDI, and/or Medicaid

28  and to assist in linking clients to those possible benefits.  Where AFBH is notified of

1  upcoming release or transfer, AFBH shall work with the Behavioral Health Client to

2  update their discharge plan and provide the individual with a copy of the plan prior to

3  release.  The written plan shall help link the individual to community service providers

4  who can help support their transition from jail to community living.  The written plan shall

5  identify community services, provider contacts, housing recommendations community

6  supports (if any), and any additional services critical to supporting the individual in

7  complying with any terms of release.  In no case shall these efforts conflict with or

8  interfere with the work of the Mental Health Courts.

9      Defendants shall cooperate with community service providers, housing providers,

10  people with close relationships to the individual (including friends and family members),

11  and others who are available to support the individual's transition and re-entry from jail are

12  able to communicate with and have access to the individual, as appropriate and necessary

13  for their release plan.  Where an individual authorizes it, Defendants shall facilitate access

14  to mental health and other records necessary for developing the release plan.  If an

15  individual has a relationship with a community provider at the time of incarceration,

16  AFBH staff shall meaningfully attempt to engage that provider in the discharge planning

17  for that individual and facilitating visits where requested by the provider.  To facilitate a

18  warm hand-off, Defendants shall initiate contact with community mental health providers

19  in advance of a scheduled release for all incarcerated persons with serious mental illness,

20  including assisting in facilitating meetings between incarcerated individuals and

21  community mental health providers prior to or at the time of release and arranging a

22  follow-up appointment as needed.  With respect to planned and unplanned releases of

23  Behavioral Health Clients, custody staff shall notify AFBH as soon as possible so that they

24  can take appropriate steps to link these individuals with community services and resources

25  as needed.

26      If the individual takes prescription psychiatric medications in Jail (at the time of

27  release), Defendants shall ensure that the individual leaves the Jail with access to a 30-day

28  supply of the medication from a local pharmacy, when provided with adequate advance

1   notice of the individual's release.  Additionally, Defendants shall educate individuals who

2   are prescribed psychiatric medications regarding the location and availability of drop-in

3   clinics to obtain a refill of their medication in the community upon release.  In addition to

4   the 30-day supply of medication, Defendants shall coordinate with the County's outpatient

5   medication services to have individuals' prescriptions refilled if necessary to ensure an

6   adequate supply of medication to last until their next scheduled appointment with a mental

7   health professional.  Defendants shall ensure that SMI clients who are already linked to

8   services have referrals to mental health providers and other service providers upon release,

9   unless the individual refuses such referrals, or if staff was not provided adequate advance

10  notice of release.  SMI individuals who are not already linked to services shall be referred

11  to the 24-7 ACCESS line.

12      AFBH shall coordinate informing each Full Service Partnership in the County when

13  a client or individual with whom they have had contact is incarcerated.  Defendants shall

14  also collect data regarding the number of individuals with a serious mental illness in the

15  jail, including the number of days that these individuals spend in the Jail, the number of

16  times these individuals have been booked in the Jail previously, the number of times that

17  these individuals have returned to the jail due to probation violations, and the number of

18  Behavioral Health Clients released with a written release plan.

19      **J.      ADA**

20      Defendants shall work with the agreed-upon joint subject matter Joint Expert, as

21  discussed in Section IV(A), to develop and implement policies, procedures, and forms

22  required to implement the provisions contained herein.  All Staff shall be trained on the

23  topics, as discussed in Section IV(A), including any modifications to policies and

24  procedures, described herein.

25      **1.      ADA Coordinator**

26      ACSO shall continue to employ a full-time, dedicated ADA Coordinator at the Jail

27  who shall, among other ADA-related responsibilities, oversee the following issues related

28  to individuals with Psychiatric Disabilities: monitoring of the ADA Tracking System,

ADA-related training, grievances, disciplinary reports, Message Request forms, requests for accommodations, classification actions, orientation materials, touring housing units and discussing ADA-related issues with incarcerated persons and staff (*e.g.*, housing unit deputies, medical staff, mental health staff, dental staff, education staff, re-entry services staff, inmate program staff, library staff, religious services staff, etc.) as set forth below and on an as-needed basis, and any other ADA-related responsibilities as appropriate.  The ADA Coordinator shall be strongly encouraged to serve in that role for at least five (5) years to provide for consistency and to maximize the benefit of the training and expertise of the ADA Coordinator.  ACSO shall consult with the ADA Joint Expert regarding the Post order for the ADA Coordinator, and Plaintiffs' counsel shall have an opportunity to review and provide input prior to ACSO finalizing the Post order.  The ADA Coordinator shall report up the chain of command.  Additionally, the Compliance Captain shall oversee the day-to-day activities of the ADA Coordinator but shall not have the ability to re-assign the ADA Coordinator away from their ADA-related duties.

As soon as practical, but under no circumstances more than fourteen (14) days after an individual has been identified at intake or post-intake as having a Psychiatric Disability, the ADA Coordinator and/or her or his staff shall personally meet with each newly identified individual.  In the meeting, the ADA Coordinator shall employ effective communication to assist the individual in understanding the rules of the Jail; explain how to request accommodations and what accommodations are available; ensure the individual has access to grievance forms to raise disability-related issues; and inform them that ADA Unit staff are available to assist the individual with disability-related needs.  For any person identified as having a Psychiatric Disability who remains in the Jail for more than sixty (60) days, the ADA Coordinator and/or their staff shall meet with the individual to determine if their ADA-related needs are being met and at least every sixty (60) days thereafter.  This meeting and any relevant notes regarding accommodation needs shall be documented in writing.  Once the ADA Tracking System is implemented, this information shall be documented there.

1   After the initial ADA training is provided by the ADA Joint Expert, the ADA

2   Coordinator shall be charged with providing ADA-related training to Staff and with

3   monitoring programs and work assignments to ensure meaningful access for all individuals

4   with Psychiatric Disabilities.

5   The ADA Coordinator shall have sufficient staffing to assist him or her (the "ADA

6   Unit").  ACSO staff assigned to the ADA Unit shall be strongly encouraged to serve in that

7   capacity for at least three years to provide for consistency and to maximize the benefit of

8   the training and expertise of the Custody staff assigned to this unit.  During any period

9   where the ADA Coordinator is unavailable for any reason, a sergeant or higher-ranked

10  individual shall fulfill the duties of the ADA Coordinator position until the ADA

11  Coordinator becomes available or a replacement is appointed to the position.  The ADA

12  Coordinator position shall not remain vacant for more than ninety (90) days.

13  Within one (1) year from their initial assignment, all sworn staff assigned as ADA

14  Unit staff, including the ADA Coordinator, shall attend and complete a nationally

15  recognized certificate course designed for ADA coordinators and obtain a certification and

16  maintain said certification with updates and continuing education courses.  Any

17  replacement ADA Coordinator, interim ADA Coordinator, or sworn staff assigned to the

18  ADA Unit shall obtain their ADA certification within twelve (12) months of starting in the

19  position.

20          **2.      Effective Communication**

21  In consultation with the ADA Joint Expert, and in accordance with Section IV(A),

22  Defendants shall develop and implement policies and practices to ensure effective

23  communication ("Effective Communication policy") with individuals with Psychiatric

24  Disabilities at intake and in due process events (*e.g.*, grievance processes, classification

25  processes, disciplinary processes, pre-release processes, and conditions of release process),

26  religious activities, vocational and educational programs, and clinical encounters including

27  mental health appointments.  The Effective Communication policy shall include, at a

28  minimum, processes for: (a) identifying individuals whose cognitive, intellectual, or

1  developmental disability pose barriers to comprehension or communication; (b) promptly

2  providing reasonable accommodation(s) to overcome the communication barrier(s); and

3  (c) documenting the communication including the method used to achieve effective

4  communication and how the relevant staff person determined that the individual

5  understood the encounter, process, and/or proceeding.

6      For those individuals with a SMI diagnosis or a cognitive, intellectual, or

7  developmental disability, who have effective communications needs, the ADA Unit shall

8  meet with the individual in advance of any disciplinary hearing that may result in an

9  increase in security level and/or placement in more restrictive housing.  In order to provide

10  Effective Communication, the ADA Unit shall discuss the upcoming event with the

11  individual and ensure they are able to understand, participate, and communicate

12  effectively.

13              **3.      Intake & Orientation**

14      In consultation with the ADA Joint Expert, Defendants shall develop and

15  implement healthcare screening questions in order to identify individuals with intellectual,

16  developmental, psychiatric or learning disabilities.  These healthcare screening questions

17  shall be asked of all newly booked persons and conducted in a reasonably confidential

18  setting.  If the initial screening identifies a possible intellectual, developmental, psychiatric

19  or learning disability, the individual shall be referred to a Qualified Mental Health

20  Professional, including a Licensed Clinical Psychologist where appropriate, for a

21  secondary screening and assessment to occur within sixty (60) days of booking.  In the

22  context of learning disabilities, the referral may be made to an appropriately qualified

23  community provider, such as 5 Keys, for screening using a screening tool such as the Test

24  of Adult Basic Education to occur within fourteen (14) days of booking.  The date of the

25  assessment, the nature of the individual's disability, and any accommodations authorized

26  for the incarcerated person shall be promptly documented in the ADA Tracking System.

27      Individuals identified at intake as having a Psychiatric Disability shall be referred to

28  the ADA Unit for follow-up as described in Section III(J)(1).  Individuals not identified as

1  having Psychiatric Disability at intake may request a post-intake assessment at any time

2  after they are processed into the Jail.  Staff may also refer individuals for a post-intake

3  assessment.  Individuals shall also be referred for an assessment where there is

4  documentation of a Psychiatric Disability in the individual's health record or prior

5  correctional records or where a third party, such as an individual's community mental

6  health provider or family member, where appropriate, makes a request for an assessment

7  on the individual's behalf.

8        During intake, Defendants shall provide all incarcerated persons with a copy of the

9  Jail handbook and any other orientation materials including instructions on how to request

10  disability-related accommodations, how to contact the ADA Coordinator, and how to file a

11  grievance regarding ADA-related issues.  Upon request, ACSO staff shall provide

12  Effective Communication and assist incarcerated persons with Psychiatric Disabilities in

13  understanding the rulebook and orientation materials.  Where an individual has been

14  flagged as having a severe cognitive, developmental, or intellectual disability, regardless of

15  whether assistance is requested, ADA Unit Staff shall assist the individual in

16  understanding the rules of the Jail.

17            **4.      Provision of Reasonable Modifications**

18        Defendants shall provide reasonable modifications and accommodations as

19  necessary to ensure that qualified individuals with Psychiatric Disabilities have equal

20  access to programs, services, and activities that are available to similarly situated

21  individuals without disabilities.  The process for submitting ADA-related requests for

22  modifications and accommodations is contained in Section III(J)(9)(a).  The specific type

23  of modification required shall be based on an individualized assessment of the needs of the

24  individual and the program, service, or activity at issue.  In the context of vocational

25  programs, the assessment shall also take into account the essential job functions and

26  whether the individual can meet those functions with reasonable modifications.

27        Examples of possible reasonable modifications/accommodations include, but are

28  not limited to, providing Effective Communication, designated therapeutic and/or

1 protective housing unit appropriate to the individual's classification level,

2 counseling/therapy (group and individual), reliable access to necessary medications,

3 Qualified Mental Health Professional input prior to removing privileges and/or otherwise

4 imposing discipline, and any modifications necessary to ensure equal access to programs.

