LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410
Email: yhuang.law@gmail.com

Attorney for Class Member Objectors

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO/OAKLAND DIVISION

ASHOK BABU, ROBERT BELL,
IBRAHIM KEEGAN-HORNSBY,
DEMAREA JOHNSON, BRANDON
JONES, STEPHANIE NAVARRO,
ROBERTO SERRANO, and ALEXANDER
WASHINGTON on behalf of themselves and
all others similarly situated.

               Plaintiffs,

    vs.

ALAMEDA COUNTY SHERIFF'S OFFICE, et
al.,
             Defendants.

No. 5:18-cv-07677

OBJECTIONS AND SUPPLEMENTAL
OBJECTIONS ON BEHALF OF CLASS
MEMBERS TO THE PROPOSED CLASS
ACTION SETTLEMENT AND CONSENT
DECREE AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT

This Objection and supporting Memorandum of Points and Authorities is filed on behalf of

the following Objecting Class Members who have not filed a separate, individual statement.

1. Tyler W, Abbott

2. Jeffry Bryden

3. Hamlett Carrero

4. Alan Driscoll

5.  Earl Fowler

6.  Lipine Faafiu

7.  Eleazar Garcia

8.  Kent Harris

9.  Rafael Herrera

10. Ursell LaVaughn

11. Darnell Kent

12. Jorge Mejia

13. Ismael Mendoza

14. Shawn Nalls

15. Gil Osvaldo

16. William Joseph Riedy

17. Joe Robinson

18. Steven Roy Smith

19. Martin Trevino Vargas

20. Trevor G. Walsh

and as a supplement in support of the individual objections  these following class members have filed:

21. Andrew Anchondo

22. Earl Anthony

23. George Banks

24. Avante Bradley

25. Jason Brown

26. Joshua Chavez

27. Dashauna Demartra

28. Nicole Elmore

29. Adriana Falcon

30. Oscar Joaquin Garcia

2

31. Andre Griffin

32. Stephen Head

33. Darryl Hickman

34. Alexander Inguanzo

35. Jesse Jackson

36. Albert Jones

37. Damon Jones

38. Katrish Jones

39. Rayann Krum

40. David Martin

41. April Morrow

42. Christopher Moss

43. Kejon Paris

44. Taneasha Parish-Saucer

45. Melissa Perez

46. Matthew Pierce

47. Frankie Porcher

48. Isaiah Richard

49. Trevor Simpson

50. James Spingola

51. Joseph Tabron

52. Pilaar Thomas

53. Jaylynn Walton

54. Lindsay Williams

55. Patricia Williams

56. Sergio Williams

57. Otis Wyatt

58. Leanne Zamora

59.  Jovan Zachary

60. Robert Abeyda

61. Dana Alexander

62. Tiara Arnold

63. Alfonso Arroyo

64. Shawanda Black

65. Brandon Burns

66. Michael Castillo

67. Cervetti, Bridget

68. Johney Davis

69. Miranda Devlin

70. William Epting

71. Jacobi Gaines

72. Jonathan Gloede

73. Daniel Gonzalez

74. Randy Harris

75. Richard Hill

76. Leonard Jones

77. Michael Lockhart

78. Kevin McCullom

79. David Misch

80. Richard Myers

81. Jaclyn Mohrbacher

82. Tommy Navarette

83. James Pace

84. Robert Paige

85. Timothy Phillips

86. Dahryl Reynolds

87. Zachary Rideaux

88. Timothy Thompson

89. Tyler Underwood

90. David Vigil

91. Eric Wayne

92. Tashawn Williams

## 1. SUMMARY

No one questions the fact that Santa Rita Jail is an abysmal facility that violates the constitutional rights of Class members' in both the jail's general conditions of confinement and its lack of mental health care. These violations are evidenced by a suicide rate at Santa Rita Jail that is double the national average and the high rate of attempted suicides, which average 120 a year.

This proposed Settlement agreement is a sham and benefits class counsel and the Sheriff and Jail, but provides no improvements or genuine benefits for the majority of class members – both those currently in custody and those who in the future will be incarcerated while abrogating their rights. The net value of the settlement is a negative for the majority of currently in custody class members; the general population; who would receive less than what they had pre-covid in all the major components of this settlement: mental health care, out of cell time and programming. At the same time, class lawyers will receive $1.8 up front and $2.2 over the course of the settlement for a total of $4 million. Defendant Sheriff and Santa Rita Jail leveraged this lawsuit to obtain $21 million in additional funding for staff hiring. For the price of attorney's fees, these defendants will buy peace and protection from future lawsuits from all present and future prisoners, while committing to provide nothing of value for the majority of prisoners. And the class lawyers have obtained their easy money fee after having conducted no litigation and having refused to actually advocate on behalf of any prisoner.   (See Exhibit A to Objection of Kevin McCollum.)

