LAW OFFICES OF YOLANDA HUANG
YOLANDA HUANG, SBN 104543
528 Grand Avenue
Oakland, CA 94610
Telephone: (510) 329-2140
Facsimile:  (510) 580-9410
Email: yhuang.law@gmail.com

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| ASHOK BABU, ROBERT BELL, IBRAHIM KEEGAN-HORNSBY, DEMAREA JOHNSON, BRANDON JONES, STEPHANIE NAVARRO, ROBERTO SERRANO, and ALEXANDER WASHINGTON on behalf of themselves and all others similarly situated.<br><br>         Plaintiffs,<br><br>    vs.<br><br>ALAMEDA COUNTY SHERIFF'S OFFICE, et al.,<br>         Defendants. | No. 5:18-cv-07677<br><br>EXPERT OPINION OF DANIELA KANTOROVA SUPPORTING THE OBJECTIONS TO THE PROPOSED CLASS ACTION SETTLEMENT AND CONSENT DECREE |

Attached please find, as Attachment A, the expert opinion of Daniela Kantorova supporting the objections to the Proposed Class Action Settlement and the Consent Decree; and as Attachment B, Prof. Kantorova's curriculum vitae.

Dated: December 31, 2021         LAW OFFICE OF YOLANDA HUANG


                    By     */S/ Yolanda Huang*
                         YOLANDA HUANG

1

---

**CLASS MEMBER NAME'S OBJECTION TO PROPOSED SETTLEMENT AND CONSENT DECREE**
*Babu, et al, et al v. Alameda County Sheriff's Office* United States District Court, Northern District of California, Case No. 5:18-cv-07677

# ATTACHMENT A

**Babu Proposed Settlement – Summary of Opinion**
**Daniela Kantorová, Psy.D., PSY29182**

I am presenting a number of objections to the Consent Decree, Case No. 5:18-CV-07677, Babu vs. County of Alameda. In short, it is my opinion that the consent decree does not adequately address issues raised by the complaint, and in addition, that the consent decree lacks specificity; it is unclear, and at times even confusing.

**Proposed Settlement's Remedies:**
It has been well established, that incarceration has negative impacts on mental health, including it being a source of traumatization for incarcerated individuals (Quandt and Jones, 2021). The complaint Babu vs. Alameda County clearly describes the abusive, violent, neglectful and harmful conditions of the jail, which appear to constitute its very culture. As such, people who have pre-existing trauma histories or mental health diagnoses are particularly vulnerable to experience further traumatization and a deterioration of their conditions. People without pre-existing histories of trauma or mental health issues are likely to experience trauma while incarcerated and develop symptoms of mental illness.

The Babu vs. Alameda County class action lawsuit was an opportunity to rethink resource allocation in Alameda County and make effort leading to decarceration, including strengthening of mental health diversion programs and funding community resources. Instead, the consent decree proposes what is essentially jail expansion, with a new building, and over 250 sheriff deputy hires. In comparison, there is a plan to hire 107 mental health professionals. The overall emphasis of this consent decree appears to be on the expansion of the carceral apparatus, rather than ensuring appropriate mental health treatment.

Based on data collected by National Lawyers Guild, there are likely hundreds of people in Santa Rita jail with severe mental illness. This lawsuit was an opportunity to review the charges of people with severe mental illness and consider community alternatives for people whose charges were related to their mental health issues, as a bare minimum.

The consent decree recommends that people experiencing severe functional impairment in the jail are transferred to the John George psychiatric hospital. This practice has already been in place; however, there is no evidence that it has been working; moreover, the recent report by Department of Justice, *Investigation of Alameda County, John George Psychiatric Hospital and Santa Rita Jail* from April 22, 2021, identified a need for community based services and mental health diversion. The following is a quote from that report:

"The lack of community-based services drives individuals with serious mental illness into costly psychiatric facilities, but it also can lead to costly incarceration. Alameda County spent $177.2 million in fiscal year 2016–2017 on Santa Rita Jail, not including mental health services, with around 25% of its population having serious mental illness. The County has recognized both its significant reliance on the Jail for people with mental illness and that appropriate mental health treatment could address this problem. The Alameda County Board of Supervisors' Mental Health Board recognized in 2015 that "Santa Rita Jail has become a warehouse for people with mental illness."[21] The Board further explained that "since there is nowhere to place [individuals with mental health disabilities],

1

they languish in jail, often isolated in jail cells. We need to develop a system so that this population can be diverted out of the criminal justice system and into treatment" (Department of Justice, 2021).

The American Public Health Association (APHA) calls for decarceration as a public health measure in its policy. This call, first issued in light of the Covid-19 pandemic, and later accepted as the organization's permanent policy, states that incarceration does not ensure safety, but rather contributes to violence, and to health and social inequity. The APHA policy calls for investment in community alternatives, as primary prevention strategy. It also calls for "moving people with mental health issues and substance use disorders from locked facilities to community-based treatment" (APHA, 2020).

Based on these findings it is reasonable to conclude that people with severe mental illness should be treated outside the jail setting. The stay in jail represents a risk of harm and further deterioration of their condition, and there is nothing in the consent decree that safeguards adequate treatment for people with severe impairment in functioning, or in general, people with severe mental illness. People with histories of untreated trauma may present with various behavioral difficulties and their reactions to trauma triggers within the jail setting may contribute to behaviors that represent rule violations. As such, trauma survivors are also vulnerable to discipline, punishment, and neglect in the jail setting, which can prove deadly.