5       For individuals with learning-related disabilities, possible reasonable

6 accommodations may include, but are not limited to, providing notetakers, providing extra

7 time to allow the individual to understand instructions/forms and repeating and/or

8 clarifying as needed, or explaining how to fill out written forms (ADA request for

9 Accommodations, Grievance, and Appeal forms) and/or in using the electronic tablets

10 including providing assistance if needed.

11       For individuals with cognitive, developmental and/or intellectual disabilities,

12 possible reasonable accommodations may include providing designated housing in a

13 therapeutic unit appropriate to the individual's classification level, prompts for adaptive

14 support needs (including but not limited prompts to take showers, clean cells, attend

15 appointments, etc.), ensuring Effective Communication, explaining how to fill out written

16 forms (ADA request for Accommodations, Grievance and Appeal forms, forms to request

17 medical or mental health services, and any other written forms the Jail implements for

18 incarcerated persons use) and/or in using electronic tablets and providing assistance if

19 needed, assistance with commissary (*e.g.*, observing the individual post commissary

20 purchase for possible victimization concerns), assistance with laundry exchange, and

21 obtaining input from a Qualified Mental Health Professional prior to conducting

22 disciplinary/misconduct hearings.

23       **5.    Tracking**

24       Defendants shall implement an electronic, real-time networked tracking system

25 including a grievance module ("ADA Tracking System") to document and share internally

26 information regarding an individual's disability(ies) and disability-related accommodations

27 within six (6) months of the Effective Date.  The ADA Tracking System shall have the

28 following functional capabilities: (1) to store historical information regarding an

1   individual's accommodation needs in the event the individual is returned to custody

2   multiple times; (2) to list the current types of accommodations the individual requires; and

3   (3) to track all programs, services, and accommodations offered to incarcerated persons

4   with Psychiatric Disabilities throughout their incarcerations including any

5   accommodations they refused.  Access to the ADA Tracking System shall be made

6   available to and shall be used by ACSO staff at the Jail who need such information to

7   ensure appropriate accommodations and adequate program access for people with

8   Psychiatric Disabilities.  At a minimum, Classification Staff, the ADA Coordinator and

9   their staff, the Facility Watch Commander, Division Commander, Administrative

10  Sergeant, Program Managers, and AFBH and medical staff shall have access to the ADA

11  Tracking System.  Clinical and ADA Unit staff shall be responsible for adding or

12  modifying information regarding the nature of an individual's Psychiatric Disability and

13  necessary accommodations, including accommodations identified at intake and throughout

14  the individual's incarceration.  Clinical and ADA Unit staff may delegate the actual data

15  entry piece to non-clinical or non-ADA Unit staff where appropriate.  Prior to any due

16  process events and clinical encounters, clinical and ADA Unit staff shall be required to

17  view information in the system to determine if the individual has a disability and what

18  accommodations are to be provided.  All housing unit deputies, clinicians, and program

19  managers who interact with incarcerated persons shall be trained to properly use the ADA

20  Tracking System within six (6) months of the rollout of the ADA Tracking System.

21          Housing unit, education, and program office staff shall be provided with a report

22  listing all individuals with Psychiatric Disabilities in the relevant unit or program, as well

23  as any needed accommodations.  The information provided shall be limited to identifying

24  the individuals who have a disability and what accommodations shall be provided.  It shall

25  not contain any information beyond the minimum required to ensure the individual's

26  disability needs are accommodated.  Until the electronic ADA Tracking System is fully

27  implemented, this report shall be updated and provided to staff in written form at least

28  once per week.  Once the ADA Tracking System is fully implemented the report shall be

updated electronically, in a manner accessible to housing unit deputies, daily.

### 6.    Housing Placements

The fact that an individual has a Psychiatric Disability and/or requires reasonable accommodations for that disability shall not be a factor in determining the individual's security classification. Individuals with Psychiatric Disabilities shall be placed in housing that is consistent with their security classification and disability-related needs. Individuals with Psychiatric Disabilities shall be screened for potential victimization and vulnerability concerns and those factors shall be considered when determining appropriate housing; however, their disabilities shall not be used to justify placing an individual in a more restrictive privilege level than that in which they would have otherwise been classified except as provided herein. Individuals with severe or profound cognitive, intellectual, or developmental disabilities shall not be housed in a more secure setting unless it is determined by the Classification Unit and mental health staff that there are no other viable alternatives to prevent the individual from being victimized. This decision shall be based on an individualized assessment of the person's needs and the specific safety and/or security concerns affecting the individual including whether the person is able to function safely in a dormitory environment. To the extent possible, individuals housed in more secure settings due to victimization concerns shall receive the same privileges, access to programs, and out-of-cell hours that they would otherwise receive. The reason for housing an incarcerated person with a severe or profound cognitive, intellectual, or developmental disability in a more secure setting due to victimization concerns shall be clearly justified and documented in the ADA tracking system and classification documents and shall be reevaluated at least every sixty (60) days.

### 7.    Access to Out-Of-Cell Time and Yard

Defendants shall ensure that individuals with Psychiatric Disabilities are offered equal access to yard and day room exercise and recreation time as non-disabled individuals in comparable classification levels. Refusals of out-of-cell time and yard shall be documented consistent with Section III(D). Minimum out-of-cell time requirements apply

1  to all incarcerated persons unless specifically contraindicated by a mental health treatment

2  plan due to suicide precautions.

3          **8.**     **Access to Programs and Work Assignments**

4         Defendants shall ensure that individuals with Psychiatric Disabilities have equal

5  access, as compared to non-disabled individuals, to all programs, activities, and services

6  including, but not limited to, educational, vocational, work, recreational, visiting, medical,

7  mental health, substance abuse, self-improvement, religious, electronic tablets, and re-

8  entry programs, including Sandy Turner Center and Transition Center programs, consistent

9  with their classification and for which they are qualified.  To the extent they do not

10  currently exist, Defendants shall develop job descriptions and the essential job functions

11  associated with each position.  Defendants shall inform individuals with Psychiatric

12  Disabilities, using Effective Communication, of the programs and worker assignments that

13  are available to them, any job descriptions/essential job functions, how to contact the ADA

14  Coordinator,  that they have a right to request reasonable accommodations, and how to do

15  so using the ADA Request form.  To the extent a person is denied access to a program or

16  worker assignment, they shall have the right to file an ADA-related grievance and/or

17  otherwise appeal that decision.  Programming staff shall access the ADA Tracking System

18  to determine whether participants in a program have a disability and their accommodation

19  needs.  Until the ADA Tracking System is in place, the ADA Unit shall, on a weekly basis,

20  provide program staff with a list of individuals with disabilities and their accommodation

21  needs.

22          **9.**     **ADA Grievances and Requests**

23          **(a)**     **ADA Requests**

24         Defendants shall provide and maintain a readily available mechanism for

25  individuals  to make a request for reasonable modifications independent of the grievance

26  system ("ADA Request").  This ADA Request form must be available in hard-copy as well

27  as on electronic tablets, to the extent electronic tablets are provided to individuals for use.

28  All ADA Requests shall be routed to the ADA Coordinator, or a member of their team, for

review.  The ADA Coordinator or a member of the ADA Unit shall review all ADA Requests within seven (7) days to evaluate them for any emergent issues that require an expedited response.  Where an emergent issue is identified, the ADA unit shall respond within 48 hours of review and facilitate, as needed, obtaining any information required from AFBH to provide a response and/or scheduling an emergency appointment with AFBH staff as needed.  For non-emergent issues the ADA Unit shall provide a response within thirty (30) days of receipt of such a request.  All ADA Requests and responses shall be documented in the ADA tracking system.  Defendants shall inform individuals with Psychiatric Disabilities of the process for submitting ADA Requests in a manner that is effectively communicated.  Where an individual is unable to submit written or electronic requests the individual may make a request orally and the Multi-Service deputy, housing unit staff, and/or the ADA Unit shall assist the individual in submitting the request in writing.

**(b)    ADA Grievances**

Defendants shall provide and maintain a grievance system that provides for prompt and equitable resolution of complaints by individuals with Psychiatric Disabilities who allege disability-related violations.  Defendants' grievance form shall continue to include a checkbox or similar means to identity that the grievance is ADA-related.  Defendants shall train grievance staff to route "ADA" grievances appropriately even if the individual who filed the grievance did not check the "ADA" checkbox.  Once implemented, the ADA Tracking System shall route grievances relating to class members who are Behavioral Health Clients to AFBH for their review in case there are underlying mental health issues that are driving the grievances.  ADA staff shall consult with AFBH prior to imposing any grievance-related restrictions on class members who are Behavioral Health Clients.  Until the ADA Tracking System is implemented the ADA Unit shall review and route grievances filed by individuals with SMI electronically to AFBH for review.  AFBH shall assist as necessary in resolving issues raised by class members in grievances, including meeting with the grievant as needed.

The ADA Coordinator or a member of the ADA unit shall: (i) review all ADA-related complaints; (ii) assign an ADA-trained staff person to investigate the complaints, and/or interview the individual to the extent his or her complaint or requested reasonable modification is unclear or consult with AFBH as appropriate; and (iii) provide a substantive written response.  The ADA Coordinator or a member of the ADA Unit shall review all ADA-related grievances within seven (7) days to evaluate them for any emergent issues that require an expedited response.  Where an emergent issue is identified, the ADA unit shall respond within forty-eight (48) hours of review and facilitate, as needed, obtaining any information required from AFBH to provide a response and/or scheduling an emergency appointment with AFBH staff as needed.  For non-emergent issues the total response time for all ADA-related grievances shall be thirty (30) days from receipt.  All ADA-related grievances and responses, including provision of interim reasonable modifications, shall be documented and tracked in the ADA Tracking System Grievance Module.

IV.   **MONITORING & IMPLEMENTATION**

   A.   **Development of Policies, Procedures, and Training**

All policies, procedures, and forms shall be developed and implemented within six (6) months of the Effective Date.  Defendants shall work with the agreed-upon Joint Experts to develop and implement updated policies, procedures, and any necessary forms mentioned within this Consent Decree or otherwise needed to implement the provisions of this Consent Decree.  Class Counsel shall be provided an opportunity to review all policies, procedures, and necessary forms before they are finalized and provide their comments to the relevant Joint Expert(s) and Defendants.  All policies, procedures, and necessary forms will also be shared with the Department of Justice.  Final versions of all policies, procedures, and forms shall be approved by the relevant Joint Expert(s).

Staff, including ACSO and AFBH staff, shall be trained on any and all relevant and updated policies, procedures and forms within ninety (90) days of finalization of any new policies, procedures, and/or forms.  Defendants shall consult with the relevant Joint

1  Expert(s) regarding the content and provider of trainings depending on the subject matter

2  of the training.  The final training materials as well as the proposed duration and manner of

3  instruction, which shall include an interactive component, must be approved by the

4  relevant Joint Expert(s) and shall be provided to Class Counsel prior to training for Class

5  Counsel's input.  Final training materials will also be shared with the Department of

6  Justice.  Class Counsel shall be permitted to attend the initial training(s) in order to

7  observe.  The relevant Joint Expert(s) may also attend the training(s) upon request.

8         To the extent the Parties disagree about the adequacy of final policies, procedures,

9  forms, trainings and/or training materials, the Parties shall utilize the dispute resolution

10  procedure set forth herein.