The proposed Settlement and class lawyers have provided no notice to a significant portion of the class, those individuals who "in the future will be, incarcerated in the Alameda County Jail."  It is

5

**OBJECTIONS AND  POINTS AND AUTHORITIES IN SUPPORT OF CLASS MEMBERS' OBJECTIONS TO PROPOSED SETTLEMENT AND CONSENT DECREE**

*Babu, et al, et al  v. Alameda County Sheriff's Office*  United States District Court, Northern District of California, Case No. 5:18-cv-07677

estimated that these individuals, over the proposed life of the consent decree, would number in the neighborhood of 100,000 individuals.

This proposed Settlement does not make changes to the jail's fundamental institutional structures and practices, but at all significant junctures, allows security to be the trump card, with only the Defendants able to use these trump cards.   The jail is the sole determinator of when security trumps any and all the terms in the settlement agreement, and if the past is any lesson, the jail uses security as a justification to routinely, regularly, and daily excuse itself from its constitutional duties.

This proposed settlement agreement covers up its paucity of genuine improvements for prisoners with vague and undefined terms, over-broad and over-inclusive assertions of subject matter; and lists of undefined standards and to be determined.  The settlement agreement tells women they should get the "equivalent" not equal.  Is the back of the bus an "equivalent" ?

The proposed settlement provides no incentive to the Alameda County Sheriff to actually make jail improvement because all benefits to the Sheriff are provided upfront and automatic.   The benefits to defendant Sheriff will accrue regardless of whether the jail actually improves conditions and regardless of whether the jail improves the quality and quantity of mental health care.    The proposed settlement lacks any accountability for the Alameda County Sheriff's Office provided by individuals who are approved and selected and paid for by the Sheriff's Office; and who, the Sheriff's office can dismiss without just cause or judicial oversight.

This settlement, shields the County and the Sheriff from further and additional responsibilities and liabilities for their wrongful conduct by hiding these "accountability reports" under the cloak of confidentiality, and still gives the County and the Sheriff protection against all pending and future litigation through res judicata and issue preclusion

Class Members object to the proposed Settlement because the Settlement and class lawyers failed to provide notice,  to a large portion of the class and to non-English speakers; does not provide any actual improvements for the majority of class members; with the significant adverse consequence of depleting the County's budget for actual improvements to jail conditions and bars existing and ongoing efforts to reform and improve conditions in Santa Rita Jail via issue preclusion and res judicata.  Prisoners would rather continue and endure the ongoing conditions and be able to continue

1   seeking viable and genuine jail improvements.  Objecting Class Members, therefore, request that this

2   wholly bad proposed settlement, be rejected.

3                          **2.    STATEMENT OF FACTS**

4          The subject scope of this litigation states, "[t]he Action alleges that Defendants fail to provide

5   minimally adequate mental health care and conditions of confinement affecting individuals

6   incarcerated within Santa Rita Jail ("Jail"), including, but not limited to, relying on the excessive use

7   of isolation, providing an insufficient amount of out-of-cell time and programming, inadequate

8   classification systems, and a lack of due process protections, among other items, in violation of the

9   Eighth and Fourteenth Amendments to the United States Constitution and the California

10  Constitution." [Doc. 266-1, p. 1.]

11          The class definition is broad, including in its "Class"["all adults who are now, or in the future

12  will be, incarcerated in the Alameda County Jail." [Doc. 266-1, p. 1.] (emphasis added). According to

13  the joint expert reports, approximately 22,271 individuals were incarcerated between September 1,

14  2018 and August 31, 2019. [Dkt 111-5, p. 6]   If the current daily population, according to the jail's

15  website,  is 2,196, then the estimate would be that 20,000 people are arrested each year and released

16  at some point, for a possible numbers of class members who are individuals with the future likelihood

17  of incarceration, at 20,000 for each year.    For the 5 years of the projected consent decree, the

18  number of future incarcerated individuals, all class members based upon the proposed Settlement's

19  definitions, could be a number as high as 100,000 people.  And, this settlement states that it will

20  agree to provide defendant Alameda County, the Sheriff's Office and Santa Rita jail with the shields

21  of res judicata and issue preclusion; which will apply to all 100,000 individuals who are future

22  potential incarcerated individuals. ("Defendants and their employees and agents may use this Consent

23  Decree and any statement contained herein to assert issue preclusion or res judicata.").  [DKT. 266-1,

24  p. 71]

25          The complaint, filed on  December 12, 2018, describes abusive, violent, neglectful and

26  harmful conditions that further traumatize and injure already vulnerable prisoners with histories of

27  trauma and mental illness.  Plaintiffs Lawyers, rather than engaging in the normal processes of

28  litigation, forsook the normal adversarial process, chose to forgo normal discovery and agreed for the

parties to retain joint experts.  These retained joint experts reviewed records, conducted some inspections of the jail, and made recommendations.  Thereafter, the parties went immediately into settlement negotiations, which did not involve the participation of any prisoners, nor community groups, nor any members of the class, or even the named plaintiffs.  These settlement negotiations were shrouded in the cone of silence called confidentiality.