**The Consent Decree does not adequately address all issues brought by the complaint.**
**Remedy for People Incarcerated in the past or currently:** The Consent Decree does not outline a plan for evaluation, creation of treatment plans, and provision of adequate care for people currently incarcerated in Santa Rita. It also does not provide any remedy for people who were harmed by inadequate or lack of care in Santa Rita in the past. There should be a remedy for individuals who endured suffering on account of the conditions and lack of adequate treatment in Santa Rita.

**Proposed Settlement's Proposed Treatment for People with Severe Functional Impairment:** The consent decree does not adequately address care for people with level MH4 (severe functional impairment). Severe functional impairment, which can rise to grave disability, is likely to require more intensive treatment than twice per week; stating that people will be seen "at least twice per week" does not guarantee adequate treatment. Additionally, transferring people to John George as the consent decree suggests, is not likely to address issues raised in the complaint since its plaintiffs did experience hospitalization in John George, which did not help their conditions. The John George facility and the phenomenon of cycling between John George and Santa Rita is subject to another lawsuit, initiated by Disability Rights California and has been described in the aforementioned DOJ report. Under the current conditions, including transfers to the John George facility in this consent decree does not provide any assurance of adequate care.

**Proposed Settlement's Does Not Address Abuse and Neglect by Jail Staff**:
The complaint mentions abusive behavior by deputies in Santa Rita, including use of racial and ableist epithets, and making threats if incarcerated people file grievances about this behavior or about jail conditions. The consent decree does not contain sufficient measures to address this behavior, to hold perpetrators accountable, to prevent future occurrences, or to provide any remedy to people harmed by this behavior. The training for jail staff mentioned in the consent

2

decree does not address this issue, and the grievance processes mentioned in the consent decree do not provide any measures to protect people filing grievances from retaliation.

**Proposed Settlement Does Not Discuss Ensuring Effective Treatment:**
The consent decree contains almost no information about the mental health services that will be provided in the jail, and how their quality, effectiveness, or relevance is going to be assured. One issue raised in the complaint is the short duration of appointments, but the consent decree does not specify appointment duration, it only says "appropriate clinical duration," which is vague. Confidentiality, another issue covered by the complaint is not sufficiently addressed in the consent decree; for instance, the consent decree states that deputies may observe telehealth appointments. Elsewhere it states that staff will work to "maximize confidentiality." Given that the issue of confidentiality is so prevalent in the claim, and given that confidentiality is a crucial component of any effective mental health treatment, the consent decree should elaborate on how confidentiality will be safeguarded in the jail. Additionally, the phrase "clinically appropriate" is vague and should be elaborated on. For instance, this clinician would consider a treatment that is trauma-informed, holistic, culturally relevant and responsive, evidence based, and tailored to the individual needs of the client based on their history and case formulation, clinically appropriate. However, another clinician may think otherwise. What is "clinically appropriate" should therefore be clarified in the consent decree. The consent decree also does not specify which services would be available in person and which services via telehealth, and whether the person would be able to choose.

**The Proposed Settlement Lacks Guarantees for Independence of Mental Health Professionals:** Given that extensive abuse and mistreatment have been the subject of this complaint, and given that no clinicians employed in the jail to our knowledge called attention to this issue, the way clinical services are embedded in the structure and culture of the jail must be considered. It is important to safeguard the independence of mental health professionals as there is a trend in institutions to co-opt mental health professionals to serve the purposes of the institutions. This has been well documented in a report by Physicians for Human Rights (PHR), *Dual Loyalty and Human Rights*. In this report, PHR states: "When ethical guidelines are brought to their attention, health professionals working in these environments often find them meaningless in the world in which they practice. Formal mechanisms for seeking improvements in care or protection of the human rights of their patients are few, and speaking out to improve health care or to change abusive conditions may jeopardize their employment."

There needs to be a process and structure in place to assure objectivity and prevent co-optation of mental health professionals, and protect the mental health professionals in case they do encounter ethical or legal issues that would need to be reported. Instead of jail expansion, it should be considered to build a third party, community-run facility with trauma-informed mental health professionals who have roots in the community and are able to provide culturally relevant services. Additionally, programming should be available from organizations who are connected to local communities, informed about specific struggles and challenges faced by people incarcerated in Santa Rita and their communities, and can provide services that are specifically tailored to the needs of incarcerated people. The consent decree does not specify which programs are currently available, or which will be provided in the future, so there is no current assurance that relevant programming will be widely available.

**Out of Cell Time and Prolonged Solitary Confinement:** According to the United Nations Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment, solitary confinement is defined as *"the physical isolation of individuals who are confined to their cells for 22 to 24 hours a day."* Prolonged solitary confinement is defined as any such confinement longer than 15 days (Mendez, 2011). The United Nations report states that some psychological harms caused by solitary confinement can become irreversible at this point, and that solitary may rise to the level of torture. It recommends that prolonged solitary confinement is not used with mentally disabled people; that a medical officer should visit individuals held in solitary confinement every day, and that individuals held in solitary confinement for more than 12 hours should have access to fresh air for at least one hour each day.

**Restrictive Housing – Recreate Alone; No Safeguards for Deterioration in Mental Health**:
According to the consent decree, people in the most restrictive housing category: Restrictive Housing-Recreate Alone status, will have an allowance of 14 hours of out of cell time per week, which comes to 2 hours per day. This leaves them with 22 hours in cell, constituting solitary confinement. Quarterly review of Restrictive Housing Classification is too long and means that anyone placed there is at risk of developing irreversible psychological harm. Reviewing the status for people with SMI every 30 days is also too long as this amounts to prolonged solitary confinement with its associated risks. Additionally, it is not clear how any possible deterioration in mental health will be monitored for people under this classification.