11         **B.    Development of Implementation Plan**

12         Within three (3) months of the Effective Date, the Parties shall develop a detailed

13  plan setting forth key benchmarks for implementation of the terms of this Consent Decree.

14  This shall include a timeline with identifiable goals and any necessary interim measures

15  that will need to be taken.  It is the Parties' intent to provide, in as much as detail as

16  possible, the deliverables that will be identified for monitoring purposes both during the

17  interim period and thereafter.[7]  The Parties shall update the implementation plan on a

18  quarterly basis for the first two (2) years following the Effective Date to adjust benchmarks

19  and deadlines and to address any issues regarding implementation.

20         **C.    Monitoring by Joint Experts**

21         As described in Section IV(A), the Parties agreed to retain a panel of Joint Experts[8]

22  to evaluate the policies, procedures, practices, and conditions regarding mental health

23

24  [7] For instance, AFBH is committed to developing treatment plans for qualifying

25  individuals as part of its commitment to reform the mental health services it provides to
    incarcerated persons.  It is anticipated that the parties will establish quarterly goals for the

26  completion of treatment plans for qualifying individuals.

27  [8] Dr. James Austin (classification); Kerry Hughes, M.D. (mental health services); Terri
    McDonald (custody operations and restrictive housing); and Michael Brady and Rick

28  Wells from Sabot Consulting (disability access and custody staffing).  Eloisa Carolina
    Montoya, Psy.D., replaced Dr. Hughes as mental health services expert as of May 3, 2021.

17786622.1[3703035.23]

services, including suicide prevention, custody operations, classification, restrictive housing, disability rights, and other issues in the Jail and to complete reports with their findings.  In the event the Joint Experts are required to collaborate on a recommendation, they shall coordinate and advise the Parties who will serve as a Coordinator.  The Coordinating Expert is not in a leadership role over the Joint Experts, but rather, serves to coordinate responses in instances where more than one expert needs to be involved in making a recommendation.

ACSO and AFBH shall each designate an agreement coordinator within thirty (30) days of Effective Date to serve as a point of contact for the joint experts.

The Parties agree that Defendants shall continue to retain and to use the Joint Experts as subject matter monitors who shall monitor Defendants' compliance with the Consent Decree and assist in implementing changes as necessary.

If, for any reason, any of the Joint Experts can no longer serve or the Parties jointly wish to engage a different or additional monitor, the Parties shall first meet and confer to attempt to agree on who shall be appointed to serve as the replacement monitor.

If the Parties are unable to agree on the replacement monitor, the Parties shall each submit a list of two (2) proposed new monitor candidates, all of whom shall have already agreed to be subject to, and comply with, the County's contracting requirements, to the Honorable Magistrate Judge Laurel Beeler.

Prior to submitting their respective lists to Judge Beeler, the Parties agree to meet and confer to ensure that each proffered candidate is eligible to be considered.  If a proposed candidate is found to be ineligible due to their inability or unwillingness to comply with the County's contractual requirements or due to a conflict of interest, the Party who proposed that candidate shall be given an opportunity to propose an alternative candidate for consideration.  The Parties shall submit written suggestions to Judge Beeler as to who to select from the lists.  Judge Beeler shall then select the new monitor from the lists, and Defendants shall retain the new monitor.

### 1.    Joint Expert Facility Tours

Each Joint Expert shall conduct biannual tours and program reviews regarding their respective areas.  Joint Experts may choose to tour together and otherwise share information received from Defendants between themselves where doing so would increase efficiency or otherwise be of benefit.  Class Counsel and Counsel for Defendants may attend the tours.  No more than two attorneys for each side may attend.  The Parties may jointly agree in writing to conduct monitoring on a less frequent basis if the Parties agree such reduction is appropriate based on the current circumstances.  If the Parties cannot agree on the frequency of the Joint Experts' touring, they shall utilize the dispute resolution procedure set forth herein.

Defendants shall provide the Joint Experts, Class Counsel, and the Department of Justice with access to records, reports, and documents the Joint Experts deem necessary to evaluate Defendants' ongoing compliance.  The Joint Experts shall have access to ASCO and AFBH staff, including contractors, and individuals incarcerated at the Jail, for interviews as they deem appropriate.  The Joint Experts' interviews with class members and staff shall be conducted confidentially and outside the presence of Staff (for class member interviews), Class Counsel, and Defense Counsel unless otherwise agreed by both Parties.  The Joint Experts shall also have access to documents, including budgetary, custody, and mental health care documents, and institutional meetings, proceedings, and programs to the extent the Joint Experts determine such access is needed to fulfill their obligations.

### 2.    Joint Expert Reports

The Joint Experts shall prepare written reports within forty-five (45) days after monitoring tours that shall evaluate the status of compliance for each relevant provision of the Consent Decree using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-Compliance.  The Joint Experts' reports shall also recommend specific actions the Joint Experts believe are necessary to substantially comply with the Consent Decree.

1    In order to encourage candor and completeness by ACSO and AFBH Staff and

2    contractors, the Joint Expert's final reports shall be considered confidential and treated

3    confidentially by all parties.  Upon request, final reports shall be shared with the

4    Department of Justice.  Additionally, counsel for the County may review the final reports

5    with the County, including the Alameda County Board of Supervisors, and any other

6    officers and employees of the County instrumental to carrying out the recommendations.

7    Final reports that are shared with the Department of Justice or with any County officer or

8    employee shall remain confidential.  Class Counsel may also discuss the contents of the

9    final reports with class members, but agree not to provide copies of the reports to class

10   members.  Final reports may also be filed in Court under seal as permitted by the Court in

11   connection with any disputes related to the Consent Decree.

12       The Joint Experts shall also prepare a non-confidential "Summary of

13   Recommendations and Conclusions" ("Summary") of the written reports.  The Summary

14   shall be comprehensive and shall contain all pertinent findings and recommendations

15   related to the final report at issue.

16       The Parties agree that they are each entitled to engage in *ex parte* communications

17   with the Joint Experts for the duration of the Consent Decree.

18       All of the Joint Experts' findings and recommendations shall be set forth in writing

19   in their respective reports.  To the extent reports discuss protected health information or

20   other confidential mental health information, they shall be prepared using number or letter

21   codes to refer to class member identities at issue, with a separate key identifying the class

22   members by name and booking number, so that the reports can be shared with custody

23   staff and publicly filed, where necessary, on the Court's docket.

24       The Parties shall have fourteen (14) days to make written comments or objections to

25   the report and Summary.  The report and Summary shall become final after fourteen

26   (14) days if no party has made written comments or objections.  If any party has made

27   written comments or objections, the Joint Experts shall have fourteen (14) days to revise

28   the report and/or Summary in response to the Parties' comments or objections.  If the Joint

Experts have made no such revisions within fourteen (14) days of receiving the Parties' comments or objections, the report and/or Summary shall become final without changes unless a Party asserted an objection on the basis of confidentiality.

If either Party objects to the inclusion or exclusion of any content in the final report and/or Summary on the basis of confidentiality, and the Joint Expert elects not to revise their report and/or Summary in response to the Party's objection(s) after 14 days, the Party may invoke the dispute resolution procedure set forth herein.  The Summary shall not be publicly filed until the Party's dispute regarding the inclusion or exclusion of any content on the basis of confidentiality is resolved through the dispute resolution procedure.  The Joint Experts' Summaries shall be public and not considered confidential once the dispute is resolved, or if there are no objections on the basis of confidentiality, once the Summary becomes final.

Under no circumstances will a publicly available Summary contain protected health information or information that would pose a legitimate safety and/or security risk to the institution.  Such information may be redacted from any publicly posted version.

### D.    Monitoring by Class Counsel

Defendants shall permit Class Counsel reasonable access to tour the jail facilities, meet with County staff, including mental health contractor-providers and other third-party entities providing educational and other related programming (such as Five Keys), and class members, and observe practices related to Defendants' compliance with the provisions of this Consent Decree, so long as Class Counsel believe in good faith such information is necessary to monitor Defendants' compliance with the Consent Decree. Class Counsel shall have reasonable access to County staff, including mental health contractor-providers and other third-party entities providing educational and other related programming (such as Five Keys), and class members to ensure a full evaluation, but shall not speak with County staff (including mental health contractor-providers and other third-party contractors) outside of the presence of Defense Counsel unless otherwise agreed to by Defense Counsel.  Interviews of class members by Class Counsel shall be conducted

1   confidentially and outside the presence of Defense Counsel and Staff.  Interviews with
2   County staff may be conducted outside the presence of other jail staff or supervisors but
3   shall be conducted in the presence of Defense Counsel unless Defense Counsel agrees
4   otherwise.  Class Counsel shall not be entitled to personnel records, including records and
5   information deemed confidential pursuant to California Penal Code § 832.7.

6          Class Counsel's tours shall not exceed more than three tours annually for each of
7   the first two (2) years following the Effective Date.  Thereafter, Class Counsel may
8   conduct up to two tours of the jail per year.  Class Counsel may, however, bring a motion
9   seeking authorization from the Court to conduct a third monitoring tour in any given year
10  (after the first two (2) years) provided they first comply with the dispute resolution process
11  set forth herein.  Defendants' counsel may attend Class Counsel's tours.  No more than
12  two (2) representatives per side may attend.  Unless otherwise agreed by the Parties or
13  ordered by the Court, monitoring tours by Class Counsel shall be separated by a period of
14  no less than ninety (90) days.  Nothing herein prevents Class Counsel from visiting or
15  otherwise communicating with class members as necessary.

16         Defendants shall also permit the Department of Justice, including a mental health
17  subject matter expert selected and paid for by the Department of Justice, the same access to
18  jail facilities, personnel, contractors, third parties, and inmates as described herein with
19  respect to Class Counsel.  Interviews with inmates shall be conducted confidentially.

20         Tours by the Department of Justice pursuant to this agreement shall not exceed
21  more than two tours annually.  Tours conducted by the Department of Justice shall be
22  performed contemporaneously with monitoring by the relevant Joint Expert.  Counsel for
23  the Parties may attend the Department of Justice's tours.  The Department of Justice's
24  mental health subject matter expert will not issue any public compliance report or
25  compliance findings following any tour.  Subject to all relevant laws, regulations, or court
26  orders, any reports or findings made by the Department of Justice's mental health expert
27  will be maintained confidentially by the Department of Justice.

28         **1.      Requests for Documents and Individual Advocacy**

1    Defendants shall provide Class Counsel with reasonable access to records, reports,

2    and documents necessary to evaluate Defendants' ongoing compliance with the Consent

3    Decree, including but not limited to, copies of all grievances and requests related to mental

4    health treatment, out-of-cell time, use of force, and accommodations for class members

5    with Psychiatric Disabilities as well as Defendants' written responses to the grievances

6    and/or requests.  If the Parties cannot agree on the reasonableness of Class Counsel's

7    request, the Parties shall meet and confer to address any disagreements.  Defendants shall

8    provide Class Counsel with such information within twenty-one (21) calendar days of the

9    request, unless a longer period of time is necessary.  Disputes regarding access to

10   documents shall be subject to the dispute resolution procedure set forth herein.

11   Where Class Counsel has a good faith basis for doing so, they may bring individual

12   class member concerns on topics covered by this Consent Decree to the attention of

13   Defendants in writing.  Defendants shall respond in writing within ten (10) business days,

14   unless otherwise agreed to by the Parties.  This process is not meant to replace or

15   circumvent the existing Jail processes for requesting mental health services or submitting

16   grievances.  Class Counsel shall encourage inmates to make use of those existing processes

17   except where exigent circumstances or failures of those processes have occurred.