Demographics And Classification.  Based upon the filed expert reports, on September 8, 2019 (pre-covid), the inmate population was 2,442 with 2,220 men and 118 females (5%).  Of the total population almost half were Black (1,170, 48%), slightly less than a third were Hispanic (5675, 28%) and one-sixth were White (383, 16%).  [Dkt.111-5, p. 8]   Of this population, the vast majority was general population:  (1,432; 59%), with 40% in some form of restrictive housing (957; 40%).  [Dkt. 111-5, p. 8]   The total number of individuals identified by Santa Rita Jail in September 8, 2019 has having some form of mental illness was 275 inmates (11%)  The remainder in restrictive housing are due to protective custody or gang affiliation.  Of those who were classified as having a mental illness component of their classification, 116 of the 275 were deemed maximum with the most restrictive conditions, and the remainder or 159 are mediums and minimums.  The mental health maximums constitute 4% of the total population.  [Dkt. 111-5, p. 8]   The individuals classified as mental health mediums and minimums, or 159 individuals are currently receiving 3 hours out of cell per day. (Obj.; J. Gloude ¶ 12)   Those classified as maximums in administrative segregation, or 116 individuals,  are receiving 3 hours per week, out of cell time. (See Supp. Obj.; D. Misch Ex. A & B)

As of December 29, 2021, the inmate population at Santa Rita Jail is 2,149.[1]  While current population data analysis is not available, using the 2019 breakdowns as a rough guide, Objectors approximate that at 59%, there are there are approximately 1,296 general population inmates; at 48%, there are  1,032 Black inmates; at 28% there are 602 Hispanic inmates; at 16%, there are 344 White inmates, at 5% there are 107 female inmates, and at 10%, 215 inmates with a mental health classification.  Of the total jail population, 1,934 inmates, or 90% did not have a diagnosed or known mental health component to their classification status.  Of the 10% with a mental health classification, approximately 86 or 4% are mental health maximum security inmates.

---

[1] https://content.govdelivery.com/bulletins/gd/ACSO-3032869?wgt_ref=ACSO_WIDGET_2

Of the inmates objecting, 21 are women inmates; which constitute 20% of the total in custody women class members.  As of the date of this filing, approximately120 incustody inmates have objected, slightly less than 5% of the total incustody Santa Rita inmate population

In detailed objections, as well as the shorter ballot objections, inmates articulated their personal narratives and documentations of the deprivations and  abuses endured daily or regularly; as well as their reasons for objecting to the proposed Settlement.

**Notice.**  The proposed Settlement describes the Notice Process.  The proposed Settlement states, within the jail, notice was provided.  The proposed Settlement makes no mention of any other effort to provide notice.  Inside the jail, notice included "posting" in intake and housing units; posting on the class counsel website, posting on the tablets, and posting on the notification system inside the jail.  (ECF266-1, p. 77)  The notice was Exhibit D to ECF 266-1.  The attached notice and the proposed Settlement was only in English.

The proposed Settlement did not describe nor include any details of Notice to class members who are not currently incarcerated in Santa  Rita Jail.

The Class Notice and the proposed Settlement makes no mention and provides no information regarding translations or the availability of Notice and proposed Settlement in any language other than English.

Starting the week before Thanksgiving, class lawyer Jeffry Borenstein of Rosen Bien, Galvan and Grunfeld was given access by the Sheriff to personally make announcements over the public address system to each of the housing units, and only in English.  (Addendum, Misch ¶ 4, 5; Addendum, Phillips ¶ 27)  Prisoners reported that the announcement touted the merits of the settlement.  Later, members of RBGG were allowed into the housing unit.  Prisoners reported the visit as short, and some did not get to speak to any members of RBGG at all.  Timothy Philips, his Objection report that he asked Jeffry Borenstein to look into cells of some severely mentally ill inmates, who were living in filth and squalor, which Jeffry Borenstein did do.  (See Addendum, Phillips ¶ 28)  Since RBGG's visit, nothing changed.