Although people with SMI should not be placed in restrictive housing – recreate alone status, the consent decree mentions conditions under which people with SMI can be placed under this classification. This poses a serious risk to health of such individuals. Additionally, violations can be a symptom of mental illness, and restrictive housing does nothing to address the symptoms, but rather, it is only likely to exacerbate them.

**Restrictive Housing - Recreate Together; Insufficient Remedy:** This classification allows for 21 hours per week out of cell time, which amounts to three hours per day. This is very low, considering that it is just one hour difference from meeting the UN definition of solitary confinement. This is likely to also have severe negative impacts on individuals' mental health. It is not clear from the consent decree how is mental health monitoring going to be conducted for people in this classification, and re-evaluation every 30 days is too long a period.

**People Placed in Restrictive Housing Currently or in the Past; No Specified Remedy**:
Individuals who were placed in solitary confinement in the Santa Rita Jail in the past, or are placed in it at present should be released out of solitary, evaluated for mental health impacts and provided trauma-informed treatment. The consent decree does not include any remedy for people already impacted by solitary.

**Yard Time – No Specificity:** Everyone should have access to the yard time. The length of time (24 months) to reconfigure the yard space appears too long. The consent decree does not clarify how much of yard time will be guaranteed to incarcerated individuals in all levels of classification.

4

**Excessive Vague and Confusing Content**: The consent decree does not sufficiently define and describe multiple important aspects of the settlement, and mentions concepts that are not elaborated on, or defined, which leaves much to interpretation and does not provide an assurance of effective treatment. The following are examples of vague and unclear content, but this is not an exhaustive list:
- Therapeutic Housing Units: this has not been defined or described. What are the criteria for admission to the therapeutic housing units?
- Behavioral Health Units are mentioned in passing. How are they different from therapeutic housing units?
- Mental Health/ Program Services Building – is this where the therapeutic housing units will be? There is not much information provided on the building.
- Qualified mental health professional – not defined. For instance, does being trauma-informed, culturally responsive, and anti-racist factor into the qualification?
- What is a "special handling unit"? Mentioned for the first time on page 44?
- What are "food-related disciplinary cases"? Mentioned in passing on page 36.
- What are "forensic outpatient programs"? It would be worthwhile to elaborate on these to see if these could be expanded, for the purposes of mental health diversion.
- Mental health staffing: which positions and qualification does the staffing plan include?
- Restorative justice practices implementation mentioned in passing -what is the plan and commitment?
- Behavioral Health Client definition is not provided
- BHAT team is not sufficiently defined or described
- Suicide resistant cells – this needs to be clearly described
- "Diagnostic testing" and "therapeutic regimen" should be elaborated on in the document as this can have a wide range of interpretations.
- New classification system is mentioned in the consent decree, which states that it should be approved by Dr. Austin. Since  - should be more people/ independent body. New classification system should be included in this consent decree (this seems to be avoiding accountability and transparency)
- Statement that restrictive housing may last "as long as necessary" is vague and keeps the door open to use of prolonged solitary confinement.
- The consent decree does not include sufficient information on what programming will be available; including what substance use treatment will be available
- Emergent mental health condition is not defined

**Availability of Non-Pharmacological Treatment – Lack of Specificity:**
The Babu complaint mentions lack of availability of forms of non-pharmacological treatment for mental illness. The proposed consent decree does not sufficiently and clearly address this issue. People who are incarcerated should have access to non-pharmacological methods of treatment, such as supplements, healthy nutrition, exercise, outdoor time, and social support. Sleep and hygiene are important for maintenance of good metal health. Everyone should receive

instructions about diet/exercise and psychoeducational materials regarding prevention of mental illness and maintenance of good mental health.

**Neurodevelopmental Disorders, Neurocognitive Disorders and Medical Issues that Manifest in Mental Health Symptoms – Not Addressed**: The consent decree does not address how neurodevelopmental disorders, neurocognitive disorders and medical issues marked with psychological symptoms can be screened for, detected, and treated, while those conditions might qualify as disabilities for people who are incarcerated. These conditions can have a significant impact on behavior, and on a person's ability to follow rules, and they require specialized treatment. One significant issue that often goes undiagnosed in jail and prison settings with sometimes adverse consequences is that of seizures. Other likely largely undetected issues may be autism and head injuries.

**Suicide Prevention and Crisis Response – Insufficient Specificity**

Suicide prevention and crisis response is not clearly described in the consent decree. There is no definition of "suicide resistant cells" or description of "one-on-one suicide watch." It is not described in the consent decree who would be tasked with "one-on-one suicide watch" and how they would be trained. It is also not clarified whether suicide resistant cells represent solitary. There exists ample research on the harms of solitary confinement, including that it can bring about suicidality, or exacerbate it. No crisis response should ever involve solitary confinement as that is only likely to cause worsening of the symptoms. Moreover, "restrictions on privileges" are mentioned in the context of suicide assessment. This is not clear and gives rise to concern that suicidality could be met with punitive measures. Given the prevalence of abuse and neglect by deputies in Santa Rita Jail, there should be a clarification on how safety of some of the most vulnerable people in the jail (i.e., people who are in crisis) will be protected.

Respectfully submitted,

DocuSigned by:
*Daniela Kantorova*
3D14B84E799843C...

12/20/2021

Daniela Kantorová, Psy.D.

6

DocuSign Envelope ID: 31227929-633D-436A-8751-C35ADCB39799
Case 5:18-cv-07677-NC   Document 381-6   Filed 12/31/21   Page 9 of 20

**References**

American Public Health Association. (October 24, 2020). *Advancing Public Health Interventions to Address the Harms of the Carceral System.* Retrieved from: https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2021/01/14/advancing-public-health-interventions-to-address-the-harms-of-the-carceral-system

Quandt, K.R. & Jones, A. (May 13, 2021). *Research Roundup: Incarceration can cause lasting damage to mental health.* Prison Policy Initiative. Retrieved from: https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/

Mendez, J. (2011). *Interim report of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman or degrading treatment or punishment*. United Nations.