18                          **2.      Reporting**

19   Defendant shall provide Class Counsel and the Department of Justice with the

20   following quarterly reports: (a) a report identifying all class members with SMI, including

21   where they are housed, any accommodations they receive, and to which programs the class

22   members are assigned; (b) a report of out-of-cell time provided in all Restrictive Housing

23   Units and Therapeutic Housing Units and maximum security housing units; and (c) a

24   report detailing the use of safety cells over the preceding quarter including how many

25   times they were used and for how long on each occasion.

26   **V.    DISPUTE RESOLUTION**

27   If a dispute arises about compliance with the Consent Decree, the Parties shall meet

28   and confer in an attempt to resolve the dispute.  With thirty (30) days' notice to Defendants

1  of a possible dispute, Class Counsel may bring in an expert or consultant to attend any of

2  Class Counsel's tours and/or to review relevant documentation and/or otherwise interview

3  class members.  Defendants reserve their rights to utilize the dispute resolution process

4  with respect to any fees charged by Class Counsel's expert to the County.  If that process is

5  not successful, either party may seek to mediate the dispute with the assistance of

6  Magistrate Judge Beeler or if she is unavailable, another magistrate judge or mediator.  If

7  the mediation is unsuccessful, either Party may apply to the Court for relief.

8  **VI.    SETTLEMENT APPROVAL PROCESS**

9        **A.    Motion for Preliminary Approval**

10          The Parties shall jointly move the Court within thirty (30) days of execution of this

11  Consent Decree for an Order granting Preliminary Approval of this Consent Decree and

12  setting a hearing for Final Approval of this Consent Decree.

13        **B.    Class Notice**

14          The Parties shall negotiate and draft a proposed notice to the Class, which shall

15  include the terms of this Consent Decree and their right to object thereto.  The proposed

16  notice shall be attached to and incorporated into this Consent Decree as **Exhibit D**.

17          The Parties shall develop a plan for posting the notice.  At a minimum, the notice

18  plan shall include the following:  (1) posting notice in all intake and housing units of the

19  Jails; (2) posting notice on Class Counsel's website; (3) posting notice on the tablets used

20  by class members; and (4) posting notice on the television-notification system inside the

21  Jail.  The Parties shall provide alternate format copies of the notice upon request.  Notice

22  shall be posted/distributed by the Parties within twenty-one (21) days of the date of the

23  Court's Order granting preliminary approval, and shall remain posted so long as the

24  Consent Decree is in effect, absent further order of the Court.  The Parties shall submit

25  declarations to the Court as part of the motion for final approval confirming that notice has

26  been issued according to this paragraph.

27        **C.    Fairness Hearing**

28          The Parties shall take all procedural steps regarding the fairness hearings as may be

1   requested by the Court and shall otherwise use their respective best efforts to consummate

2   the agreement set forth in this Consent Decree, and to obtain final Court approval of this

3   Consent Decree and entry of Judgment.  If, for any reason, the Court does not approve this

4   Consent Decree, the executed Consent Decree shall be null and void.  Upon final approval

5   by the Court, this Consent Decree shall be binding upon the Defendants, Plaintiffs, and all

6   Class and Disability Subclass members and shall constitute the final and complete

7   resolution of all issues addressed herein.

8   **VII.   ATTORNEY'S FEES AND COSTS**

9          The Parties agree that, by entry of this Consent Decree, Plaintiffs shall be

10   considered the prevailing party in this litigation.  The Prison Litigation Reform Act

11   (PLRA), 42 U.S.C. Section 1997e, limits the hourly rate at which counsel may be

12   compensated for claims alleging constitutional violations under 42 U.S.C. § 1983.  Other

13   claims, including those under the Americans with Disabilities Act and the Rehabilitation

14   Act, are not subject to such statutory limits and Courts, in their discretion, may or may not

15   apply the non-capped rates where the claims are intertwined.  Notwithstanding the

16   foregoing, subject to Court approval, the Parties have reached a compromise and

17   Defendants have agreed to pay Plaintiffs' counsel $2,150,000.00 for reasonable fees and

18   expenses incurred through Final Approval of the Consent Decree.

19          Plaintiffs' counsel shall be compensated ("Monitoring Fees") for their reasonable

20   time and reasonable expenses (the sum of which includes the costs of any consultants

21   Plaintiffs may reasonably retain) relating to monitoring this Consent Decree.  The

22   Monitoring Fees shall not apply to any fees and costs that Plaintiffs may incur in enforcing

23   or defending the Consent Decree in court.  If Class Counsel prevail in enforcing or

24   defending the terms of the Consent Decree, Class Counsel shall be entitled to attorneys'

25   fees and costs to be awarded by the Court.  Defendants may be awarded attorneys' fees

26   and costs only when the Court, in the exercise of its discretion, finds that the Class

27   Counsel's motion was frivolous, unreasonable, or without foundation.  Defendants retain

28   the right to challenge any such motions for Class Counsel's fees and costs on any legally

1  appropriate basis, including on the basis of reasonableness of hours and/or rates and the

2  applicability of the PLRA rate cap.

3      The Parties have agreed to the following yearly caps on Class Counsel's Monitoring

4  Fees, beginning as of the Effective Date, up to: $550,000 for year one; $450,000 for year

5  two; $375,000 for year three; $300,000 for each of years four and five; and $275,000 for

6  year six and for each of any subsequent years.  At quarterly intervals starting three

7  (3) months after the Effective Date, Plaintiffs shall provide Defendants with a written

8  demand for Monitoring Fees using Class Counsel's ordinary rates.  Such demand shall be

9  submitted within a reasonable time after the expiration of each quarterly period, and no

10 later than thirty (30) days absent written agreement otherwise.  Defendants shall issue

11 payment within sixty (60) days of receipt absent written agreement otherwise.  Demands

12 made within the agreed-upon caps shall generally be presumed reasonable.  To the extent

13 the parties cannot agree as to reasonableness of hours incurred or work performed, such

14 disputes shall be subject to the Dispute Resolution procedures contained herein.  Class

15 Counsel shall not bill their time spent reviewing or compiling quarterly invoices but may

16 seek fees on fees for time spent in the Dispute Resolution process, including for time spent

17 litigating any disputes regarding Monitoring Fees before the Court.

18 **VIII.  EFFECT OF CONSENT DECREE IN OTHER ACTIONS**

19     Neither the fact of this Consent Decree nor any statement of claims contained

20 herein shall be used in any other case, claim, or administrative proceedings, except that

21 Defendants and their employees and agents may use this Consent Decree and any

22 statement contained herein to assert issue preclusion or *res judicata*.

23 **IX.    DURATION AND TERMINATION**

24     This Consent Decree shall remain in effect for six (6) years from the date it is

25 entered by the Court, unless it is terminated earlier pursuant to the processes set forth

26 below.

27     Defendants may seek termination of this Consent Decree by bringing a termination

28 motion pursuant to 18 U.S.C. § 3626(b)(1)(A)(i), provided however, that Defendants shall

1  not bring any such motion for a period of two (2) years from the Effective Date.

2  Defendants shall comply with the dispute resolution process described herein prior to

3  seeking termination by the Court.

4      If, at any time during the term of this Consent Decree, the Parties agree that any

5  material component has reached Substantial Compliance, they may jointly request a

6  finding by the Court that the material component may be terminated from the Consent

7  Decree and is no longer subject to monitoring.  Defendants may also request a finding by

8  the Court that they are in substantial compliance with one or more material components of

9  the Consent Decree and shall base such request on evidence that they have maintained

10  such substantial compliance for a period of at least twelve months, provided that, before

11  requesting such a finding, Defendants shall have complied with the dispute resolution

12  process described herein.  Unless otherwise ordered by the Court, such a finding shall

13  result in a suspension of monitoring of any such material component(s) by the relevant

14  Joint Monitor and Class Counsel.

15      If Plaintiffs form the good faith belief that Defendants are no longer in substantial

16  compliance with any material component(s) of the Consent Decree previously found to be

17  in substantial compliance as to which monitoring has been suspended, Plaintiffs shall

18  promptly so notify Defendants in writing and present a summary of the evidence upon

19  which such belief if based.  Within thirty (30) days thereafter, Defendants shall serve a

20  written response stating whether they agree or disagree that they are no longer in

21  substantial compliance with respect to that material component of the Consent Decree.  In

22  the event that Defendants agree, monitoring by the Joint Expert and Class Counsel

23  pursuant to this Consent Decree shall resume.  In the event Defendants disagree, Plaintiffs

24  may bring a motion before the Court seeking such relief as may be appropriate, including

25  but not limited to, reinstating full monitoring provided that, before bringing such a motion,

26  Plaintiffs shall have complied with the dispute resolution process described herein.

27      A year before the end of the six (6)-year term, the Parties and the Joint Experts shall

28  conduct a comprehensive compliance inspection of the Jail.  The Joint Experts shall then

1  advise the Parties of their findings in reports, which would be governed by the provisions

2  on Expert Reports in Section IV(C).  The Parties shall then meet and confer to see if the

3  Parties could reach agreement regarding ending or extending the consent decree in whole

4  or in part.  If the Parties fail to reach agreement, then the Parties shall use the dispute

5  resolution procedure.

6  **X.      RESERVATION OF JURISDICTION AND ENFORCEMENT**

7         The District Court of the Northern District of California shall retain jurisdiction to

8  enforce the terms of this Consent Decree and shall retain jurisdiction to resolve any dispute

9  regarding compliance with this Consent Decree.  The Court shall have the power to

10  enforce the Consent Decree through specific performance and all other remedies permitted

11  by law and equity throughout the Term of this Consent Decree.

12  **XI.     MISCELLANEOUS**

13         **A.      Knowing Agreement**

14         The Parties each acknowledge that they are entering into this Consent Decree

15  freely, knowingly, voluntarily, and with a full understanding of its terms.  The Parties

16  acknowledge that they have consulted with counsel of their own choosing concerning this

17  Consent Decree and that they were given reasonable time to review and consider the terms

18  of this Consent Decree.

19         **B.      Binding on Successors**

20         This Consent Decree shall be binding on all successors, assignees, employees,

21  agents, and all others working for or on behalf of Defendants and Plaintiffs.

22         **C.      Construction**

23         The language of this Consent Decree shall be construed as a whole according to its

24  fair meaning, and not strictly for or against any of the Parties.  The terms of this Consent

25  Decree are the product of joint negotiations and shall not be construed as having been

26  authored by one party rather than another.  Any ambiguity shall not be construed against

27  any Party.  Where required by context, the plural includes the singular and the singular

28  includes the plural.  The headings in this Consent Decree are solely for convenience and

1  shall not be considered in its interpretation.

2  **D.    Severability**

3  If any provision or provisions of this Consent Decree shall be held invalid, illegal,

4  or unenforceable, the validity, legality, and/or enforceability of the remaining provisions

5  shall not in any way be affected or impaired thereby.

6  **E.    Counterparts**

7  This Consent Decree may be executed in counterparts, each of which shall be

8  considered an original, but all of which, when taken together, shall constitute one and the

9  same instrument.

10  **F.    Governing Law**

11  The terms of this Consent Decree shall be governed by and construed in accordance

12  with the laws of the State of California.