Objectors' counsel, Yolanda Huang had a more difficult time accessing and communicating with inmates.  Inmates who requested paper copies of the proposed Settlement saw those paper

9

**OBJECTIONS AND  POINTS AND AUTHORITIES IN SUPPORT OF CLASS MEMBERS' OBJECTIONS TO PROPOSED SETTLEMENT AND CONSENT DECREE**

*Babu, et al, et al  v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 5:18-cv-07677

copies confiscated  (See Obj. Jaclyn Mohrbacher ¶16 ; and Tiara Arnold ¶ 11).  For prisoners who requested assistance with objections, Yolanda Huang mailed in legal paperwork, via the postal service to these prisoners.   For one documented mailing, despite three efforts: on October 18, 2021, December 2, 2021 and finally on December 17, 2021 only the final one package was actually delivered by the Jail to  the inmate on December 27, 2021.  (See Dec. of Y. Huang ¶ 11)  The postal service confirmed the delivery of all three packages to the jail. (See Dec. of Y. Huang ¶12)

Counsel for Objectors engaged law school students to assist in helping class members prepare objections.  On this occasion, when requesting access for law students, which is permitted pursuant to Santa Rita's policy, Objector's counsel was informed that the jail was denying access, recognizing only the public defender as the attorney of record.  This is despite of the fact Objectors' counsel Yolanda Huang had been visiting male and female prisoners regularly since Spring of 2018 due to her representation of inmates and class members in the Mohrbacher v. Alameda County Sheriff's Office, et al. 3:18-cv-00050 JD, and Gonzalez v. Alameda County Sheriff's Office, et al. 3:19-cv-07423-JSC, both pending in the Northern District, San Francisco.

The original goal was to have law students complete their assignment in November, prior to final exams.  However, due to the jail's new interpretation of their policy, Objector's counsel was required to apply to the Court.  [3:18-cv-00050, Dkt. 216)  Only after Judge Donato issued an order to show cause, did the jail withdraw its objection and permit the law students access.  However, by this time, the reading period and finals were upon the students, so the students' trip to Santa Rita and their assign to assist inmates was postponed until after finals, and took place on December 18th and 19th.  As a result, instead of 13 law students, only 7 were able to participate.  Declarations from the law students, paralegals and volunteer attorneys (See Dec. Jess Hallet, Dec. Lina Schmidt; Dec. Deanna Mouton, Dec. Ethan Reilly) document the extensive effort utilized to inform prisoners regarding the proposed settlement and to assist class members who wished to object.

**Motion For Intervention.**  Plaintiffs of Gonzalez, et al. v. ALAMEDA COUNTY SHERIFF'S OFFICE, moved first to relate  and then to intervene 3:19-cv-0724 JSC (Dkt 149), on July 13, 2021.  The motion to relate was opposed by defendants Alameda County on the grounds that the parties were substantially different and had involved substantially different claims and requests

10

for relief.  The motion to intervene was opposed by defendant Alameda County on the grounds that the class members' interests were adequately represented by class lawyers, Rosen Bien, Galvan and Grunfeld.  Both motions were denied.

**Res Judicata & Issue Preclusion**.  The proposed Settlement states:  " [n]either the fact of this Consent Decree nor any statement of claims contained herein shall be used in any other case, claim, or administrative proceedings, except that Defendants and their employees and agents may use this Consent Decree and any statement contained herein to assert issue preclusion or res judicata." ECF 119-1, p. 79.

### 3.  MEMORANDUM OF POINTS AND AUTHORITIES

### A.  LACK OF DUE PROCESS FOR CLASS MEMBERS

The general standard that has been used by the courts when determining whether to approve a class settlement is that the proposal must be fair, reasonable, and adequate in the way in which it addresses the interests of all those who will be affected by it.  Wright & Miller, 7B Fed. Prac. & Proc. Civ. (3d ed.) § 1797.1 Settlement, Voluntary Dismissal, or Compromise of Class Actions—Factors Considered for Approval.  Rule 23(e)(1)(C) now explicitly contains the direction that a court approving a settlement must find that it is "fair, reasonable, and adequate."  Of utmost concern is that the rights of the passive class members not be jeopardized by the proposed settlement.  Wright & Miller, 7B Fed. Prac. & Proc. Civ., supra, § 1797.1.

On January 21, 2020, this Court certified a class consisting, in part, of "all adults who are now, or in the future will be, incarcerated in the Alameda County Jail."  (Case No. 5:18-cv-07677-NC, ECF No. 64.)  The consent decree entered into by class counsel and the defendants purports to provide notice to this entire class through the dissemination of a "Notice of Class Action Settlement to Address Conditions at Santa Rita Jail" (the "Notice").  See Decl. of Kara Janssen in Supp. of Pls.' Unopposed Mot. for Prelim. Approval of Consent Decree (ECF No. 266-1), Ex. 1 at 69, Ex. 1-D.  As modified by this Court, the Notice "shall be disseminated (1) in all intake and housing units of the Jails; (2) in the Jails' hospitals and mental health facilities; (3) on Class Counsel's website; (4) on the tablets used by class members; and (5) on the television-notification system inside the Jail.  The

11

**OBJECTIONS AND  POINTS AND AUTHORITIES IN SUPPORT OF CLASS MEMBERS' OBJECTIONS TO PROPOSED SETTLEMENT AND CONSENT DECREE**

*Babu, et al, et al  v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 5:18-cv-07677

Parties shall provide alternate format copies of the notice upon request.  Notice shall remain posted so long as the Consent Decree is in effect, absent further order of the Court."  (ECF No. 280 at 2 ¶ 6.) The consent decree was granted preliminary approval on September 24, 2021.  (Id.)