Physicians for Human Rights. (2002). *Dual Loyalty & Human Rights*. Retrieved from: https://phr.org/wp-content/uploads/2003/03/dualloyalties-2002-report.pdf

U.S. Department of Justice, Civil Rights Division. (22 April 2021). *Investigation of Alameda County, John George Psychiatric Hospital and Santa Rita Jail.*

# ATTACHMENT B

# Daniela Kantorová, Psy.D.
The Wright Institute
2728 Durant Ave
Berkeley, CA 94704

**Contact Information**
Cell: +1 650 743 2620
E-mail: dkantorova@wi.edu

## Curriculum Vitae

**Licensed Clinical Psychologist (PSY29182)**
Psychological services offered for adolescents and adults.

**Languages**
Bilingual: Czech, English
Receptive Skills Only: Polish, Slovak

## Experience

| | |
|---|---|
| June 2016 – Present | **Clinical Faculty at the Wright Institute, Berkeley, CA**<br>I have worked as a Program Director of Contra Costa Wellness and Counseling, Program Director of the Wright Institute Sanctuary Project (WISP), and Consultant and Supervising Psychologist with WISP. I have also been chairing dissertations, teach classes, serve on the Diversity Committee, conduct admissions interviews, and lead independent study groups on mass incarceration and psychology. |
| August 2020 – Present | **Program Director, Contra Costa College Wellness and Counseling Program, San Pablo, CA**<br>The program provides individual and group therapy, crisis intervention and psychoeducation to the Contra Costa College, including specialized services for students of two high schools that operate on the community college campus. The program trains PsyD students in providing services, and as such it involves group supervision, individual supervision, running a didactic training seminar, providing direct services, and consulting with college and high school staff. |
| June 2016 – August 2020 | **Program Director for Contra Costa High Schools Counseling Program, San Pablo, CA**<br>The Contra Costa High Schools Counseling Program is located at the Contra Costa Community College and serves the Gateway to College and Middle College high schools. Responsibilities of the program director include overall management of the training program, teaching didactic seminar, providing individual and group supervision of doctoral students, providing individual and group therapy, providing consultations to staff, and conducting curriculum and program development. |
| September 2019 - Present | **Consultant and Supervising Psychologist at the Wright Institute Sanctuary Project**<br>My duties include co-facilitating group supervision, providing individual supervision, and teaching didactics in an advanced supplemental practicum program that trains doctoral students in conducting forensic psychological evaluations to supplement asylum applications. |
| September 2017 - Present | **Supervision of Research**<br>I have been involved in supervising dissertation research of eight students, on topics related to migration, trauma, mass incarceration, activism and police violence. Additionally, I served as a research consultant on a project conducted by a student from |

1

Ostrava University who was a visiting scholar at the Wright Institute in 2019. In 2019, one of my advisees received The Wright Institute Outstanding Dissertation Award.

| | |
|---|---|
| February 2020 - Present | **Member of Diversity Committee, The Wright Institute Psy.D. Program**<br>I participate in monthly meetings where members consult on issues related to diversity, and organize events that facilitate diversity, inclusion, and community building in the WI PsyD program. |
| September 2015 – August 2019 | **Program Director at the Wright Institute Sanctuary Project**<br>Supervised advanced practicum students in conducting dozens of forensic psychological evaluations of asylum seekers, teaching didactic seminar, conducting program development, and overall administration and management of the program including development of community partnerships. |

## Forensic Work

| | |
|---|---|
| March 2021 - ongoing | **Expert witness in a civil case of a death row exoneree**. In collaboration with Edwards Kirby, North Carolina. |
| December 2021 | **Trauma assessment for an asylum seeker** in removal proceedings, at the request of University of California, Hastings, Center for Gender and Refugee Studies |
| September 2019- ongoing | **Expert witness for a class action lawsuit regarding prison conditions**. In collaboration with Montroy Law, Illinois. |
| Winter 2012- June 2015 | **The Wright Institute Sanctuary Project (WISP)**<br>Conducted 12 psychological evaluations for asylum as a part of WISP practicum during the years 2011-2012, 2012-2013, and as a postdoctoral fellow during the 2014-2015 academic year.<br>Supervisor: Sumana Kaipa, Psy.D., Brenda Padilla, Psy.D. |

## Teaching Experience

| | |
|---|---|
| Winter 2019 - Present | **Independent Study Groups for Wright Institute Psy.D. Students**<br>I led two independent study groups in Winter 2019 and Winter 2020 for Wright Institute Psy.D. students, aimed at learning about psychological impacts of mass incarceration. The groups have been designed collaboratively with students and used principles of liberation pedagogy. |
| Spring 2019 and 2021 | **Expertise and Advocacy in the Carceral System**<br>Co-designed and co-taught an elective class together with Wright Institute Professor Emeritus, Dr. Terry Kupers. The class provided an overview of the carceral system, discussed the role of psychologists in this system, and provided an overview of skills and competencies needed to work in the carceral system. |
| Spring 2018 - Present | **Adjunct Faculty at the Wright Institute Counseling Psychology Program**<br>Taught classes Crisis, Disaster & Trauma Counseling in the Spring of 2018 and 2019, and Psychopharmacology and the Biological Bases of Behavior in the Summer of 2018 and 2019. |
| Spring 2013 – Present | **Adjunct Faculty at Notre Dame de Namur University, Belmont, CA**<br>Taught a Psychobiology class in the Fall 2012 and Spring 2013, Personality Theory in the Fall 2015, Social Psychology in Spring 2016 and Summer 2017, and Introduction to Trauma during Spring 2019. |
| Winter 2013 and 2012 | **Teaching Assistant for Cognition, Emotion, and Personality Class**<br>The Wright Institute, Berkeley, CA |