13  **G.    Execution of Documents**

14  To the extent any documents are required to be executed by any of the Parties to

15  effectuate this Consent Decree, each party hereto agrees to execute and deliver such and

16  further documents as may be required to carry out the terms of this Consent Decree.

17  **H.    Signatories**

18  Each signatory to this Consent Decree certifies that it, he, or she is fully authorized

19  by the party it, he, or she represents to enter into the Consent Decree, to execute it on

20  behalf of the party represented, and to legally bind that party thereto.

21  **I.    Notices and Communication**

22  Unless otherwise indicated in the Consent Decree, all notices or communications

23  required by this Consent Decree shall be in writing by email addressed as stated below.

24  Should any Party's contact information change from what is listed below, that Party shall

25  promptly provide written notice of the updated contact information to the other Parties.

26  **To Named Plaintiffs, Class Counsel, or the Settlement Class:**

27  Jeffrey L. Bornstein
Rosen Bien Galvan & Grunfeld LLP

28  101 Mission Street, Sixth Floor

San Francisco, CA  94105-1738
jbornstein@rbgg.com

**To Named Defendants or Defense Counsel:**

Gregory B. Thomas
Burke, Williams & Sorensen, LLP
1901 Harrison St. #900
Oakland, CA 94612
gthomas@bwslaw.com

Samantha D. Wolff
Hanson Bridgett LLP
1676 N. California Blvd. #620
Walnut Creek, CA 94596
swolff@hansonbridgett.com

DATED:  August 25, 2021                  Respectfully submitted,

                                         ROSEN BIEN GALVAN & GRUNFELD LLP

                                         By: _____
                                              Jeffrey L. Bornstein
                                              Attorneys for Plaintiffs

DATED:  August 25, 2021                  BURKE, WILLIAMS & SORENSEN LLP

                                         By: _____
                                              Gregory B. Thomas
                                              Temitayo O. Peters
                                              Attorneys for Defendants

DATED:  August 25, 2021                  HANSON BRIDGETT LLP

                                         By: _____
                                              Paul B. Mello
                                              Samantha D. Wolff
                                              Attorneys for Defendants

CONSENT DECREE

Case No. 5:18-CV-07677

17786622.1[3703035.23]

E X H I B I T    A

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| Record Keeping | |
|---|---|
| 1. A COVID-19 line list should be kept and updated daily with new cases and new quarantined units as soon as they are identified. | Infection Control Team/ Record-Keeping Team |
| 2. A separate Influenza line list should be kept and updated daily with new confirmed cases, persons who have influenza-like illness, and new quarantined units as soon as they are identified | Infection Control Team/ Record-Keeping Team |
| 3. A separate line list should be kept tracking staff who fall ill or are on leave for other reasons. | HSA/Infection Control Team/ Record-Keeping Team |
| 4. The line lists should be reviewed daily, and new details added every 24 hours. | Infection Control Team |

| Communication | |
|---|---|
| 1. An email list should be set up to include the following:<br><br>    a.  Wellpath: HSA, AHSA, DON, Medical Director, Infection Control Team,<br>        Supervising RNs and core Medical Providers<br><br>    b.  ACSO: SRJ Captains, Clinic Sergeant, Contracts Lieutenant, Watch Commanders from all teams, Classification Lieutenant, Classification<br>        Sergeant, Visiting Sergeant, Projects Lieutenant, ITR Lieutenant, Inmate<br>        Services Lieutenant or Admin Sergeant, Admin Lieutenant, Compliance<br>        Lieutenant, and Commander<br><br>    c.  AFBH Clinical Manager, AFBH Leadership<br><br>    d.  Pharmacy Manager<br><br>    e.  Contractors: Food service, Housekeeping, GSA/BMD | Medical Director/HSA/Contracts Lieutenant |
| 2. Supervising RNs are in charge of notifying the Wellpath Admin Team, the Infection Control Team, and the Watch Commander of new COVID and/or Influenza cases/quarantined units/pods via email. | Supervising RNs/ Record-Keeping Team |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 3. Daily communication should take place between key staff via email, phone and/or in person<br><br>    a.   Daily meetings should occur if the situation is changing rapidly<br>    b.   The line list should be emailed daily | Medical Director/HSA/Infection Control Team |
| 4. Communication should be set up with Alameda County Public Health Department | Medical Director/Infection Control Team |
| 5. The line lists and other updates should be emailed daily to the ACPHD | Infection Control Team |
| 6. Positive COVID and/or Influenza results will be promptly communicated to the ACPHD | Infection Control Team |

## Supplies

| | |
|---|---|
| 1. PPE supplies: masks, gloves, hand sanitizer etc. should be secured for both staff and inmates. Eye protection and gowns should be available when needed. | Infection Control Team/AHSA/Projects Lieutenant |
| 2. Testing: adequate supplies of lab tests for each illness should be secured | Infection Control Team/AHSA/Lab staff |
| 3. Medications: adequate supplies of medications should be secured | Infection Control Team/Pharmacy |
| 4. Vaccination: Influenza vaccine will be secured per the allotment from Wellpath, Public Health and Maxor pharmacy. | Infection Control Team/Pharmacy |

## Influenza Vaccine Criteria

| | |
|---|---|
| 1. Phase 1: ORANGE patients should be offered Influenza vaccines as a first priority. | Infection Control Team |
| 2. Phase 2: Age criteria (ages 55 and older) should be offered the Influenza vaccine, if supply allows. | Infection Control Team |
| 3. Phase 3: All other inmates in the facility should be offered the Influenza vaccine, if supply allows.<br><br>  •  Bi-weekly base-wide vaccination will be offered, if supply allows, for all patients who initially refused or were not offered. | Infection Control Team |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 4. Phase 4: All ORANGE inmates at time of booking should be offered the Influenza vaccine, if supply allows. | Infection Control Team |
| **COVID-19 Vaccine Criteria** | |
| 1. COVID-19 Vaccine administration to patient population will have two distinct steps prior to administration of the Vaccine.<br>• The facility will provide an educational campaign that will include video and written material that showcase the safety and efficacy of the COVID-19 vaccines<br>• A prior consent process will occur for all three tiers of vaccine administration to both further encourage vaccine compliance, and allow for an accurate capture of expected doses for ordering the vaccine from the ACPHD. | Infection Control Team |
| 2. The COVID-19 Vaccine administration will follow the prioritization schedule recommended by the ACPHD.<br>• First Tier – Patients with an Orange medical alert and patients who have a CDC comorbidity that increases risk of complications such as hospitalization or mortality.<br>• Second Tier – Pod/Inmate Workers and patients living in Dormitory-style Housing Units<br>• Third Tier – All other incarcerated patients | Infection Control Team |
| **Staff Protection** | |
| 1. Staff should be informed of an outbreak promptly. | HSA/ACSO Captains |
| 2. Staff should be encouraged to receive their seasonal influenza vaccine as early as October 1, 2020. If staff do not receive their Influenza vaccine, mask wearing will continue to be mandatory. | Infection Control Team |
| 3. Staff who had received their influenza vaccine will be provided a label that indicates compliance for their ID badge. | Infection Control Team |
| 4. Staff will have their temperature taken and a symptom screen done before entering the facility. Persons with temperature ≥ 100° or symptoms of fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea will be sent home until they are afebrile for at least 24 hours, symptoms have improved, and at least 10 days have passed since onset of their symptoms. Refer to County Guidance documents for additional information. If the employee is positive for COVID, then CDC guidance would be followed | HSA/ACSO Captains |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 5. All staff should wear appropriate PPE when in contact with potentially infected individuals. Staff should wear a N95 mask, goggles and gloves, and should don a gown if in close proximity to a patient, especially when performing procedures likely to expose them to respiratory secretions. | HSA/ACSO Captains |
| 6. If N95 masks are not available, staff should wear surgical masks and eye protection and attempt to maintain distance from the patient. | HSA/ACSO Captains |
| 7. Staff should have surgical, or cloth masks available to hand to any inmate if a mask is not readily available to them. | HSA/Projects Lieutenant |
| 8. Any staff displaying signs of illness should sent home until they are no longer contagious, symptomatic and/or their quarantine period is lifted. | HSA/ACSO Captains |
| 9. If Wellpath or ACSO were to experience staffing shortages (e.g., 10% or more of staff affected) then will discuss with ACPHD if it is possible for asymptomatic exposed persons with a pending test are able to work in accordance with CDC guidelines (https://www.cdc.gov/coronavirus/2019-ncov/hcp/mitigating-staffshortages.html). If approved by ACPHD, staff who think they may have been exposed to a COVID-19 positive person may continue to work, pending a test, if asymptomatic. They must perform a temperature check and symptom screen twice a day, and should self- quarantine if they display any signs or symptoms. Staff should wear surgical masks and attempt to maintain distance from patients and staff.  Staff must follow standard quarantine requirements when not at work. | HSA/ACSO Captains |

## ITR Procedures

| | |
|---|---|
| 1. Arrestees who have not reported symptoms of COVID-19 or Influenza to the arresting agency will receive a Supplemental screening questionnaire in the tent outside the lobby during the outbreak. | Director of Nursing/ITR Lieutenant |
| 2. Arrestees reporting symptoms of COVID-19 or Influenza, or exposure risk, to the arresting agency will remain in the car for their initial medical screening. | Director of Nursing/ITR Lieutenant |
| 3. Arrestees will be questioned about current COVID-19 and Influenza symptoms (including fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea), or about contact with known or suspected COVID-19 cases, or travel to high risk areas. | Director of Nursing/ITR Lieutenant |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 4. Arrestees arriving at ITR reporting concerning symptoms should be provided with appropriate PPE while being assessed for fitness for incarceration. | Director of Nursing/ITR Lieutenant |
| 5. Usual acceptance policies should be followed during an outbreak. Inmates who would normally be accepted will be accepted, as long as the facility has current capacity to provide appropriate housing (isolation, OPHU etc.), and medical care for the inmate. | Director of Nursing/ITR Lieutenant/Watch Commanders |
| 6. If an arrestee with concerning symptoms or high-risk history is accepted past the bubble, they must be placed in an isolation room in ITR during processing, and the room should be sanitized after their departure. | Director of Nursing/ITR Lieutenant |
| 7. If there are not enough single-room isolation cells in ITR, then will follow CDC guidance on isolation and quarantine of inmates. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html | Director of Nursing/ITR Lieutenant |
| 8. Ideally, inmates with increased risk for COVID-19 or Influenza complications should be cohorted away from the sick while held in ITR (==ORANGE==) (High risk for COVID: 65 and older, Pregnant, Asthma [Moderate-or- severe asthma who have one or more of the following risk factors for an asthma exacerbation (i.e., hospitalization for asthma in past year, history of GERD, BMI of 30 or higher, atopic conditions such as atopic dermatitis or allergic rhinitis) or who have a risk for hospitalization for COVID (i.e., aged 50 years or older)]Chronic Lung Disease (to include COPD), Diabetes aged 50 years and older or any diabetic who is insulin dependent or has uncontrolled diabetes, Serious Heart Conditions (to include heart failure, coronary artery disease, congenial heart disease, cardiomyopathies, and pulmonary hypertension), Chronic Kidney Disease requiring Dialysis (to include all patients on Dialysis), Severe Obesity (BMI of 40 or above), Immunocompromised (to include patients receiving cancer treatment, organ transplants, immune deficiencies, HIV with low CD4 count, or not taking any HIV treatment), Liver Disease (to include cirrhosis) and Sickle Cell disease. (For further definition of high-risk vulnerable patients, refer to CDC guidance) ORANGE patients, with symptoms, should be considered for OPHU housing as a RED patient. ORANGE patients, with symptoms, should be started on Tamiflu pending the results of their PCR tests. | Director of Nursing/ITR Lieutenant |
| 9. Patients set to be released, transferred, or sent to a program will be provided education and/or screening based on their situation. If they are currently (==YELLOW==) or (==RED==), or have been provided the COVID-19 vaccine in a form that requires a second dose, they will be provided an instruction sheet giving them information for necessary precautions or follow up. Vaccine recipients will be provided a copy of their vaccination card. | Director of Nursing/ITR Lieutenant |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