In order to protect the nonparty class members, Rule 23(e)(1)(B) provides that notice of a proposed dismissal or compromise must be directed "in a reasonable manner to all class members who would be bound."  Here, the Notice fails to comply with the class members' due process rights in two critical respects.  First, the Notice reaches only the smaller portion of class members—those presently housed at Santa Rita Jail.  The consent decree makes no effort to reach any adults who "in the future will be, incarcerated" at the jail.  Second, the Notice fails to account for the fact that a sizeable portion of those class members who are presently housed at Santa Rita Jail—38%, according to class counsel's expert—are of Hispanic origin.  Yet the Notice was never translated into Spanish. The presentation by class lawyers inside the jail were also only in English.  These deficiencies threaten to bind class members to the final judgment pursuant to Rule 23(c)(3) without notice that complies with due process.

### i.     No Notice To Future Class Members

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950).  That is, "[t]he means employed [to provide notice] must be such as [a person] desirous of actually informing the absentee might reasonably adopt to accomplish it."  Id. at 315.  "[T]here [is a] a failure of due process only in those cases where it cannot be said that the procedure adopted, fairly insures the protection of the interests of absent parties who are to be bound by it."  *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). In order to protect the nonparty class members, Rule 23(e)(1)(B) provides that notice of a proposed dismissal or compromise must be directed "in a reasonable manner to all class members who would be bound."  The court has complete discretion in determining what constitutes a reasonable notice scheme, both in terms of how notice is given and what it contains.  Still, the notice should be designed to inform each class member of what is happening in the action and what the consequences

12

of the dismissal or compromise may be.  Wright & Miller, Fed. Prac. & Proc. Civ. (3d ed.) § 1797.6
Settlement, Voluntary Dismissal, or Compromise of Class Actions—Settlement Notice.  Notice in a
class suit must present a fair recital of the subject matter and proposed terms and given an
opportunity to be heard to all class members. Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 94 S. Ct.
2140, 40 L. Ed. 2d 732 (1974); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.
Ct. 652, 94 L. Ed. 865 (1950)   A notice that fails to apprise the absent class members of their rights
will be rejected as it would be ineffective to ensure due process. *Molski v. Gleich*, 318 F.3d 937, 954
(9th Cir. 2003), overruled on other grounds by *Dukes v. Wal-Mart Stores, Inc*., 603 F.3d 571 (9th Cir.
2010) (en banc).

Assuming the adequacy of the Notice itself, Rule 23(e)(2) requires the Court to consider
whether "the class representatives and class counsel have adequately represented the class." Fed. R.
Civ. P. 23(e)(2)(A); see also *Ortiz v. Fibreboard Corp*., 527 U.S. 815, 821 (1999); *Phillips Petroleum
Co. v. Shutts,* 472 U.S. 797, 812 (1985) (The Due Process Clause also "requires that the named
plaintiff at all times adequately represent the interests of the absent class members.").  Further, courts
must consider the reaction of the class to the settlement.  See *Molski v. Gleich*, 318 F.3d at 953.  Both
of these factors weigh against final approval of the consent decree.  The Notice is to be disseminated
only to individuals who are currently in custody at Santa Rita Jail.  Therefore, only those individuals
will have the opportunity to ask questions or object before losing their ability to later bring an action
regarding one of the enumerated issues.  However, class counsel has made no effort to give notice to
any of the class members who "in the future will be, incarcerated" at Santa Rita Jail.  It could have,
for example, alerted members in the general community through flyers or neighborhood meetings,
through communications with parole officers, or through community-based organizations, substance
abuse programs, and shelters.  Instead, class counsel chose to do nothing.  Plainly, the failure to
inform these class members of the pending settlement fails to demonstrate adequate representation.
Additionally, without notice of the settlement, these class members will have no opportunity to react
it.