|  |  |
|---|---|
|  | Worked as a teaching assistant for a second year required class in Winter 2012 and 2013. In this class, students familiarize themselves with the latest research in the areas of cognition, emotion, and personality and learn to apply this information to their clinical practice. The tasks included consultations on the course syllabus, grading of student reflection papers and facilitation of small groups.<br>Professors: Milena Esherick, Psy.D., and Karen Godfrensen, Psy.D. in 2012, and Alicia del Prado, Ph.D. in 2013. |
| Spring 2011 | **Teaching Assistant for Neuropsychoanalysis Class**<br>**The Wright Institute, Berkeley, CA**<br>This elective class combines the findings from neuroscience research and applies them to the area of psychoanalysis. The work included planning the content for three sessions of the class and facilitating group discussions.<br>Professor: Laeeq Evered, Psy.D. |

## Clinical Training

| | |
|---|---|
| September 2014 – June 2016 | **Postdoctoral Fellow at the Wright Institute School Based Collaboration, Berkeley, CA**<br>Acting as a site supervisor at the Samuel Gompers Continuation High School (later renamed to Sylvester Greenwood Academy) in Richmond for first year doctoral students from the Wright Institute. Providing individual and group supervision. Providing individual and group therapy to adolescent clients, and consultations to school staff, using the Attachment, Regulation, and Competency (ARC) theoretical framework for trauma in children and adolescents. The training included monthly consultations with Margaret Blaustein, a co-author of the ARC framework. |
| August 2014 – June 2015 | **Postdoctoral Fellow at the Wright Institute Sanctuary Project, Berkeley, CA**<br>Conducting psychological evaluations for asylum seekers, supervising advanced practicum students in conducting psychological evaluations, facilitating didactic groups, and teaching didactic classes for advanced practicum students. |
| July 2013 – June 2014 | **Predoctoral Internship: UCSF Trauma Recovery Center and Survivors International**<br>Provided individual psychotherapy and case management to adult survivors of physical and sexual assaults, domestic violence, torture, and traumatic brain injuries. Provided group therapy for trauma and substance use based on the Seeking Safety protocol. Conducted intakes. Provided crisis intervention services at the San Francisco General Hospital Rape Treatment Center.<br>Supervisors: Laurie Fields, Ph.D.; Loren Krane, Ph.D. |
| September 2012 – June 2013 | **Clinical Trainee: Wright Institute Sanctuary Project, Berkeley, CA**<br>Provided psychological evaluations of asylum seekers that included clinical interviews and administration of psychodiagnostic measures. Wrote evaluation reports to be used in support of asylum cases. Participated in program development, as collaboration between The Wright Institute and East Bay Sanctuary Covenant, a non-profit organization providing legal services and advocacy to predominantly LGBT asylum seekers from Mexico and Mam asylum seekers from Guatemala.<br>Supervisor: Sumana Kaipa, Psy.D. |
| Spring 2012 | **The Wright Institute Assessment Program – Neuropsychological Assessment**<br>Administered a neuropsychological assessment battery for evaluation for learning disability to a client referred through the Wright Institute Assessment program. Completed scoring, wrote an evaluation report, and provided a feedback session to the client.<br>Supervisor: Sumana Kaipa, Psy.D. |

| | |
|---|---|
| September 2011 – July 2012 | **Clinical Trainee: Kaiser Permanente, Adult Outpatient Psychiatry, Oakland, CA**<br>Provided group psychotherapy to adults from diverse backgrounds in the Department of Psychiatry. Co-facilitated groups, including Dialectical Behavioral Therapy Skills, Coping Skills, Posttraumatic Stress Disorder (based on a Cognitive Processing Therapy protocol), Social Phobia, Breast Cancer support group, Domestic Violence Survivors group, and Acceptance Commitment Therapy group for Worry. Developed a group protocol for treatment of Trichotillomania and Skin Picking utilizing Acceptance Commitment Therapy. Worked in an Intensive Outpatient Program (IOP) for patients in crisis: provided psychoeducation, led mindfulness exercises, facilitated small support groups and collaborated with a multidisciplinary IOP team. Provided brief therapy for issues including trauma, adjustment disorder, interpersonal problems and impulse control disorder. Administered two neuropsychological screening batteries using the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS).<br><br>Supervisor: Cathia Walters-Knight, Psy.D. |
| Summer 2011 | **Grief Group Facilitator, Camp Erin, Kara**<br>Grief facilitator in a camp for bereaved children. Facilitated grief groups and provided emotional support for a group of eight-year-old girls.<br>Supervisor: Sue Shaffer, Ed.D., M.F.T. |
| August 2010 - July 2011 | **Clinical Trainee: Cognitive Behavioral Therapies Clinic, Berkeley, CA**<br>Provided individual and group psychotherapy to adults ages 23-59 from diverse ethnic and socio-economic backgrounds, using Acceptance Commitment Therapy, Dialectic-Behavioral Therapy, and Time-Limited Psychodynamic Therapy. Presenting problems included Obsessive Compulsive Disorder, Attention Deficit Hyperactivity Disorder, Posttraumatic Stress Disorder, Social Anxiety, Generalized Anxiety, Interpersonal Issues, and Major Depressive Disorder. Co-developed a protocol for group treatment of anxiety using Acceptance Commitment Therapy, conducted outreach, and facilitated the group three times.<br>Supervisor: Koke Saavedra, Psy.D. |
| September 2009 – June 2010 | **Clinical Trainee: Cleo Elau Center, Community School North, San Bruno, CA**<br>Provided individual and group psychotherapy to adolescents expelled from their high schools. Clients were mostly from lower socioeconomic class and predominantly from Mexican, Central American, Pacific Islander and Palestinian backgrounds. The therapy took place at the community school in San Bruno and in the juvenile hall in San Mateo. Many clients were on probation, and some were incarcerated. Presenting issues included: complex chronic trauma, gang affiliation, Bipolar Disorder, Substance Abuse and emotional dysregulation.<br>Supervisor: Beth Walton, M.F.T. |