## Color Coded System

| | |
|---|---|
| • **RED** = Symptomatic patient(s) with suspected COVID-19 or Influenza | Medical |
| • **DARK RED** = Symptomatic or Asymptomatic patient(s) with known COVID-19 | Medical |
| • **PURPLE** = Symptomatic patient(s) with known Influenza | Medical |
| • **YELLOW** = Asymptomatic patient(s) with exposure to COVID-19 | Medical |
| • **BRIGHT YELLOW** = Asymptomatic patient(s) with close exposure to a COVID-19 case | Medical |
| • **ORANGE** = Asymptomatic patient(s) who are currently healthy but have increased risk to COVID-19 or Influenza complications | Medical |
| • **GREEN** = Asymptomatic patient(s) who are currently healthy | Medical |

## General Quarantine Procedures

| | |
|---|---|
| 1. New books who are **GREEN** will be quarantined in a "new book" housing unit, or, Ad Sep for 14 days before being introduced into the general population. They will receive a daily temperature check and symptom screen by medical staff. Within 48 hours of booking, the inmate will be offered a COVID-19 test. Additionally, the inmate will be offered a second COVID-19 test at day 10 of new book quarantine. The inmate will continue to be monitored by medical staff daily, regardless of the testing results. | HSA/Captains/Medical Director |
| 2. Inmates displaying symptoms consistent with COVID-19 or the Flu will be housed in the OPHU, or isolated in cells around the base = **RED** | Medical Director/Classification Lieutenant |
| 3. Inmates with increased risk for COVID-19 or Influenza complications (i.e., as noted above in ITR 8) will be housed in "Vulnerable" Housing= **ORANGE.** If an **ORANGE** patient becomes symptomatic, then they should be considered for OPHU housing. | Medical Director/Classification Lieutenant |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 4. Inmates who have had contact with known or suspected COVID-19, or persons with a high-risk travel history should be cohorted for a 14-day quarantine period in a special housing unit = **YELLOW**<br><br>An inmate with direct close contact (refer to CDC guidance for definition of a close contact) with a known or suspected COVID-19 person should be quarantined for a 14-day period in isolation- **BRIGHT YELLOW** (High-risk solo). | Medical Director/Classification Lieutenant |
| 5. Any pod or housing unit that was previously healthy (**GREEN**) but develops a symptomatic case will have the index case removed to isolation cells (**RED**) and the housing unit/pod will be placed on quarantine for 14 days (**YELLOW**) or until testing comes back negative for COVID on the index patient. If the index case is positive for Influenza, and there are two or more symptomatic individuals within a 24-hour period from the same housing unit/pod, then the quarantine will be changed to 5 days (YELLOW). If they are negative for both, then the quarantine will be lifted. | Medical Director/Captains/Watch Commanders |
| 6. A sign will be posted outside of each pod/housing unit displaying the quarantine status, the start date, and possible release date. | Infection Control Nurse |
| 7. Inmates should be given sufficient space during meals, pod time, etc. to practice social distancing | Captains/Watch Commanders |
| 8. During quarantine, there should be no new inmates transferred into the pod or housing unit. | Medical Director/Captains/Watch Commanders |
| 9. No inmates will leave the quarantined area for clinic appointments, classes, visiting, work etc. | Medical Director/Captains/Watch Commanders |
| 10. Commissary will be allowed, but workers who are delivering the packages must wear PPE and wash their hands in between units. | Medical Director/Captains/Watch Commanders |
| 11. All staff working in the quarantined area are required to wear appropriate PPE, and use careful hand hygiene, especially before entering other pods or housing units. | Medical Director/Captains/Watch Commanders |
| Sick Call Protocol | |
| 1. **GREEN** and **YELLOW** housing units should have sick call conducted in the sick call room. All **YELLOW** patients will be masked and moved with appropriate precautions. | Director of Nursing/ Watch Commander |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 2. ORANGE housing units should have sick call conducted outside of the housing unit door in the day room. Sick call rooms should only be used if the inmate requires a more thorough exam. The patient will be masked and moved with appropriate precautions. | Director of Nursing/ Watch Commander |
| 3. Red, Dark Red, and Purple housing units should have sick call conducted at the cell door. The patient should always be masked during sick call interactions. | Director of Nursing/ Watch Commander |

## COVID Testing Protocol

| | |
|---|---|
| 1. CDC recommendations will be followed to guide the testing strategy for inmates. According to current guidance, all inmates exhibiting symptoms of any severity will be tested for COVID-19 | Medical Director/Infection Control Team |
| 2. A second phase of testing will be conducted on asymptomatic inmates who are housed in a quarantined housing unit A COVID-19 test will be offered between day 7-10 of the quarantine. Additional efforts (2 additional days) will be made to continue offering testing to patients who initially refuse testing. The inmate will continue to be monitored by medical staff twice a day regardless of the testing results.<br><br>    a.  Testing Supplies will be provided by CPHD<br>    b.  All labs will be processed through CPHD | Medical Director/HSA/ Infection Control Team |
| 3. A third phase of testing will be conducted on asymptomatic inmates within 48 hours of booking. All new bookings will continue to be screened through the intake process and housed in an intake housing unit for 14 days. On, or before the 48-hour mark, the inmate will be offered a COVID-19 test. Additionally, the inmate will be offered a second COVID-19 test at day 10 of new book quarantine. The inmate will continue to be monitored by medical staff daily regardless of the testing results.<br><br>    a.  Testing Supplies will be provided by CPHD<br>    b.  All labs will be processed through CPHD | Medical Director/Infection Control Team |
| 4. A fourth phase of testing will be conducted on asymptomatic inmates at a minimum of 48 hours prior to release from custody. All inmates identified at a minimum of 48 hours prior to release will be offered a COVID-19 test.<br><br>    a.  Testing Supplies will be provided by CPHD<br>    b.  All labs will be processed through CPHD | Medical Director/Infection Control Team |
| 5. A fifth phase of testing will be conducted on asymptomatic inmates who resided in a housing and/or pod with a positive COVID-19 index case. After phase two testing occurs, within the effected housing | Medical Director/Infection Control Team |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| unit/pod, if the inmate tests negative for COVID-19, then Wellpath will conduct serial point prevalence surveys in an affected unit every 7 days. Testing will conclude when two consecutive surveys do not detect any new positive cases.<br><br>a.  Testing Supplies will be provided by CPHD<br>b.  All labs will be processed through CPHD | |
| 6. A sixth phase of testing will be conducted on asymptomatic inmates who are currently working as pod/inmate workers. All individuals who meet this criteria will be offered testing on a biweekly basis.<br><br>a.  Testing Supplies will be provided by CPHD<br>b.  All labs will be processed through CPHD | Medical Director/Infection Control Team, Classification |
| 7. A seventh phase of testing will include testing offered to all patients with an Orange medical alert. This will be done monthly.<br>a.  Testing Supplies will be provided by CPHD<br>b.  All labs will be processed through CPHD | Medical Director/Infection Control Team, Classification |
| 8. An eighth phase of testing will include testing offered to all patients residing in dormitory style settings. This will be done monthly.<br><br>a.  Testing Supplies will be provided by CPHD<br>b.  All labs will be processed through CPHD | Medical Director/Infection Control Team, Classification |
| **Influenza Testing Protocol** | |
| 1. CDC recommendations will be followed to guide the testing strategy for inmates. According to current guidance, all inmates exhibiting Influenza-Like Illness (ILI) symptoms of any severity will be tested for Influenza throughout the duration of flu season. Influenza testing will begin when there is documented flu activity within the community. | Medical Director/Infection Control Team |
| 2. Upon identification of a confirmed positive influenza case in a housing unit or pod, subsequent patients from that housing unit presenting with ILI symptoms, for a duration of 10 days from the date of the index case test, will be offered a rapid antigen and PCR test. | Medical Director/Infection Control Team |
| **Influenza Treatment Protocol** | |

## Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 1. Wellpath to provide oseltamivir prophylaxis to all inmates who reside in an affected housing unit when the following criteria have been met:<br>a) Two or more laboratory confirmed influenza cases that were acquired in the jail (i.e., tested positive 3 or more days after intake), epidemiologically-linked to one another (i.e., resided in the same housing unit), and were identified within 72 hours of one another<br>b) One laboratory confirmed influenza case that was acquired in the jail (i.e., tested positive 3 or more days after intake) is detected in a housing unit dedicated to individuals who are at high-risk for COVID-19 complications (ORANGE housing units/pods)<br>c) One laboratory confirmed influenza case that was acquired in the jail (i.e., tested positive 3 or more days after intake) is detected in a housing unit and following criteria are met:<br>   i. ILI attack rate in the housing unit is 8% or higher within 5 days of initial presentation of the first confirmed influenza case. | Medical Director/Infection Control Team/ Nursing Staff |
| 2. If the aforementioned criteria are not met for providing oseltamivir prophylaxis to an entire housing unit, then would still recommend providing oseltamivir prophylaxis to close contacts of a laboratory confirmed case of influenza and inmates who are residents of same housing unit who are not a close contact but have a comorbidity that increases their risk for complications from influenza virus infection.<br>a. Close Contact is defined as someone who was within 2 meters or 6 feet of the confirmed case, not wearing a mask, and was in contact for 1 or more hours while the index case was infectious.<br>b. Practically, close contact could be defined as anyone who was a cellmate or who had a bed that was within 6 feet of the confirmed case. | |