The exclusion of these class members from the settlement process thus violates their due
process rights.  The exclusion is particularly egregious because they will be bound by this settlement

through res judicata.  (Case No. 5:18-CV-07677, ECF No. 266-1 at 71 ("Defendants and their employees and agents may use this Consent Decree and any statement contained herein to assert issue preclusion or res judicata.").  By binding class members who will in the future be incarcerated at Santa Rita Jail to this settlement, it precludes them from re-litigating issues addressed by a settlement of which they are unaware.  Given this preclusive effect, Alameda County has every incentive to move this settlement forward—it will all but extinguish their future liability in a single action. Conversely, this preclusion makes it imperative that class counsel adequately represent any absent class members just as they would participating class members.  The consent decree has wide-ranging reach across Santa Rita Jail and could mean the difference between life and death for class members. Subjecting class members who are unaware of the settlement to its effects and barring them from any future remedy is a violation of their due process rights guaranteed by the Fourteenth Amendment to the U.S. Constitution.   Therefore, the Proposed Settlement should not be approved so that class lawyers may have an opportunity to notify the estimated 100,000 members of the class who have a likelihood of future incarcerated; more than a majority of the class that class lawyers represent in this Proposed Settlement.  Alternatively, the moving parties request that the Court amend the definition of the class to exclude any future class members, and maintain a class only of those inmates at present, in custody.  See Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

       2.      **Inadequate Notice To Class Members Currently Incarcerated In Santa Rita Jail**

      In furtherance of Rule 23(e)(1)(B)'s directive that notice be directed "in a reasonable manner to all class members who would be bound," the notice must be written in "plain, easily understood language." Fed. R. Civ. Proc. 23(c)(2)(B).  In this case, the Notice was drafted in English and is to be disseminated only in English.  For non-English speakers, a notice drafted solely in English would hardly meet the requirement that it be drafted in "easily understood language."  By making no effort to have the Notice or the Proposed Settlement translated, class counsel failed to adequately represent the class and violated their due process rights, giving them no opportunity to engage with the settlement process, but still binding them to the outcome and barring them from any future issue-related litigation.  Cf. *Mendoza v United States*, 623 F2d 1338, 1351 (9th Cir. 1980), cert den. 450 US

912 (1981) (adequacy of notice based, in part, on provision of a Spanish translation); *In re Google Referrer Header Privacy Litigation*, 2014 WL 1266091, *7 (N.D. Cal. 2014) (notice approved where it featured dissemination in both English and Spanish); *Braggs v. Dunn*, 321 F.R.D. 653 (M.D. Ala. 2017) (in a proposed class settlement alleging discrimination against the Alabama Department of Corrections, the notice and comment forms, and copies of the proposed agreement were made available in English, Spanish, Braille, and in large print); *In re AT & T Mobility Wireless Data Services Sales Tax Litigation*, 789 F.Supp.2d 935 (N.D. Ill. 2011) (adequacy of notice was based, in part, on the inclusion of a Spanish translation); *Hernandez v. Immortal Rise, Inc.,* 306 F.R.D. 91 (E.D.N.Y. 2015) (same); *Charron v. Pinnacle Group N.Y. LLC*, 874 F.Supp.2d 179 (S.D.N.Y. 2012), aff'd, 731 F.3d 241 (2d Cir. 2013) (same); *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436 (S.D.N.Y. 2004) (same). See Objections of Jaclyn Mohrbacher and Daniel Gonzalez.

## B.  PROPOSED SETTLEMENT PROVIDES NO BENEFITS FOR NINETY-SIX PERCENT OF THE CURRENT INMATES

Careful reading this lengthy shows that some benefits would accrue to only four (4) percent of the current inmate population.  The vast majority of prisoners would receive not only no benefit, but would actually see basic conditions such as out of cell time, frozen at a level lower than pre-covid levels.   For the vast  majority of prisoners, they would lose important benefits and suffer greater restrictions as a result of the proposed Settlement.

Based upon the numbers and classification breakdowns provided, the four percent that would receive benefits, constitutes 86 individuals, who have a severe mental health component to their classification <u>and</u> are considered maximum security.  The essential classification breakdowns are contained in the proposed Settlement's Exhibit C, which articulates the four levels of the Mental Health Levels of Care (ECF 266-1, p. 104-106)   Based upon Exhibit C's standards, the vast majority of prisoners would fall into the bottom category of "MH1" – those individuals with:

　　　　1) "Low risk of self harm";

　　　　2) not "engaged in physical altercations";

　　　　3) able to maintain "activities of daily living";

　　　　 4) able to manage "daily environment";  and,

15

5) responds to "supportive counseling".

This group, is labeled the "Mild functional Impairment in a correctional setting" 266-1, p. 106/110. The proposed Settlement agreement provides no increase of out of cell time for these folks, instead setting a very low standard of four (4) hours per day of out of cell time, which is less than the amount of out of cell time provided by the jail pre-covid.  And the amount of mental health care is actually reduced to only once every 60 days. [Dkt 266-1. P. 106]   In addition,  this proposed Settlement would actually worsen conditions of confinement for the majority of prisoners by permitting the jail to subtract out of cell time, hour for hour, for programming time.  [Dk6. 266-1, p.18, (a)iii); p. 19 b(iii); p.20 (c)(iii)] ] The sum total, rather than an improvement of conditions of confinement, would be a net loss  of out of cell time for 96% of the current inmates in Santa Rita Jail.