## Other Work Experience

| | |
|---|---|
| Winter 2011 – Winter 2013 | **Reviewer, Admissions Committee, The Wright Institute**<br>Reviewed applications of prospective students applying to the PsyD program at The Wright Institute and provided input around determining which applicants to interview. |
| 1997 – 2010 | **Applications Architect, Oracle Corporation**<br>Worked for Oracle Corporation in Prague, Czech Republic; Reading, United Kingdom, and Redwood Shores, CA, United States in the following roles:<br>• *Applications Architect:* Facilitated multidisciplinary, international groups with membership in USA, Europe, and India collaborating on complex system design projects.<br>• *Principal Product Manager, Development Operations:* Facilitated international working groups developing standards and procedures for the Applications Development Division that had to be disseminated to several thousand employees. |

4

- *Domain Expert for Czech and Slovak Rep.:* Analysis of Czech and Slovak localization requirements for Oracle Applications
- *Language Specialist:* Ensured quality of the translation of Oracle Applications into Czech language. Coordinated all translations and interpreting required by the Oracle Czech subsidiary.

| | |
|---|---|
| 1993 –1996 | **Free Lance Translator and Interpreter** <br> Prague, Czech Republic, and Bratislava, Slovak Republic <br> Translator and interpreter between Czech, Slovak, and English. Clients included AGA Systems, Unisys, and Oracle Corporation. |

## Advocacy and National Psychology Associations

| | |
|---|---|
| Jan 20219- Present | **Administrative Team Member, Psychologists for Social Responsibility** <br> Currently serving on the team as the past president. The administrative team consists of the past president, current president, president elect, secretary, and treasurer, and is responsible for managing the organization. |
| Jan 2020 – Dec 2021 | **President, Psychologists for Social Responsibility** |
| March 2013 – Present | **Psychologists for Social Responsibility** <br> Steering Committee Member |
| November 2019 | **Chair of the Conference Healing Justice: Ending Mass Incarceration Conference** <br> Two-day conference at the Wright Institute, Berkeley, CA (CE event), co-sponsored by Psychologists for Social Responsibility, the Wright Institute DEI Office, and Justice Teams Network. The conference was focused on the intersections of mental health and grassroots organizing towards ending mass incarceration. |
| 2011 - 2013 | **Founding Member and Co-Coordinator, Psychologists for Social Responsibility, Student Chapter at The Wright Institute** <br> Founding member and a co-coordinator of the student chapter of Psychologists for Social Responsibility at the Wright Institute. |

## Civic Engagement and Service

| | |
|---|---|
| June 2020 – Present | **Program Director, MH First (Mental Health First), Anti Police-Terror Project, Oakland, CA** <br> Coordinator of a community crisis response volunteer run hotline and mobile crisis response team that seeks to reduce community interactions with the police. The program has approximately 50 volunteers (MDs, LCSW, MFT, PsyD, attorneys, peer counselors, advocates, etc.) |
| October 2014 – Present | **Co-Chair, First Responders Committee, Anti Police-Terror Project, Oakland, CA** <br> Providing support and advocacy to families whose family members were killed or injured by the police. This includes: contributions to curriculum for trauma informed interviewing and independent investigations of police killings and providing support to the families, organizing a team of volunteers providing services to the families, organizing and logistics for family support group, organizing of vigils, memorials, and community events, and accompaniment of family members to court. |
| March 2013 – Present | **Independent writer and photographer** <br> Contributed articles and photography to Czech outlets, including an online publication Romea.cz, a website focused on documenting human rights violations of the Roma |

|  |  |
|---|---|
|  | community in the Czech Republic, and Novy Prostor, a print magazine focused on issues of homelessness. |
| February 2012 - 2013 | **Organizer, White Privilege Accountability Group, The Wright Institute** <br> Founding member and organizer of the White Privilege Accountability Group at The Wright Institute. The purpose of this group is to work on deconstructing white privilege and developing as effective allies for people of color in the work towards elimination of racism. |
| 2010 - 2011 | **Organizer, Tell All Perspectives Group, The Wright Institute** <br> This group organizes educational events at the Wright Institute that address issues of social justice, and provides perspectives of marginalized groups. |
| 2009- 2011 | **Creative Director**, **MideastYouth** <br> Mideastyouth is an organization based in Bahrain that specializes in raising awareness about human rights issues of minorities in the Middle East using art, music, and digital media. Wrote scripts for awareness raising videos about human rights violations of the Baha'i and Kurdish minorities, and for promotion of its LGBTQ project Ahwaa. Enlisted bands, co-coordinated articles and interviews with bands for its Mideastunes project. Provided input into human rights campaign planning. |
| July 2008 – July 2009 | **Kara, Palo Alto, CA** <br> Co-facilitated a support group for bereaved children ages 5-12. The group activities included play therapy and art therapy. The work included development of plans for the group sessions. <br> Supervisor: Liz Powell, M.A. |
| 2008-2012 | **Community Organizer** <br> Organized community building events, including Young Adults Conference exploring intersections of spirituality and professional life, as well as a number of Open Mic events. |
| 2008 - 2010 | **Public Information Officer for the Bahá'í Community of Belmont, CA** <br> Advocacy regarding human rights violations on Bahá'ís in Iran. This work included interfacing with media and with elected representatives as well as organizing and promoting events. |