### Monitoring Protocol

| | |
|---|---|
| 1. Inmates who are in an intake housing unit are monitored once a day by nursing staff for a temperature and symptoms checks. If the inmate presents with a temperature or symptoms, they are to be moved to a RED housing unit wearing a mask. | Medical Director/Infection Control Team/ Nursing Staff |
| 2. Inmates who are of a YELLOW status are monitored twice a day by nursing staff for a temperature and symptoms check. If the inmate presents with a temperature or symptoms, they are to be moved to a RED housing unit wearing a mask. | Medical Director/Infection Control Team/ Nursing Staff |
| 3. Inmates who are in a RED, PURPLE and DARK RED housing unit are monitored at a minimum of twice a day by nursing staff for a temperature and symptoms check and seen daily by a provider. | Medical Director/Infection Control Team/ Nursing Staff |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 4. Inmates who test positive for COVID-19 are released back to a **GREEN** or **ORANGE** housing unit after one of the following CDC recommended strategies are used, indicating that the patient has recovered: _COVID positive patients who have had symptoms:_<br><br>**_Test-based strategy_**<br><br>• CDC no longer recommends a test-based strategy to determine when to discontinue Transmission-based Precautions<br><br>**_Symptom-based strategy_**<br><br>• At least 24 hours have passed _since recovery_ defined as resolution of fever without the use of fever-reducing medications **and** improvement in symptoms (e.g., cough, shortness of breath); **and**,<br>• At least 10 days have passed _since symptoms first appeared in mild to moderate cases and at least 20 days have passed since symptoms first appeared in severe or severely immunocompromised cases._ | Medical Director/Infection Control Team/ Nursing Staff |
| **Mild Illness defined:**<br><br>Individuals who have any of the various signs and symptoms of COVID-19 (e.g., fever, cough, sore throat, malaise, headache, muscle pain) without shortness of breath, dyspnea, or abnormal chest imaging. | Medical Director/Infection Control Team/ Nursing Staff |
| **Moderate Illness defined:**<br><br>Individuals who have evidence of lower respiratory disease by clinical assessment or imaging, and a saturation of oxygen (SpO2) ≥94% on room air at sea level. | Medical Director/Infection Control Team/ Nursing Staff |
| **Severe Illness defined:**<br><br>Individuals who have respiratory frequency >30 breaths per minute, SpO2 <94% on room air at sea level (or, for patients with chronic hypoxemia, a decrease from baseline of >3%), ratio of arterial partial pressure of oxygen to fraction of inspired oxygen (PaO2/FiO2) <300 mmHg, or lung infiltrates >50%. | Medical Director/Infection Control Team/ Nursing Staff |
| _**Severely Immunocompromised defined:**_<br><br>Some conditions, such as being on chemotherapy for cancer, untreated HIV infection with CD4 T lymphocyte count < 200, combined primary immunodeficiency disorder, and receipt of prednisone >20mg/day for more than 14 days, may cause a higher degree of immunocompromise and inform decisions regarding the duration of Transmission-Based Precautions. | Medical Director/Infection Control Team/ Nursing Staff |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| Other factors, such as advanced age, diabetes mellitus, or end-stage renal disease, may pose a much lower degree of immunocompromise and not clearly affect decisions about duration of Transmission-Based Precautions.<br><br>Ultimately, the degree of immunocompromise for the patient is determined by the treating provider, and preventive actions are tailored to each individual and situation. | |
| ***COVID positive patients who have had NO symptoms***:<br><br>**Test-based strategy**<br><br>• CDC no longer recommends a test-based strategy to determine when to discontinue Transmission-based Precautions<br><br>**Time-based strategy:**<br><br>At least 10 days have passed since the date of their first positive COVID-19 diagnostic test assuming they have not subsequently developed symptoms since their positive test. If they develop symptoms, then the symptom based strategy should be used. | Medical Director/Infection Control Team/ Nursing Staff |
| 8. Influenza precautions should last for 7 days after illness onset or until 24 hours after resolution of fever and respiratory symptoms, whichever is longer. | Medical Director/Infection Control Team/ Nursing Staff |

## Environmental Controls and Hygiene

| | |
|---|---|
| 1. High-touch surfaces in common areas (both inmate and staff areas) should be wiped with antiseptic wipes several times each day. If antiseptic wipes are not available, diluted bleach solution (5 tablespoons (1/3rd cup) bleach per gallon of water or 4 teaspoons bleach per quart of water) should be used. | HSA/Captains |
| 2. Staff should clean shared equipment (radios, keys, blood pressure cuffs, etc.) several times per day and at the end of each shift. | HSA/Captains |
| 3. Soap should be made available to all inmates and the importance of proper hand hygiene should be reinforced. | HSA/Captains |
| 4. All inmates should be given surgical, or cloth, masks and mask-wearing of inmates will be mandatory prior to any movement. | Captains/ Watch Commanders |

## Management of Inmate Workers during Quarantine

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 1. Inmate workers in quarantined areas should not participate in work during the lockdown. | Projects Lieutenant/Vendors |
| 2. Custody should anticipate an alternative plan for providing food and laundry during the quarantine. | Projects Lieutenant/Vendors |
| 3. Medical staff should be prepared to screen substitute workers during the quarantine. | Director of Nursing/Projects Lieutenant |
| 4. Inmate workers assigned to ITR should be provided with adequate PPE and trained on proper hand hygiene and facility disinfection techniques. At the end of their shift they should be provided with a change of clothes and wash their hands carefully before returning to their housing units. | Director of Nursing/Projects Lieutenant |

## Court

| | |
|---|---|
| 1. At present, county and federal court has been modified to allow for a safe number of physical transports as well as a virtual court option. | Captains/ Judges |
| 2. Any inmate displaying symptoms of COVID-19 or Influenza (RED), positive for COVID-19 (DARK RED) and/or positive for influenza (PURPLE) or claiming contact with a person with known or suspected COVID-19, or with high risk travel history (YELLOW) will be prevented from going to court until they are out of quarantine or isolation. | Medical Director/Captains |
| 3. Asymptomatic inmates with no known contact with COVID-19 or Influenza may go to court. | Medical Director/Captains |

## Visiting/Attorneys

| | |
|---|---|
| 1. Contact visits are suspended during the outbreak. Video visits will be allowed. | Medical Director/Captains |
| 2. Attorney visits will be non-contact during the outbreak. | Medical Director/Captains |

## Programs

| | |
|---|---|
| 1. Programs and classes will be modified during the outbreak and these activities will be discussed with ACPHD to ensure appropriate infection control procedures are followed | Captains |

## Weekenders

| | |
|---|---|
| 1. Then weekender program will be suspended during the outbreak due to an order by the presiding judge. | Captains/ Judges |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| Non-Essential Workers/Outside Contractors | |
|---|---|
| 1. Currently all workers at SRJ are considered to be essential to operations and will be allowed into the facility. | Captains |

| Transfers during Quarantine | |
|---|---|
| 1. No inmates should be transferred from quarantined housing units until the quarantine has been lifted on that unit. The only exception to outside transfers is ED visits, Psych emergencies, and urgent/ emergent medical appointments. All receiving facilities would be made aware of the patient's medical status prior to transfer. | Medical Director/Captains/Watch Commanders |
| 2. The list of inmates due for other facility transfers should be reviewed the night before to make sure none of the individuals are coming from quarantined units – If quarantined inmates are identified the Watch Commander should be notified as soon as possible. | Supervising RNs/ Watch Commanders |
| 3. Inmates being transferred to other facilities from non-quarantined units should have a symptom screen and a temperature check (if applicable) before boarding the bus – symptomatic inmates should be held back at Santa Rita until they are well. | Medical Director/Captains/Watch Commanders |
| 4. Inmates being transferred from other facilities will be quarantined and offered COVID-19 testing as a new book inmate (See Testing Protocols #3). | Medical Director/Captains/Watch Commanders |

| Release/Discharge Planning | |
|---|---|
| 1. Releases who are currently identified as **YELLOW** or **RED** must wear an appropriate mask and be escorted alone to ITR. They must be held in an isolation/quarantine cell in ITR prior to release depending on their color. | Medical Director/Captains/Watch Commanders |
| 2. Releases who are currently identified as **YELLOW** or **RED** at time of release will be given discharge instructions, including information on isolation or quarantine, and asked for their contact information and address by ITR RNs. This information is provided to the Supervising RN for internal notification - The Public Health Department will be provided a daily release report for all **YELLOW** and **RED** releases for community tracking and follow up purposes. | Director of Nursing/ITR Lieutenant |

# Santa Rita Jail COVID-19 & Flu Outbreak Control Plan

| | |
|---|---|
| 3. Releases who are currently identified as **YELLOW** or **RED** will have their temperatures taken and have a symptom screen performed before release. Individuals identified to be medically unstable to shelter in their home, will be referred to a community hospital and provided a courtesy shuttle. | Director of Nursing/ITR Lieutenant |
| 4. Releases may have 14 days of discharge meds instead of the usual 7 days. | Medical Director/Discharge Planners |
| 5. Releases with pending test results will be communicated with ACPHD as soon as possible. | Nursing Supervisors/Discharge Planners |
| 6. Releases with pending test results will have the lab personnel notify the RN supervisor as soon as the results become available. Notification to released patients determined to have a positive result will occur by ACPHD as part of community tracking and follow up. | Lab/Infection Control Team |
| 7. Discharge planning team and ITR RNs will work to identify patients with unstable housing. The discharge team will coordinate with Operation Comfort if there is a known period of 24 hours prior to release to potentially procure transportation to a shelter-in-place facility for releases currently identified as DARKRED, PURPLE, or RED. An attempt to obtain contact information will be done by nurses in ITR. | Discharge Planners/Director of Nursing |
| 8. Any patient with confirmed influenza virus infection (PURPLE) who has not completed a recommended course of Tamiflu or isolation, and any person who is identified as a close contact will be provided education regarding influenza in accordance with material provided by the Alameda County Public Health Department. | Discharge Planning/ ITR Nurses |

E X H I B I T   B

Alameda County Sheriff's Department
Restrictive Housing Committee (RHC) Referral Form


Inmate's Name: _____   Booking # _____

Current Housing Assignment: _____ Classification Level: _____

Booking Date: _____/_____/_____   Current Mental Health Level of Care: MH_____SMI: Y/N

Referral Date: _____/_____/_____   Referred by:_____

Referral Reason: (Select all that apply)

☐ Recent assaultive behavior resulting in serious injury

☐ Recent assaultive behavior involving use of a weapon

☐ Repeated patterns of assaultive behavior (such as gassing)

☐ Inmate poses a high escape risk

☐ Repeated threatening to assault other inmates or staff

Referral Reason Where Inmate Has SMI (Select all that apply):

☐ Inmate committed an assaultive act within the past 72 hours

☐ Inmate is threatening to imminently commit an assaultive act

Inmate Committee Appearance:  _____ Appeared  _____ Did not Appear

If no appearance, reason why:_____

Committee Decision:
___ Place into Restrictive Housing Step 1     ___Place into Restrictive Housing Step 2
___ Remain in Current Housing Unit            ___Refer to Therapeutic Housing Committee

Reasoning: _____

_____

_____

[3779450.5]

17805941.1

If inmate has SMI and is approved for placement in Restrictive Housing Step 1, has a Qualified Mental Health Professional determined that such placement is not contraindicated and that the individual is not a suicide risk and does not have active psychotic symptoms? Y/N

AFBH Representative: _____ Date:____/____/_____

Classification Representative_____ Date: ___/____/_____

Security Representative: _____ Date: ___/___ /_____

Inmate Acknowledgement:  I have been told why I was referred to the Ad Sep Committee and how it works.  I have been told why the Ad Sep Committee made its decision either to keep me in Ad Sep or reject the referral.

Inmate Signature: _____ Date: ___/____/_____

* * *

[For ACSO or AFBH staff to complete]

Effective Communication Method Used: (Select all that apply)

☐ Language: _____

☐ Spoke in simpler terms

☐ Spoke Slowly

☐ Used a sign language interpreter

☐ Used a TTY

☐ Used VRS

☐ Videophone

☐ Talk to text

☐ Other

☐ None Needed

I am satisfied that the inmate understood why he/she was being referred to the BHI Committee for potential placement in the BHI Unit or Ad Sep Unit.  [Initial] _____

I explained the BHI committee's decision to the inmate, and based on the effective communication method(s) used, I am satisfied the inmate understood the committee's decision.  [Initial] _____

E X H I B I T    C

# EXHIBIT C

## Mental Health Levels of Care

This document was developed to fulfill Consent Decree section III(F)(3).  The mental health levels of care outlined below were designed—and will be used—to reflect a client's current acuity level and ability to function within the correctional setting.  The levels are meant to be used as guidelines, meaning that mental health staff may determine that a client qualifies for a particular level when the client is displaying only some of the symptom descriptors used to define each level, and/or other similar symptoms.  A level of care determination will be made by a Qualified Mental Health Professional.  Levels MH 2, 3, and 4 will be housed in areas where they will receive the services aligned with their commensurate level of care.  Behavioral Health staff will conduct daily huddles in the Therapeutic Housing Units to discuss clients who need additional support in making progress toward a lower level of care.  The Therapeutic Housing Committee will make decisions on levels of care for all clients housed in the Therapeutic Housing Units.