> i.     **No Increase in Out of Cell Time for Majority of Class Members**

The number one condition, cited by all the objectors, as contributing to mental health distress and decline is excessive lock-up, the lack of out of cell time, enforced idleness and sensory deprivation.  The significant opposition by class members against this proposed Settlement, is because on this fundamental basic issue, that the proposed Settlement provides no improvement and no benefit to the vast majority of class members.

> ii.     **No Increase or Improvement in Proposed Mental Health Care for the Majority of Class Members.**

While class lawyers describe the proposed Settlement as "comprehensive",  it's accurate to say that the asserted scope of the proposed settlement is "comprehensive" but the actual remedies are limited in scope, meager in benefits and actually provide mental health care for only a very small number of individuals.  While not stating so out right, the limited focus of the proposed settlement is on individuals who are severely, or seriously mentally ill.   The emergency standard are for individuals:

a.     who are at active risk of self harm, or harm of others          Or

b.     have "severe decompensation" or

c.     appear "disoriented or confused or unable to respond to basic requests or give basic information. "  (Dkt 266-1, p. 39/110)

---

These emergency cases are to be seen by mental health staff within 4 hours.   Although the proposed Settlement does not identify which class members are in the sub-class of individuals with a "psychiatric disability", one assumes that these emergency cases will be contained in this subclass.  The next level are those individuals who would be seen by a mental health provider within 24 hours, and are described as:

a.      Displaying signs of acute mental illness

b.      So psychotic that they are at imminent risk of severe decompensation; or

c.      Individuals who have attempted suicide or report suicidal ideation within the past 30 days.

(Dkt 266-1, p. 39/110)

Everyone else is designated as "routine" and would be seen within 7 days.  And for those designated "routine", mental health services would only be provided no more than once every 30 days or once every 60 days.  Common knowledge and practice indicates that regular mental health services, normally weekly or at most bi-weekly is the standard practice.  This proposed settlement does not come close.  It begs the question whether providing clinical contact for mental health once every 30-60 days has any measurable benefit.

        iii.      **Settlement is Vague on Standards and Criteria.**

This Settlement is exceedingly vague on standards and criteria.  Without repeating the detailed critique contained in Objector's Expert, Daniela Kantorova's report, the relevant flaw is that while the proposed Settlement contains a large number of  nomenclatures including "suicide resistant cell", "therapeutic housing Unit", among others; the proposed Settlement provides no definitions nor descriptions of what this jail housing should contain or be like; nor criteria for deciding who is to be assigned to these jail housing, nor even a requirement that each person who so qualifies, be so housed. (Kantorova Report, p. 5).

        iv.      **Settlement Provides for Inadequate Monitoring And Enforcement**

Due to the overabundance of verbiage, accompanied by the actual lack of specificity and definition, this proposed Settlement will be impossible to monitor, and equally impossible to enforce.  At multiple junctures, the jail is provided a loop hole for all compliance.  For example:

"Defendants shall also ensure that incarcerated persons are provided maximum confidentiality in interactions with telepsychiatry providers, but it is understood that custody staff may need to observe the interaction to ensure safety and security. " [Dkt 266-1, p. 21/110]

"Inmates may participate in these programs in handcuffs or other appropriate restraints only if necessary to ensure the safety and security of the Jail. [Dkt 266-1, p. 26/110]

"These minimum requirements for out-of-cell time are subject to exceptions including, … and any other emergencies …to preserve the safety and security of inmates and staff. [Dkt 266-1, p. 30/110]

The phrase "clinically appropriate" shall be defined to refer to the quality and quantity of mental care necessary to promote individual functioning within the least restrictive environment consistent with the safety and security needs of the patient [Dkt. 266-1, p. 44]

Security is not defined.  The proposed settlement does not specify who has the authority to make the determinations regarding security, but the clear implication is a deferral to the Sheriff and custody staff.  This provides an undefined, daily opt out for the jail, from any meaningful compliance.

### v.  Over Broad Settlement Subjects

The parties who drafted this proposed Settlement attempt to create a mighty shield of res judicata and issue preclusion to protect defendants from pending and future litigation.  This shield is undeservedly broad and thick due to both its exceedingly broad class definition, that theoretically hundreds of thousands of people, including people who are at "future" risk of incarceration; and the expansive and thick language of the subject areas of the proposed settlement which covers women' rights, use of force, restraint devices, disciplinary process, outdoor recreation, restrictive housing, medical isolation and quarantine, mental health care, ADA, inmate programs; all of which lack specifics, and are intertwined with harmful language.  Specifically, this proposed settlement relegates women to the "equivalent" of men, and not the equal of men, but would still provide the shield of res judicata and issue preclusion while providing women with no substance toward equal rights and equal access.  The proposed settlement could potentially eviscerate and prevent the significant

injunctive relief sought by plaintiffs in the Mohrbacher v. Alameda County Sheriff's, pending litigation.