## Education

|  |  |
|---|---|
| September 2009-2014 | **The Wright Institute,** Berkeley, CA <br> Doctor of Clinical Psychology |
| September 2005-May 2008 | **Notre Dame de Namur University,** Belmont, CA <br> B.A. in Psychology <br> Summa Cum Laude, Academic Award in Psychology |
| September 1999-May 2001 | **University of Reading,** United Kingdom <br> Diploma in Management <br> Completed with distinction |

## Selected Additional Training

|  |  |
|---|---|
| 3/20/2021 | *Establishing Reliability when Coding Qualitative Data,* Moin Syed, PhD. (2 CE hours). Online. |
| 1/30/2021 | *The Hermeneutic, Reflexive Stance in Qualitative Research*, Ruthellen Josselson, PhD. (2 CE hours). Online. |

| | |
|---|---|
| 11/26/2020 | *Internal Family Systems Therapy (IFS): A Revolutionary & Transformative Treatment for Permanent Healing of PTSD, Anxiety, Depression, Substance Abuse and More,* Frank Anderson, MD. (6 CE hours). Online. |
| 11/14/2020 | *Half-Day Practical Workshop on Interpretative Phenomenological Analysis*, Jonathan Smith, PhD. (3 CE hours). Online. |
| 2/27-2/28/2020 | *Internal Family Systems Therapy (IFS): 2-Day Experiential Workshop*, Richard Schwartz, PhD. (12.5 CE). Oakland. |
| 2/1-2/3/2019 | *44th Annual Tavistock Group Relations Conference*, The Family Institute at the Northwestern University, Evanston, IL. |
| 10/6/2018 | *Innovations in Clinical Assessment and Treatment of Suicidal Risk*, Jobes, D., PhD, ABPP, (6 CE). The Wright Institute, Berkeley, CA. |
| 10/7/2017 | *The Role of Wellness and Fairness in Feeling Valued and Adding Value* by Isaac Prilleltensky, Ph.D., (6 CE), at the Wright Institute, Berkeley, CA |
| 9/22/2017 | *Mental Health Implications of Prison Solitary Confinement* by Terry Kupers, MD (2 CE) at the Wright Institute, Berkeley. |
| 6/3/2017 | *HealthRight International Human Rights Clinic Training*: 1-day training in conducting psychological evaluations for asylum at UC Hastings, San Francisco. |
| 6/26/2015 | *Trauma, Love & the Brain: Using Neuroscience and the Power of Human Connections to Help Children Heal*, Bruce Perry, MD, PhD, 1-day training at Napa Valley College, Napa. |
| 6/17/2015 | *Forensic Documentation of Trauma for Immigrant Children* by Physicians for Human Rights: (3-part, 4.5 hours webinar), |
| Oct 2014 - May 2015 | *6-part series on treatment of torture and trauma survivors* by International Institute for Psychosocial Trauma (IIPT) at the Wright Institute, Berkeley. |
| Sep 2014 | *Conducting psychological evaluations for asylum by Physicians for Human Rights* (day-long training) at the Highland Hospital, Oakland. |
| 4/26/2012 | *Healing the wounds of internalized oppression and internalized privilege: Building hope and change in our health organizations*. Day-long training with Dr. Kenneth Hardy at UC Berkeley School of Public Health. |
| 02/11/2012 | *Of Walls and Wars: Creating Dialogues to Bridge Racial Differences in the Workplace*.  A three-hour presentation by Dr. Kenneth Hardy at the Wright Institute Continuing Education Program, Clark Kerr Campus of the UC Berkeley. |
| 11/10/2011 | Incorporating Exposure Treatments into DBT (day long workshop with Marsha Linehan) at ABCT Conference in Toronto, Canada. |
| 10/29/10 | *AEDP: The Birth of Transformation, Transformational Theory and the Healing Oriented Practice of AEDP*, Diane Fosha, Ph.D., Wright Institute Continuing Education Program, UC Berkeley Fine Arts Museum/Pacific Film Theater, Berkeley. |
| April 2008 | Grief counselor training by at Kara, Palo Alto. (approx. 24 hours). |

## Selected Presentations

Kantorová, D. (September, 2020). *Suicide Prevention Month Panel Presentation for Alameda County Crisis Support Services.* Online.

Kantorová, D. & Singer, S. (February, 2020). *Forensic Psychological Evaluations Training for OUSD*. Oakland.

Kantorová, D. (December, 2019). *Surveillance of the Brain, Mass Incarceration, and Freedom in the Era of Late Capitalism*. Invited Lecture for Ostrava University, Ostrava, Czech Republic.

Kantorová, D. (December, 2019). *Decolonization and Research Methods*. Presented at Ostrava University, Ostrava, Czech Republic.

Boykin, A. & Kantorová, D. (November, 2019). *Mental Health Crisis and Police*. Presentation at the Healing Justice: Ending Mass Incarceration Conference (CE event) at the Wright Institute, Berkeley, CA.

Kantorová, D., Borges, V., Florsheim, M., Shogren, K., Tang-Smith, E. & Černý, J. (August, 2019). *Structural competency: Collaborative learning about impacts of mass incarceration*. Poster presented at the annual convention of the American Psychological Association, Chicago.