These mental health levels of care will be used by mental health staff to determine initial placement within the jail's mental health program, as well as to monitor changes in acuity and improvement in patient function over time.  The levels may also be used to communicate a client's current acuity level with custody staff when there is a concern about sharing potentially sensitive information.  A suicide risk assessment will be performed anytime a client's level of care changes.  This Levels of Care document will be subject to further modification as the provisions in Section III(G) of the Consent Decree are developed and implemented.

## MH 4:  Severe functional impairment in a correctional setting, which may be evidenced by any combination of the following:
- Imminent risk of self-harm with or without suicidal intent
- Persistent violence or threats of violence to others due to mental illness
- Ongoing refusal to engage in any form of treatment, intervention, or medication
- Unable to maintain personal hygiene or care for self (e.g., refusal of medical treatment) due to mental illness
- Experiencing hallucinations commanding harm to self or others
- Severely disorganized thinking and behavior
- Actively psychotic (hallucinations and/or delusions)
- **Service components:**
  - Clients at this level shall be evaluated for a possible transfer to John George or placed in highest level of therapeutic housing.
  - While in therapeutic housing, clients will be provided the following services:
    - **Clinician frequency:** Clients will be seen at least twice a week.
    - **Psychiatry frequency:** Clients will be seen at least weekly.
    - **Daily rounds:** Behavioral Health staff will conduct daily rounds to discuss client needs and progress towards lower level of care.

- o **Available Programming:** Clients will have access to at least milieu programming (i.e. art therapy).  Socialization is the focus of programming for these clients.
- **Goals:** The goals for this level of care may include some of the following criteria:
  - o Actively participate in developing an individualized treatment plan;
  - o Adherence to prescribed psychiatric medication;
  - o Demonstrate active participation in available treatment interventions;
  - o Participate in dayroom and recreational programming.

## MH 3:  High functional impairment in a correctional setting, which may be evidenced by any combination of the following:

- High risk of self-harm
- Episodic violence or threats of violence towards others due to mental illness
- Episodic acts of aggression/aggressive behaviors, for example, destruction of property and verbal hostility
- Inability to maintain consistent personal hygiene due to mental illness
- Intermittent impairment in communication
- Frequent reliance on crisis stabilization services
- Recurrent episodes of mood instability (e.g., isolation, poor judgment, decline in mood, etc.)
- Psychotic symptoms that interfere with daily routines
- **Service components:**
  - **Clinician frequency:** Clients will be seen at least once a week.
  - **Psychiatry frequency:** Clients will be seen at least twice a month.
  - **Daily rounds:** Behavioral Health staff will conduct daily rounds of clients at this level who refuse to participate in structured programming and/or refuse to leave their cell for unstructured time.
  - **Available Programing:** Clients will have access to at least milieu programming and limited structured programming (i.e. medication compliance, symptom management, hygiene).
  - **Goals:** The goals for this level of care may include some of the following criteria:
    - o Actively participate in developing an individualized treatment plan;
    - o Adherence to prescribed psychiatric medication;
    - o Demonstrate active participation in available treatment interventions;
    - o Participate in dayroom and recreational programming;
    - o Identify triggers to mental health symptoms (i.e. self-harm, suicidal ideation, homicidal ideation);
    - o Demonstrate consistent control over behavior.

## MH 2:  Moderate functional impairment in a correctional setting, which may be evidenced by any combination of the following:

- Moderate risk of self-harm
- Infrequent violence or threats of violence towards others due to mental illness
- Infrequent attempts of non-lethal/superficial self-injury (i.e. lacerations/scratches)
- Intermittent impulsive acts but responds well to redirection
- Does not engage in physical altercations

- Able to attend to activities of daily living
- Psychotic symptoms may be present but do not interfere with daily routines
- Intermittent episodes of mood instability (e.g., isolation, poor judgment, decline in mood, etc.)
- **Service components:**
  - **Clinician frequency:** Clients will be seen at least twice a month.
  - **Psychiatry frequency:** Clients will be seen at least once a month.
  - **Available Programming:** Clients will have access to structured, group treatment (i.e. seeking safety).
  - **Goals:** The goals for this level of care may include some of the following criteria:
    - Actively participate in reviewing and updating individualized treatment plan;
    - Adherence to prescribed psychiatric medication;
    - Demonstrate active participation in available treatment interventions;
    - Participate in clinically indicated treatment groups;
    - Regularly attend scheduled clinical appointments;
    - Demonstrate regular utilization of pro-social coping skills to address mental health triggers.

**MH 1:  Mild functional impairment in a correctional setting, which may be evidenced by any combination of the following:**
- Low risk of self-harm
- Does not engage in physical altercations
- Emotional and behavioral impairment that does not prevent daily functioning or ability to follow directions
- Regularly maintains activities of daily living
- Ability to manage daily environment
- Responds to supportive counseling
- **Service components**:
  - **Clinician frequency:** Clients will be seen every 60 days unless they decline services .
  - **Psychiatry frequency:** Clients will be seen at least every 90 days.
  - **Available Programming:** Clients will have access to programming through ACSO.
  - **Goals:** The goals for this level is to:
    - Adequately maintain ability to live in general population housing and participate in programming.

EXHIBIT  D

## <u>NOTICE OF CLASS ACTION SETTLEMENT TO ADDRESS CONDITIONS AT SANTA RITA JAIL</u>

A proposed settlement has been reached in *Babu, et al., v. County of Alameda, et al.*, N.D. Cal. No. 5:18-cv-07677.  The *Babu* case is a federal class action lawsuit challenging: the adequacy of mental health care and treatment at the Jail; suicide prevention and the use of safety cells; overuse of isolation and adequacy of out-of-cell time; access to programs, services and activities especially for persons with mental health disabilities; discharge planning for people with mental health disabilities; sufficiency of accommodations in disciplinary proceedings and in pre-planned use-of-force incidents for persons with mental health disabilities; and the overall policies, procedures, and practices regarding COVID-19 on behalf of all people incarcerated at the Jail. You are a member of this class if you are currently incarcerated in Santa Rita Jail.

The *Babu* case is only about improving Jail conditions and does not seek money damages.  No one incarcerated in the Jail will receive any money as a result of this lawsuit.  Nor does the proposed Consent Decree release any claims for monetary damages class members may have, or affect your rights or ability to petition for a writ of habeas corpus

The County has worked cooperatively with attorneys for the Plaintiff class to resolve the complex issues in this case through the Consent Decree.  The Court has preliminarily approved the Consent Decree in this matter.  **This notice explains the proposed Consent Decree, how you can see it, and how you can tell the court whether you think it is fair.**

The Consent Decree outlines specific conditions in the Jail that the County has agreed to change and how the Jail will operate in the future.  Key terms of the Consent Decree include the following:

1.     The County will be required to:

   a) Ensure that people in the Jail receive adequate mental health care, including by ensuring adequate staffing, establishing levels of care, creating treatment plans for eligible individuals, providing treatment services, and implementing Therapeutic Housing Unit(s) to provide additional mental health support to those who need it;

   b) Ensure that people in the Jail are offered adequate out-of-cell time each day, including a process for significantly increasing the amount of out-of-cell time offered at the Jail within three months of the effective date.  The Jail will continue to increase the amount of out-of-cell time offered until the Jail reaches the new minimum out-of-cell times set out in the Consent Decree which will be to offer at least: 14 hours out-of-cell time per week for people in Restrictive Housing, Recreate Alone Status (Step 1); 21 hours out-of-cell time per week for people in Restrictive Housing, Recreate Together Status (Step 2); and 28 hours out-of-cell time per week for people in General Population celled housing. Individuals housed in the most restrictive setting within the Therapeutic Housing

Units will be offered at least 28 hours of out-of-cell time per week and people housed in the less restrictive, transitional units within the Therapeutic Housing Units will be offered at least 35 hours of out-of-cell time per week;

c) Take measures to prevent suicide and self-harm in the Jails, including severely curtailing the use of safety cells and limiting placement in them to no more than 8 hours (which will be further reduced to no more than 4 hours after construction of suicide-resistant cells), and implementing procedures and assessments to identify individuals at risk upon arrival at the Jail;

d) Ensure that individuals with mental health  disabilities can access programs and services at the Jail and ensure that those programs are offered throughout the Jail, consistent with their classification; and

e) Implement a new classification system that limits the use and duration of restrictive housing.

2. Joint neutral experts and Class Counsel will monitor the County's compliance with the Consent Decree.  The Department of Justice will also receive certain access to the Jail and documents in connection with its April 22, 2021 report of investigation.

3. The parties can bring any disputes about whether the County is complying with the Consent Decree back to the Court.

4. The lawyers for people incarcerated in the Jail, also known as "class counsel", are Rosen Bien Galvan & Grunfeld LLP (RBGG).  Class counsel will ask the Court to have Defendants pay their attorneys' fees and expenses.  If approved by the Court, the Consent Decree requires Defendants to pay RBGG's fees and expenses in the amount of $2,150,000.00 for the work done so far and also requires the County to pay monitoring fees to the attorneys each year throughout the term of the Consent Decree subject to the caps set out in the Consent Decree.

You can read about all of these changes in the Consent Decree. A copy is available in a binder in each housing unit.  You can also view the Consent Decree on your tablet.

The Consent Decree is also available: online at www.rbgg.com; by contacting RBGG at the address or phone number below; by accessing the Court docket in this case through the Court's Public Access to Court Electronic Records (PACER) system at https://pacer.uscourts.gov/; or by visiting any office of the Clerk of the Court for the United States District Court for the Northern District of California between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

17776523.3

Jeffrey Bornstein
Kara Janssen
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
415-433-6830 (collect calls accepted)

PLEASE DO NOT TELEPHONE THE COURT OR THE CLERK'S OFFICE TO ASK ABOUT THE SETTLEMENT

The Court will hold a hearing on the fairness of this settlement at _____ on _____, before the Honorable Nathanael Cousins at the United States District Court, Northern District of California, San Jose Courthouse, Courtroom 5 - 4th Floor, 280 South 1st Street, San Jose, CA 95113.

If you do not think the settlement is fair, you can write to the Court, also known as "objecting", and the Court will consider your comments when deciding whether to approve the Consent Decree. The Court can only approve or deny the Consent Decree. The Court cannot change the terms of the Consent Decree.

Any objections must include the case name, *Babu, et al., v. County of Alameda, et al.*, and case number, N.D. Cal. No. 5:18-cv-07677, as well as your name, address, and signature. Objections may be submitted by filing them in person at any location of the United States District Court for the Northern District of California no later than _____, or sent by mail. If mailed, your objections must be postmarked no later than _____, and sent to the following address:

Clerk of the Court
United States District Court
Northern District of California
280 South 1st Street
San Jose, CA 95113

17776523.3