The proposed settlement ensnares the daily and important issues of out of cell time and programming for all prisoners, but is wholly lacking in specificity of either the types of programming which are required for the majority of prisoners, the general population prisoners.

Given the lack of benefits for the general population prisoners, as an alternative, the class definition could be limited solely to the sub-class of individuals with a psychiatric disability, and to remove all general population inmates from the confines of the Babu case.

### C. The Proposed Settlement Ensnares Women But Does Not Remedy The Discrimination Women Prisoners Face In Santa Rita Jail.

Even in Santa Rita jail, women are second class citizens. And the overbroad language attempts to ensnare the rights of women to seek equal treatment, with as single throw-away sentence in the proposed settlement.

"Defendants shall also ensure that mental health programming and care available for women is equivalent to the range of services offered to men."

[Dkt. 266-1, p.55]

Women class member objectors reject that "equivalent" means equal. They further reject the lack of definition, the lack of real advocacy, and the lack of enforcement and accountability. The proposed settlement identifies none of the areas of inequality, and provides no specifics of what the remedy would be. However, that one throwaway line would be a basis to assert issue preclusion and res judicata against the pending litigation on women's issues regarding conditions at Santa Rita Jail, Mohrbacher v. Alameda County Sheriffs, et. al.   Easy protection for the jail with no cost and no benefit to class members.  There is every reason to reject this proposed Settlement.

      i.    <u>Significant Number of Women In Custody Class Members Are Objecting</u>

Twenty percent (20%) of the in custody women prisoners have filed objections.  Women prisoners are approximately 5% of the total population.  Given the current daily population of 2,196, five (5%) percent would equal 109 prisoners.  Twenty-one women class members have filed objections, or 20%.  This is a significant number, particularly given the obstacles the jail maintained

19

OBJECTIONS AND POINTS AND AUTHORITIES IN SUPPORT OF CLASS MEMBERS' OBJECTIONS TO PROPOSED SETTLEMENT AND CONSENT DECREE

*Babu, et al, et al v. Alameda County Sheriff's Office United States District Court, Northern District of California, Case No. 5:18-cv-07677*

1  and created to Class Objectors' counsel efforts to inform, communicate with and assist class members
2  in drafting objections.

3  **D.    No Real Advocacy and No Real Representation**

4  This was a sweet heart dance.  The Sheriff is getting quite a deal, including having class
5  lawyers appear before the Board of Supervisors to advocate for a significant budget increase for the
6  Sheriff in addition to issue preclusion and res judicata..  The class lawyers, without being required to
7  engage in any discovery, or any adversarial litigation, will be rewarded with a significant fee, worth
8  $4 million over the term of the consent decree.

9  The hypocrisy of this proposed Settlement is to justify the significant increase to the jail's
10  budget, and the exceedingly high attorney's fees with an over-broad class definition to give the
11  appearance of being comprehensive, but to provide extremely limited, if not less the actual benefits
12  under the proposed settlement as compared to what most prisoners are currently receiving.

13  **E.    Inadequate Monitors**

14  The joint experts do not include anyone who is formerly incarcerated.  The joint experts are
15  by and large individuals who have worked for incarceration.  Terri McDonald, who is the expert on
16  incarceration, is not a neutral.  Class members object to Terri McDonald because she was a paid
17  expert on behalf of the Sheriff,  where a pregnant woman was placed into a solitary confinement cell,
18  in Santa Rita Jail, and then left alone so she had to give birth alone, without any assistance or medical
19  attention.  (Steel v. Alameda County Sheriff's Office, 3:18-cv-05072 JD)  As the designated expert
20  regarding custody, Terri McDonald is not fair and impartial, and will not adequately represent the
21  interests of prisoners.  Nor do the joint experts include anyone who is Black, although 48% of all the
22  inmates are Black, and a number of class members raised the issue of cultural competency and
23  sensitivity.

24  **F.    Lack Of Transparency**

25  As a further indication of the fundamental flaw of this proposed settlement is the agreement
26  negotiated by the class lawyers which makes future monitors' reports confidential and only a curated
27  summary shall be available to the public.  The lack of transparency and accountability, given that the
28  agreed to benefits from the outset are so paltry and that all future monitoring and compliance reports

will be completely shielded, highlights both the lack of benefits to class members and the lack of advocacy by class lawyers for class members.

**CONCLUSION**

Objectors request that this Court reject this proposed settlement.  This rejection will permit further modifications, which may produce  a settlement that is more responsive to the interests of all class members, and which may actually produce some benefit and improvement to the conditions which class members must endure.

Respectfully submitted,

Dated:  December 31, 2021                  LAW OFFICE OF YOLANDA HUANG

By:  /s/ Yolanda  Huang
                                     Attorney for Objecting Class Members