Kantorová, D. & Černý, J. (June, 2019). *Transformative moments of solidarity with communities resisting state and structural violence*. Workshop presented at the 4th International Congress of Collaborative-Dialogic Practice, Brno, Czech Republic.

Rose, T., Pulley, A., Eigler, C., Kantorová, D. & Langhout, R. *Rapid Responses to State Violence: Considerations and Possibilities.* (June, 2019). Workshop presented at the 17th Biennial Conference of the Society for Research and Action, Chicago.

Kantorová, D. (December, 2018). *Psychological Evaluations*. Presented at the Forensic Asylum Examination and Documentation Training organized by the Highland Hospital Human Rights Clinic. Oakland.

Kantorová, D., Balbus, A, Weicker, A. & Fields, L. (November, 2018). *Losing a loved one to police violence: Family and community-level responses*. Panel conducted at the annual meeting of the International Society of Traumatic Stress Studies (ISTSS), Washington, D.C.

Kantorová, D. & Jordan, A. (August, 2018). *Accompaniment in times of terror—supporting families impacted by police killings*. Discussion conducted at the annual convention of the American Psychological Association, San Francisco.

Kantorová, D., Noriega, M. & Rich, A. (August 2018). *Conducting Psychological Evaluations for Asylum*. Presented at the Division 56 (Trauma Psychology) Hospitality Suite at the annual convention of the American Psychological Association, San Francisco.

Debro, K. and Kantorová, D. (July, 2018). *Collision Course: Where Accountability Meets Trauma Informed Practice.* Workshop presented at the Peer Learning Conference of Gateway to College National Network, Portland.

Kantorová, D. (2018, July). In Mathern, N. (moderator) panel, *Mental Health* conducted at the Peer Learning Conference of the Gateway to College National Network, Portland.

Kantorová, D. (2018, May). *Psychological Evaluations for Asylum*. Invited presentation at the UCSF Cultural Psychiatry Annual Workshop. San Francisco.

Kantorová, D., Keller, A., Reyburn, L, & Kosdon, S. (2018, February). *Sanctuary in Psychology. Using Assessment to Advocate for Immigrants.* Breakout session presented at California Psychological Association Graduate Students Conference, The Wright Institute, Berkeley, CA.

Kantorová, D. (January, 2018). *Working With Trauma Across Cultural Differences*. Invited presentation for the Rafael Institute, Prague, Czech Republic.

Kantorová, D. (December, 2017). *Psychological Evaluations*. Presented at the Forensic Asylum Examination and Documentation Training organized by the Highland Hospital Human Rights Clinic. Oakland.

Kantorová, D. & Trinidad, M. (2016, April). *People's Responses to Police Terror*. Roundtable discussion presented at Racial Justice in Praxis Conference, National Luis University, Chicago, IL.

Kantorová, D. (2015, April). *Interviewing Trauma Survivors*. Training conducted for International Refugee Assistance Project (IRAP). University of California, Berkeley.

Kantorová D. (2014, August). *Neuroethics*. Roundtable discussion conducted at Division 48 Hospitality Suite, American Psychological Association Convention, Washington DC.

Kantorová, D. (2013, October). *Neuroethics.* Roundtable discussion conducted at Psychologists for Social Responsibility Regional Conference, NYC.

Kantorová, D. (2013, October). In Shidlo, A. (moderator) panel, *Social Justice in Psychology Education* conducted at the Psychologists for Social Responsibility Regional Conference, NYC.

## Academic Writing and Publications

Balbus, A., & Kantorová, D. (2021). No Justice and No Peace: The Ongoing Traumatic Stress of Families Bereaved by Law Enforcement. *Journal of Trauma & Dissociation*, 1-13.

Kim, A.S. & Kantorová, D. (2017). Embracing Immigration:  Challenge for Psychology Training Programs. *California Psychologist*, 50 (4), 20-28.

Kantorová, D. (2014).  *Risking Trauma in the Service of Eliminating Continuous Traumatic Stress.* Unpublished doctoral dissertation, the Wright Institute, Berkeley.

## Non-Academic Writing

Kantorová, D. (2020, June). Protesty v USA jsou důsledkem dlouhodobě neřešeného násilí. *A2arm.* https://a2larm.cz/2020/06/protesty-v-usa-jsou-dusledkem-dlouhodobe-nereseneho-nasili/

Černý, J. Kantorová, D. (2019, April). Mučení v zemi svobody. *A2larm*. https://a2larm.cz/2019/04/muceni-v-zemi-svobody/

Kantorová, D. (2015) Přerušit běžný chod věcí. *Nový prostor* (č. 453). http://novyprostor.cz/clanky/453/prerusit-bezny-chod-veci

Kantorová, D. (2013, September). Trayvon Martin. Rasově motivované vraždy v USA. Romano vod'i. 11(9), 14-15.

Kantorová, D. (2013, March). Problém rasismu v Oaklandu je stále aktuální. Vyšetřování smrti Alana Blueforda se hýbe až po protestech. *Romea.cz* http://www.romea.cz/cz/zpravodajstvi/zahranicni/daniela-kantorova-problem-rasismu-v-oaklandu-je-stale-aktualni-vysetrovani-smrti-alana-blueforda-se-hybe-az-po-protestech

## Awards

2021        The Psychologists for Social Responsibility Anthony J. Marsella Prize for the Psychology of Peace and Social Justice

## Professional Affiliations

- Psychologists for Social Responsibility
- International Society for Traumatic Stress Studies
- APA Division 56: Trauma Psychology
- Alameda County Psychological Association
- San Francisco Center for Psychoanalysis

9

**References**

Provided upon request.